## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MISSOURI GENERAL ASSEMBLY,

DENNY HOSKINS, IN HIS OFFICIAL
CAPACITY AS MISSOURI SECRETARY OF
STATE,

&

STATE OF MISSOURI,

     *Plaintiffs*,

        v.

RICHARD VON GLAHN

&

PEOPLE NOT POLITICIANS,

     *Defendants*.

Case No.

### COMPLAINT

Plaintiffs, the Missouri General Assembly, Missouri Secretary of State Denny Hoskins, and the State of Missouri, for their Complaint respectfully allege as follows:

### INTRODUCTION

1.    The U.S. Constitution expressly vests the power to apportion federal congressional districts in the state legislatures, with only Congress itself expressly given oversight authority over state legislatures.  U.S. Const. art. I, § 4, cl. 1.  Yet in Missouri, Defendants, Richard von Glahn and People Not Politicians, have initiated a referendum

process that would strip the General Assembly of its authority over redistricting. This unprecedented act violates both the U.S. and Missouri Constitutions.

2.     Just two years ago, the U.S. Supreme Court reaffirmed the core authority of state legislatures to draw congressional districts for the U.S. House of Representatives. The court emphasized how other state-governmental actors "do not have free rein" to transgress state legislatures' authority to apportion congressional districts. *Moore v. Harper*, 600 U.S. 1, 34 (2023). For good reason: The U.S. Constitution's Elections Clause uniquely bestows on state legislatures the power to set the times, places, and manner of federal elections, including reapportionment authority—with only Congress itself being the enumerated overseer of legislatures' actions. *See* U.S. Const. art. I, § 4, cl. 1.

3.     Despite that constitutional language, some state constitutions have expressly transferred authority over federal redistricting from state legislatures to other entities— like independent redistricting commissions. *See, e.g., Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 796–98 (2015). Jurists have disagreed on whether such delegations are constitutional. *See id.* at 826 (Roberts, C.J., dissenting).

4.     This case does not require this Court to revisit that debate. Where the U.S. Constitution expressly vests authority in a particular actor, that authority cannot be taken away without a clear and express statement. *See Moore*, 600 U.S. at 34–36. In *Arizona State Legislature*, for example, the Arizona Constitution *did* "directly and immediately" transfer the Arizona's Legislature's authority over redistricting to another entity. 576 U.S. at 801. And in *State of Ohio ex rel. Davis v. Hildebrant*, the Supreme Court considered a federal constitutional challenge under the Guarantee Clause to

2

Ohio's redistricting scheme *only after* concluding that state law "ma[de] it clear" that the legislature had been partially divested of its authority over federal redistricting. 241 U.S. 565, 567–68 (1916) (holding it was "obvious" that state law was "conclusive" on that point).

5.    Such clear-statement rules are fixtures of American constitutional law because they ensure that the relevant governmental actors actually intended to push the boundaries and potentially upset the careful balances struck by the U.S. Constitution's Framers. *See West Virginia v. EPA*, 597 U.S. 697, 736–37 (2022) (Gorsuch, J., concurring); Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 166–67 (2010). For example, even though the Constitution vests legislative power in Congress, courts allow Congress to delegate major policy decisions to the Executive Branch—but only if Congress provides a clear statement of authority. *West Virginia*, 597 U.S. at 723; *id.* at 746–49 (Gorsuch, J., concurring); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari). Similarly, courts demand a clear statement before assuming Congress intended to legislate in areas of traditional state authority—to protect the U.S. Constitution's commitment to federalism. *See Sackett v. EPA*, 598 U.S. 651, 679–80 (2023); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

6.    Defendants cannot identify any language that "makes it clear" that the Missouri Constitution transfers authority over federal redistricting away from the General Assembly. *Hildebrant*, 241 U.S. at 568. While Missouri has chosen to allow voters to revisit legislation passed by the General Assembly, nothing in the Missouri

3

Constitution expressly says that federal congressional reapportionment may be subjected to a referendum. *See* Mo. Const. art. III, §§ 49, 52(a). In other words, the people of Missouri have never made the conscious choice to undermine the Framers' decision to vest this State's legislature with the reapportionment authority.

