# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MISSOURI GENERAL ASSEMBLY, ET AL.

    *Plaintiffs,*

        v.

RICHARD VON GLAHN, ET AL.

    *Defendants.*

Case No. 4:25-cv-01535

## CORRECTED MEMORANDUM IN SUPPORT OF THE STATE OF MISSOURI'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Introduction ................................................................................................ 1

Background ................................................................................................. 2

Argument .................................................................................................... 3

    I.   Missouri is likely to succeed on the merits—the Elections Clause vests redistricting in "the Legislature" and there is no clear statement divesting the Missouri General Assembly of this power. ................................... 3

        A.  Clear-statement rules are fixtures of American law, protecting the initial vesting of authority by the U.S. Constitution in a specific governmental actor. ........................................................................ 4

        B.  The Elections Clause vests redistricting power in "the Legislature" of the State absent a clear statement. ................................................ 6

        C.  Missouri law does not clearly permit a referendum on congressional redistricting. ...................................................................................... 8

    II.  Plaintiffs are suffering irreparable harm. ........................................ 10

    III. Balance of the equities and public interest both favor Plaintiffs. ................. 11

    IV. The State requests expedited briefing, argument, and decision. .................... 14

    V.  State requests waiver of bond. ........................................................ 15

Conclusion ................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**                                                              Page(s)

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) .................................................................. 4

*Abbott v. Perez,*
  585 U.S. 579 (2018) ................................................... 11, 12, 15

*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
  576 U.S. 787 (2015) .................................................................. 7

*Carson v. Simon,*
  978 F.3d 1051 (8th Cir. 2020) ..................................... 8, 12, 14

*Cigna Corp. v. Bricker,*
  103 F.4th 1336 (8th Cir. 2024) .............................................. 12

*Edmond v. United States,*
  520 U.S. 651 (1997) .................................................................. 1

*Ex parte Yerger,*
  8 Wall. 85 (1869) ...................................................................... 5

*FCC v. Consumers' Research,*
  145 S. Ct. 2482 (2025) .............................................................. 4

*FDA v. Brown & Williamson,*
  529 U.S. 120 (2000) .................................................................. 1

*Felker v. Turpin,*
  518 U.S. 651 (1996) ......................................................... 1, 5, 6, 8

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) ............................................................ 1, 6

*Kiobel v. Royal Dutch Petroleum Co.,*
  569 U.S. 108 (2013) .................................................................. 5

*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) .............................................................. 12

*Missouri v. Trump,*
  128 F.4th 979 (8th Cir. 2025) ................................................ 11

*Moore v. Harper,*
  600 U.S. 1 (2023) ............................................................................ 7

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
  595 U.S. 109 (2022) ......................................................................... 5

*Org. for Black Struggle v. Ashcroft,*
  978 F.3d 603 (8th Cir. 2020) ........................................................ 11

*Reynolds v. Sims,*
  377 U.S. 533 (1964) ....................................................................... 13

*Richland / Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,*
  826 F.3d 1030 (8th Cir. 2016) ...................................................... 15

*RJR Nabisco v. Eur. Cmty.,*
  579 U.S. 325 (2014) ......................................................................... 5

*Sackett v. EPA,*
  598 U.S. 651 (2023) ......................................................................... 6

*Schmitt v. Rebertus,*
  148 F.4th 958 (8th Cir. 2025) ........................................................ 3

*Sleep Number Corp. v. Young,*
  33 F.4th 1012 (8th Cir. 2022) ........................................................ 3

*State ex rel. Gordon v. Becker,*
  49 S.W.2d 146 (Mo. 1932) .............................................................. 9

*State of Ohio ex rel. Davis v. Hildebrandt,*
  241 U.S. 565 (1916) ................................................................... 7, 10

*The Queen & Crescent Case,*
  167 U.S. 479 (1897) ......................................................................... 4

*Utility Air Regulatory Group v. EPA,*
  573 U.S. 302 (2014) ......................................................................... 5

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ................................................................. 4, 5, 6

*Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) ............................................................................. 5

**Statutes**

Mo. Const. art. III, § 7 (1945) ........................................................................ 11

Mo. Const. art. III, § 45 ................................................................................... 9

Mo. Const. art. III, § 49 ......................................................................... 3, 11, 15

