**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

MISSOURI GENERAL ASSEMBLY, ET AL.,

    *Plaintiffs,*

        v.

RICHARD VON GLAHN, ET AL.,

    *Defendants.*

Case No.

**DECLARATION OF CHRISSY PETERS IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

I, Chrissy Peters, declare as follows:

1.    I am the Director of Elections for the State of Missouri in the Missouri Secretary of State's Office. I have worked in this office since 2008.

2.    As Director of Elections, I am responsible for ensuring compliance with all Missouri laws pertaining to petitions for voter initiatives or referenda.

3.    I have personal knowledge of the matters in this declaration and would testify truthfully to them if called upon to do so.

**Background**

4.    The Missouri Constitution has long permitted Missouri voters to nullify legislation passed by the General Assembly via a referendum. Specifically, under the Missouri Constitution, citizens can seek "to approve or reject" legislation by the General Assembly via a referendum. Mo. Const. art. III.

5.    The Secretary of State oversees the process for seeking an initiative or referendum—from its inception to its inclusion on the ballot. This, of course, includes

reviewing new referendum petitions. The process begins with a petitioner submitting a sample sheet of the referendum petition to the Secretary for review. Missouri statutory law constrains the Secretary's ability to reject a referendum petition—rejection may only occur when the referendum petition is insufficient "as to form." Mo. Rev. Stat. § 116.332.1.

6. After the Secretary determines that a referendum petition is sufficient as to form, the petitioner must collect signatures from "five percent of legal voters in each of two-thirds of congressional districts in the state." Mo. Const. art. III, § 52(a).

7. After signatures are collected, the proponent then submits the finalized referendum petition with signatures to the Secretary of State. The Secretary of State's Office will need to "examine the petition to determine whether it complies with the Constitution of Missouri and with" governing statutes. Mo. Rev. Stat. § 116.120.1. This includes working with local election authorities to verify the signatures, confirming that numerical-signature thresholds have been met, and ensuring that the referendum petition meets other legal requirements.

8. If a referendum qualifies for the ballot, the challenged law is immediately frozen pending the result of the referendum. The Secretary of State's Office then prepares the referendum for inclusion on the ballot.

### People Not Politicians' Petition for Referendum

9. Following the General Assembly's enactment of a new congressional map in a September 2025 special session, Defendant Richard von Glahn submitted a petition for referendum on September 12, 2025. He then resubmitted the petition on

September 15, 2025. A true and correct copy of Defendant von Glahn's various petition papers are attached as **Exhibit A**. On September 15, 2025, the Elections Division of the Secretary of State's Office responded by letter to Defendant von Glahn, informing him that review of his petition by the Attorney General and the State's Auditor would commence. A true and correct copy of the letter is attached as **Exhibit B**. On September 26, 2025, the State's Director of Elections sent Defendant von Glahn a response informing him that his referendum petition had been rejected as to form. A true and correct copy of the response to Defendant von Glahn's petitions is attached as **Exhibit C**. The reason for the rejection was because the petition had been submitted prior to the Governor's signing the reapportionment into law. The defendants are now seeking judicial review of this denial in state court. A true and correct copy of the petition for review is attached as **Exhibit D**. The suit contests only the timing aspect of Mr. von Glahn's filing his referendum petition—*i.e.*, whether the Secretary of State was required to approve the petition prior to the Governor's signing the new apportionment and thereby permit valid signature collection following the submission. Now that the Governor has signed the reapportionment, the defendants can pursue the referendum without this impediment.

10. And in fact, Mr. von Glahn subsequently filed another petition seeking a referendum on the redistricting bill on September 29, 2025. A true and correct copy of that petition is attached as **Exhibit E**. The Secretary of State's Office and the Attorney General's Office reviewed this petition for form. On October 14, 2025, the Secretary of State approved that referendum petition for form, clearing the way for

3

Mr. von Glahn to start collecting valid signatures. A true and correct copy of that approval is attached as **Exhibit F**.

11.    As a recent news article explains, the Democratic National Committee has promised to devote staff and monetary support to the referendum. A true and correct copy of the St. Louis Public Radio article by Jason Rosenbaum entitled *Democratic National Committee Will Contribute to Blocking Missouri Congressional Map*, published on September 29, 2025, is attached as **Exhibit G**.

