**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MISSOURI GENERAL ASSEMBLY, | ) | |
| DENNY HOSKINS, in his official capacity | ) | |
| as Missouri Secretary of State, and | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-01535-ZMB |
| | ) | |
| RICHARD VON GLAHN and | ) | Hon. Zachary M. Bluestone |
| PEOPLE NOT POLITICIANS, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT .......................................................................................................................5

I.      The Complaint Should Be Dismissed Without Reaching the Merits. .................................5

        A.      No Plaintiff Has Article III Standing. ....................................................5

                1.      Missouri General Assembly......................................................6

                2.      Secretary of State and the State of Missouri ................................8

        B.      This Declaratory Suit Is Unripe. ...........................................................11

        C.      Construing the Complaint as a Pure Declaratory Action, There Is No
                Federal-Question Jurisdiction. ...............................................................12

        D.      Plaintiffs Have No Valid Cause of Action..............................................15

II.     If the Court Reaches the Merits, the Complaint Should Be Dismissed for Failure
        to State a Claim......................................................................................................18

        A.      The Supreme Court Has Squarely Held that Popular Referenda on
                Congressional Districting Are Fully Consistent with the Elections Clause. .........19

        B.      No "Clear Statement" Rule Applies Here...............................................21

                1.      The Supreme Court's Elections Clause cases preclude a "clear
                        statement" rule. ..........................................................21

                2.      Plaintiffs misunderstand the nature of clear-statement rules. ...................23

        C.      If a "Clear Statement" Were Required, Missouri's Constitution Supplies
                It. ...................................................................................25

III.    At a Minimum, This Court Should Abstain Pending Further State-Court
        Litigation...............................................................................................................28

        A.      Plaintiffs Have Pleaded Themselves into *Pullman* Abstention. ...........................28

        B.      Pending State-Court Litigation Underscores the Need for Abstention.................30

IV.     The Motion for a Preliminary Injunction Should Be Denied. ...........................................32

        A.      Plaintiffs Are Unlikely to Succeed on the Merits. ..................................33

B.    Plaintiffs Will Not Suffer Irreparable Harm. ..........................................................34

C.    The Balance of Equities Strongly Counsels Against an Injunction. ......................35

D.    A Preliminary Injunction Is Not in the Public Interest. ........................................38

CONCLUSION ...........................................................................................................................40

CERTIFICATE OF SERVICE AND COMPLIANCE ...............................................................41

# TABLE OF AUTHORITIES

CASES

*29 Greenwood, LLC v. City of Newton*, 128 F.4th 1 (1st Cir. 2025) .......................................30

*ACLU of Missouri v. Ashcroft*, 577 S.W.3d 881 (Mo. Ct. App. 2019)......................................4

*Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.*, 10 F.3d 425 (7th Cir. 1993) .................................................................................................................15

*Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125 (2011) ......................8

*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015).................................................................................6, 7, 16, 20

*Arkansas United v. Thurston*, 146 F.4th 673 (8th Cir. 2025) ..................................................10

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)........................................17

*Bacon v. Neer*, 631 F.3d 875 (8th Cir. 2011)..........................................................................14

*BASF Corp. v. Symington*, 50 F.3d 555 (8th Cir. 1995) ....................................................12, 13

*Beavers v. Arkansas State Board of Dental Examiners*, 151 F.3d 838 (8th Cir. 1998) .........................................................................................................................28, 29

*Bergstrom v. Bergstrom*, 623 F.2d 517 (8th Cir. 1980)..........................................................11

*Bond v. United States*, 572 U.S. 844 (2014) ...........................................................................24

*Braxton County Court v. West Virginia*, 208 U.S. 192 (1908) ..................................................9

*Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942).......................................31

*Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)...........................................................................................................................36–37

*Caldara v. City of Boulder*, 955 F.3d 1175 (10th Cir. 2020)..................................................30

*California v. Texas*, 593 U.S. 659 (2021) ...............................................................................10

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)....................................................................21

*CDI Energy Services, Inc. v. West River Pumps, Inc.*, 567 F.3d 398 (8th Cir. 2009) ...........................................................................................................................33

*City of Kennett v. EPA*, 887 F.3d 424 (8th Cir. 2018) .........................................................7–8

iii

*D.M. ex rel. Bao Xiong v. Minnesota State High School League*, 917 F.3d 994 (8th Cir. 2019) ...................................................................................38–39

*Dakota, Minnesota & Eastern Railroad Corp. v. Schieffer*, 711 F.3d 878 (8th Cir. 2013) ...........................................................................................15

*Davis v. Passman*, 442 U.S. 228 (1979) ...............................................15

*Dennis v. Sparks*, 449 U.S. 24 (1980) ..................................................17

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) ...................17

*E.L. ex rel. White v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932 (8th Cir. 2017) ......................................................................................8, 11

*First Federal Savings & Loan Ass'n of Harrison v. Anderson*, 681 F.2d 528 (8th Cir. 1982) ...................................................................................14

*FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980) .................34

*Gagnon v. Maharishi International University*, __ F. Supp. 3d __, No. 25-cv-219, 2025 WL 2651288 (S.D. Iowa Sept. 16, 2025) ............................15

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..............................37

*Hamilton v. City of Hayti*, 948 F.3d 921 (8th Cir. 2020) .....................17

*Harris County Commissioners Court v. Moore*, 420 U.S. 77 (1975) .......30

*Hawke v. Smith*, 253 U.S. 221 (1920) ..................................................19

*Healey v. Missouri*, No. 2516-CV31273 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 28, 2025) ...................................................................................12, 32

*Heine v. Board of Levee Commissioners*, 86 U.S. (19 Wall.) 655 (1874) ..............16

*Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428 (2011).............24

*Hoffmann v. Mayor of Liberty*, 905 F.2d 229 (8th Cir. 1990) ..............36

*Huizenga v. Independent School District No. 11*, 44 F.4th 806 (8th Cir. 2022) (per curiam).....................................................................................5–6

*Jones v. Hendrix*, 599 U.S. 465 (2023)................................................23

*KCCP Trust v. City of North Kansas City*, 432 F.3d 897 (8th Cir. 2005) ...............11

*Kennedy v. Ferguson*, 679 F.3d 998 (8th Cir. 2012) ............................10

*Lexington Insurance Co. v. Integrity Land Title Co.*, 721 F.3d 958 (8th Cir. 2013) ..................................................................................................14

*Lindsey v. Whitmer*, 124 F.4th 408 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 2704 (2025) ......................................................................................................7

*Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959) .............................29

*Luther v. Hoskins*, Case No. 25AC-CC06964 (Mo. Cir. Ct. Cole Cty. filed Sept. 12, 2025) ............................................................................................12, 30

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191 (2014) ............................13

*Missouri ex rel. Missouri Highway & Transportation Commission v. Cuffley*, 112 F.3d 1332 (8th Cir. 1997) ...............................................................11, 14

*Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789 (8th Cir. 2016).......................6

*Moore v. Harper*, 600 U.S. 1 (2023)...............................................2, 20, 21, 22, 23

*Murthy v. Missouri*, 603 U.S. 43 (2024) .............................................................10

*NAACP Missouri State Conference v. Kehoe*, No. 25AC-CC06724 (Mo. Cir. Ct. Cole Cnty. filed Sept. 3, 2025).............................................................12, 32

*National Federation of Independent Business v. OSHA*, 595 U.S. 109, 124 (2022) ....................................................................................................24

*Oglala Sioux Tribe v. C & W Enterprises, Inc.*, 487 F.3d 1129 (8th Cir. 2007) ....................13

*Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916) .........................................19

*Pearson v. Koster*, 359 S.W.3d 35 (Mo. 2012).....................................................3

*People Not Politicians v. Missouri Secretary of State*, Case No. 25AC-CC07128 (Mo. Cir. Ct., Cole Cty. filed Sept. 18, 2025) ...................................31

*Petitta v. 3M Co. (In re Bair Hugger Forced Air Warming Devices Products Liability Litigation)*, 999 F.3d 534 (8th Cir. 2021)...........................................11

*Planned Parenthood Great Plains v. Missouri ex rel. Bailey*, 713 S.W.3d 213 (Mo. Ct. App. 2025)....................................................................................26

*Preisler v. Doherty*, 284 S.W.2d 427 (Mo. 1955)...................................................39

*Preisler v. Hearnes*, 362 S.W.2d 552 (Mo. 1962) ................................................27

*Public Service Commission v. Wycoff Co.*, 344 U.S. 237 (1952) ....................................12–13

*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941) .................................28

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................................7

*Richard/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030 (8th Cir. 2016).................................................................40

*Sackett v. EPA*, 598 U.S. 651 (2023) ......................................................................25

*Scott v. Farm Bureau Town & Country Insurance Co. of Missouri*, 713 S.W.3d 232 (Mo. Ct. App. 2025)..............................................................26

*SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023) .........................................37, 39

*Sebelius v. Auburn Regional Medical Center*, 568 U.S. 145 (2013) .................25

*Sessler v. City of Davenport*, 990 F.3d 1150 (8th Cir. 2021) ..........................34

*Smiley v. Holm*, 285 U.S. 355 (1932) ..........................................................20, 22

*State ex rel. Barrett v. Hitchcock*, 146 S.W. 40 (Mo. 1912).............................39

*State ex rel. Carroll v. Becker*, 45 S.W.2d 533 (Mo.) *aff'd*, 285 U.S. 380 (1932)................................................................................................27

*State ex rel. Moore v. Toberman*, 250 S.W.2d 701 (Mo. 1952) .......................27

*Stenger v. Bi-State Development Agency Missouri/Illinois Metropolitan District*, No. 14-cv-1655, 2015 WL 164044 (E.D. Mo. Jan. 13, 2015), *aff'd*, 808 F.3d 734 (8th Cir. 2015) ...................................................................15–16

*Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019)....................36

*Texas Voters Alliance v. Dallas County*, 495 F. Supp. 3d 441 (E.D. Tex. 2020)...................16

*Texas v. United States*, 523 U.S. 296 (1998) ..........................................11, 12

*Thomas v. Mundell*, 572 F.3d 756 (9th Cir. 2009).............................................9

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .........................................10

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)......................................................16

*Tulsa Professional Collection Services v. Pope*, 485 U.S. 478 (1988)...................17

*United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75 (1947)...................12

*Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019)...................7

*Vowell v. Kander*, 451 S.W.3d 267 (Mo. Ct. App. 2014) ........................................9

*West Virginia v. United States Department of Treasury*, 571 F. Supp. 3d 1229 (N.D. Ala. 2021), *aff'd*, 59 F.4th 1124 (11th Cir. 2023) ....................................7

*Wise v. Missouri*, No. 2516-CV29597 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 12, 2025) ...........................................................................................12, 32

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) .......................................................31

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)...........................32, 33

*X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024) ..................................................37

*Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851 (8th Cir. 2001) ..............................17

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, § 4, cl. 1 (Elections Clause) ..........................1–2 10–11, 13, 15–16, 18–21, 23–24, 27–29, 31, 33

U.S. Const. amend. I ................................................................. 1–2, 17, 36-39

U.S. Const. amend. I (Free Speech Clause) ...............................................18, 36

