# EXHIBIT B

**MISSOURI STATE AUDITOR'S OFFICE**
**FISCAL NOTE (20-063)**

**Subject**

Initiative petition from Heidi Miller regarding a proposed constitutional amendment to Article IV.  (Received May 3, 2019)

**Date**

May 23, 2019

**Description**

This proposal would amend Article IV of the Missouri Constitution.

The amendment is to be voted on in November 2020.

**Public comments and other input**

The State Auditor's office requested input from the **Attorney General's office,** the **Department of Agriculture,** the **Department of Economic Development,** the **Department of Elementary and Secondary Education,** the **Department of Higher Education,** the **Department of Health and Senior Services,** the **Department of Insurance, Financial Institutions and Professional Registration,** the **Department of Mental Health,** the **Department of Natural Resources,** the **Department of Corrections,** the **Department of Labor and Industrial Relations,** the **Department of Revenue,** the **Department of Public Safety,** the **Department of Social Services,** the **Governor's office,** the **Missouri House of Representatives,** the **Department of Conservation,** the **Department of Transportation,** the **Office of Administration,** the **Office of State Courts Administrator,** the **Missouri Senate,** the **Secretary of State's office,** the **Office of the State Public Defender,** the **State Treasurer's office, Adair County, Boone County, Callaway County, Cass County, Clay County, Cole County, Greene County, Jackson County, Jasper County, St. Charles County, St. Louis County, Taney County,** the **City of Cape Girardeau,** the **City of Columbia,** the **City of Jefferson,** the **City of Joplin,** the **City of Kansas City,** the **City of Kirksville,** the **City of Mexico,** the **City of Raymore,** the **City of St. Joseph,** the **City of St. Louis,** the **City of Springfield,** the **City of Union,** the **City of Wentzville,** the **City of West Plains, Cape Girardeau 63 School District, Hannibal 60 School District, Malta Bend R-V School District, Mehlville School District, Wellsville-Middletown R-1 School District, State Technical College of Missouri, Metropolitan Community College, University of Missouri, St. Louis Community College, University of Central Missouri, Harris-Stowe State University, Lincoln University, Missouri State University, Missouri Southern State University, Missouri Western State University, Northwest Missouri State University, Southeast Missouri State University,** and **Truman State University.**

**Heidi Miller, MD**, **Timothy McBride, PhD**, and **Abigail Barker, PhD** provided information to the State Auditor's office.

**Assumptions**

Officials from the **Attorney General's office** indicated they expect that, to the extent that the enactment of this proposal would result in increased litigation, their office can absorb the costs associated with that increased litigation using existing resources. However, if the enactment of this proposal were to result in substantial additional litigation, their office may request additional appropriations.

Officials from the **Department of Agriculture** indicated no fiscal impact on their department.

Officials from the **Department of Economic Development** indicated no impact to their department.

Officials from the **Department of Elementary and Secondary Education** indicated this legislation does not impact their department.

Officials from the **Department of Higher Education** indicated they report no fiscal impact for this initiative petition.

Officials from the **Department of Health and Senior Services** indicated they defer to the Department of Social Services to calculate the fiscal impact of the proposed legislation.

Officials from the **Department of Insurance, Financial Institutions and Professional Registration** indicated this petition, if passed, will have no cost or savings to their department.

Officials from the **Department of Mental Health** indicated they defer to the Department of Social Services for an estimate of fiscal impact.

Officials from the **Department of Natural Resources** indicated they would not anticipate a direct fiscal impact from this proposal.

Officials from the **Department of Corrections** indicated they defer to the Department of Social Services.

Officials from the **Department of Labor and Industrial Relations** indicated this initiative petition does not appear to have a fiscal impact on their department.

Officials from the **Department of Revenue** indicated this initiative petition will have no impact to their department.

Officials from the **Department of Public Safety - Office of the Director** indicated they see no fiscal impact due to this initiative petition.

Officials from the **Department of Social Services** indicated this initiative petition will impact the budgets of the Department of Social Services, Department of Mental Health, the Department of Corrections, and the Department of Health & Senior Services by proposing the expansion of Medicaid eligibility.

**Article IV, Section 36(c):**

- Today, Missouri covers custodial parents below 19% of the federal poverty level (FPL), which for a family of four is currently $4,769 per year. In addition, non-custodial adults and childless adults without other qualifying criteria are not currently eligible for Medicaid in Missouri regardless of income.

- The Affordable Care Act allows states to expand health care coverage under the Medicaid program to non-elderly, non-Medicare, low-income adults up to 133% of the FPL. The same law includes a 5% disregard of income when determining eligibility for health care benefits; thus, adults with incomes up to 138% FPL will qualify. For a family of four in Missouri, this is currently income up to $34,638 per year.

- The Family Support Division estimates a need of an additional 56 Eligibility Specialists, 6 Eligibility Supervisors, and 1 Social Services Manager to assist in enrolling new participants. The estimated cost for the new full time employees (FTEs) is $4.6 million.

- The Family Support Division estimates increased costs for the call center for eligibility questions is $9.1 million.

- MO HealthNet would need to contract with an actuary to provide actuarially sound managed care rates. MO HealthNet estimates this cost to be approximately $500,000 based on the previous scope for expansion.

- MO HealthNet estimates a need of an additional 15 Correspondence and Info Specialists, 18 Medicaid Specialists, 15 MASII, and 2 Social Services Managers to provide call center and customer service support, tracking, and reporting claims data. The estimated cost for the new FTEs is $4.1 million.

- MO HealthNet estimates changes to the Medicaid Management Information System (MMIS) would be in excess of $5 million.

- OA-ITSD estimates costs for system changes related to Medicaid Expansion to be approximately $657,000 for the first year, and $289,000 for the second year.