7.     Defendants therefore have no legal basis to proceed with their referendum. This Court should declare that such a referendum would violate both the U.S. and Missouri Constitutions.

<u>**PARTIES**</u>

**I.     Plaintiffs**

8.     Plaintiff Missouri General Assembly is the legislative branch of Missouri's government. *See* Mo. Const. art. III, § 1. The People of Missouri directly elect the General Assembly.

9.     Plaintiff Denny Hoskins is the Missouri Secretary of State.

10.     Plaintiff State of Missouri is a sovereign State of the United States of America.

11.     Plaintiffs bring this action to prevent Defendants Richard von Glahn and People Not Politicians from unconstitutionally usurping the General Assembly's vested authority to reapportion the State of Missouri's congressional representation.

12.     Plaintiffs come to this Court asking for an order barring Defendants from seeking to overturn the General Assembly's reapportionment of Missouri's congressional representation via a statewide referendum, a direct imposition on the General Assembly's authority under Article I, § 4, cl. 1, of the U.S. Constitution, and Article III, § 45 of the Missouri Constitution.

13.    States and legislatures can seek, in the federal courts, to protect the congressional-apportionment authority—a power vested in the state legislatures by Article I, § 4, cl. 1, of the U.S. Constitution. *See, e.g.*, *Ariz. State Leg.*, 576 U.S. at 803–04.

14.    Plaintiffs sue to prevent the dedication of the State's resources to a referendum whose aim is unconstitutional and at odds with the General Assembly's vested authority over federal congressional reapportionment.

15.    Plaintiffs need not wait for the outcome of the referendum before seeking to protect the General Assembly's exercise of authority under Article I, § 4, cl. 1, of the U.S. Constitution.  With the initiative process already commenced, the State must presently expend its resources on an initiative whose aim is unlawful.

**II.    Defendants**

16.    Defendant Richard von Glahn is a natural person seeking to commence a referendum that would overturn the General Assembly's latest reapportionment of Missouri's congressional representation.

17.    Mr. von Glahn submitted a referendum petition challenging the General Assembly's recent redistricting bill to the Secretary of State.

18.    On information and belief, Mr. von Glahn resides and has engaged in actions pertaining to his pursuit of the referendum at 9 Wilshire Terrace, Webster Grove, MO 63119.

19.    On information and belief, Mr. von Glahn is the Executive Director of Defendant People Not Politicians.

5

20.     Defendant People Not Politicians is an organization dedicated to, among other things, opposing the Missouri General Assembly's actions regarding reapportionment.[1]

21.     On information and belief, Defendant People Not Politicians is a non-profit political and advocacy organization operating within the State of Missouri.

22.     On information and belief, Defendant People Not Politicians is soliciting donations from politically progressive individuals and organizations from around the country to fund its referendum efforts.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331 because a provision of the U.S. Constitution governs the disposition of this case.

24.     This Court has supplemental jurisdiction over the state-constitutional claim under 28 U.S.C. § 1367.

25.     This Court has the authority to issue the requested declaratory relief under 28 U.S.C. §§ 2201–2202 and this Court's inherent equitable authority.

26.     This Court has personal jurisdiction over Defendant Richard von Glahn because, on information and belief, Mr. von Glahn resides and has engaged in actions pertaining to this case at 9 Wilshire Terrace, Webster Grove, MO 63119.

27.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant Richard von Glahn resides and has undertaken efforts to secure an unlawful referendum within this District and the Eastern Division.

---

[1] *See* People Not Politicians, https://peoplenotpoliticiansmo.org/#about.