Mo. Const. art. III, § 52(a) ...................................................................... 14, 16

Mo. Const. art. III, § 52(b) .............................................................. 13, 14, 16

Mo. Rev. Stat. § 115.349 .......................................................................... 13, 14

Mo. Rev. Stat. § 116.030 ................................................................................... 2

Mo. Rev. Stat. § 116.120 ................................................................................. 12

Mo. Rev. Stat. § 116.150 ................................................................................. 14

Mo. Rev. Stat. § 116.080 ................................................................................. 12

U.S. Const. art. I, § 4, cl. 1 ..................................................................... 7, 8, 15

U.S. Const. art. II, § 1, cl. 2 ............................................................................. 7

**Rules**

Federal Rule of Civil Procedure 65(c) ........................................................ 15

## INTRODUCTION

Defendants are attempting to transfer the General Assembly's authority over federal redistricting to a referendum vote—financed largely by dark money.  This bizarre system for redistricting starkly departs from the regime established by the U.S. Constitution, which expressly vests the Missouri General Assembly with authority over redistricting.  Here, as in several other contexts where the U.S. Constitution bestows a specific authority on a designated body, that power cannot be taken away absent a clear statement. *See, e.g.*, *Edmond v. United States*, 520 U.S. 651, 658 (1997) (rule guarding President's authority over appointments); *FDA v. Brown & Williamson*, 529 U.S. 120, 159–60 (2000) (major questions); *Felker v. Turpin*, 518 U.S. 651, 660 (1996) (jurisdiction stripping statutes); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (federalism).  And nothing in the Missouri Constitution, state law, or historical practice suggests that Missouri made an intentional choice to transfer the federal redistricting power away from the General Assembly.  Without such evidence, Defendants' proposed referendum violates the Elections Clause.

The Court should grant preliminary injunctive relief.  Missouri is likely to succeed on the merits because Defendants are trying to transfer the General Assembly's federal-constitutional prerogative over congressional redistricting without a clear blessing to do so in the Missouri Constitution.  Moreover, the State is currently suffering substantial irreparable harm through the expenditure of resources on Defendants' unconstitutional referendum process.  And the balance of equities and public interest strongly favor the State because Defendants' actions

1

threaten to destabilize Missouri's federal congressional map with filing deadlines for the 2026 elections just a few months away. At a minimum, the State should be spared such chaos until its claims are fully adjudicated.

## BACKGROUND

On August 29, 2025, Governor Mike Kehoe called an extraordinary session of the General Assembly to establish new congressional districts. Compl. ¶ 30. The General Assembly convened on September 3 and passed House Bill 1 reapportioning congressional districts on September 12. Compl. ¶¶ 31–32.

On September 12, before the Governor signed the redistricting bill, Defendant Richard von Glahn submitted a referendum petition sample sheet—the first step in Missouri's referendum process—respecting House Bill 1 to Plaintiff Missouri Secretary of State Denny Hoskins. Decl. Peters Ex. A. On September 15, Defendant von Glahn submitted a second sample sheet to the Secretary of State. *Id.* After the Attorney General reviewed the referendum petitions, the Secretary of State denied them as to form because the redistricting bill had not been enacted into law. Decl. Peters Ex. C. Defendants then sued the Secretary of State, alleging that this denial violates the limited review in Mo. Rev. Stat. § 116.030. *See* Decl. Peters Ex. D.

On September 28, Governor Kehoe signed House Bill 1, enacting the new congressional districts. Compl. ¶ 33. Defendant von Glahn again submitted a new referendum petition on House Bill 1 on September 29. Decl. Peters Ex. E. The Secretary of State approved this petition at to form on October 14. *See* Decl. Peters Ex. F.

<u>ARGUMENT</u>

Preliminary injunctive relief is warranted. This Court considers four preliminary-injunction factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025). Although "[n]o single factor is dispositive," and "the district court must balance all factors to determine whether the injunction should issue," with "the third factor—probability of success—[being] the most significant." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (cleaned up). Missouri satisfies all of these.

## I. Missouri is likely to succeed on the merits—the Elections Clause vests redistricting in "the Legislature" and there is no clear statement divesting the Missouri General Assembly of this power.