### Effects of the Referendum Effort on the State

12.    As summarized above, Missouri law imposes several mandates on various state actors once a petition for a referendum is filed. To date, the Secretary of State's Office and the Attorney General's Office have dedicated resources to Defendant von Glahn's petitions to determine whether they were acceptable as to form. Because he initially submitted his petitions prior to the Governor's signing the new apportionment, the Attorney General's Office had to issue opinion letters on whether Defendant von Glahn had properly sought a referendum against "a law" passed by the General Assembly. *See generally* Exhibit C. The Attorney General's Office produced three separate opinion letters responsive to Defendant von Glahn's petitions. *See generally id.* The Attorney General's Office also prepared a fourth opinion letter responsive to Defendant von Glahn's latest referendum petition. *See* Exhibit F at 2.

13.    Moreover, Defendant von Glahn is seeking judicial review of the decision to reject his initial petitions—those submitted before the Governor signed the

4

redistricting bill—as to form. *See* Exhibit D; *see also* Docket, *People Not Politicians v. Hoskins*, 25AC-CC07128 (Cir. Ct. Cole Cnty.). The case is being litigated on an expedited basis with a trial likely to occur at the end of October or the beginning of November, 2025.

14. The Secretary of State's legal commitments will only increase once the defendants submit a final petition with signatures to the Secretary of State. Among other things, our office will be responsible for signature verification and quality control. This requires both verifying the signatures themselves, as well as confirming that a person properly registered with our office collected the signatures on petition pages. *See* Mo. Rev. Stat. §§ 116.120, 116.080. Our office will also need to double check the signatures and the petition, which takes a lot of resources to ensure consistent processing across the State. Our office also requests election authorities to assist with verification. *Id.* at § 116.130. Regardless of how we undertake signature verification, this is a labor-intensive process—usually involving the work of no less than 20 employees from our office and up to 116 local election authorities and their staff. Adding to all of this are statutory time limits. We must issue our final determination as to a petition's sufficiency no later than the thirteenth Tuesday prior to a general election or two weeks after the date the local election authorities certify results, whichever is later. *See id.* § 116.150.3.

15. After the signature-verification process ends, the Secretary of State's Office still faces several commitments. We remain responsible for verifying that the referendum petition is legally sufficient. Mo. Rev. Stat. §§ 116.120, 116.150.2. In

cases where we are concerned about any legal issues, we consult with the Attorney General's Office regarding our concerns. Because this effort to subject a congressional map to a referendum is so rare, we will need to consult with the Attorney General's Office before we can approve this petition for inclusion on the ballot.

16.    Even if there are no legal concerns about the petition and the Secretary of State finds the petition sufficient for inclusion on the ballot, the obligations for Missouri and this office do not end. Missouri law requires the Joint Committee on Legislative Redistricting to hold a public hearing and take comments on any petition deemed to have sufficient signatures. *See* Mo. Rev. Stat. § 116.153.

17.    The Secretary of State's Office and the Attorney General's Office will also need to dedicate personnel, time, and resources to preparing the ballot measure itself. Responsibility for drafting "fair ballot language statements that fairly and accurately explain what a vote for and what a vote against the measure represent" falls initially with our office. Mo. Rev. Stat. § 116.025. We then transmit our proposed language to the Attorney General's Office for their review and input. Proponents of the ballot measure can, and often do, sue over the details of ballot-measure language

18.    Finally, our office along with local election authorities will be responsible for overseeing the logistics of the referendum itself—including the ordering and appearance on the ballot (Mo. Rev. Stat. § 116.220), preparation and distribution of notices of the referendum and sample ballots (*id.* § 116.240), and ensuring publication of the referendum in newspapers (*id.* § 116.260).

6

19.     The State will bear significant publication costs under these requirements. We will have to publish a 60-page ad in two newspapers in each of Missouri's 114 counties. Previous initiatives have cost the State $7 million in publication costs and this referendum petition could cost about $10 million.

20.     Additionally, if the defendants succeed in collecting the necessary signatures, the Missouri Constitution will prevent the new map from taking effect until a referendum occurs. *See* Mo. Const. art. III, § 52(b). This would prevent congressional candidates from filing according to the new congressional maps. Recall that a petitioner need only collect signatures from 5% of legal voters in two-thirds of the State's congressional districts. This is not a difficult burden for well-funded and well-organized campaigns, like the effort at issue here. In previous petition cycles, well-funded petitions with a statement of committee organization have had a high rate of success complying with the signature thresholds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of October, 2025

Chrissy Peters
Director of Elections
Missouri Secretary of State's Office