U.S. Const. amend. I (Petition Clause) ....................................................18, 36

28 U.S.C. § 1367(c)(3) ...................................................................28

28 U.S.C. § 2284(a) .....................................................................16

Mo. Const. art. I, § 1 ...................................................................39

Mo. Const. art. III, § 3(i) ..............................................................26

Mo. Const. art. III, § 7(h) ..............................................................26

Mo. Const. art. III, § 45 ..............................................................3, 25

Mo. Const. art. III, § 49 ..............................................................3, 25, 26, 39

Mo. Const. art. III, § 52(a) ...........................................................3, 26, 39

Mo. Const. of 1875, art. IV, § 57 (1908) ................................................27

Ohio Const. art. II, § 1 (1915)........................................................19

Ohio Const. art. II, § 1d (1915).......................................................19

Mo. Rev. Stat. § 1.185.8 ................................................................................6

Mo. Rev. Stat. § 1.185.9 ................................................................................6

Mo. Rev. Stat. § 115.349 ..............................................................................37

Mo. Rev. Stat. § 116.120 ...........................................................................9, 13

Mo. Rev. Stat. § 116.120.1 .......................................................................3, 4, 8

Mo. Rev. Stat. § 116.120.2 .............................................................................4

Mo. Rev. Stat. § 116.120.3 .............................................................................4

Mo. Rev. Stat. § 116.120.4 .............................................................................4

Mo. Rev. Stat. § 116.130 ...........................................................................4, 9

Mo. Rev. Stat. § 116.150 .......................................................................4, 9, 13

Mo. Rev. Stat. § 116.150.3 ............................................................................38

Mo. Rev. Stat. § 116.200 .........................................................................4, 13

Mo. Rev. Stat. § 116.220 ...............................................................................9

Mo. Rev. Stat. § 116.332.1 .............................................................................3

Mo. Rev. Stat. § 526.030 ..............................................................................13

Mo. Rev. Stat. § 527.010 ..............................................................................13

## LEGISLATIVE MATERIALS

Act of Nov. 22, 1921, S.B. 4, 1921 Mo. Laws 17 ........................................26–27

*Laws of Missouri*, 2d Extra. Sess., 51st Gen. Assemb. (1921) ................................27

H.B. No. 1, 2d Extraordinary Sess., 1st Reg. Sess., 103rd Gen. Assemb. (Mo. 2025) ..........................................................................................26

## OTHER AUTHORITIES

Brief of Arkansas et al. as *Amici Curiae* in Support of Petitioners, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 4136601 ...................22–23

Brief of *Amici Curiae* Carolyn Shapiro et al. in Support of Respondents, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 16630888 ......................23

Brief of *Amici Curiae* Thomas Griffith et al. in Support of Respondents, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 14613823 ......................23

Brief of Group of New York Voters as *Amici Curiae* in Support of Neither Party, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 4132063............................................................................................................23

Brief for Non-State Respondents, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 14052280............................................................................22

Brief for Petitioners, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 4084287 ........................................................................................22

Brief for State Respondents, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 14052447 ............................................................................22

Brief for the United States as *Amicus Curiae* Supporting Respondents, *Moore v. Harper*, 600 U.S. 1 (2023) (No. 21-1271), 2022 WL 16556220 ...................................22

Complaint, *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 997 F. Supp. 2d 1047 (D. Ariz. 2014) (No. 12-cv-1211), ECF No. 1 ...............................................................................................16

William N. Eskridge, Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 Vand. L. Rev. 593 (1992)...............................................................................................24

Fed. R. Civ. P. 65(c) ............................................................................................40

*Official Manual of the State of Missouri, 1923–1924* (1923)................................27

## INTRODUCTION

The State of Missouri, its General Assembly, and its Secretary of State have filed this suit, invoking the Missouri Constitution and Article I, Section 4 of the U.S. Constitution (the "Elections Clause") to attempt to block Missouri citizens from "continuing to seek a referendum on the General Assembly's redistricting bill." ECF No. 1, p. 22 ("Compl."). Such a lawsuit—brought by a State and state actors against their own citizens, alleging that those citizens are committing federal and state constitutional violations by exercising their fundamental First Amendment right to petition their government—appears unprecedented.

This is not how Missouri's referendum process—or the judicial process—works. The normal sequence starts when citizens submit a referendum petition with the requisite number of signatures. Under Missouri law, the Secretary of State is then charged with determining whether the petition is legally valid. If, after consulting with the Attorney General, the Secretary concludes the petition is *not* valid, he can reject it. Any citizen may then sue him, alleging that his rejection violated state law. That suit—bringing state-law claims against a state official—must proceed in state court. The Secretary is free, in that forum, to raise any defense he wishes, whether under state or federal law. This complaint has it all backwards.

As a result, this suit is dead on arrival in federal court. Plaintiffs lack Article III standing. Their claims are unripe. And if the suit is construed as a pure declaratory action about the Secretary of State's rights, there is no federal-question jurisdiction. If it is construed instead as an assertion of the General Assembly's rights, there is no valid cause of action. In any event, Plaintiffs' interlocking state and federal claims have pleaded them into *Pullman* abstention. For any or all of these reasons, this Court need not even reach the merits of this suit.

But if the Court does consider the merits, it will find that Plaintiffs' claims are squarely foreclosed by more than a century of Elections Clause precedent, reaffirmed by the U.S. Supreme

1

Court just two years ago in *Moore v. Harper*, 600 U.S. 1 (2023).  Plaintiffs' inventive theory that this Court must create a "clear statement" rule to read the Missouri Constitution is contradicted by those very same Elections Clause precedents, as well as fundamental principles of federalism.  And even if a "clear statement" were somehow required, the Missouri Constitution is plain on its face that congressional-redistricting enactments are subject to referenda, as the Missouri Supreme Court has repeatedly recognized.

As to Plaintiffs' request for a preliminary injunction to prohibit Defendants from even "submitting a petition for referendum" to the Secretary of State, ECF No. 2, at 1 ("PI Mot."), Plaintiffs have no likelihood of succeeding on the merits and struggle to articulate any cognizable harm—let alone irreparable harm—that they will face absent an injunction.  At this point, it is speculative whether enough signatures will be submitted before the December 11, 2025 deadline, and it is entirely within Secretary Hoskins's control whether the petition will be certified to go on the ballot, such that he will need to expend any resources on it.  Instead, it is Defendants and the tens of thousands of Missourians who have signed or seek to sign the referendum petition who would be harmed irreparably if an injunction were granted.  An injunction literally would preclude them from exercising their fundamental right to petition their government, in clear violation of the First Amendment.

Defendants respectfully request that the complaint be dismissed for lack of jurisdiction.  In the alternative, the complaint should be dismissed for failure to state a claim or, at a minimum, held in abeyance given pending state-court litigation that could moot or resolve the issues in this case.  If any portion of the suit survives, the motion for a preliminary injunction should be denied.

## BACKGROUND

The Missouri Constitution specifies that the General Assembly shall enact new congressional maps "[w]hen the number of representatives to which the state is entitled in the House of

the Congress of the United States under the census . . . is certified to the governor."  Mo. Const. art. III, § 45.  The Missouri Supreme Court has long understood that congressional maps enacted by the General Assembly will "remain in place for the next decade or until a Census shows that the districts should change."  *Pearson v. Koster*, 359 S.W.3d 35, 37–38 (Mo. 2012).  Accordingly, Missouri lawmakers have historically redrawn congressional maps only once a decade, after the release of new census data.

Earlier this year, the Missouri General Assembly departed from that constitutionally pre-scribed practice.  On August 29, 2025, Governor Kehoe convened the General Assembly for a "special session" to enact congressional-redistricting legislation.  Compl. ¶ 30.  On September 12, the General Assembly passed House Bill 1, redrawing Missouri's congressional districts.  *Id.* ¶ 32.  The Governor signed House Bill 1 into law on September 28.  *Id.* ¶ 33.

The Missouri Constitution reserves power for its citizens "to approve or reject," via a ref-erendum and with certain exceptions not relevant here, "any act of the general assembly."  Mo. Const. art. III, § 49.  To exercise that power, citizens must first submit a petition to the Secretary of State for review "as to form."  Mo. Rev. Stat. § 116.332.1.  Once the petition has been submitted, its proponents must then gather signatures from "five percent of the legal voters in each of two-thirds of the congressional districts in the state."  Mo. Const. art. III, § 52(a).  Proponents have only ninety days to gather those signatures supporting a referendum.  *Id.*  The referendum's pro-ponents must then submit the signed petition to the Secretary, after which the Secretary "shall examine the petition to determine whether it complies with the Constitution of Missouri" and with Missouri statutory law.  Mo. Rev. Stat. § 116.120.1.  The Secretary also provides the signed

petitions to local election authorities to verify that the signatories are registered voters. *Id.* § 116.130.[1] The referendum is placed on the ballot only after the Secretary determines the petition is sufficient. *See id.* § 116.150 (requiring the Secretary to issue a certificate finding the petition sufficient or insufficient); *ACLU of Mo. v. Ashcroft*, 577 S.W.3d 881, 892 (Mo. Ct. App. 2019) ("[A]fter signatures have been collected, . . . [the Secretary] shall examine the petition to determine whether it complies with the Constitution of Missouri . . . ." (emphasis and internal quotation marks omitted)). And if the Secretary determines the petition is insufficient, any Missouri citizen can challenge that decision in state court. *See* Mo. Rev. Stat. § 116.200.

On September 12—the day the General Assembly passed its new congressional redistricting legislation—Defendants submitted to Secretary Hoskins a referendum petition sample sheet requesting to refer House Bill 1 to Missouri voters. Compl. ¶¶ 37–38. Due to a potential technical error, Defendants submitted another referendum petition sample sheet. *Cf.* ECF No. 3-1, ¶ 9 ("Peters Decl."). Nearly two weeks later, Secretary Hoskins rejected Defendants' petition as to form. *Id.* Defendants and Secretary Hoskins are currently litigating the legality of that rejection in state court. *See* Compl. ¶ 45; Peters Decl. ¶ 9.

On September 29, the day after the Governor signed House Bill 1 into law, Defendants submitted another referendum petition sample sheet. *See* Peters Decl. ¶ 10. On October 14, after another two weeks' wait, Secretary Hoskins finally approved Defendants' referendum petition as to form. *See id.* ¶ 14. The very next day, Plaintiffs—including Secretary Hoskins, who had just approved the referendum petition as to form—filed this lawsuit "to prevent Defendants from continuing to seek a referendum on the General Assembly's redistricting bill." Compl. p. 22.

---

[1] Under Missouri law, the Secretary of State may verify the petition without referral to local election authorities by use of random sampling, Mo. Rev. Stat. § 116.120.1–.4, but the Secretary has rarely used that procedure.

Plaintiffs also seek a preliminary injunction to prohibit Defendants from "submitting a petition for referendum on the General Assembly's recent congressional redistricting to the Missouri Secretary of State." PI Mot. 1. Claiming that Defendants—who are private citizens—are violating both the federal and state constitutions, Plaintiffs seek to stop Defendants from gathering signatures (the relief requested in the complaint) and submitting their referendum petition (the relief requested in the preliminary-injunction motion).