- The expansion of eligibility for Medicaid benefits under the proposed federal program could potentially include coverage for an estimated 250,000 additional Missourians. The costs for this expansion would be in excess of $2 billion per year. The expansion population state match would be at least 10%; however, that match is subject to change as federal law is amended. Depending on implementation requirements from CMS, there could be some costs shifted from state funds to federal funds; however, the cost of implementing this proposal will result in a significant cost in state general revenue. The overall estimated general revenue cost for implementation of this proposal is estimated to exceed $200 million.

Officials from the **Governor's office** indicated there should be no added costs or savings to their office.

Officials from the **Missouri House of Representatives** indicated no fiscal impact to their office.

Officials from the **Department of Conservation** indicated that no adverse fiscal impact to their department would be expected as a result of this proposal.

Officials from the **Department of Transportation** indicated this initiative petition would not have a fiscal impact on their department/Missouri Highways and Transportation Commission.

Officials from the **Office of Administration** indicated they are deferring to the Department of Social Services for the fiscal impact of this initiative petition.

Officials from the **Office of State Courts Administrator** indicated there is no fiscal impact on the courts.

Officials from the **Missouri Senate** indicated they anticipate no fiscal impact.

Officials from the **Secretary of State's office** indicated unless a special election is called for the purpose, Referendums are submitted to the people at the next general election. Article III section 52(b) of the Missouri Constitution authorizes the general assembly to order a special election for measures referred to the people. If a special election is called to submit a Referendum to a vote of the people, Section 115.063.2 RSMo. requires the state to pay the costs. The cost of the special election has been estimated to be $7.8 million based on the cost of the 2016 Presidential Preference Primary.

Their office is required to pay for publishing in local newspapers the full text of each statewide ballot measure as directed by Article XII, Section 2(b) of the Missouri Constitution and Section 116.230-116.290, RSMo. Funding for this item is adjusted each year depending upon the election cycle. A new decision item is requested in odd numbered fiscal years and the amount requested is dependent upon the estimated number of ballot measures that will be approved by the General Assembly and the initiative petitions

certified for the ballot. In FY (fiscal year) 2014, the General Assembly changed the appropriation so that it was no longer an estimated appropriation.

In FY19, over $5.8 million was spent to publish the full text of the measures for the August and November elections. They estimate $65,000 per page for the costs of publications based on the actual cost incurred for the one referendum that was on the August 2018 ballot.

Their office will continue to assume, for the purposes of this fiscal note, that it should have the full appropriation authority it needs to meet the publishing requirements. Because these requirements are mandatory, they reserve the right to request funding to meet the cost of their publishing requirements if the Governor and the General Assembly again change the amount or continue to not designate it as an estimated appropriation.

Officials from the **Office of the State Public Defender** indicated this initiative petition will not have any significant impact on their office.

Officials from the **State Treasurer's office** indicated no fiscal impact to their office.

Officials from the **City of Kansas City** indicated this amendment will have a positive fiscal impact on their city, in an indeterminate amount, because it will increase the benefits people receive thus freeing up their city's health levy dollars for other uses.

Officials from **State Technical College of Missouri** indicated there is no fiscal impact to their college.

**Heidi Miller, MD**, **Timothy McBride, PhD**, and **Abigail Barker, PhD** provided the following information:

May 8, 2019

Nicole Galloway, CPA
Missouri State Auditor
301 West High Street, Rm 880
Jefferson City, Missouri 65102
Sent to *moaudit@auditor.mo.gov*

Ms. Galloway,

On May 2, I submitted a constitutional amendment (2020-063) to expand access to health care for more than 300,000 Missourians. I understand that in the process of certifying this initiative for signature collection, your office will provide a fiscal note and fiscal note summary. To aid in this process, I'd like to share the attached document "Analysis of the Fiscal Impact of Medicaid Expansion in Missouri," which was funded by the Missouri Foundation for Health and produced by the Center for Health Economics and Policy at Washington University in St. Louis. I am also including a memo that was requested by your office as part of the process to develop the fiscal note for 2020-053.

To complete this analysis, Center researchers conducted reviews of other states' experiences, including reports at the national level by the Urban Institute, Robert Wood Johnson Foundation, the Commonwealth Fund, and the Centers for Medicare and Medicaid Services.  They relied upon published Missouri Medicaid enrollment and cost data as well as a prior fiscal analysis of Medicaid expansion conducted by the Department of Social Services, and the Office of Administration in the Governor's Office, in 2014.  They also carried out independent analyses of American Community Survey data and Medical Expenditure Panel Survey data.

Drawing upon these data sources and making conservative assumptions at every step, the report concludes that Medicaid expansion in Missouri is cost neutral and could create cost savings. **The best-estimate is that Medicaid expansion in Missouri will reduce the state's 2020 financial obligation by $39 million.**

If you or a member of your staff would like to meet and discuss this analysis further, I am happy to connect you with Timothy McBride PhD and Abigail Barker PhD who authored the report. Thank you for your service to Missourians and the opportunity to share this analysis to inform the fiscal note process.

Sincerely,


Heidi Miller, MD
314-400-8446
millerheidib@gmail.com



Center for Health
Economics and Policy
INSTITUTE FOR PUBLIC HEALTH AT WASHINGTON UNIVERSITY

# EXECUTIVE SUMMARY

## Analysis of the Fiscal Impact of Medicaid Expansion in Missouri
February 2019

## Introduction

Although the Affordable Care Act (ACA) of 2010 directed the expansion of Medicaid to cover all adults with incomes up to 138% of the Federal Poverty Level (FPL), a subsequent Supreme Court ruling in 2012 made this expansion optional. Thus far, 37 states have expanded their programs. This analysis estimates the impact of an expansion of Medicaid in Missouri on the state budget. The full report outlines the important background, sources of data, methods, and assumptions used to generate these estimates.  The "best estimate" of the impact on the state budget is presented, along with some sensitivity analysis to show the impact of crucial assumptions on the estimate. There are about 18-20 assumptions made in creating this analysis for 2020, but several of them are quite minor, and most of them have very little impact on the state's overall financial obligation. The most influential assumptions are highlighted and discussed in the full report.