28.     Exercising specific personal jurisdiction over Defendant People Not Politicians is proper under the Due Process Clause because Defendant has such a deep and systemic presence in Missouri that it can reasonably foresee being sued in Missouri.  *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 364–65 (2021).

29.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) respecting People Not Politicians because Plaintiffs allege that the Defendant has undertaken efforts to secure an unlawful referendum within this District and Division.

<u>FACTS COMMON TO ALL COUNTS</u>

## I.     The General Assembly Reapportions Missouri's Congressional Representation.

30.     On August 29, 2025, Missouri's Governor called a special session of the General Assembly to, among other things, "enact legislation establishing updated congressional districts."[2]

31.     The General Assembly convened its special session in September, with the House of Representatives opening the session on September 3, 2025.  The House of Representatives approved the new apportionment on September 9, 2025.

32.     The Missouri Senate concurred and passed the redistricting bill on September 12, 2025.

33.     The Missouri Governor signed the redistricting bill on September 28, 2025.

---

[2] *Governor Kehoe Announces Special Session on Congressional Redistricting and Initiative Petition Reform*, Off. of Gov. Mike Kehoe (Aug. 29, 2025), https://governor.mo.gov/press-releases/archive/governor-kehoe-announces-special-session-congressional-redistricting-and.

II.     **Defendants Initiate Their Effort to Subject the Reapportionment to a Referendum.**

34.     In Missouri, citizens can seek "to approve or reject" legislation by the General Assembly via a referendum.  Mo. Const. art. III, § 49; *see also Ariz. State Leg.*, 576 U.S. at 794 (explaining how "the referendum serves as a negative check" by voters on the legislature's actions).

35.     Doing so first requires submitting a petition to the Plaintiff Secretary of State for review.  *See* Mo Rev. Stat. § 116.332.1.  The Secretary has limited discretion to reject the proposal.  *See id.*

36.     Following review by the Secretary, the petition must garner "five percent of legal voters in each of two-thirds of congressional districts in the state."  Mo. Const. art. III, § 52(a).  If a petition receives the necessary signatures, the challenged law cannot take effect until a referendum occurs.  *Id.* § 52(b).

37.     After the passage of the new congressional map, but before the Governor signed the reapportionment into law, Defendants began their efforts to subject the new map to a citizen referendum.[3]

38.     On September 12, 2025, Defendants submitted their petition for a referendum to the Secretary of State.

---

[3] *See* Jason Hancock, *Three Lawsuits and a Referendum: New Missouri Congressional Map Faces Multiple Attacks*, Mo. Indep. (Sept. 15, 2025), https://missouriindependent.com/2025/09/15/three-lawsuits-and-a-referendum-new-missouri-congressional-map-faces-multiple-attacks/.

39.   In a public statement, Mr. von Glahn made the initiative's aim clear:  "The people who are going to put this issue on the ballot are Missourians.  The people who are going to have the final say on this are Missourians."[4]

40.   Similarly, Defendant People Not Politicians expressed its intentions of pursuing a referendum.  It called the reapportionment "an illegal gerrymandering scheme that is nothing more than an unconstitutional power grab."[5]  It then said, in no uncertain terms, "*We believe that Missouri voters—not politicians—should have the final say*.  We have filed a citizen's referendum to gather signatures to put this unjust map before voters on an upcoming ballot."[6]

41.   The organization then asks visitors of its website to "Donate Now"—without limiting the request solely to Missouri voters or residents.[7]

42.   Defendants have already seen great success in securing support and resources from out-of-state partisan special interests.  Notably, the Democratic National Committee has promised to devote staff and monetary support to the referendum.[8]

---

[4] Charlie Keegan, *Opponents to Missouri Redistricting Identify 2 Paths to Block Bill*, KSHB 41 (Sept. 15, 2025), https://www.kshb.com/news/local-news/opponents-to-redistricting-going-down-2-paths-to-block-bill.

[5] People Not Politicians, *supra* note 1.

[6] *Id.* (emphasis in original).