Defendants seek to subvert the delicate constitutional balance struck by the framers. Their proposed referendum rests on a broad assumption—that general language granting referendum proponents the ability to refer "any act of the general assembly" to the voters, Mo. Const. art. III, § 49, divested the General Assembly of its congressional redistricting authority. If true, this has profound and destabilizing implications for Missouri's government. If von Glahn's theory is correct, nothing prevents all federal congressional redistricting from being done by citizen initiative (on the front end) or referendum (on the back end). All the complex tradeoffs of congressional redistricting—usually hashed out during the legislative process—will instead be decided by dark-money organizations who can afford to put proposed maps

3

on the ballot.  Citizens will then pick between such maps—heavily funded by out-of-state money—with only 100-word summary statements to guide their votes.

The U.S. Constitution's Elections Clause does not permit this scheme unless—at minimum—the Missouri Constitution provides a clear statement that federal congressional maps are subject to the initiative and referendum processes.  No such clear statement exists in the Missouri Constitution.

### A.    Clear-statement rules are fixtures of American law, protecting the initial vesting of authority by the U.S. Constitution in a specific governmental actor.

It is axiomatic in American constitutional law that courts will not presume a major reordering of the delicate balances struck by the framers.  All actors vested with grants of authority by the U.S. Constitution benefit from this clear-statement presumption in some way.  State legislatures should be treated no differently.

Beginning with Article I, the Supreme Court has long used various tools to police delegations of congressional power in order for "our constitutional system . . . to be maintained."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 530 (1935); *see also The Queen & Crescent Case*, 167 U.S. 479, 505 (1897) (explaining that a delegation of a major power to an administrative agency must be "clear and direct" and "open to no misconstruction").  Although the Supreme Court has sanctioned broad delegations of legislative authority to the Executive Branch, *see FCC v. Consumers' Research*, 145 S. Ct. 2482, 2514 (2025) (Kavanaugh, J., concurring), it requires "clear congressional authorization" before presuming a federal agency has authority to act on a major policy initiative, *West Virginia v. EPA*, 597 U.S. 697, 723

4

(2022) (internal quotation marks omitted).  In such cases, where a federal agency claims the power to make a major policy decision, "both separation of powers principles and a practical understanding of legislative intent make [courts] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there."  *Id*. (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  The requirement for a clear statement helps "ensure[] that the national government's power to make the laws that govern us remain where Article I of the Constitution says it belongs— with the people's elected representatives."  *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring).

Clear-statement rules also guard the President's traditional prerogatives under Article II.  The Constitution vests the conduct of foreign affairs with the executive branch, *see Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015), and "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application," *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2014).  This rule "ensure[s] that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches."  *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013).

Clear-statement rules also prevent excessive intrusions on the Article III judicial power, governing Congress's exercise of its jurisdiction-stripping prerogative in the Exceptions Clause.  The Supreme Court has guarded its jurisdiction and not allowed "[r]epeals by implication."  *Felker*, 518 U.S. at 660 (quoting *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 105 (1869)).  For example, when Congress withdrew the Supreme

Court's statutory jurisdiction to review "a judgment on an application for leave to file a second habeas petition in the district court," the Supreme Court "decline[d]" to find this a repeal of its original jurisdiction over habeas petitions. *Id.* at 661. As it explained, the act made "no mention of [the Supreme Court's] authority to hear habeas petitions filed as original matters." *Id.* In other words, the statute lacked a clear statement withdrawing the Supreme Court's original jurisdiction. *See id.*

Clear-statement rules not only protect the Constitution's division of power amongst the different federal branches, but also guard the "constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. Just as with these other constitutional limits, the Supreme Court has mandated that Congress speak clearly "before finding that federal law overrides" this constitutional balance. *Id.* at 461 (internal quotation omitted); *see Sackett v. EPA*, 598 U.S. 651, 679–80 (2023). All told, these clear-statement rules "operate[] to protect foundational constitutional guarantees." *West Virginia*, 597 U.S. at 735 (Gorsuch, J., concurring).

**B.    The Elections Clause vests redistricting power in "the Legislature" of the State absent a clear statement.**

As explained, clear-statement rules operate trans-substantively, protecting the prerogatives of the body initially vested with the constitutional power and requiring that any changes to this order be clearly expressed. The balance struck by the Elections Clause receives no less protection. It vests congressional-redistricting authority in "the Legislature" of each State, with only Congress itself having clear authority to override the decisions of state legislatures. U.S. Const. art. I, § 4, cl. 1. This initial power of state legislatures cannot be divested absent a clear statement.