Defendants are currently exercising their constitutional right to gather the required number of signatures by the December 11 deadline so that the question whether to reject the recently enacted congressional-redistricting plan can be put to the Missouri electorate. Defendants have already spent significant amounts of time and money gathering signatures, and they will spend more still in preparing to submit signatures by December 11.[2]

## ARGUMENT

## I.    The Complaint Should Be Dismissed Without Reaching the Merits.

This Court need not ever reach the merits of this suit because no Plaintiff has standing. Even if any Plaintiff did have standing, this dispute is unripe. Jurisdiction cannot be salvaged by construing this as a pure declaratory suit. And Plaintiffs lack a valid cause of action.

### A.    No Plaintiff Has Article III Standing.

To establish standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806,

---

[2] *See* People Not Politicians, Quarterly Report to Missouri Ethics Commission 49–50 (Oct. 14, 2025) (Alixandra Cossette Decl. Ex. E) (identifying expenditures from August 23 to September 30); Joint Stipulation of Facts and Exhibits ¶¶ 29, 32, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Oct. 28, 2025) (Cossette Decl. Ex. H) (identifying in excess of 100,000 collected signatures between September 15 and October 14).

809 (8th Cir. 2022) (per curiam) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  The requisite injury in fact must be "concrete and particularized" and "actual and imminent, not conjectural or hypothetical."  *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  None of the three Plaintiffs has standing to assert a claim against Defendants Richard von Glahn and People Not Politicians (collectively the "referendum proponents").

### 1.     Missouri General Assembly

The lead plaintiff here is the Missouri General Assembly, but it is not authorized by state law to sue and, in any event, lacks standing.

At the outset, nothing in Missouri law authorizes the General Assembly's presence in this suit.  Missouri law provides detailed procedures for the General Assembly to *intervene* in ongoing actions, though it may do so only through the President Pro Tem of the Senate and the Speaker of the House—not as a party in its own right.  *See* Mo. Rev. Stat. § 1.185.8–.9.  The complaint offers no explanation for the General Assembly's appearance as a plaintiff—no statutory authority, and certainly no "authorizing votes in both of its chambers."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015).  Indeed, the General Assembly has *not* authorized this lawsuit.[3]  The Attorney General's decision to name the General Assembly in the complaint is not sufficient to make the General Assembly a plaintiff and does not bring the General Assembly within this Court's jurisdiction.

In any case, the General Assembly lacks standing to sue.  The complaint claims that Defendants' mere submission of signatures for a referendum would cause the General Assembly to "lose[] its authority over redistricting pending that public vote" because the challenged law would

---

[3] *See* Ashley Aune Decl. ¶ 7; Doug Beck Decl. ¶ 7.

become "frozen" pending the result. Compl. ¶ 48. This argument fails for three reasons.

First, the purported injury to the General Assembly's redistricting authority through popular review of a single, specific redistricting bill is not cognizable under Article III. In *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019), the Supreme Court rejected legislative standing to defend a challenged congressional map on appeal, explaining that the lower-court order striking down the map as a racial gerrymander "d[id] not alter the General Assembly's dominant initiating and ongoing role in redistricting." *Id.* at 668; *see id.* at 663–71; *see also Raines v. Byrd*, 521 U.S. 811, 823 (1997) (legislative standing requires a claim that one's role in the legislative process has been "completely nullified"). The Court contrasted *Arizona State Legislature*—where it held that the Arizona legislature had standing to challenge a redistricting map created by an independent redistricting commission—by noting that the commission "was assailed on the ground that it *permanently* deprived the legislative plaintiffs of their role in the redistricting process." *Bethune-Hill*, 587 U.S. at 668; *see Ariz. State Legislature*, 576 U.S. at 803–04. Since *Bethune-Hill*, courts have consistently rejected legislative standing in cases like this one, where a state legislature is purportedly injured by a challenge to a specific redistricting enactment rather than a wholesale effort to permanently remove the state legislature from the redistricting process. *See, e.g.*, *Lindsey v. Whitmer*, 124 F.4th 408, 414 (6th Cir. 2024) (Sutton, C.J.) (rejecting legislators' standing because the case was "not one in which the [challenged] citizen petitions 'completely nullify' the legislators' votes" (quoting *Ariz. State Legislature*, 576 U.S. at 804)), *cert. denied*, 145 S. Ct. 2704 (2025); *West Virginia v. U.S. Dep't of Treasury*, 571 F. Supp. 3d 1229, 1246 (N.D. Ala. 2021) ("It is not enough that the legislature's power is diluted; it must be completely lost."), *aff'd in other part*, 59 F.4th 1124 (11th Cir. 2023).

Second, even if this injury were cognizable, it is entirely speculative. *See City of Kennett*

7

*v. EPA*, 887 F.3d 424, 430 (8th Cir. 2018) (injury supporting standing must be "*certainly* impend-ing" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013))).  Although the referendum proponents have every intention to gather the requisite number of signatures, it is unknown at this point whether they will.  And when they submit those signatures, the onus is then on Secretary Hoskins to "examine the petition to determine whether it complies with" governing law.  Mo. Rev. Stat. § 116.120.1.  Given the Secretary's current position as to the legality of the referendum—as expressed in this very lawsuit—there is strong reason to doubt that he will deem the petition com-pliant.  If Secretary Hoskins determines that the petition is unlawful, and his decision survives state-court scrutiny, the General Assembly's asserted injury would never materialize.

Third, for related reasons, the General Assembly's standing theory fails as to causation. When an alleged injury "is the result of actions by some third party, not the defendant, the plaintiff cannot satisfy the causation element of the standing inquiry."  *E.L. ex rel. White v. Voluntary In-terdistrict Choice Corp.*, 864 F.3d 932, 936 (8th Cir. 2017) (quoting *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 935 (8th Cir. 2012)); *see Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011).  Any purported injury to the General Assembly would come from Secretary Hoskins's decision to certify the referendum petition and then the Missouri voters' decision on the referendum. Referendum proponents' collection and submission of signatures, standing alone, is not the cause of any injury to the General Assembly.

### 2.    Secretary of State and the State of Missouri

The two other Plaintiffs—the State of Missouri and Secretary Hoskins —rest their standing on a different allegation of injury: that they are "forced to commit resources" with respect to the referendum.  Compl. ¶ 43.  In short, the argument is that if Defendants submit signatures, Secretary Hoskins will have to examine the signatures, make a determination as to whether the referendum should go on the ballot, accept feedback from the public, and prepare the ballot.  *See id.* ¶¶ 46–47.

As discussed, that injury is speculative and within Secretary Hoskins's control. Whether Secretary Hoskins has to process a referendum petition is contingent on whether Defendants gather enough signatures and submit their petition. And even if Secretary Hoskins became obligated to carry out this work, that the Secretary of State must do his job does not inflict injury on the office of the Secretary or the State of Missouri. *See, e.g.*, Mo. Rev. Stat. §§ 116.120, .130, .150, .220; *see also Vowell v. Kander*, 451 S.W.3d 267, 275 (Mo. Ct. App. 2014) ("As a ministerial officer, the Secretary of State is required to carry out his or her statutory duties to the letter of the law . . . ."). There is no allegation that additional appropriations or staff will be needed to handle the referendum process, or that other priorities will have to be abandoned. *See Braxton Cnty. Ct. v. West Virginia*, 208 U.S. 192, 198 (1908) (explaining that the "performance" or "nonperformance" of official duties is not an interest that permits a public official to invoke federal jurisdiction) (quoting *Smith v. Indiana*, 191 U.S. 138, 148 (1903)); *Thomas v. Mundell*, 572 F.3d 756, 761 (9th Cir. 2009) (public official loses only "an abstract measure of constitutional principle" by having to engage in duties he believes to be unconstitutional, and therefore lacks standing to challenge those duties (internal quotation marks omitted)). Indeed, the Secretary has admitted that any referendum-related costs—seemingly costs associated with publishing the referendum text in local newspapers and printing the ballots—are covered by legislative appropriations.[4]

More fundamentally, even if Secretary Hoskins were correct that the burden of work he was elected to perform constitutes cognizable Article III injury, that injury could not support standing to assert the claims here. It is not enough that the Secretary suffers *some* injury; he must be

---

[4] *See* Mo. State Auditor's Off., Fiscal Note 26-R004, at 3 (Oct. 17, 2025) (Cossette Decl. Ex. A); Mo. State Auditor's Off., Fiscal Note 20-063, at 4–5 (May 23, 2019) (Cossette Decl. Ex. B); Mo. State Auditor's Off., Fiscal Note 18-R002, at 3 (Mar. 14, 2017) (Cossette Decl. Ex. C); Mo. State Auditor's Off., Fiscal Note 26-134, at 3 (Sept. 18, 2025) (Cossette Decl. Ex. D).

injured *by the conduct he alleges to be unlawful.* *See California v. Texas*, 593 U.S. 659, 678–80 (2021). And he cannot make that showing here. The Secretary's alleged injuries arise from the referendum proponents' invocation of procedures created by Missouri law, but Plaintiffs' legal claims relate solely to the *substance* of the proposed referendum: namely, whether a congressional-redistricting act can be referred to the people of Missouri consistent with the Elections Clause and the Missouri Constitution. No one claims (or could reasonably claim) that, in general, it violates the U.S. Constitution to submit a referendum petition to the Missouri Secretary of State. *See Ark. United v. Thurston*, 146 F.4th 673, 678–79 (8th Cir. 2025) (Supremacy Clause simply creates a rule of decision that resolves conflicts between state and federal law). Put differently, the claims here solely concern the division of redistricting authority between the Missouri General Assembly and the people of Missouri. The Secretary of State may be a cheerleader for one side in that dispute, but he has no personal interest in its resolution.

The complaint also raises several other insubstantial theories of Article III injury suffered by Secretary Hoskins. It outlines the resources previously expended to handle the referendum proponents' submission of a "sample sheet," but acknowledges that these costs have already been expended. Compl. ¶ 44. The Secretary cannot seek injunctive relief based on past injury. *See Murthy v. Missouri*, 603 U.S. 43, 69 (2024) ("To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury . . . ."); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (standing must be established "for each form of relief that [plaintiffs] seek"). The complaint also invokes the "expend[iture of] substantial resources litigating" against the referendum proponents. Compl. ¶ 45; *see id.* ¶ 50. But government litigation expenditures do not give rise to Article III standing. *See Kennedy v. Ferguson*, 679 F.3d 998, 1002–03 (8th Cir. 2012) (litigation-

10

related expenses "are not injuries for purposes of assessing the presence of Article III standing").[5]

As to the State itself, Plaintiffs suggest standing based on the "dedication of the State's resources to [the] referendum." Compl. ¶ 14. As Plaintiffs see it, the State is harmed because the referendum petition will "trigger[ ] several ongoing responsibilities" by the Secretary of State and other state officials. *Id.* ¶ 44. But that purported injury suffers from the same defects as the Secretary of State's. *See* pp. 8–11, *supra*. What's more, an injury caused by "some third party"—here, a co-plaintiff—does not suffice for Article III standing. *E.L. ex rel. White*, 864 F.3d at 936 (quotation marks omitted).