## Results for 2020

Using the best available data we estimate that about 231,000 adults would take up Medicaid in 2020 (out of a total eligible of about 315,000) and be part of the expansion population. In addition, about 40,500 children in families with income below 138% of the FPL would be added to the Medicaid population in 2020.  This brings the total estimate of the population that could be enrolled in an expansion to 271,500.  Assuming a 4.5% annual growth rate in projecting FY2017 values to FY2020, and assuming that DSH cuts occur as currently specified in federal law, **we find that a Medicaid expansion in Missouri is approximately revenue neutral and could create cost savings**.  This analysis finds that the total state obligation (general revenue plus other sources, excluding provider tax revenues) in 2020 is about $3.245 billion in the absence of expansion and $3.206 billion in the presence of an expansion, for **a savings of about $39 million**.

| Key Assumptions | Lower Bound | Best Estimate | Upper Bound |
|---|---|---|---|
| Total New Adult Eligible Population | 270,000 | 315,000 | 360,000 |
| Average Take-up Rate | 68% | 73% | 78% |
| New Enrollee Cost, PMPM | $350 | $425 | $525 |
| % Never-Dual Who Forgo P&TD Pathway | 40% | 30% | 20% |
| **Key Findings** | | | |
| State Obligation with Expansion | $3,150.4M | **$3,206.1M** | $3,287.3M |
| State Obligation without Expansion | $3,245.0M | $3,245.0M | $3,245.0M |
| **Net Change** | **-$94.6M** | **-$38.9M** | **+$42.3M** |

In addition to our estimate, the table shows two additional estimates based on changes in the key assumptions. These estimates should be viewed as lower and upper bounds for the actual value, as many assumptions must be set at the extreme end of their likely ranges in order to obtain these values.  **The most likely result, if assumptions vary moderately in either direction from our choices, is a value that is plus or minus $30 million of the best estimate.**

## Projections, 2020-24

The last piece of the analysis is to extend these projections to 2024. As mentioned previously, we expect a cumulative effect to occur due to attrition from the permanently and totally disabled Medicaid category. Due to the significant savings expected from this population, by 2023 our projection shows the state's obligation actually declining compared to 2020. Thus, Figure 1 shows that, beginning with the "best estimate" values for 2020, and continuing to assume a 4.5% growth rate in prices and utilization, by 2024 the annual savings due to expansion is estimated to be about $932 million.  The projection also includes an annual population growth rate of 0.66% for both scenarios.



## Conclusion

This analysis has shown that expansion of Medicaid in Missouri is close to budget neutrality and actually has an estimated savings of $39 million. While this value is our best estimate, we also provide a range of -$95 million to +$42 million, which should be considered the lower and upper bounds of what the net impact to the state, within the MO Healthnet program, would be in FY2020. Other forms of savings across other departments, as well as increases to general revenue, are likely. There are numerous benefits in terms of health outcomes that have been documented in other states, many of which will likely generate economic dividends over time, as investment in a healthy workforce has been shown in other settings to create savings.

### About Missouri Foundation for Health

This report is supported by Missouri Foundation for Health, a resource for the region, working with communities and nonprofits to generate and accelerate positive changes in health. As a catalyst for change, the Foundation improves the health of Missourians through partnership, experience, knowledge, and funding.

# Analysis of the Fiscal Impact of Medicaid Expansion in Missouri



## February 2019

> *To complete this analysis, Center researchers conducted reviews of all existing documentation of other states' experiences, including reports at the national level by the Urban Institute, Robert Wood Johnson Foundation, the Commonwealth Fund, and the Centers for Medicare and Medicaid Services.  We relied upon published Missouri Medicaid enrollment and cost data as well as a prior fiscal analysis of Medicaid expansion conducted by the Department of Social Services in 2014.  We also carried out independent analyses of American Community Survey data and Medical Expenditure Panel Survey data.  Parts of the analysis were informed by a discussion with analysts at The Urban Institute.  The key assumptions were vetted by health policy staff at the Missouri Foundation for Health, the Missouri Hospital Association, the Missouri Primary Care Association, and others.*

## Introduction

Although the Affordable Care Act (ACA) of 2010 directed all states and the District of Columbia to expand their Medicaid programs to cover all adults with incomes up to 138% of the Federal Poverty Level (FPL), a subsequent Supreme Court ruling in 2012 made this expansion optional.  Initially, in 2014, 25 states expanded their programs. Subsequently, eight additional states expanded their programs through legislative action, and in 2017-18, four states passed ballot initiatives to expand.[1]  Early evidence from multiple states indicates that expansion has a positive impact on state budgets; due to the increased federal match available for expansion populations, some states have even realized net cost savings.

The goal of this analysis is to estimate the impact of an expansion of Medicaid in Missouri (to 138% of the FPL) in 2020 for the first five years of expansion on the state budget.  This report outlines the important background, sources of data, methods, and assumptions used to generate these estimates.  The "best estimate" of the impact on the state budget is presented, along with some sensitivity analysis to show the impact of crucial assumptions on the estimate.  A companion spreadsheet to this report allows the user to vary all assumptions as desired.