[7] *Id.*

[8] Jason Rosenbaum, *Democratic National Committee Will Contribute to Blocking Missouri Congressional Map*, St. Louis Pub. Radio (Sept. 29, 2025), https://www.stlpr.org/government-politics-issues/2025-09-29/democratic-national-committee-will-contribute-to-blocking-missouri-congressional-map.

III.      **Plaintiffs' Ongoing Commitments Regarding the Initiative.**

43.   Because Defendants have initiated the referendum process, the Secretary of State in particular and the State in general are currently being forced to commit resources in response.

44.   Defendants' filing a petition seeking a referendum triggers several ongoing responsibilities that will force the committal of resources by the Secretary of State and the State as a whole.   The process begins with submission of a "sample sheet" of the initiative to the Secretary of State.   Mo Rev. Stat. § 116.332.1.   Missouri law requires the Secretary and the Attorney General to "review the petition for sufficiency as to form and approve or reject the form of the petition, stating the reasons for rejection, if any." *Id.* The Secretary also refers the petition to the State Auditor "for purposes of preparing a fiscal note and fiscal note summary." *Id.* The Secretary must post the proposed measure on State's website within two business days of receipt. *Id.* § 116.332.2.   The Secretary has fifteen days to review the petition. *Id.* § 116.332.4.   As noted, Defendants have already filed their sample sheet with the Secretary.

45.   Even before the Secretary issued a decision on the form of the proposed referendum, Defendants sued over the Secretary's review process. *See* Pet., *People Not Politicians v. Hoskins*, 25AC-CC07128 (Cir. Ct. Cole Cnty. Sept. 18, 2025).   The State is currently being forced to expend substantial resources litigating that case.

46.   A host of new obligations occurs when a proponent submits a final petition with signatures to the Secretary of State.   All of these will force the Secretary to reallocate scarce resources and personnel to handling the referendum petition.   First, the Secretary will need to "examine the petition to determine whether it complies with the Constitution

of Missouri and with this chapter." *Id.* § 116.120.1.  Second, responsibility for verifying signatures falls with the Secretary.  *See id.* § 116.120.  The Secretary may also involve election authorities in checking signatures.  *See id.* § 116.130.  Once the Secretary makes a determination regarding whether a petition has received the necessary number of non-fraudulent signatures, he must then issue a certificate of sufficiency or insufficiency.  *See id.* § 116.150.  In the latter case, the Secretary must detail "the reason for the insufficiency." *Id.* § 116.150.2.  Time limits govern when the Secretary must make a decision.  *See id.* § 116.150.3.

47.     Even if the Secretary finds a petition sufficient, the resource commitments do not end.  Missouri law requires the State to hold a public hearing and take comments on any petition deemed to have sufficient signatures.  *See id.* § 116.153.  The Secretary will then be responsible for preparing the ballot initiate.  *See id.* § 116.220.

48.     If a referendum petition gains enough signatures to qualify for a vote before the people, the challenged law is frozen pending the public vote.  Mo. Const. art. III, § 52(b).  Thus, the General Assembly loses its authority over redistricting pending that public vote.  And the entire State would be plunged into legal uncertainty over which legislative maps would govern Missouri elections in 2026.

49.     Given these state-law requirements, the Secretary of State and the State as a whole are currently forced to expend resources facilitating a referendum initiative that they believe unconstitutionally deprives the General Assembly of its vested and previously undisturbed authority to reapportion the State's federal congressional representation.  This creates a sufficient injury-in-fact for justiciability purposes.  *See,*

11

*e.g.*, *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59–60 (2d Cir. 2020) (holding "States' alleged economic harms are sufficiently concrete and imminent to constitute injury in fact" for preliminary injunction); *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) (holding that the government plaintiff had standing because of its legally required committal of resources); *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (explaining that "here-and-now injury" occurs when the plaintiff alleges being subjected to an unconstitutional process); *Ariz. State Leg.*, 576 U.S. at 800–01 (explaining that government need not first violate the law to gain standing); *BTS Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (explaining that "the diversion of resources" and burdens on the State's constitutionally granted role qualify as irreparable harms). Likewise, an order from this Court confirming that Defendants' proposed referendum is unconstitutional and enjoining their actions would redress the harms alleged here. *See Ariz. State Leg.*, 576 U.S. at 800 (recognizing as much and concluding that the case met standing and ripeness requirements).