6

Courts have long looked for a clear statement before finding a state legislature's redistricting authority abrogated. In *State of Ohio ex rel. Davis v. Hildebrandt*, a "conclusive" decision by the state supreme court "ma[d]e[] it clear that . . . the referendum constituted a part of the state Constitution and laws." 241 U.S. 565, 568 (1916). In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, Arizonians had specifically "amended the Arizona Constitution to remove congressional redistricting authority from the State Legislature." 576 U.S. 787, 796–97 (2015). And in *Moore v. Harper*, there was no debate as to whether North Carolina's redistricting process could be subjected to ordinary judicial review. *See* 600 U.S. 1, 19–22 (2023).

Assuming that the Elections Clause "does not preclude" a State from delegating redistricting authority to a referendum, changes to Elections Clause authority must at least be specific—as this Court must "safeguard limits imposed by the Federal Constitution." *Id.* at 25, 35. This searching inquiry exists for good reason: The U.S. Constitution's framers made "a deliberate choice" to vest redistricting power in state legislatures, and courts thus cannot permit the vagaries of state law to transfer that power elsewhere. *Id.* at 34.

The Electors Clause, a "similar" clause to the Elections Clause, shows how state law can interact with the U.S. Constitution's vested authority in state legislatures. *Id.* at 27. Both clauses vest power in "the Legislature" of each State. U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2. The vested authority under the Electors Clause "is not just the typical legislative power exercised pursuant to a state

7

constitution" as "it operates 'by virtue of a direct grant of authority' under the United States Constitution." *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) (per curiam). Importantly, the Electors Clause does not permit the delegation of the legislature's authority to another actor "by means of a general statute in the election code." *Id.* Hence, a general state provision cannot be understood to transfer the power vested in the legislature by the Electors Clause. *See id.* ("Nothing in this statute authorizes [another entity] to override the Legislature[] . . . ."). Nothing suggests that the Elections Clause should receive less protection.

Indeed, failing to apply a clear-statement rule here would mean that state legislatures under the Elections Clause are the only governmental actors who do not receive the benefit of a clear-statement rule. Every other actor vested with authority by the Federal Constitution is protected by clear-statement rules guarding that actor's default prerogatives. This remains true even when the Constitution openly permits another branch of government to rebalance the authority initially vested in a given body. *See Felker*, 518 U.S. at 660 (Exceptions Clause). There is no principled reason state legislatures should receive less protection under the Elections Clause.

## C. Missouri law does not clearly permit a referendum on congressional redistricting.

Nothing in the Missouri Constitution expressly provides for Missouri's referendum processes to displace the General Assembly's congressional redistricting authority. Missouri law says *nothing* about the permissibility of including a referendum as a part of congressional redistricting. *See* Mo. Const. art. III, § 45. It

certainly does not "directly and immediately" transfer the State's authority to another entity. *Ariz. State Leg.*, 576 U.S. at 801.

History also provides little support for Defendants' theory. In 1922, a federal congressional map was blocked by a referendum vote. *See* Lloyd M. Short, *Congressional Redistricting in Missouri*, 25 Am. Pol. Sci. Rev. 634, 640 (1931). But, as far as Plaintiffs are aware, that effort was never challenged in court and no Missouri court ever adjudicated the legality of that effort. Additionally, in 1932, the Missouri Supreme Court stated that state-senate districts were subject to the referendum. *State ex rel. Gordon v. Becker*, 49 S.W.2d 146, 162 (Mo. 1932).

But notably, at the 1945 Missouri Constitutional Convention, the State adopted a constitutional provision prohibiting state reapportionment from "be[ing] subject to the referendum." Mo. Const. art. III, § 7 (1945). The delegates at the Missouri Constitutional Convention specifically cited the *Gordon* decision as warranting adoption of the amendments to prohibit such referenda. *See* Debates of the 1943–1944 Constitutional Convention of Missouri 7016 (2008). Hence, far from blessing the use of referenda to overturn apportionment decisions, the framers of Missouri's Constitution rejected such uses.