### B.      This Declaratory Suit Is Unripe.

Aside from these standing problems, it is premature for Plaintiffs to seek declaratory relief now. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *KCCP Tr. v. City of North Kansas City*, 432 F.3d 897, 899 (8th Cir. 2005) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). And ripeness doctrine directs "courts [to] avoid passing upon constitutional questions in advance of the strictest necessity for deciding them." *Bergstrom v. Bergstrom*, 623 F.2d 517, 519 (8th Cir. 1980).

Plaintiffs here request exactly what the ripeness doctrine forbids: "an opinion advising what the law would be upon a hypothetical state of facts." *Missouri ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1337 (8th Cir. 1997) (internal quotation marks omitted). It is highly speculative whether any Elections Clause dispute will ever materialize: insufficient signatures could be collected; the Secretary of State could deem the referendum petition legally

---

[5] At any rate, this Court lacks power to enjoin the referendum proponents from litigating against the Secretary in state court. *See Petitta v. 3M Co. (In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.)*, 999 F.3d 534, 537 (8th Cir. 2021) (under the Anti-Injunction Act, a federal court generally "may not grant an injunction to stay proceedings in a State court" (quoting 28 U.S.C. § 2283)).

deficient; or the underlying redistricting enactment of the General Assembly could be invalidated in any one of the multiple ongoing state-court suits currently challenging it.[6]  And while ripeness concerns can be alleviated when a party would otherwise face "hardship," *Texas*, 523 U.S. at 301, here there is no hardship if adjudication is postponed.  The issue will be fit for resolution, if ever, following submission of the referendum petition.[7]  In the meantime, Plaintiffs are "not required to engage in, or to refrain from, any conduct."  *Id.*  In sum, federal courts "do not render advisory opinions" of the sort Plaintiffs request.  *United Pub. Workers v. Mitchell*, 330 U.S. 75, 89 (1947).

### C. Construing the Complaint as a Pure Declaratory Action, There Is No Federal-Question Jurisdiction.

What Plaintiffs appear to be seeking in this case is a declaration that Defendants do not have the right to pursue a referendum on House Bill 1 (either because the Missouri Constitution does not actually provide it, or because the U.S. Constitution forbids it).  Plaintiffs are suing because they would like a federal court's input on that question now, rather than face suit by the referendum proponents in state court later. So construed, there is no federal-question jurisdiction over this pure declaratory action.

To determine whether federal-question jurisdiction exists in a declaratory action, a court must "realign the parties to reflect the actual controversy underlying the action."  *BASF Corp. v. Symington*, 50 F.3d 555, 557 (8th Cir. 1995); *see Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237,

---

[6] House Bill 1 is currently being challenged as a violation of Missouri law in several lawsuits.  *See Luther v. Hoskins*, No. 25AC-CC06964 (Mo. Cir. Ct. Cole Cnty. filed Sept. 12, 2025); *Healey v. Missouri*, No. 2516-CV31273 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 28, 2025); *Wise v. Missouri*, No. 2516-CV29597 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 12, 2025); *NAACP Mo. State Conf. v. Kehoe*, No. 25AC-CC06724 (Mo. Cir. Ct. Cole Cnty. filed Sept. 3, 2025).

[7] Indeed, in pending state-court litigation brought by Defendant People Not Politicians against Secretary Hoskins concerning the validity of certain signatures gathered by the referendum proponents, the Secretary himself has argued that the case is unripe until the referendum petition is actually submitted.  *See* Defendants' Pretrial Brief at 19–20, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Oct. 31, 2025) (Cossette Decl. Ex. G).

248 (1952).  The Eighth Circuit calls declaratory defendants seeking to "ward off" future suits the "natural plaintiff[s]." *BASF*, 50 F.3d at 557.  If a court would not have jurisdiction over the hypothetical "coercive action" brought by the natural plaintiffs, it does not have jurisdiction over the declaratory action. *Medtronic, Inc. v. Mirowski Fam. Ventures*, 571 U.S. 191, 197 (2014) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983)); *see Oglala Sioux Tribe v. C & W Enters., Inc.*, 487 F.3d 1129, 1131 (8th Cir. 2007) ("Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the *character of the threatened action*, and *not of the defense*, which will determine whether there is federal-question jurisdiction in the District Court." (emphasis added) (quoting *Wycoff Co.*, 344 U.S. at 248)).

The question here is whether this Court would have subject-matter jurisdiction over a suit brought by Defendants against Secretary Hoskins for failing to certify the referendum.  The answer is easy: of course not.  In that hypothetical action, the referendum proponents would sue the Secretary in state court for violating Missouri law.  *See* Mo. Rev. Stat. § 116.200 (permitting suit by any citizen challenging the Secretary's certification decision); *id.* §§ 526.030, 527.010 (authorizing injunctive and declaratory relief).  That would be a pure state-law claim.  *See id.* §§ 116.120, .150 (Secretary of State's obligations to determine sufficiency of the referendum petition).

To be sure, the Secretary could defend his conduct in that suit by invoking the two "claims" presented here: that the Missouri Constitution does not authorize a referendum on congressional-redistricting enactments, and that the Elections Clause prohibits referenda from overriding state

legislative enactments.[8]  But "[a]n assertion of federal preemption as a defense to a state law claim does not provide an adequate basis for federal question jurisdiction." *First Fed. Sav. & Loan Ass'n of Harrison v. Anderson*, 681 F.2d 528, 533 (8th Cir. 1982).  And "[f]ederal-question jurisdiction may not be created by a declaratory-judgment plaintiff's 'artful pleading [that] anticipates a defense based on federal law.'" *Bacon v. Neer*, 631 F.3d 875, 879–80 (8th Cir. 2011) (alteration in original) (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673 (1950)).

Following this analysis, the Eighth Circuit rejected federal-question jurisdiction in *Missouri ex rel. Missouri Highway & Transportation Commission v. Cuffley*, 112 F.3d 1332 (8th Cir. 1997).  There, the State sued an applicant seeking to sponsor a stretch of I-55 rather than wait to deny its application and face suit on First Amendment grounds.  *See id.* at 1333–34.  The court observed that "it is not enough that … a [federal] constitutional issue is present in the case." *Id.* at 1334.  Applying the principles set forth above, the court "look[ed] to see what sort of traditional damage or coercive action could come out of this standoff between the State and the [applicant]." *Id.* at 1335.  And the court noted that "[i]n the only case we have located that is even remotely similar to the instant case, a federal district court reached the same conclusion we do today:  a declaratory judgment suit brought by a state to uphold the constitutionality of its action is not within the federal-question jurisdiction of the federal courts." *Id.* at 1336–37 (citation omitted).

There appears to be no basis for Plaintiffs to bring this premature action other than to attempt to keep the parties' dispute out of state court.  These types of "suits 'for declaratory judgment aimed solely at wresting the choice of forum from the natural plaintiff will normally be dismissed.'" *Lexington Ins. Co. v. Integrity Land Title Co.*, 721 F.3d 958, 973 (8th Cir. 2013) (quoting

---

[8] Indeed, the Secretary is invoking these arguments in one of the pending state-court suits.  *See* Defendants' Pretrial Brief at 29 n.5, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Oct. 31, 2025) (Cossette Decl. Ex. G).

*BASF*, 50 F.3d at 558); *accord, e.g.*, *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993).

### D.    Plaintiffs Have No Valid Cause of Action.

This suit also should be dismissed because Plaintiffs lack any conceivable cause of action authorizing them to use the federal courts to sue their own citizens for invoking the State's constitutional referendum procedures.  *See Davis v. Passman*, 442 U.S. 228, 239 & n.18 (1979).[9]

The complaint nowhere identifies the source of Plaintiffs' purported cause of action, observing only that "[t]his Court has the authority to issue the requested declaratory relief under [the Declaratory Judgment Act] and this Court's inherent equitable authority."  Compl. ¶ 25.  But neither the Declaratory Judgment Act nor any equitable principle furnishes a cause of action here.

The Declaratory Judgment Act is merely a procedural statute that authorizes a particular form of relief; it does not create a federal cause of action or otherwise "expand federal court jurisdiction."  *Dakota, Minn. & E. R.R. Corp. v. Schieffer*, 711 F.3d 878, 881 (8th Cir. 2013) (quoting *Bacon*, 631 F.3d at 880); *see, e.g.*, *Gagnon v. Maharishi Int'l Univ.*, __ F. Supp. 3d __, No. 25-cv-219, 2025 WL 2651288, at *6 (S.D. Iowa Sept. 16, 2025) ("The Declaratory Judgment Act does not create an independent cause of action or confer substantive rights; rather, it provides a procedural mechanism through which courts may declare the rights of parties in actual controversies."); *Stenger v. Bi-State Dev. Agency Mo./Ill. Metro. Dist.*, No. 14-cv-1655, 2015 WL 164044, at *3 (E.D. Mo. Jan. 13, 2015) ("That Plaintiffs seek declaratory relief does not change the conclusion

---

[9] While this discussion refers to "Plaintiffs," it focuses on the lack of cause of action available to the General Assembly, the only Plaintiff even purporting to assert a federal right.  If the General Assembly were dismissed on jurisdictional grounds and the Secretary of State remained, the analysis would become even more straightforward:  Article I's Elections Clause grants no rights to state *executive* officials, so obviously the Secretary of State does not have a federal cause of action here.  And the State of Missouri itself advances no theory apart from its Secretary of State.

that no federal cause of action exists, as the Declaratory Judgment Act is procedural and does not expand federal court jurisdiction."), *aff'd*, 808 F.3d 734 (8th Cir. 2015).

There is no equitable cause of action either. Plaintiffs ask this Court to create a novel cause of action that would permit States (or perhaps their legislatures) to sue private citizens whose political activity interferes with the state legislature's power under the Elections Clause. But as the Supreme Court recently reaffirmed, federal courts' "equitable authority is not freewheeling"; it "encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (quoting *Grupo Mex. de Desarrollo, S.A. v. All. Bond Fund*, 527 U.S. 308, 319 (1999)). No court has ever asserted equitable authority to entertain a suit like this, at the time of the Founding or in the centuries since. *See Heine v. Levee Comm'rs*, 86 U.S. (19 Wall.) 655, 658 (1873) (a court of equity may not "depart from all precedent and assume an unregulated power of administering abstract justice at the expense of well-settled principles"). "Simply put, no cause of action based solely on the text of the Elections Clause exists for Plaintiffs to plead." *Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 462 (E.D. Tex. 2020).[10]

True enough, constitutional rights are often vindicated through equitable suits brought

---

[10] Citing *Arizona State Legislature*, the complaint asserts that "States and legislatures can seek, in the federal courts, to protect the congressional-apportionment authority." Compl. ¶ 13 (citing *Ariz. State Legislature*, 576 U.S. at 803–04). In *Arizona State Legislature*, however, the Arizona legislature brought a federal lawsuit only after a redistricting map had been enacted through the independent-commission mechanism that the legislature believed to be unconstitutional. *See* 576 U.S. at 792. Federal law explicitly authorizes "action[s] . . . challenging the constitutionality of the apportionment of congressional districts," 28 U.S.C. § 2284(a), which is the precise authority the Arizona legislature relied upon, *see* Compl. ¶¶ 6, 8, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 997 F. Supp. 2d 1047 (D. Ariz. 2014) (three-judge court) (No. 12-cv-1211), ECF No. 1. Nothing in the Supreme Court's decision or procedural history of *Arizona State Legislature* supports the right to bring Elections Clause suits in federal court outside the context of a challenge to a specific redistricting map not drawn by the legislature itself.