## Background

In the first three years after the implementation of the ACA (2014-16), expansion states received 100% federal match on spending for newly eligible populations, which ensured that states' budgets would not be negatively impacted due to upfront costs or high pent-up demand.  From 2017 to 2020, the federal matching rate is being gradually reduced to 90%.  This was expected to have a minimal impact on state budgets, given the likelihood that cost savings would ultimately occur as better access to care would both decrease uncompensated care and

increase prevention and early intervention in the course of disease treatment, resulting in very little net cost to the states.[2]  However, for states such as Missouri that did not expand Medicaid during that window, the challenge when considering a later expansion is that the federal match is initially set at 90%, meaning that the state budget must cover 10% of the costs of expansion, and any upfront costs or high pent-up demand are not fully covered.

Furthermore, prior to the ACA, Missouri's eligibility levels for parents were among the lowest in the United States. Although most states, like Missouri, previously offered no coverage to childless adults, this still creates some difficulty in applying other states' outcomes to Missouri, as the newly eligible population would contain a disproportionate share of extremely low-income parents.  Conversely, because Missouri did not expand Medicaid in 2014, a large share of otherwise eligible people with slightly higher incomes (100% to 138% FPL) obtained highly subsidized coverage through health insurance marketplaces of the ACA, and these people may now be better managing their health conditions or have less pent-up demand for health care services.  These caveats suggest that a range of values be considered as representative of the costs of the expansion population.

Finally, Missouri's reliance on provider taxes and other forms of revenue to finance its Medicaid program is much greater than in other states.[3]  Because of the magnitude of the provider tax programs, it is important to consider the role these have played in drawing down federal dollars and how this might change in an environment of Medicaid expansion.  Current federal law also specifies cuts to the Disproportionate Share Hospital (DSH) program beginning in 2020, and since Missouri's state share of DSH-eligible expenditures is financed through provider taxes, it is important to consider the potential impact of a cut to the cap on federal matching funds.

## Data and Methods

Cost and financial data for this analysis come primarily from aggregation of MO HealthNet Monthly Management Reports for fiscal year 2017, as this was the last full fiscal year of data available at the start of the project.[4]  These data have been supplemented by information on the Federal Reimbursement Allowance (FRA) from the Missouri Hospital Association (MHA), which administers that program.[5]  Supplemental cost data have also been calculated using the Medical Expenditure Panel Survey (MEPS), 2015-16.

Information on the size and composition of the population that would potentially enroll in a MO HealthNet expansion comes from census data:  the 2017 American Community Survey (ACS) has been analyzed for Missouri and checked against administrative (enrollment) counts.  In certain cases, we relied on information from a 2014 Missouri Department of Social Services (DSS) analysis of the impact of Medicaid expansion, in particular for estimating proportions of existing Medicaid eligibility groups whose incomes would qualify them for coverage under an expansion.

Methods for processing the ACS data include restricting the sample to individuals in households earning at or below 138% FPL, then combining responses to a series of questions on insured status, removing those with Medicare and Medicaid while sorting others into categories.  As detailed in the next section, we separate those with employer coverage, those with other private coverage, and those without insurance, because we assume different take-up rates will apply to these three groups.

4

## Assumptions

There are about 18-20 assumptions made in creating this analysis for 2020, but several of them are quite minor, and most of them have very little impact on the state's overall financial obligation.  We highlight and discuss the most influential assumptions below, including ways in which other states' experience may inform that of Missouri, and conclude with a list of other assumptions made.

- **How many adults will enroll?**

   The Kaiser Family Foundation (KFF) estimated for Missouri in 2016 that 199,000 uninsured adults would be eligible for Medicaid under an expansion, which excludes those currently buying Marketplace coverage (about 72,500 with incomes below 138% FPL in 2018[6]) as well as those already eligible but not enrolled.[7] This suggests a total of at least 271,500 adults *eligible*.  The Urban Institute estimates a total of 352,000 new enrollees (non-elderly adults and children) in Missouri *will actually enroll* in the event of an expansion.[8]

   Our own analysis of ACS data indicates that roughly 458,000 nonelderly adult citizens of Missouri with incomes below 138% of the FPL are potentially eligible for expansion, including about 190,000 uninsured adults, 72,400 with private coverage from another source, and 195,750 adults with employer-sponsored insurance (ESI) coverage.  Looking first at the currently uninsured population, there is some literature available on take-up rates: Urban Institute has found an average 73% take-up across existing expansion states, although they note that actual take-up rates have varied by state due to factors such as executive branch commitment, the role of private organizations, the political climate, etc.  **We apply a 73% take-up rate to the ACS-based estimates of about 190,000 uninsured.**

   We assume that a small number of those with ESI may be willing to take up Medicaid and drop their ESI coverage, which is known as "crowd out."  According to KFF, studies exploring the potential for Medicaid expansion to crowd out private insurance have found mixed results, with most showing no evidence of crowd out and some showing slight declines in private coverage in expansion states following expansion. **We use a 10% crowd-out rate.**

   As noted, the ACS indicates that about 72,400 adults age 18-64 below 138% of the FPL hold private non-ESI coverage, meaning they likely purchase it directly from an insurance company (potentially subsidized through the Health Insurance Marketplaces).  Since all Medicaid coverage has a zero premium, making this the dominant choice for such individuals, **we assume that all (100%) of those with other private coverage would take up Medicaid coverage.**

   Combining these assumptions, we estimate that about 231,000 adults would take up Medicaid in 2020 and be part of the expansion population.  (Note that this is equivalent to an average take-up rate of 73% applied to a combined potential adult population of about 315,000.)