50. Plaintiffs also do not need to wait for any future actions by Defendants. As noted, Defendants have already filed their sample sheet with the Secretary of State— the first step in the initiative process, and Defendants are litigating the manner in which the Secretary handled their first sample sheet. While that litigation is ongoing, Defendants submitted an additional sample sheet, which the Secretary of State approved as to form, thus ensuring the referendum process will continue. *See Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 625 n.1 (1986) (recognizing that

the filing of an administrative action threatening harm to the plaintiffs' interests shows that the controversy is ripe). Hence, Defendants will continue forcing the State to allocate resources on the referendum per the governing statutes, and through their ongoing litigation against the Secretary of State. These resource expenditures should not occur because the referendum's ultimate aim—depriving the General Assembly of its vested authority without a clear statement—is unconstitutional. *See Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1039–40 (8th Cir. 2000) (recognizing a claim was ripe because of the hardship that delay would impose).

## IV. The Effort at a Ballot Initiative Has Violated, Is Violating, and Will Continue to Violate, the Federal and Missouri Constitutions.

51.     Absent a clear statement in the Missouri Constitution transferring the apportionment power from the General Assembly to a ballot referendum, Defendants cannot proceed with their referendum. The Elections Clause provides that, as an initial matter, the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. The General Assembly's "vested authority is not just the typical legislative power exercised pursuant to a state constitution. Rather, when a state legislature enacts statutes governing [federal] elections, it operates 'by virtue of a direct grant of authority' under the United States Constitution." *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) (per curiam).

52.     In choosing to specifically entrust state legislatures with authority over federal congressional redistricting, the Framers of the U.S. Constitution ensured that such power would be exercised by officials "accountable by the people for the rules they write

or fail to write." *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring in denial of application to vacate stay). They also ensured that redistricting decisions would reflect "the collective wisdom of the whole people"—as expressed through the people's elected representatives. *Id.*

53.   While the U.S. Supreme Court has recognized that express state constitutional amendments can divest legislatures of their apportionment power, the court has never held that a general referendum provision can curtail the legislature's exercise of that authority. *See Ariz. State Leg.*, 576 U.S. at 814 (holding that a State can adopt an express constitutional provision transferring the legislature's apportionment authority to an independent commission). Because the Framers of the Federal Constitution made "a deliberate choice" to vest reapportionment power in state legislatures, other state actors cannot use the vagaries of state law to transfer that power elsewhere. *Moore*, 600 U.S. at 34. Hence, state law must plainly circumscribe the legislature's federal congressional-apportionment authority. *Cf. id.* at 34–36 (holding that state "courts do not have free rein" to intrude upon the legislature's apportionment power absent "a fair reading" of state law limiting the power); *Carson*, 978 F.3d at 1060 (discussing how state officials cannot "override" the state legislature's exercise of power under the Elections Clause).

54.   Moreover, serious constitutional doubt persists about whether state-ballot initiatives can ever divest state legislatures of their congressional-apportionment authority. The "text, structure, or history of the Constitution" plainly show that Article I, Section 4 deliberately vests "the 'Legislature,'" not "'the people'" with the power to reapportion congressional representation. *Ariz. State Leg.*, 576 U.S. at 825 (Roberts,