Further, Plaintiffs are unaware of any evidence that the framers of the 1945 Constitution—or any other version of the Missouri Constitution—considered the possibility that federal congressional maps would be subject to initiative petitions or referenda. At most, state law is vague about using a referendum on congressional redistricting. But vagaries of state law are not enough to provide a "conclusive"

9

decision on the use of a referendum in congressional redistricting. *Hildebrandt*, 241 U.S. at 568.

In short, Missouri has made no clear and conscious choice to depart from the balance struck by the Elections Clause. And the departure from the Elections Clause would hardly be minimal. If Defendants can proceed here, then redistricting is not just subject to referendum; the initiative could be used too. *See* Mo. Const. art. III, § 49. Nothing would prevent out-of-state dark money from drafting maps and putting them directly before the people in the first instance. Applying a clear-statement rule here prevents the State from stumbling unknowingly into consequences that its lawmakers and people have not fully considered.

## II.    Plaintiffs are suffering irreparable harm.

Missouri law mandates the State and its actors—including the Plaintiff Secretary of State—to undertake specific acts facilitating the referendum. Absent an injunction prohibiting Defendants from submitting a finalized referendum petition, Plaintiffs will face twofold irreparable harms.

First, the State and the Secretary of State must commit resources and personnel to processing and facilitating the referendum. The State has already spent considerable resources reviewing Defendants' petitions and defending against a suit brought in state court. Decl. Peters ¶¶ 12–13. Additionally, Defendants have sued the Secretary of State over his refusal to approve the initial proposed referendum— and accept signatures obtained before—the Governor even signed the redistricting bill. *See* Pet., *People Not Politicians v. Hoskins*, 25AC-CC07128 (Cir. Ct. Cole Cnty.

Sept. 18, 2025).   Further, absent relief from this Court, the State's resource commitments will grow substantially.   The Secretary of State will be forced to undertake signature verification of the over 106,000 signatures that Defendant von Glahn must submit with his petition.  *See* Mo. Rev. Stat. §§ 116.120, 116.080.  This is a labor-intensive and time-consuming process.  Decl. Peters ¶ 14.  Even after the signature-verification process, several obligations on the parts of the Secretary of State and other Missouri actors remain.  *See id.* ¶¶ 15–18.  The State also faces costs of about $10 million publicizing the referendum pursuant to Missouri law.  *Id.* ¶ 19.  Plaintiffs cannot recover lost expenditures—nonrecoverable financial loss constitutes an irreparable injury.  *See Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025).

Second, if Defendants succeed in obtaining the requisite signatures, the new duly enacted congressional map is placed on hold and cannot take effect until after referendum.  *See* Mo. Const. art. III, § 52(b).  Hence, "the issue here is whether [next] year's elections can be held under the plans enacted by the Legislature."  *Abbott v. Perez*, 585 U.S. 579, 601 (2018).  Allowing the referendum petition to proceed could result in "barring the State from conducting [next] year's elections pursuant to a statute enacted by the Legislature," *id.* at 602, and being "precluded from applying [a State's] duly enacted legislation regarding election procedures" is per se irreparable, *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020).

### III.    Balance of the equities and public interest both favor Plaintiffs.

The balance of the equities and public interest also firmly weigh in favor of Plaintiffs.

11

Without preliminary relief, the likely harm to Plaintiffs "exceeds" any likely harm Defendants may suffer. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024). If this Court does not preliminarily enjoin the submission of the referendum petition, Missouri's congressional districts could be changed just before candidate filing deadlines. *See* Mo. Rev. Stat. § 115.349. This could disrupt any candidate plans and investments made in reliance on the current map. *See Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring); *cf. Carson*, 978 F.3d at 1062 (the Constitution recognizes that the state legislature "sets the status quo" in elections).

Adding to the potential harm inflicted on the State, the referendum deadlines are incompatible with carrying out the congressional elections. Although a referendum petition is due "ninety days after the final adjournment of the session," Mo. Const. art. III, § 52(a), the Secretary of State has until "the thirteenth Tuesday prior to the general election" to certify the petition, Mo. Rev. Stat. § 116.150.3. This time is necessary due to the laborious and time-intensive process of validating signatures for a referendum petition. However, this is well past the candidate-filing deadline for the 2026 congressional election. Mo. Rev. Stat. § 115.349.1 (candidate filing deadline is "last Tuesday in March"). So if the referendum were allowed to proceed and there were enough valid signatures for it to be on the ballot, then the newly passed congressional districts cannot take effect until after the election. Mo. Const. art. III, § 52(b). Hence, the State faces harm through being unable to run its election according to the rules it has set. *See Perez*, 585 U.S. at 601–02.