*against* governments and government officials who violate those rights.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).  But that principle is of no help to Plaintiffs, since they are attempting to sue *private* individuals.  "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal *executive* action, tracing back to England."  *Id.* at 327 (emphasis added).  *No* history—long or short—supports judicial review, as a matter of equity, of allegedly unconstitutional *private* action.  Nor is there any reason for such a cause of action, as a State has many legitimate tools at its disposal when it believes its citizens are acting unlawfully; here, for instance, Secretary Hoskins can simply refuse to certify what he believes is an improper referendum petition and then face suit.  Nothing warrants Plaintiffs' resort to federal equity.

Nor can Plaintiffs prevail on the theory that the referendum proponents are somehow rendered state actors because they are invoking state-law referendum procedures:  "The Supreme Court has held that a private party's mere invocation of state legal procedures does not constitute state action."  *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 n.21 (1982)); *accord Hamilton v. City of Hayti*, 948 F.3d 921, 931 (8th Cir. 2020); *see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 622 (1991) ("[P]rivate use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action . . . .").  A private party can become a state actor only when it acts "jointly" with government officials, *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980), or with their "overt, significant assistance," *Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 486 (1988).  Here, the government-official Plaintiffs are *adverse* to the private-citizen Defendants.

Finally, basic First Amendment principles confirm that no cause of action can exist here.  Plaintiffs presuppose a claim that would entitle them to "prevent [the referendum proponents] from

17

continuing to seek a referendum on the General Assembly's redistricting bill." Compl. p. 22. If Congress had passed a statute authorizing a State to sue its citizens to stop them from engaging in pure political advocacy—not just from generating support from the populace but also from submitting petitions to the state government—courts would have no hesitation declaring that statute void under the First Amendment's Free Speech and Petition Clauses. Just as Congress lacks power to create a legal cause of action permitting States to override fundamental individual rights, so too do courts lack power to fashion equitable causes of action having the same effect.

## II.    If the Court Reaches the Merits, the Complaint Should Be Dismissed for Failure to State a Claim.

The complaint should be dismissed for myriad reasons before the Court ever reaches the merits of Plaintiffs' federal and state constitutional claims. If, however, the Court reaches the merits, the complaint still should be dismissed as Plaintiffs' claims fail as a matter of law. Count 1, a claim that "Defendants' efforts to initiate a referendum . . . violate[] the Elections Clause," Compl. ¶ 65, is squarely foreclosed by directly on-point precedent—reaffirmed by the U.S. Supreme Court just two years ago in *Moore*—holding that it is fully consistent with the Elections Clause for congressional redistricting to be subject to a popular referendum pursuant to state constitutional procedures. Count 2, Plaintiffs' state-law claim that it is "unlawful under the Missouri Constitution" for Defendants to seek a referendum, Compl. ¶ 74, turns entirely on the existence of a "clear statement" principle under which the Missouri Constitution must be interpreted not to permit a congressional-redistricting referendum unless it says so explicitly. *See id.* ¶¶ 51–56. But in none of its Elections Clause jurisprudence has the Supreme Court ever required the "clear statement" rule that Plaintiffs pitch. And even if this Court created this novel rule, the Missouri Constitution is more than sufficiently clear that referenda on congressional redistricting are permitted.

### A.    The Supreme Court Has Squarely Held that Popular Referenda on Congressional Districting Are Fully Consistent with the Elections Clause.

The U.S. Supreme Court has long held that the exact claim Plaintiffs advance—that referenda on congressional-redistricting plans violate the Elections Clause—is "plainly without substance." *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916). Plaintiffs barely mention the Court's decision in *Hildebrant*, but an unbroken line of precedent from *Hildebrant* through to the Court's recent decision in *Moore* directly forecloses Plaintiffs' Elections Clause claim.

In *Hildebrant*, almost identically to here, the state constitution reserved to the "people" of the State "the power to adopt or reject any law . . . passed by the general assembly, except as hereinafter provided." Ohio Const. art. II, § 1 (1915); *see id.* § 1d (excepting only laws providing for tax levies and certain emergency laws passed by bicameral supermajorities). There was no provision in the state constitution expressly subjecting congressional districting to the referendum process. In 1915, the people of Ohio deployed the referendum to reject a mid-decade, highly gerrymandered congressional map enacted by the Ohio General Assembly. The validity of that referendum then was challenged in the Ohio Supreme Court and eventually the U.S. Supreme Court as a violation of the Elections Clause. The U.S. Supreme Court unanimously rejected that challenge as "plainly without substance." *Hildebrant*, 241 U.S. at 569.[11]

For more than a century, the U.S. Supreme Court has repeatedly reaffirmed *Hildebrant*'s Elections Clause holding. In *Hawke v. Smith*, 253 U.S. 221 (1920), the Court, again unanimously, confirmed that "the referendum provision of the state Constitution, when applied to a law

---

[11] The complaint is thus simply wrong when it says the Supreme Court "has never held that a general referendum provision can curtail the legislature's exercise of [congressional redistricting] authority." Compl. ¶ 53. The complaint is also wrong to suggest that the *Hildebrant* Court relied on the Guarantee Clause and did not rule on the Elections Clause. *Id.* ¶ 4. Had the Court done that, it would have dismissed for want of jurisdiction rather than affirming the state supreme court's judgment, as the Court's unanimous opinion explained. *See Hildebrant*, 241 U.S. at 569–70.

redistricting the state with a view to representation in Congress, was not unconstitutional." *Id.* at 230–31. In *Smiley v. Holm*, 285 U.S. 355 (1932), the Court relied heavily on *Hildebrant* in holding that each State has "the authority . . . to determine what should constitute its legislative process," and thus the Elections Clause's reference to "the Legislature" does not preclude a State from exercising its lawmaking power however its constitution demands, including by referendum. *Id.* at 371–73.

More recently, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015), the Court explained that *Hildebrant* had "properly held that the referendum was part of the legislative authority of the State" for the purpose of enacting a congressional-redistricting plan; that *Hildebrant* had established that the term "'the Legislature' . . . encompassed a veto power lodged in the people"; and that the "Elections Clause does not bar treating the referendum as part of the legislative power for the purpose of apportionment, where so ordained by the state constitutions and laws." *Id.* at 805–06 (internal quotation marks omitted). The Court thus reaffirmed that "'the Legislature' comprises the referendum . . . in the context of regulating congressional elections." *Id.* at 808; *see also id.* at 840 (Roberts, C.J., dissenting) (explaining that *Hildebrant* "approved a State's decision to employ a referendum"); *id.* at 841 (agreeing with the majority that the Courts' precedents hold that congressional "redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum").

And just two years ago, in *Moore v. Harper*, 600 U.S. 1 (2023), the Court held that "the Elections Clause does not exempt state legislatures from the ordinary constraints imposed by state law." *Id.* at 34. Writing for the six-Justice majority, Chief Justice Roberts summed up "the core principle espoused in *Hildebrant* and *Smiley* 'that redistricting is a legislative function, to be

performed in accordance with the State's prescriptions for lawmaking, which may include the referendum.'" *Id.* at 25–26 (quoting *Ariz. State Legislature*, 576 U.S. at 808). The Court explained that "*Hildebrant*, *Smiley*, and *Arizona State Legislature* each rejected the contention that the Elections Clause vests state legislatures with exclusive and independent authority when setting the rules governing federal elections." *Id.* at 26. Even the dissent in *Moore* conceded that state-constitutional referendum provisions can constrain a state legislature's exercise of authority without offending the Elections Clause. *See id.* at 57–59 (Thomas, J., dissenting); *id.* at 58 & n.8 (citing *Hildebrant* for the proposition that a state constitution can vest in the people of the State the lawmaking power to determine congressional districts).[12]

### B.    No "Clear Statement" Rule Applies Here.

Recognizing that their Elections Clause theory is foreclosed by *Moore* and the century of precedent before it, *see* Compl. ¶ 54 & n.9; ECF No. 3, at 7 ("PI Br."), Plaintiffs invite this Court to invent, from whole cloth and as a matter of federal law, a novel "clear statement" rule that would govern interpretation of the Missouri Constitution. In Plaintiffs' view, the Missouri Constitution must "*expressly* say that a referendum can overturn the exercise of the General Assembly's federal redistricting decisions." Compl. ¶ 57 (emphasis added). The Court should decline this invitation.

#### 1.    The Supreme Court's Elections Clause cases preclude a "clear statement" rule.

Plaintiffs' clear-statement theory falters first on precedent. Not once in the long line of Elections Clause cases just discussed has the Supreme Court ever applied the clear-statement rule

---

[12] With the Supreme Court precedents so squarely aligned against them, Plaintiffs rely heavily on *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) (per curiam). *See* Compl. ¶¶ 51, 53, 56, 61; ECF No. 3, at 8, 12, 14 ("PI Br."). *Carson*, however, dealt with a challenge under Article II's Electors Clause to a state *executive official's* alteration of election processes. *See* 978 F.3d at 1054. It has nothing to say about a scenario where a state constitution vests the people with authority to review the legislature's enactments.

Plaintiffs propose.  To the contrary, such a rule is flatly inconsistent with the Court's decisions.

As noted above, in *Hildebrant*, the Ohio referendum provision was materially the same as Missouri's provision; there was no express statement that the referendum applied to congressional redistricting.[13]  Likewise, in *Smiley*, when the Supreme Court upheld a gubernatorial veto over a congressional-redistricting enactment, the Court did not demand an express reference to veto authority *over congressional-election laws in particular*, or otherwise ask for any sort of clear statement.  *See* 285 U.S. at 367–73.  And then in *Moore*, the Court again upheld the power of a non-legislative body (the North Carolina judiciary) to invalidate the state legislature's congressional-redistricting map based on language in the North Carolina Constitution stating that "[a]ll elections shall be free."  600 U.S. at 8 (quoting N.C. Const. art. I, § 10); *see id.* at 22–34.  The Court did not look for "clear" language in the state constitution authorizing state courts to invalidate congressional-redistricting maps.

In fact, the Court in *Moore* was presented with essentially the same argument that Plaintiffs assert here: that "open-ended" constitutional provisions lack sufficient clarity to support (what were argued to be) infringements on the state legislature's redistricting authority, and instead only "specific" provisions could suffice.  *See* Brief for Petitioners at 46–47, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 4084287.  That point was hotly contested,[14] and the Court conspicuously declined

---

[13] Plaintiffs purport to find the necessary clear statement in state law in the U.S. Supreme Court's description of the state supreme court's decision below as "conclusive."  PI Br. 7 (quoting *Hildebrant*, 241 U.S. at 568).  But a clear-statement rule looks for an unambiguous statement in the text of a written instrument (usually a statute); it does not turn on the relative firmness of a judicial decision interpreting that text.