- **How many kids will enroll?**

   Our estimate includes the possibility that some children who are currently eligible for Medicaid but are enrolled in private coverage or uninsured may enroll during an expansion, which is reflected in an

increased budget for kids at the standard match.  Analysis of the data for children under age 18 and with family income below 138% of the FPL suggests that about 30,000 children are currently uninsured, that roughly 15,000 children have private, non-ESI coverage, and that 77,000 have ESI coverage derived from a parent.  That there remain any uninsured children under 138% of the FPL may seem perplexing since all are currently eligible for Medicaid and have been for years.  On the other hand, there are several reasons that some parents may have chosen not to sign their eligible children up for Medicaid.  These include: stigma, lack of awareness that they are eligible, barriers to obtaining coverage (complexity of the system and many bureaucratic requirements), parents' immigration status, and the possibility that if the children are very healthy the parents may not see the need to obtain coverage.

Experience from ACA implementation has shown that a large number of children have obtained coverage due to ACA coverage expansions even though they were eligible prior to 2014, in what is often characterized as the "woodwork effect."  For this and other reasons, we assume that some children will obtain coverage after a Medicaid expansion, but also that there remain some underlying reasons why some children will never be signed up for coverage.  **We assume take-up rates of 66%, 9%, and 90% respectively (reducing the adult values of 73%, 10%, and 100% by 10%) for a total of about 40,000 kids being added to Medicaid at the standard match.**  Note that a few higher-income kids would likely enroll in SCHIP, pay premiums, and be eligible for the enhanced FMAP associated with that program, which is not reflected in the model.

**The assumptions made here imply that about 40,500 children who are citizens and in families with income below 138% of the FPL would be added to the Medicaid population in 2020.  This brings the total estimate of the population that could be enrolled in an expansion to 271,500.**

- **How much will the adult expansion population cost?**

As noted above, a range of information is available to address this question.  One option is to use the average cost of a current adult, non-pregnant recipient who is not aged, blind, or disabled (ABD).  In FY17, this was $459/month, including pharmacy, which represented about 25% of that cost.  Evidence from other states suggests that the new enrollees will be less expensive, possibly not initially, but after the first couple of years.  Since Missouri's eligibility level is so low, it suggests that the average cost may not be representative of the general Medicaid expansion population, who may be healthier.

Another approach is to analyze Medical Expenditure Panel Survey (MEPS) data, which is not Missouri specific, but which can generate average total health expenditures across demographic groups (age, gender) and self-reported health status.  These average costs can then be combined with CPS data in which counts of the eligible population by age, gender, and self-reported health status in Missouri are specified.  When analyzing costs for low-income Midwestern MEPS respondents with public insurance or no insurance, this method gives an estimated cost of about $340/month in 2018 dollars.  This is likely a low estimate due to some uninsured people not seeking needed care.

Other states have reported data on this issue, but it is difficult to separate out the costs of the truly newly eligible, who are more likely to be relatively healthy, and the spend-down population, who are by

6

definition incurring unusually high costs.  The latter group – or the subset who are eligible for expansion by reason of their income – typically becomes incorporated into the expansion cost data. We assess this group separately in the next section. To inform our estimate, we reviewed analyses from several Medicaid expansion states as well as considering a CMS report that summarizes data on expenditures for expansion states.[9]  We expect that the newly eligible population will be slightly healthier and less expensive than the current adult non-ABD population, i.e., custodial parents with incomes less than 20% FPL.

**We use a cost estimate of $425/PMPM for the newly eligible**, but we consider a range from $350 to $525, noting that a bell-shaped distribution applies to this (and all) estimates and that the extreme ends of the range are considered unlikely.

- **How much can be saved on the spend-down population?**

FY2017 enrollment data show that about 8.5% of the ABD population is considered "spenddown."  This category of individuals earns too much to qualify for Medicaid, but are able to gain Medicaid coverage by documenting their high out-of-pocket costs that effectively reduce their income to the qualifying level. Fiscal data show that total spending across the entire ABD population is about $5.7 billion.  If we assume proportionality, then about $480 million is spent by this population.  (In fact, it is likely much greater than this.  A Kaiser report found in 2012 that on average, the medically needy population in 2009 was 5% of enrollment but incurred 11% of costs, and this is a similar group.)[10]  Thus, when estimating spending on this population, we make the conservative assumption that they are 25% more expensive than proportionality would suggest.

Data from Arkansas show that their spend-down disabled population was actually reduced by 87.2% pre/post expansion (although the overall size of the population was much smaller to start), allowing significant savings to occur through the increased match.[11]  Washington state expected savings of $35 million in FY2015 (year two of implementation)[12] on a pre-ACA spend-down population of about 12,000.[13] Missouri's population averages about 19,000, so a savings of $55 million by year two would be predicted on this basis.

Finally, an earlier DSS analysis found that about 14.5% of the spend-down population would qualify for expansion – because this subgroup of individuals are not on Medicare and have incomes between 85% and 138% FPL, so they would be immediately eligible under the Medicaid expansion without having to spend down first – so we use 14.5% of 8.5% of the original permanently and totally disabled (PT&D) spending, scaling up by 25% as mentioned above, to determine that **about $70.7 million in P&TD spending would be subject to the new 90% match, saving about $17.4 million.**

- **How much can be saved on the disabled population that never becomes dual eligible?**

Previous DSS analysis of enrollment patterns found that about 47% of persons who applied for Supplemental Security Income (SSI) benefits did not ever become disabled according to that standard and thus were not ultimately dually Medicare- and Medicaid-eligible.  That analysis also made the assumption that about 25% of this group, on a rolling basis, would not elect to apply for Medicaid through obtaining P&TD eligibility if they were instead eligible through an expansion.  This translates into about a 4.9%

7

annual rate of attrition from the standard match rate and to the 90% match rate: each year, 4.9% of the total P&TD enrollment will be replaced by expansion-population enrollment.[14]  This is one key assumption in the model that has a cumulative impact over time, which will be reflected in the five-year horizon analysis.  We do assume that the impact tapers off over the course of the five years.