C.J., dissenting). "Direct lawmaking by the people was 'virtually unknown when the Constitution of 1787 was drafted.'" *Id.* at 793 (majority opinion). And the U.S. Supreme Court has never upheld the use of a ballot referendum to nullify a legislature's congressional reapportionment against an Elections Clause challenge. *See id.* at 840 (Roberts, C.J., dissenting) (explaining how the only instance where the Supreme Court considered the use of such a referendum was in the context of a Guarantee Clause challenge in *Hildebrant*).[9]

55.    Clear-statement rules are fixtures of American law where doubt persists regarding the exercise of authority under the U.S. Constitution. For example, the U.S. Supreme Court declined to find that Congress intended to use its power under the Commerce Clause to impose employment regulations on state-government officials when the federal statute did not expressly say that it applied to state officers. *See Gregory*, 501 U.S. at 464. The Court mandated a clear statement from Congress despite a prior holding that Congress possessed authority to regulate state employees. *See id.* (citing *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)). Likewise, given non-delegation concerns, the Supreme Court has long required that administrative agencies point to a specific grant of statutory authority before exercising some significant authority. *See West Virginia*, 597 U.S. at 721 ("[O]ur precedent teaches that there are

---

[9] Plaintiffs preserve their argument that *Arizona Independent Redistricting Commission* was wrongly decided, and thus should be overruled. *See, e.g.*, *Ariz. State Leg.*, 576 U.S. at 825 (Roberts, C.J., dissenting). However, even under that precedent, this Court can grant Plaintiffs all requested relief. Plaintiffs also preserve their argument that even if there is no clear-statement rule (or that it is satisfied), this case is distinguishable from *Arizona Independent Redistricting Commission*.

'extraordinary cases' that call for a different approach—cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." (second alteration in original)); *see also id.* at 740 (Gorsuch, J., concurring) (explaining the doctrine's history).

56.    The reasons for demanding a clear statement in the Missouri Constitution apply with equal force to the assertion that the referendum process permits usurping the General Assembly's authority over federal congressional apportionment.    As explained, the U.S. Constitution delegates that authority specifically to the General Assembly—with only Congress itself being granted the power to override the General Assembly's actions.  *See* U.S. Const. art. I, § 4, cl. 1.  Given this evident construction, constitutional doubt remains as to the nature and extent of other state actors' ability to transgress the legislature's congressional-reapportionment power.  *See Moore*, 600 U.S. at 34 (declining to delineate a specific standard, but explaining that state courts "do not have free rein" to revisit legislatures' congressional reapportionments); *Ariz. State Leg.*, 576 U.S. at 825 (Roberts, C.J., dissenting) (summarizing the textual, structural, and historical concerns of divesting state legislatures of their apportionment authority); *Carson*, 978 F.3d at 1060 ("[A] legislature's power in this area is such that it 'cannot be taken from them or modified' even through 'their state constitutions.'" (quoting *McPherson v. Blacker*, 146 U.S. 1, 35 (1892))).  Federal courts have already taken great care to ensure that other state actors—absent "conclusively established" plain direction—do not hamper the legislature's Elections Clause authority in the name of

state law.  *See Hildebrant*, 241 U.S. at 568; *see also Moore*, 600 U.S. at 36 (emphasizing how other state actors may not "arrogate to themselves the power vested in state legislatures to regulate federal elections" without express authority); *Carson*, 978 F.3d at 1060 (concluding that the legislature did not delegate authority to make major election changes through "a general statute in the election code").  At the very least, the novelty of Defendants' efforts to place the General Assembly's congressional redistricting on the ballot raises alarm—especially because the U.S. Supreme Court has never passed on the question in the context of an Elections Clause challenge.  *See Ariz. State Leg.*, 576 U.S. at 825 (Roberts, C.J., dissenting) (discussing *Hildebrant*, 241 U.S. at 569).