12

Moreover, permitting a referendum now would create precedent and incentives for such actions whenever the General Assembly redistricts—including after the decennial census. A post-census referendum petition could freeze the newly enacted congressional districts reapportioning voters according to population changes. If challengers successfully submit a referendum petition, the State would have to carry out the congressional election under the old—and not properly apportioned—congressional districts in violation of the U.S. Constitution. *See Reynolds v. Sims*, 377 U.S. 533, 568 (1964). And if the State gained or lost a congressional seat, the absurdity and consequences of the situation would only increase.

But the potential harm does not end with referenda. The Missouri Constitution also provides for initiative measures. *See* Mo. Const. art. III, § 49. So if a referendum were permitted, any citizen, potentially funded by out-of-state special interests, could use the initiative process to propose congressional maps. This could lead to a host of consequences, including inviting violations of the one-person, one-vote rule, *see Reynolds*, 377 U.S. at 568, or the Voting Rights Act. Indeed, multiple maps could be on the ballot—funded by competing out-of-state special interests looking to gain a partisan advantage in Congress. The potential chaos is endless.

On the other hand, Defendants are not likely to suffer any harm from preliminary relief. First, as explained above, the State lacks a clear statement permitting a congressional redistricting referendum, so Defendants have no right to seek the referendum. Second, Defendants remain free to advocate for different congressional maps by any constitutional means. They can ask the members of the

13

General Assembly to redistrict.  They can advocate for Congress to exercise its vested oversight power over state elections.  U.S. Const. art. I, § 4, cl. 1.  They do not need a referendum to advocate for the (partisan) changes they desire.  Third, they can use the initiative process to amend the Missouri Constitution so that congressional redistricting becomes subject to the referendum.  So absent preliminary relief, the potential harm to the State far exceeds the potential harm to Defendants.  The public interest also favors the General Assembly because an injunction maintains the ability to enforce the law adopted by the Missouri Legislature.  *See Carson*, 978 F.3d at 1061.

### IV.    The State requests expedited briefing, argument, and decision.

Plaintiffs request that this Court issue a preliminary injunction no later than November 15, 2025.  This expedition is necessary given the operation of state law.  Defendants have until December 11, 2025 to submit their final referendum petition.  Mo. Const. art. III, § 52(a).  Defendants are already well underway in their signature-collection efforts.  And, as explained in the accompanying declaration, the signature-collection campaign will not be "a difficult burden for well-funded and well-organized campaigns, like the effort at issue here."  Decl. Peters ¶ 20.  Notably, "the Democratic National Committee has promised to devote staff and monetary support to the referendum."  *Id.* ¶ 11.  If Defendants succeed in collecting and submitting the needed signatures prior to issuance of an injunction, harms to Missouri will increase drastically—the State will then be barred from implementing the new congressional districts during the referendum petition's pendency.  *See* Mo. Const. art. III, § 52(b).  To prevent Defendants from inflicting this harm on the State's interest in conducting

its next election according to the enacted map, *see Perez*, 585 U.S. at 601, the Court should issue an injunction before Defendants can submit their final referendum petition—not later than November 15, 2025.

## V.    State requests waiver of bond.

Plaintiffs request waiver of Federal Rule of Civil Procedure 65(c)'s bond requirement.  This litigation involves public interest and Defendants will not incur costs or damages apart from defending this suit.  *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

### CONCLUSION

The Court should grant Missouri's request for a preliminary injunction no later than November 15, 2025.

Dated: October 16, 2025                         Respectfully submitted,

**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
  *Solicitor General*
William James Seidleck, #77794(MO)
  *Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I hereby certify that true and correct copies of this Corrected Memorandum in Support of the State of Missouri's Motion for Preliminary Injunction and accompanying papers shall be served along with the Complaint in accordance with Federal Rule of Civil Procedure 4.  I further certify that the foregoing document contains 3790 words and appears on 15 typed pages, exclusive of matters designated for omission.

_s/ Louis J. Capozzi III_