[14] *See* Brief for Non-State Respondents at 53–55, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 14052280; Brief for State Respondents at 18–19, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 14052447; Brief for the United States as *Amicus Curiae* Supporting Respondents at 25–28, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 16556220.  *Compare* Brief of Arkansas et al. as *Amici Curiae* in Support of Petitioners at 10–17, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 4136601

to adopt the *Moore* petitioners' proposed standard.  To the contrary, as Plaintiffs concede, *Moore* instead suggested that a state court's interpretation of state law as to the legislature's congressional-redistricting authority must be upheld so long as that interpretation reflects a "fair reading" of state law.  Compl. ¶ 53 (quoting *Moore*, 600 U.S. at 36); *see Moore*, 600 U.S. at 35–37 (holding that to safeguard "the limits derived from the Elections Clause," courts merely must stay within "the bounds of ordinary judicial review"); *id.* at 38–40 (Kavanaugh, J., concurring) (suggesting that in "case[s] implicating the Elections Clause" federal courts should defer to any state-court interpretations of state-constitutional provisions that did not "'impermissibly distort[]" those provisions "'beyond what a fair reading required'" (quoting *Bush v. Gore*, 531 U.S. 98, 115 (2000) (Rehnquist, C.J., concurring))).  The "fair reading" standard from *Moore* is antithetical to the "clear statement" rule Plaintiffs urge here.

### 2.    Plaintiffs misunderstand the nature of clear-statement rules.

That Plaintiffs' proposed clear-statement rule is inconsistent with a century of Supreme Court precedent is enough to reject it.  But in addition, nothing about the nature of clear-statement rules supports the creation of one here.

First, while Plaintiffs catalogue various clear-statement rules applied by the Supreme Court, *see* PI Br. 4–6, they neglect to mention that each of these rules is a principle for interpreting *federal legislation*, not state law.  *See, e.g., Jones v. Hendrix*, 599 U.S. 465, 492 (2023) ("Typically,

---

(advocating clear-statement rule), *and* Brief of Group of New York Voters as *Amici Curiae* in Support of Neither Party at 5–17, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 4132063 (same), *with, e.g.*, Brief of *Amici Curiae* Thomas Griffith et al. in Support of Respondents at 8, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 14613823 ("The Court would have to overrule *Smiley* and *Hildebrant* for it to require a state constitutional provision to refer specifically to elections to be enforceable (or any so-called 'clear statement' requirement)."), *and* Brief of *Amici Curiae* Carolyn Shapiro et al. in Support of Respondents at 9, *Moore*, 600 U.S. 1 (No. 21-1271), 2022 WL 16630888 ("Imposing . . . a [clear-statement] rule on state courts would fly in the face of federalism's respect for and protection of state law from undue federal interference.").

we find clear-statement rules appropriate when a statute implicates historically or constitutionally grounded norms that we would not expect *Congress* to unsettle lightly." (emphasis added)); *see also, e.g.*, William N. Eskridge, Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 Vand. L. Rev. 593, 597 (1992) ("[T]he Court . . . has tended to create the strongest clear statement rules to confine *Congress's power* in areas in which *Congress* has the constitutional power to do virtually anything." (emphasis added)).

This makes sense:  The Supreme Court is the ultimate arbiter of the meaning of federal law, so it is the Court's prerogative to set forth clear-statement principles with presumptions about what that law means.  Absent in Plaintiffs' discussion of clear-statement rules is even a single example of a federal court imposing such a rule on a *state constitution* as a matter of *federal law*. And for good reason.  It is for state courts to decide how to interpret state law.  It is thus the prerogative of the Missouri Supreme Court—not this or any other federal court—to decide whether to create a clear-statement rule that would limit the reach of the Missouri Constitution's referendum provisions.  It is wholly unclear where a federal court would find authority to create novel interpretive principles for state constitutional text as a matter of federal law.

Second, Plaintiffs' account of clear-statement principles—that they "operate trans-substantively," PI Br. 6, such that they can be shoehorned into the Elections Clause context simply because separation-of-powers questions are at issue—is inaccurate.  Clear-statement principles have developed in specific contexts to serve specific purposes.  *See, e.g.*, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435–36 (2011) (clear-statement rule regarding non-jurisdictional character of claim-processing rules "capture[s] Congress' likely intent and also provides helpful guidance for courts and litigants"); *see also, e.g.*, *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring) (major-questions doctrine ensures that "any new laws governing

24

the lives of Americans are subject to the robust democratic processes the Constitution demands"). The Supreme Court has never set out a clear-statement rule that would apply in this context or for these purposes.

Finally, where employed by the Supreme Court, clear-statement rules consistently operate to *limit* federal intrusion on state authority.  *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 680 (2023) (clear-statement rule "preserve[s] the States' primary authority over land and water use" (internal quotation marks omitted)); *Bond v. United States*, 572 U.S. 844, 858–59 (2014) (clear statement required before Court "assume[s] that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction" (citation omitted)).  So it would be particularly perverse to create a new clear-statement rule that deprives Missouri courts of the right to interpret their own Constitution according to their own principles of construction.

### C.    If a "Clear Statement" Were Required, Missouri's Constitution Supplies It.

No "clear statement" rule applies here.  However, if the Court disagrees and finds that a "clear statement" is required, the Missouri Constitution supplies one.  Clear-statement rules are not "magic words" requirements.  *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). Instead, they "operate (when they operate) to resolve problems of ambiguity and vagueness." *Sackett*, 598 U.S. at 713 (Kagan, J., concurring in the judgment).

Here, the Missouri Constitution is perfectly clear. Article III, Section 49 reserves to the people of the State the "power to approve or reject by referendum *any* act of the general assembly, except as hereinafter provided."  Mo. Const. art. III, § 49 (emphasis added).  Section 45 of the same Article, titled "Congressional apportionment," provides for congressional redistricting by an act of the General Assembly:  "[T]he general assembly shall by law divide the state into districts corresponding with the number of [congressional] representatives to which it is entitled" under the federal decennial census.  *Id.* § 45.  Because House Bill 1, which contains the 2025 congressional-

redistricting plan, was passed by an "act of the general assembly," it plainly is subject to the referendum unless the bill falls within one of the "except[ions] . . . hereinafter provided." *Id.* § 49; *see* H.B. No. 1, 2d Extraordinary Sess., 1st Reg. Sess., 103d Gen. Assemb. (Mo. 2025) ("Be it enacted by the General Assembly of the state of Missouri, as follows: . . . ."). House Bill 1 falls within none of the exceptions for non-referable laws. It is not a "law[] necessary for the immediate preservation of the public peace, health or safety." Mo. Const. art. III, § 52(a). Nor is it a "law[] making appropriations for the current expenses of the state government, for the maintenance of state institutions [or] for the support of public schools." *Id.*

Sections 3 and 7 of Article III expressly state that no redistricting plan for the General Assembly's *House of Representatives or Senate* "shall be subject to the referendum." Mo. Const. art. III, §§ 3(i), 7(h). But Section 45 contains no such exemption from the referendum for *congressional* redistricting, ensuring that congressional-redistricting legislation is subject to referenda just like other acts of the General Assembly. The simple fact that the Constitution's framers explicitly added this language to Sections 3 and 7, yet omitted it from Section 45, resolves any doubt that congressional districting is subject to the referendum under Missouri law. *See Scott v. Farm Bureau Town & Country Ins. Co. of Mo.*, 713 S.W.3d 232, 238 (Mo. Ct. App. 2025) ("disparate inclusion or exclusion of particular language" in written law is "powerful evidence" of meaning (quotation marks omitted)); *Planned Parenthood Great Plains v. Missouri ex rel. Bailey*, 713 S.W.3d 213, 228 n.10 (Mo. Ct. App. 2025) ("Missouri precedent holds that, [w]hen statutory exceptions are plainly expressed, courts cannot add to the exceptions or exclusions beyond those explicitly provided." (alteration in original) (internal quotation marks omitted)).

None of this has been lost on the people—or the courts—of Missouri. In 1922, after the Missouri General Assembly enacted a new congressional-districting plan, *see* Act of Nov. 22,

1921, S.B. 4, 1921 Mo. Laws 17; *Laws of Missouri*, 2d Extra. Sess., 51st Gen. Assemb. at 17–19 (1921), the people of Missouri blocked its implementation by petitioning for a referendum, *see* Mo. Const. of 1875, art. IV, § 57 (1908), and then voting 62% to 38% to reject the plan, *see Official Manual of the State of Missouri*, *1923–1924*, at 286 (1923). No one filed suit challenging this use of the referendum, no doubt recognizing that such a suit would have been plainly foreclosed by *Hildebrant*.

Ten years later, in 1932, the Missouri Supreme Court cited *Hildebrant* for the proposition that the congressional "redistricting in a state should be made by the laws of the state." *State ex rel. Carroll v. Becker*, 45 S.W.2d 533, 536 (Mo.), *aff'd*, 285 U.S. 380 (1932). The court noted with approval that, in Ohio, "the referendum was a part of the lawmaking power of the state, to be asserted in approving or disapproving a redistricting act by the Legislature." *Id.*; *see id.* at 537 (holding that dividing states into congressional districts under the Elections Clause is a "legislative act" that must be "accomplished by the laws of such states," including the gubernatorial veto).

Twenty years later, the Missouri Supreme Court decided *State ex rel. Moore v. Toberman*, 250 S.W.2d 701 (Mo. 1952), concerning the timeliness of referendum petitions that voters had filed against the General Assembly's new congressional-redistricting act. The trial court had concluded that the act was "subject to the referendum provisions" in the Missouri Constitution, and the Supreme Court affirmed the trial court's judgment. *Id*. at 703 (quoting the trial court's conclusions of law); *see id.* at 707. Had the referendum been inapplicable, there would have been no need to resolve the dispute about the petitions' timeliness.

Ten years after that, the Missouri Supreme Court issued a unanimous opinion rejecting a one-person, one-vote challenge to Missouri's congressional-redistricting act, reaffirming that the referendum applied to such acts. *Preisler v. Hearnes*, 362 S.W.2d 552, 557 (Mo. 1962). The court

noted that "the people of this state have a remedy . . . [if] they do not like" the congressional plan—"through our initiative and referendum provisions." *Id.* (citing Mo. Const. art. III, §§ 49–53).

There is no "clear statement" rule applicable here, but even if there were, the Missouri Constitution clearly provides that congressional-redistricting enactments are subject to the referendum process, which the Missouri Supreme Court has repeatedly recognized. Plaintiffs have failed to state a claim for either a violation of the Elections Clause of Article I of the U.S. Constitution or of Section 45 of the Missouri Constitution. If this Court concludes that it has jurisdiction over this dispute, the complaint should be dismissed with prejudice.[15]

## III.    At a Minimum, This Court Should Abstain Pending Further State-Court Litigation.

At the very least, this Court should abstain and allow a state court to determine the rules of construction for and meaning of the Missouri Constitution, particularly in light of pending state-court litigation that has the potential to moot or narrow this case.