Data from Arkansas show that their disabled SSI population was actually reduced by 6.6% pre/post expansion, allowing significant savings to occur through the increased match.[15] They expected to save $45 million in FY2016.  Kentucky expected to save $8 million in FY2015.  In Oregon, new enrollees seeking disability determinations dropped by 80% in one year.[16]

Of the 47% who never become dually eligible, **we assume 30% of them will forgo the P&TD pathway in the presence of an expansion**.  This represents a slight increase from the assumption made in the previous DSS analysis, informed by the experiences of several states and resulting in an overall annual attrition rate of 4.9% and corresponding to about a $55 million savings in FY2020 (similar to Arkansas when adjusted for inflation and the size of its P&TD population).  We also note that this is a key driver of cost savings, and every effort should be made to strategize the best way to create fiscal savings while ensuring that those with some level of disability are making the best choice for their situation.

- **What is the growth rate of spending (inflation) and of the population likely to be?**

Growth rates in Medicaid spending, not including growth due to enrollment changes, has averaged 4-5% over the past several years.  This includes inflation, measured by the CPI, which is typically about 2%.  The remainder of growth is due to what may be broadly termed "utilization" and refers to the amount and intensity of services needed by the enrolled population.  **An annual spending growth rate of 4.5% is used**, and when projecting forward to 2024, we also add in a population growth rate of 0.66% annually to ensure that we adequately account for the fact that the much more inclusive "expansion population" eligibility category may increase proportional to Missouri's average population growth rate.  We note that by 2024 and beyond, it is likely that utilization growth may be arrested and may even reverse slightly due to increased access to preventive care and primary care services, but this is not reflected in our estimates.

- **What other assumptions are needed?**

All programs for adults not required by law are subsumed into Medicaid expansion, and all spending on these programs receives the 90% match instead of the standard match.  This includes Blind Pensions, Presumptive Eligibility, Ticket to Work Health Assurance, Breast/Cervical Cancer Treatment, and Women's Health Services.  This generates significant savings, in particular, on Medicaid for Pregnant Women in Poverty, as 94% of participants (about 13,000) would be eligible under expansion according to prior DSS analysis.  A total of about 19,000 beneficiaries would be converted to expansion and receive the 90% match (not counting the enrollment of about 68,000 in Women's Health Services).

We also assume that the FRA rate would decline somewhat due to an expansion, both because some of the funding is tied to uncompensated care and because of internal MHA formulas that ensure fairness across hospitals with varying Medicaid patient volume.  A related assumption is that DSH allotments would be reduced further (based upon published information about DSH reduction methodology[17]) if

8

Missouri expands Medicaid and thus has less uncompensated care.  Also related is our assumption regarding "direct Medicaid FRA" spending – spending that is administered by MHA outside the state budget and helps "top up" the low reimbursement rates to hospitals – which is that because about 4% of total hospital spending is made in relation to claims for P&TD patients who would become expansion population, this spending will also receive a higher match.

## Results for 2020

Assuming a 4.5% annual growth rate in projecting FY2017 values to FY2020, and assuming that DSH cuts occur as currently specified in Federal law, **we find that a Medicaid expansion in Missouri is approximately revenue neutral and could create cost savings**.  With the assumptions outlined in the previous section, we find that the total state obligation (general revenue plus other sources, excluding provider tax revenues) in 2020 is about $3.245 billion in the absence of expansion and $3.206 billion in the presence of an expansion, for **a savings of about $39 million**.

|  | Lower Bound | Best Estimate | Upper Bound |
|---|---|---|---|
| Total New Adult Eligible Population | 270,000 | 315,000 | 360,000 |
| Average Take-up Rate | 68% | 73% | 78% |
| New Enrollee Cost, PMPM | $350 | $425 | $525 |
| % Never-Dual Who Forgo P&TD Pathway | 40% | 30% | 20% |
| State Obligation with Expansion | $3,150.4M | **$3,206.1M** | $3,287.3M |
| State Obligation without Expansion | $3,245.0M | $3,245.0M | $3,245.0M |
| **Net Change** | **-$94.6M** | **-$38.9M** | **+$42.3M** |

In addition to our estimate, the table shows two additional estimates based on changes in the key assumptions discussed above.  These estimates should be viewed as lower and upper bounds for the actual value, as many assumptions must be set at the extreme end of their likely ranges in order to obtain these values.  **The most likely result, if assumptions vary moderately in either direction from our choices, is a value that is within +/- $30m of our best estimate.**  Nonetheless, for transparency in communicating the importance of key assumptions, we show:

- A worst-case scenario, in terms of immediate fiscal impact, would occur due to higher than expected take-up rates and PMPM costs, along with lower numbers of P&TD applicants switching to the expansion eligibility pathway and smaller costs currently associated with the P&TD spenddown population.  With all worst-case assumptions in place, the state obligation under expansion is estimated to be $3.287 billion, or $42 million higher than the $3.245 billion in the non-expansion case.
- A best-case scenario, in terms of immediate fiscal impact, would occur due to lower than expected take-up rates and PMPM costs, along with higher numbers of P&TD applicants switching to the expansion eligibility pathway and larger costs currently associated with the P&TD spenddown population.  With all best-case assumptions in place, the state obligation under expansion is estimated to be $3.150 billion, or $95 million lower than the $3.245 billion in the non-expansion case.

Note that this is a very narrowly defined impact insofar as higher take-up rates are associated with more individuals obtaining coverage and needed medical services, which is likely to have social and economic benefits beyond the MO HealthNet program.

Finally, we consider the possibility that DSH cuts are postponed or eliminated, and we find that the state budget improves in both cases.  The gap between expansion and non-expansion widens slightly – assuming that DSH cuts would be more dramatic in the case of expansion – but in general the outcomes are similar: costs are higher ($3.213 billion) without expansion than they are with expansion ($3.159 billion).