57.    Given its novelty and lack of textual support, Defendants' efforts to displace the Federal Constitution's vesting of redistricting authority in the General Assembly is unlawful under the Elections Clause.  The Missouri Constitution's referendum provision does not expressly say that a referendum can overturn the exercise of the General Assembly's federal redistricting decisions.  To the contrary, the Missouri Constitution specifically vests the General Assembly with the power to divide the State into congressional districts.  *See* Mo. Const. art. III, § 45 (stating General Assembly "shall" perform this function).  Given these provisions, Missouri has not yet made a deliberate and clear choice to override the Elections Clause's vesting the General Assembly with congressional apportionment authority.  *See Ariz. State Leg.*, 576 U.S. at 817 (emphasizing how the State had made the deliberate choice of reallocating that authority to an independent commission).

58.     And Missouri should have a chance to make that knowing choice before this unprecedented effort proceeds.   Subjecting Missouri's congressional redistricting to ballot referenda will invite chaos—driven by out-of-state special interests looking to gain a partisan advantage in Congress.   If Defendants succeed in using the referendum, every apportionment decision going forward could now become subject to a referendum.   In effect, this could create apportionment paralysis—where the General Assembly is unable to implement a congressional map because successive referendum efforts nullify them. This threatens to wreak havoc on the General Assembly's basic obligations to reapportion congressional districts after each census.   *See Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964).

59.     The problem runs even deeper than that.   Under Defendants' interpretation of the Missouri Constitution, nothing would stop a voter from proposing the federal congressional map *in the first instance*—thus entirely cutting the General Assembly out of the redistricting process.   The provision of the Missouri Constitution governing citizen-proposed statutory initiatives is worded—in all material respects—identically to the referendum provision.   *See* Mo. Const. art. III, §§ 49–53.   That provision just generally refers to "laws"—without any specific reference to federal redistricting bills.   *See id.*   So, under Defendants' logic, voters—backed by out-of-state money—can just seize total control of the federal redistricting process.

60.     The U.S. Constitution forecloses Defendants' legal theory and actions. By vesting authority in the state legislature, the Elections Clause made a "compromise" that ensures a measure of deliberation, but in a representative body close to the people.   *Ariz.*

*State Leg.* at 837 (Roberts, C.J., dissenting).   Nor does the Elections Clause leave dissatisfied individuals—including Defendants—without recourse.   They are free to take their concerns to Congress itself, which can reset the reapportionment rules under the Elections Clause.   *See Wise v. Circosta*, 978 F.3d 93, 112 (4th Cir. 2020) (en banc) (Wilkinson and Agee, JJ., dissenting) (emphasizing "the brilliance" of giving Congress the authority to check state legislatures).   They could also—through the citizen initiative process—seek to amend the Missouri Constitution to give the people a role in reviewing federal congressional maps through the referendum.   *See* Mo. Const. art. III, §§ 49–51.

61.   Finally, no history in Missouri supports Defendants' efforts.   The Missouri Supreme Court has never passed upon whether the referendum may be used to revisit federal congressional redistricting.   While a closely divided Missouri Supreme Court upheld the use of referenda for apportionment of seats in the General Assembly, *see State ex rel. Gordon v. Becker*, 49 S.W.2d 146, 149 (Mo. 1932), that case is inapt.   To start, federal and state legislative apportionment are governed by entirely separate provisions in the Missouri Constitution.   Mo. Const. art. III, §§ 3, 7, 10 (state); *id.* art. III, § 45 (congressional).   Additionally, *Gordon* never considered whether, per the Elections Clause, the General Assembly retained sole authority to apportion congressional districts.   Because the authority to set federal congressional districts is a power delegated by the U.S. Constitution, federal congressional reapportionment implicates uniquely federal interests not reflected in state-legislative reapportionment.   *See Moore*, 600 U.S. at 34 ("As in other areas where the exercise of federal authority or the vindication of federal rights implicates questions of state law, we have an obligation to

19

ensure that state court interpretations of that law do not evade federal law."); *Carson*, 978 F.3d at 1060 (emphasizing how setting federal elections occurs "'by virtue of a direct grant of authority' under the United States Constitution").