### A.    Plaintiffs Have Pleaded Themselves into *Pullman* Abstention.

For all the reasons discussed above, Plaintiffs' arguments fail on the merits. *See* pp. 18–28, *supra*. But to the extent this Court believes that there are serious state and federal constitutional questions here, this Court need not decide them because Plaintiffs have pleaded themselves into "[t]he paradigm case" for *Pullman* abstention. *Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 841 (8th Cir. 1998) (internal quotation marks omitted); *see R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). Given the way Plaintiffs have presented their claims to this Court, "the challenged state [law] is susceptible of a construction by the state courts that would

---

[15] This Court also can dismiss with prejudice Plaintiffs' federal Elections Clause claim, which is clearly foreclosed by precedent, and then decline to exercise supplemental jurisdiction over Plaintiffs' claim under the Missouri Constitution, which they acknowledge is a state-law claim. Compl. ¶ 24; *see* 28 U.S.C. § 1367(c)(3).

avoid or modify the [federal] constitutional question." *Beavers*, 151 F.3d at 841 (second alteration in original) (internal quotation marks omitted) (quoting *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 510 (1972)). *Pullman* teaches that such state-law questions should be answered by state courts in the first instance, *see id.*, particularly where they implicate important state interests, *see La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28 (1959).

Plaintiffs' state-law claim rests on the theory that "[b]ecause the Missouri Constitution does not specifically provide for referenda" on congressional redistricting, no such referenda are permitted. Compl. ¶ 74. Plaintiffs' federal constitutional claim, in turn, requests a declaration that a contrary construction of the Missouri Constitution would violate the federal Elections Clause. *See id.* ¶¶ 67–70. As Plaintiffs put it: "*If true*, this [alternative reading] has profound and desta-bilizing implications for Missouri's government." PI Br. 3 (emphasis added). Plaintiffs thus ask this Court to adopt a construction of the Missouri Constitution that would moot their federal claim.

Applying the Eighth Circuit's test, abstention is warranted. As to the first two factors, this Court's abstention will not affect "the right and the necessary remedy," and there are "available state remedies." *Beavers*, 151 F.3d at 841. If Plaintiffs' claims are ripe, they could be pursued as counterclaims in pending state-court litigation between many of the same parties. *See* p. 31, *infra*. As to the next factors, Plaintiffs themselves argue that the challenged state law is "unclear" and "fairly susceptible to an interpretation that would avoid any federal constitutional question." *Beavers*, 151 F.3d at 841. Indeed, Plaintiffs' entire push for a clear-statement interpretive rule is premised on the supposed ambiguity of Missouri's Constitution. As to the final factor, "abstention will avoid unnecessary federal interference in state operations." *Id.* This case presents a dispute between a state's officials and its citizens about the meaning of the state constitution. In Plaintiffs' view, "[t]he Missouri Supreme Court has never passed upon whether the referendum may be used

to revisit federal congressional redistricting." Compl. ¶ 61; *see also id.* ¶ 56 (decrying the supposed "novelty of Defendants' efforts to place the General Assembly's congressional redistricting on the ballot"). *But see* pp. 26–27, *supra* (describing the 1922 referendum). If this Court believes that issue actually is unsettled, it should allow state courts to address it in the first instance.

### B.    Pending State-Court Litigation Underscores the Need for Abstention.

Abstention is especially appropriate given the pendency of numerous live state-law cases that involve many of the same parties and related issues and that have the potential to moot this case. Courts regularly abstain when there are "overlapping legal issues between [a] pending state-court case (concerning state law, not federal constitutional law) and the case [in federal court] (concerning a federal constitutional issue)," especially where the "state court case could moot—or significantly narrow—th[e] [federal] case." *29 Greenwood, LLC v. City of Newton*, 128 F.4th 1, 4 (1st Cir. 2025) (exercising *Pullman* abstention); *see Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83 (1975) (collecting cases); *Caldara v. City of Boulder*, 955 F.3d 1175, 1183 (10th Cir. 2020) ("[T]he Supreme Court has 'regularly ordered abstention' when a case is 'pending in state court that will likely resolve the state-law questions underlying the federal claim.'" (quoting *Harris Cnty. Comm'rs Ct.*, 420 U.S. at 83)). Not only does the pendency of related state-court litigation enhance the federalism concerns that motivate abstention, but "the concern as to delay is mitigated," as well. *Caldara*, 955 F.3d at 1183.

Here, multiple independent cases currently pending in state court—two of which are set for expedited trial in a matter of days—bear on this case and counsel strongly for abstention.

One case, *Luther v. Hoskins*, No. 25AC-CC06964 (Mo. Cir. Ct. Cole Cnty. filed Sept. 12, 2025), set for trial on November 12, could moot this case altogether. There, the plaintiffs challenge the authority of the Missouri General Assembly to redraw districts before the next decennial census. *Luther* thus asks a state-law question that is antecedent to this litigation: whether the General

Assembly's congressional-redistricting enactment (at which the prospective referendum is aimed) is legally valid under the Missouri Constitution in the first place. If the state court concludes that the General Assembly lacked the power to enact the new congressional-redistricting plan under state law, this case would become moot. There would be no need to address the federal constitutional arguments at all.

Another pending state-court action, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. filed Sept. 18, 2025), set for trial on November 3, could narrow the issues here; it involves many of the same parties and questions. There, the referendum proponents sued Secretary Hoskins, alleging that he violated state law by refusing to accept for processing their pre-signature sample sheets in this very same referendum effort. *See* First Amended Petition ¶¶ 51–62, *People Not Politicians*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. filed Sept. 29, 2025) (Cossette Decl. Ex. F). That case directly implicates the Secretary of State's referendum-related obligations under state law, and Secretary Hoskins is there arguing that he "maintains that the U.S. Constitution prohibits the proposed referendum."[16] The fact that this pending state-court action involves many of the same parties as this case and that Secretary Hoskins has invoked the same arguments—that congressional redistricting enactments are not subject to referenda under the Missouri Constitution and that the federal Elections Clause forbids them[17]—further counsel for this Court to stay its hand in this declaratory-judgment action. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282–83 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942).

Beyond these expedited trials, state courts are currently considering other challenges to the

---

[16] *See* Defendants' Pretrial Brief at 29, n.5, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Oct. 31, 2025) (Cossette Decl. Ex. G).
[17] *See id.*

General Assembly's congressional redistricting plan under the Missouri Constitution that could moot this case by invalidating the plan. *See Wise v. Missouri*, Case No. 2516-CV29597 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 12, 2025) (challenging the congressional redistricting plan as violating the Missouri Constitution's timing requirement for congressional redistricting, its compactness requirement, its equal-population requirement, and its contiguity requirement); *NAACP v. Kehoe*, Case No. 25AC-CC06724 (Mo. Cir. Ct. Cole Cnty. filed Sept. 3, 2025) (challenging the Governor's proclamation convening the General Assembly to pass the congressional redistricting plan under the Missouri Constitution, as well as the General Assembly's authority to redistrict mid-decade); *Healey v. Missouri*, Case No. 2516-CV31273 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 28, 2025) (challenging the General Assembly's mid-decade redistricting authority under the Missouri Constitution, as well as the redistricting plan under the Missouri Constitution's compactness requirement).

For all these reasons, this Court should dismiss this action or hold it in abeyance and allow Missouri courts to address the state-constitutional interpretive question in the first instance. In the alternative, the Court should decline supplemental jurisdiction over Plaintiffs' state-law claim and await the resolution of the state-law issues in state court before proceeding to address any remaining federal constitutional arguments. At minimum, the Court should hold this action in abeyance pending the November 2025 trials in both *People Not Politicians* and *Luther*, which may moot or narrow the federal constitutional dispute in this case.

## IV.   The Motion for a Preliminary Injunction Should Be Denied.

Finally, this Court should deny Plaintiffs' motion for a preliminary injunction. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, Plaintiffs must establish that: (1) they are "likely to succeed on

the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20. Plaintiffs have satisfied none of those requirements.

### A.    Plaintiffs Are Unlikely to Succeed on the Merits.

Plaintiffs' arguments on the merits fail several times over. And "[w]ith no likelihood of success on the merits, there is little justification for granting a preliminary injunction." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

To start, this Court should not even reach the merits. Plaintiffs do not have Article III standing. Plaintiffs' claims are unripe. Construed as a pure declaratory action, this Court lacks federal-question jurisdiction; construed as a claim about the General Assembly's rights, Plaintiffs lack a cause of action. *See* pp. 5–18, *supra*. Those multiple defects to Plaintiffs' suit are fatal to their request for a preliminary injunction.

Assuming the Court could reach the merits, Plaintiffs still would not be entitled to injunctive relief. Plaintiffs' core argument—that Defendants' proposed referendum violates the Elections Clause—is squarely foreclosed. In cases dating back over a century, the Supreme Court has held that congressional redistricting may be subject to a state-constitutional referendum process consistent with the Elections Clause. *See* pp. 19–21, *supra*. The Supreme Court has also foreclosed—and certainly never adopted—Plaintiffs' proposed federal clear-statement rule governing interpretation of the Missouri Constitution. *See* pp. 21–25, *supra*. And in any event, such a clear-statement rule would not rescue Plaintiffs' case, because the Missouri Constitution clearly permits referenda to review congressional-redistricting enactments. *See* pp. 25–28, *supra*.

Indeed, Plaintiffs themselves appear to acknowledge that current law does not support either their federal or state-law claims. *See* Compl. ¶ 54 n.9 (urging the overruling of *Arizona State Legislature*); PI Br. 4–8 (advocating for a novel clear-statement rule that has never been applied

by any court).  Preliminary relief is particularly inappropriate when Plaintiffs will need to unsettle the law to ultimately prevail.

###    B.    Plaintiffs Will Not Suffer Irreparable Harm.

Plaintiffs have also not established that they will suffer irreparable harm absent a preliminary injunction.  That is "an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Plaintiffs' first alleged harm—that "the State and Secretary of State must commit resources and personnel to processing and facilitating the referendum," PI Br. 10—goes nowhere.  The fact that Plaintiffs have allegedly "already spent considerable resources" defending against *other* litigation in state court, *see id.*, cannot be remedied by a preliminary injunction in *this* action, and is, in all events, insufficient to justify relief.  "Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (internal quotation marks omitted).  Plaintiffs fare no better with their assertion that Secretary Hoskins "will be forced to" discharge his state-law responsibilities to verify signatures and otherwise process the referendum.  PI Br. 11.  Even assuming *arguendo* that a government official's performance of his statutory duties can be the sort of irreparable harm warranting a preliminary injunction, *but see* p. 9, *supra*, here that claim of harm is speculative and self-imposed.  Whether Secretary Hoskins will be asked to verify signatures and process the referendum is contingent on Defendants submitting a referendum petition with the requisite number of signatures, which has not yet occurred.  Even if Defendants submit such a petition, Secretary Hoskins still would not suffer any cognizable harm unless he chooses to certify a submitted referendum petition notwithstanding what he believes to be its purported constitutional defects.  Regardless, any harms he might suffer are grossly overstated.  Signature verification is ordinarily performed by local

election authorities, not the Secretary.  *See* p. 4 & n.1, *supra*.  And the costs of publishing a certified petition are covered by existing appropriations.  *See* p. 9 & n.4, *supra*.