For the assumptions corresponding to our "best estimate," the resulting costs are compared in Figure 1.  The first two columns are expenditures and sourcing in 2020 without expansion, and the last two columns are expenditures and sourcing with expansion.  Of note are the labeled gold rectangles which represent the state's obligation from general revenue and other funds (not including provider taxes).

**Figure 1.**



## Projections, 2020-24

The last piece of the analysis is to extend these projections to 2024.  As mentioned previously, we expect a cumulative effect to occur due to attrition from P&TD enrollment, which is included.  Due to the significant savings expected from this population, by 2023 our projection shows the state's obligation actually declining compared to 2020.  Another factor that also contributes is the DSH cuts, which in an expansion scenario are less challenging for the state budget due to more FRA provider tax revenues being able to be spent on expansion-eligible individuals, thereby receiving a 90% match that is not limited by the DSH cap, which applies to uncompensated care.

Thus, Figure 2 shows that, beginning with the "best estimate" values for 2020, and continuing to assume a 4.5% growth rate in prices and utilization, by 2024 the annual savings due to expansion is estimated to be about $932 million.  The projection also includes an annual population growth rate of 0.66% for both scenarios.

**Figure 2.**



Not reflected in this projection is the likelihood that better access to care, especially access to prevention and management of chronic conditions, is likely to have a dampening effect on growth of costs for both the expansion population as well as the P&TD population over time.  These effects may occur at significant rates after the first few years of expansion.

Also not reflected is the possibility that the Federal Matching Assistance Percentage (FMAP) may not be constant over the five years.  Since the FMAP formula is determined based on a state's per capita income relative to the U.S. average, it is difficult to predict.  However, it has fallen over the past few years, suggesting Missouri has been more stagnant than some other states, so it seems reasonable to make the neutral assumption that the FMAP does not change.

11

## Additional Considerations

Although not explicitly modeled here, our review of other states' experience suggests a positive fiscal impact to the state budget due to savings within the Department of Corrections, savings within the Department of Mental Health, and increased tax revenues due to the increase in paid health care services.[18]

States that have expanded have seen health care-related savings in their correction budgets for newly Medicaid-eligible prisoners who are treated in an inpatient medical facility outside of the state correctional system. Kentucky has estimated savings of $5.4 million in SFY 2014 and $11.0 million in SFY2015 from replacing state general funds with Medicaid funds for hospital inpatient costs of prisoners.  Though we are unable to find updated estimates, the Missouri Department of Corrections previously estimated (for the prior DSS expansion analysis) that inmates in Missouri incur an average of 150 inpatient bed days outside of a corrections facility per month, for a savings of about $3.1 million in 2020.  That analysis also estimated savings of $6.9 million in 2020 due to reduced recidivism.

There is some concern about cost containment, with respect to the relatively healthy expansion population who would doubtless be enrolled in managed care, because of Missouri's limited ability to accurately assess – and compensate – managed care companies' exposure to and management of risks, and even to accurately convey enrollees' information to managed care companies.  With current technology and staffing limitations, there is a chance that costs will not be well contained in a managed care setting.  However, information technology upgrades are in the beginning stages of a six-to eight-year timeline, with significant funding in the governor's FY2020 budget recommendation to achieve the IT capabilities for modernizing existing payment methodologies, even in the context of an unexpanded program.

On this point, a recent Commonwealth Fund analysis of 10 Medicaid expansion states finds:

> "States have made health system reform a core element of their Medicaid expansions, with the aim of improving access, quality, efficiency, and population health. States have sought to incorporate evidence-based practice and payment strategies, with an emphasis on populations likely to benefit from improved care management and on better integration of treatment for physical and behavioral health problems. Seven of 10 are directly engaged in provider payment and delivery system reform. Agencies noted the importance of experienced provider networks in addressing complex health and social needs, along with managed care's role in quality improvement and payment reform. States embrace their roles as payers and health care innovators, identifying stability of both coverage and the underlying federal policy environment as key factors."[19]

It is our recommendation that these issues be brought to the forefront in any discussion of Medicaid expansion, with barriers to implementation of such innovations identified and addressed as far in advance as possible of the addition of new enrollees to the program.  An ongoing commitment of resources, especially staffing, will be critical in realizing the potential savings from cost containment.

## Conclusion

This analysis has shown that expansion of Medicaid in Missouri is close to budget neutrality and actually has an estimated savings of $39 million.  While this value is our best estimate, we also provide a range of -$95 million to +$42 million, which should be considered the lower and upper bounds of what the net impact to the state, within the MO Healthnet program, would be in FY2020.  Other forms of savings across other departments, as well as increases to general revenue, are likely.  There are numerous benefits in terms of health outcomes that have been documented in other states, many of which will likely generate economic dividends over time, as investment in a healthy workforce has been shown in other settings to create.

Furthermore, there is a current net outflow of dollars from Missouri due to its lack of expansion.  In 2015, Missouri residents sent a total of $64.1 billion to the Federal government in the form of income taxes, which was 1.95% of the U.S. total.  In FY2015, Missouri received $6.28 billion back from the federal government for Medicaid, which was only 1.80% of the U.S. total.  Roughly, this difference of 0.15% of total U.S. income taxes collected represents about $500 million leaving the state each year and is therefore an economic loss to the state.  Conversely, spending within the state spurs job creation, increasing incomes and tax revenues in the state.

Although we find expansion to be roughly revenue neutral, we caution that some assumptions (in particular, the size of the new population) are fairly uncertain prior to implementation.  Other estimates could be honed with recent data available internally to DSS analysts.  The cost estimates for the newly eligible, however, really depend upon how well Missouri can commit to modernizing and improving its relationship with managed-care companies.  Costs have the potential to be well contained, based upon evidence in other states, but modern infrastructure may be required to accomplish this in Missouri while maintaining and improving delivery of services for lower-income Missourians throughout the state.