62.    If anything, *Gordon* casts further doubt on Defendants' legal theory.  Chief Justice Atwood, in dissent, carefully analyzed Missouri constitutional history and concluded that the Missouri Constitution was not originally understood to extend the referendum *even* to state legislative apportionment.  *See Gordon*, 49 S.W.2d at 152–57 (Atwood, C.J., dissenting) (contending that construction of prior Missouri constitutional provisions did not support the practice).  And if such doubt exists for *state* legislative districting, it is hard to see how Defendants could satisfy the U.S. Constitution's clear-statement rule applicable to federal congressional redistricting efforts.

63.    Defendants' actions seeking a referendum vote on the General Assembly's 2025 federal congressional redistricting bill violates the U.S. Constitution and the Missouri Constitution.  This Court should issue appropriate injunctive and declaratory relief.

<u>CAUSES OF ACTION</u>

### Count 1
### Violation of the U.S. Constitution
### Art. I, § 4, cl. 1

64.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

65.    An actual controversy exists within this Court's jurisdiction that would be resolved by a declaration of the rights and other legal relations of the parties in this action—namely, that Defendants' efforts to initiate a referendum overturning the

General Assembly's most recent congressional redistricting violates the Elections Clause of the U.S. Constitution.

66.     The authority to prescribe the times, places, and manner of federal congressional elections arises exclusively under the Elections Clause of the U.S. Constitution.

67.     The Constitution delegates and conveys the authority to prescribe the times, places, and manner of congressional elections only to "the Legislature" of "each State." U.S. Const. art. I, § 4, cl. 1.  This delegation is a broad grant of power to the General Assembly to prescribe the means by which congressional elections are held—including the redistricting of federal congressional districts.

68.     Unless the Missouri Constitution plainly limits or divests the General Assembly of its congressional-redistricting authority, the General Assembly retains its power delegated by the Elections Clause.

69.     With no express authority bestowed on the referendum process to overturn federal congressional apportionments, Defendants' efforts to revisit the General Assembly's exercise of its authority under the Elections Clause are unlawful.

70.     For these reasons, the State and General Assembly are entitled to a judgment declaring Defendants' actions unlawful under the Elections Clause of the U.S. Constitution.  The Court should grant appropriate declaratory and injunctive relief.

### Count 2
### Violation of the Missouri Constitution
### Art. III, § 45

71.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

72.    As relevant, the Missouri Constitution provides that "the general assembly shall by law divide the State into districts corresponding with the number of [congressional] representatives to which it is entitled." Mo. Const. art. III, § 45.

73.    No other provision of the Missouri Constitution strips the General Assembly of its vested authority in redistricting the State's congressional districts. *See* Mo. Const. art. III, § 52(a).

74.    Because the Missouri Constitution does not specifically provide for referenda to countermand federal congressional apportionments, the State and General Assembly are entitled to a judgment declaring Defendants' actions unlawful under the Missouri Constitution and preliminarily and permanently enjoining them from continuing to pursue any such referendum.

<u>**PRAYER FOR RELIEF**</u>

The Missouri General Assembly, Missouri Secretary of State Denny Hoskins, and the State of Missouri pray that this Court:

1.    Declare, adjudge, and decree that the actions detailed herein are unlawful under Article I, § 4, cl. 1, of the U.S. Constitution and Article III, § 45 of the Missouri Constitution;

2.    Issue declaratory relief stating that Defendants' proposed referendum is unconstitutional;

3.    Issue temporary, preliminary, and permanent injunctive relief to prevent Defendants from continuing to seek a referendum on the General Assembly's redistricting bill; and

4.    Award all other relief this Court deems equitable and just.

Dated: October 15, 2025          Respectfully submitted,


**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
  *Solicitor General*
William James Seidleck, #77794(MO)
  *Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that true and correct copies of this Complaint shall be served in accordance with Federal Rule of Civil Procedure 4.

_s/ Louis J. Capozzi III_