Plaintiffs' second asserted harm—that the recently enacted congressional map could be placed on hold, PI Br. 11—is also not irreparable because it is again within Plaintiffs' control.  If Defendants in fact submit a referendum petition with the requisite number of signatures, Secretary Hoskins might refuse to certify the referendum petition.  *Cf.* Peters Decl. ¶ 15 (asserting that the Secretary of State's Office is "responsible for verifying that the referendum petition is legally sufficient").  Should the Secretary's hypothetical future certification decision survive state-court scrutiny, the recently enacted congressional map might then take effect, and Plaintiffs (including the General Assembly) would not suffer any cognizable harm at all.

In short, none of the Plaintiffs will inevitably suffer any harm, let alone an irreparable one, if a preliminary injunction does not issue in this suit.  Because the Plaintiffs have near-complete control over the referendum process once Defendants submit the referendum petition, Plaintiffs can choose to incur harms (or not) as they wish, and they can choose to force litigation over the referendum's constitutionality (or not) as they wish.  Plaintiffs cannot recast those choices as unavoidable harm in order to obtain injunctive relief.

### C.    The Balance of Equities Strongly Counsels Against an Injunction.

In contrast to the lack of harm to Plaintiffs, a preliminary injunction here would work extraordinary and irreparable harm on Defendants.

Plaintiffs ask this Court to work a remarkable interference with the referendum proponents' protected activity:  to prohibit Defendants from even "submitting a petition for referendum" to the Secretary of State.  PI Mot. 1.  Such relief against a State's own citizens would authorize a content-based and viewpoint-discriminatory infringement on the right to engage in core political speech, to seek legislative change through the referendum process, and even to simply submit paperwork

35

requesting government action.[18]  A preliminary injunction would severely limit Defendants' fundamental rights as citizens to participate in the state electoral process, which is itself an essential feature of democratic governance.  And it would nullify the significant resources that Defendants have devoted to the referendum petition.  Defendants have already spent considerable time and money gathering the signatures that Secretary Hoskins specifically authorized them to gather.[19]  Defendants will spend more still in preparing to submit signatures to Secretary Hoskins.  If Defendants are barred from even submitting their petition, all that effort and expenditure will be for naught.[20]

Because a preliminary injunction would severely infringe the referendum proponents' First Amendment rights, Plaintiffs must satisfy strict scrutiny and show that killing the referendum before it even reaches the ballot is "narrowly tailored to serve [a] compelling state interest[]." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 754 (8th Cir. 2019) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Plaintiffs cannot make such a showing:  Even if a compelling state interest were implicated here, the remedy Plaintiffs seek—shutting down all lawful political activity related to the referendum—is not remotely tailored to the alleged problem.  *Cf. Buckley v. Am.*

---

[18] The Eighth Circuit has held that "the petition clause provides no lesser or greater guarantee of free expression than the speech clause," and thus that activity falling within the Petition Clause is "subject to the same first amendment analysis" as activity falling within the Free Speech Clause. *Hoffmann v. Mayor of Liberty*, 905 F.2d 229, 233 (8th Cir. 1990).  Defendants invoke the Petition Clause nonetheless because its coverage quite literally applies to the political advocacy in which they wish to engage.

[19] *See* People Not Politicians, Quarterly Report to Missouri Ethics Commission 49–50 (Oct. 14, 2025) (Cossette Decl. Ex. E) (detailing expenditures from August 23 through September 30, 2025); Joint Stipulation of Facts and Exhibits ¶¶ 29, 32, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Oct. 28, 2025) (Cossette Decl. Ex. H) (identifying in excess of 100,000 collected signatures between September 15 and October 14, 2025).

[20] *See* People Not Politicians, Quarterly Report to Missouri Ethics Commission 49–50 (Oct. 14, 2025) (Cossette Decl. Ex. E); Joint Stipulation of Facts and Exhibits ¶¶ 29, 32, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Oct. 28, 2025) (Cossette Decl. Ex. H).

*Const. Law Found., Inc.*, 525 U.S. 182, 192 (1999) (efforts to "significantly inhibit communications with voters about proposed political change . . . are not warranted by the state interests . . . alleged to justify those restrictions").  At the very least, the remedy Plaintiffs seek "'raise[s] serious First Amendment questions, [and] that alone compels a finding that the balance of hardships tips sharply in [Defendants'] favor.'"  *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (alterations in original) (internal quotation marks omitted).

Plaintiffs cannot shrug off the severe harm to Defendants on the ground that Defendants have other theoretical avenues for participation in the political process.  *See* PI Br. 13–14.  "It goes without saying that one is not to have the exercise of [a First Amendment right] abridged on the plea that it may be exercised in some other place."  *Grayned v. City of Rockford*, 408 U.S. 104, 118 n.40 (1972) (internal quotation marks omitted).  Indeed, just two years ago, the Eighth Circuit invalidated a South Dakota law that required initiative petitions to be filed an "entire year before a general election," reasoning that, although the law allowed exercise of the petition right at an earlier time, such an "effective[] ban[]" on later-filed petitions represented an intolerable abridgement of First Amendment rights.  *SD Voice v. Noem*, 60 F.4th 1071, 1080 (8th Cir. 2023).  The government therefore cannot justify its attempted abridgement of Defendants' First Amendment right to utilize the referendum process on the ground that Defendants can still exercise their First Amendment rights through other means.

Meanwhile, Plaintiffs' complained-of harms are largely of their own making.  Plaintiffs protest that, under Missouri state law, Missouri's congressional districts might change right before candidate filing deadlines, or might not change at all before the 2026 election, if the referendum is allowed to proceed.  *See* PI Br. 12.  But those referendum deadlines and election procedures are set by laws enacted by the General Assembly.  *See, e.g.*, Mo. Rev. Stat. § 115.349 (candidate filing

37

deadlines); *id.* § 116.150.3 (timeline for certifying the petition). To the extent Plaintiffs are harmed by them, it is within the General Assembly's power to change them.

Left with little else to justify relief, Plaintiffs fret over the "precedent and incentives," PI Br. 13, that might result if Defendants can continue pursuing their referendum petition, hypothesizing that some future citizen could attempt a post-census referendum petition or a citizen initiative. But denying a preliminary injunction now does not determine the likelihood or lawfulness of those other, different citizen measures that are not before this Court. And at the very least, such hypothetical concerns cannot outweigh the very real harms to Defendants' constitutional rights and ability to participate in the democratic process that are guaranteed to occur if this Court enters a preliminary injunction.

In any event, Plaintiffs have no need to obtain a preliminary injunction *now*. Even if this Court denies the motion for a preliminary injunction and the referendum proponents submit their signatures as planned by December 11, Plaintiffs still will have ample opportunities to secure complete relief: They could litigate these issues in state court; Secretary Hoskins could refuse to certify the petition; the General Assembly could pass new legislation; and so on. Defendants, by contrast, have everything to lose if the Court issues a preliminary injunction preventing them from submitting signatures by the December 11 deadline. If that injunction issues (and is not stayed), that is the end of the road for their referendum petition. There will almost certainly be no other opportunity to put their referendum on the upcoming ballot—and even worse, they will have suffered a grievous and permanent infringement of their First Amendment rights.

### D.      A Preliminary Injunction Is Not in the Public Interest.

The public interest also demands that this Court deny Plaintiffs' request for a preliminary injunction. For one, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004

(8th Cir. 2019) (internal quotation marks omitted).  And here, Plaintiffs' requested relief would result in just that: an abridgement of Defendants' First Amendment rights.

Indeed, it is not just the First Amendment rights of the two Defendants in this case that are at issue, but the rights of the tens of thousands of Missouri citizens who have already signed the referendum petition, thereby exercising core political speech.[21]  As the Eighth Circuit has noted: "The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as core political speech."  *SD Voice*, 60 F.4th at 1078 (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) (internal quotation marks omitted)).

The Missouri electorate has a far stronger interest than Plaintiffs in any political change to the maps that govern the election of their congressional representatives.  *Cf.* Mo. Const. art. I, § 1 ("[A]ll political power is vested in and derived from the people . . . .").  The Missouri electorate also has a strong interest in using the referendum to correct any partisan distortion of the electoral process by state officials.  As the Missouri Supreme Court has recognized, partisan gerrymandering is a "legislative evil," *Preisler v. Doherty*, 284 S.W.2d 427, 435 (Mo. 1955) (citing *State ex rel. Barrett v. Hitchcock*, 146 S.W. 40, 61 (Mo. 1912)), which "threatens, not only the peace of the people, but the permanency of our free institutions," *Barrett*, 146 S.W. at 57.  When the General Assembly enacts gerrymandered districts that will undermine proper representation, Missourians have a right to voice their objections—and to secure their own constitutional right to representation in Congress—through the referendum process.  *See* Mo. Const. art. III, §§ 49, 52(a).  Allowing

---

[21] *See* Joint Stipulation of Facts and Exhibits ¶¶ 29, 32, *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Oct. 28, 2025) (Cossette Decl. Ex. H) (detailing number of signatures gathered).

Missourians to exercise that right serves a public interest of the highest order.

This Court should deny Plaintiffs' request for a preliminary injunction.[22]

## CONCLUSION

The motion to dismiss should be granted and this action should be dismissed for lack of subject-matter jurisdiction.  In the alternative, the complaint should be dismissed for failure to state a claim, or, at a minimum, held in abeyance pending further state-court litigation.  If any portion of the suit survives, the motion for a preliminary injunction should be denied.


Dated:  November 3, 2025                                    Respectfully submitted,



                                                            /s/ Jeremy A. Root
Jessica Ring Amunson*                       Jeremy A. Root, MOBAR 59451
Jonathan J. Marshall*                       Charles W. Hatfield, MOBAR 40363
Elizabeth H. Starr*                         Alexander C. Barrett, MOBAR 68695
**JENNER & BLOCK LLP**                      Alixandra Cossette, MOBAR 68114
1099 New York Ave., Suite 900               Greta Bax, MOBAR 73354
Washington, DC 20001                        **STINSON LLP**
202-639-600 (phone)                         230 West McCarty Street
202-639-6066 (fax)                          Jefferson City, MO 65101
jamunson@jenner.com                         573-636-6263 (phone)
jmarshall@jenner.com                        573-636-6231 (fax)
estarr@jenner.com                           chuck.hatfield@stinson.com
                                            jeremy.root@stinson.com
*Pro hac vice pending*                      alexander.barrett@stinson.com
                                            alixandra.cossette@stinson.com
                                            greta.bax@stinson.com

---

[22] If the Court nonetheless grants a preliminary injunction, it should reject Plaintiffs' argument that no bond is required.  Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  In the Eighth Circuit, "[c]ourts . . . have almost always required a bond before issuing a preliminary injunction."  *Richard/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).  The only exceptions are inapplicable.  It would thus be an abuse of discretion to issue an injunction with no bond.

**CERTIFICATE OF SERVICE AND COMPLIANCE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, Eastern Division, using the CM/ECF system, which will send a notice of filing to all counsel of record who have consented to service by electronic means.  I further certify that the foregoing document contains 13,572 words and appears on 40 typed pages, exclusive of matters designated for omission.

Dated:  November 3, 2025                              */s/ Jeremy A. Root*
                                                      Jeremy A. Root