## About Missouri Foundation for Health

This report is supported by Missouri Foundation for Health, a resource for the region, working with communities and nonprofits to generate and accelerate positive changes in health. As a catalyst for change, the Foundation improves the health of Missourians through partnership, experience, knowledge, and funding.

**Notes**

[1] Idaho, Nebraska, and Utah passed ballot initiatives in November 2018, while Maine passed an initiative in November 2017 that has been opposed by the governor.

[2] U.S. Congressional Budget Office, 2009.  Cited by U. S. Supreme Court, "National Federation of Independent Business, et al v. Sebelius, Secretary of Health and Human Services, et al. (2012), page 43. https://www.semissourian.com/files/health-care-opinion.pdf

[3] https://www.kff.org/medicaid/fact-sheet/states-and-medicaid-provider-taxes-or-fees/

[4] https://dss.mo.gov/re/fsd_mhdmr.htm

[5] http://www.mhanet.com/mhaimages/FRA/FRA_Interactive_Tutorial.zip

[6] Calculated from Health Insurance Marketplace enrollment data available from the Assistant Secretary of Planning and Evaluation, Department of Health and Human Services.

[7] https://www.kff.org/medicaid/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/

[8] https://www.urban.org/research/publication/implications-medicaid-expansion-remaining-states-2018-update

[9] https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf

[10] https://kaiserfamilyfoundation.files.wordpress.com/2013/01/4096.pdf

[11] http://www.arkleg.state.ar.us/assembly/2017/Meeting%20Attachments/836/I14804/TF%20FinalDraftReport.12-14-2016.pdf

[12] https://www.rwjf.org/content/dam/farm/reports/issue_briefs/2016/rwjf419097

[13] Data obtained by FOIA request from Washington State Healthcare Authority, November 27, 2018.

[14] This value was calculated by applying the 47% and the 30% to the average number of new applicants, which is about 4400 monthly in FY2017, on a cumulative monthly basis.  The result is about 7445 enrollees who are never added to the P&TD population (which averages about 151,000), each year.  This is about 4.9%.

[15] http://www.arkleg.state.ar.us/assembly/2017/Meeting%20Attachments/836/I14804/TF%20FinalDraftReport.12-14-2016.pdf

[16] https://www.rwjf.org/content/dam/farm/reports/issue_briefs/2016/rwjf419097

[17] https://www.federalregister.gov/documents/2017/07/28/2017-15962/medicaid-program-state-disproportionate-share-hospital-allotment-reductions

[18] https://www.rwjf.org/content/dam/farm/reports/issue_briefs/2016/rwjf419097

[19] https://www.commonwealthfund.org/publications/issue-briefs/2017/oct/medicaid-payment-and-delivery-system-reform-early-insights-10

**MEMORANDUM**

**To:** Susan Beeler, Office of the Missouri State Auditor
**From:** Abigail Barker, PhD and Timothy McBride, PhD
　　　Center for Health Economics and Policy, Washington University
**Subject:** Analysis of the Fiscal Impact of Medicaid Expansion in Missouri
　　　Revised Projections for FY2022-26
**Date:** April 10, 2019

In our recent report analyzing the fiscal impact of a Medicaid expansion to the state's Medicaid budget, we produced estimates for FY2020 and extended these projections to 2024. Per your request, we have changed the timeframe of the projections to FY2022-26. The revised numbers reflect (1) trending forward the FY2017 fiscal data for 5 years rather than 3; (2) trending forward the assumed PMPM cost of newly eligible adults and newly enrolling children by 2 years; and (3) eliminating the phase-in of DSH cuts, which is slated to occur in FY2020, and assuming the full DSH cuts for all 5 years.

The figure below shows that, beginning with the "best estimate" values for 2022, and continuing to assume a 4.5% growth rate in prices and utilization, by 2026 the annual savings due to expansion is estimated to be about $1.013 billion. The projection also includes an annual population growth rate of 0.66% for both scenarios.



As mentioned previously, we expect a cumulative effect to occur due to attrition from P&TD enrollment. Due to the significant savings expected from this population, by 2023 our projection shows the state's obligation actually declining compared to 2022. By 2026, we assume a total decline of about 27% of the current P&TD population as individuals elect to obtain Medicaid coverage through expansion rather than application through the disability determination process. As P&TD enrollees incur very high costs on average, and the state can save about 25% of all costs associated with these individuals, this is a key driver of the savings over time.

The State Auditor's office did not receive a response from **Adair County, Boone County, Callaway County, Cass County, Clay County, Cole County, Greene County, Jackson County, Jasper County, St. Charles County, St. Louis County, Taney County,** the **City of Cape Girardeau,** the **City of Columbia,** the **City of Jefferson,** the **City of Joplin,** the **City of Kirksville,** the **City of Mexico,** the **City of Raymore,** the **City of St. Joseph,** the **City of St. Louis,** the **City of Springfield,** the **City of Union,** the **City of Wentzville,** the **City of West Plains, Cape Girardeau 63 School District, Hannibal 60 School District, Malta Bend R-V School District, Mehlville School District, Wellsville-Middletown R-1 School District, Metropolitan Community College, University of Missouri, St. Louis Community College, University of Central Missouri, Harris-Stowe State University, Lincoln University, Missouri State University, Missouri Southern State University, Missouri Western State University, Northwest Missouri State University, Southeast Missouri State University,** and **Truman State University.**

**Fiscal Note Summary**

State government entities are estimated to have one-time costs of approximately $6.4 million and an unknown annual net fiscal impact by 2026 ranging from increased costs of at least $200 million to savings of $1 billion. Local governments expect costs to decrease by an unknown amount.