IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MISSOURI GENERAL ASSEMBLY, ET AL.,

    *Plaintiffs,*

        v.

RICHARD VON GLAHN, ET AL.,

    *Defendants.*

Case No. 4:25-cv-01535-ZMB

**REPLY IN SUPPORT OF THE STATE OF MISSOURI'S MOTION FOR A
PRELIMINARY INJUNCTION AND RESPONSE IN OPPOSITION
<u>TO DEFENDANTS' MOTION TO DISMISS</u>**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 3

   I.   Missouri remains likely to succeed on the merits. ............................................ 3

      A.   A clear statement rule applies here to protect the General Assembly's authority. ........................................................................................... 4

      B.   Missouri law does not contain a clear statement permitting the referendum to extend to congressional-redistricting .......................................... 7

      C.   If the Court concludes that some part of Missouri law subjects federal redistricting bills to the initiative-and-referendum process, it should find that provision unconstitutional ................................................................. 10

  II.   This case is justiciable. ...................................................................................... 12

      A.   The Secretary of State faces a direct injury. ............................................ 12

      B.   The General Assembly has standing. ....................................................... 16

      C.   Plaintiffs' declaratory claims are ripe ...................................................... 19

  III. Plaintiffs have an equitable cause of action to vindicate the General Assembly's right under the Elections Clause ....................................................................... 23

  IV. The Court has Federal Question Jurisdiction. ................................................... 27

  V.   Abstention is not warranted. .............................................................................. 28

  VI. Plaintiffs easily satisfy the factors for a preliminary injunction. ................... 31

CONCLUSION ......................................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................. 37

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                              Page(s)

*Abbott v. Perez,*
    585 U.S. 579 (2018) .................................................................... 19, 24, 33

*ACLU of Mo. v. Ashcroft,*
    577 S.W.3d 881 (Mo. Ct.  App. 2019)............................................... 22, 30

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*
    594 U.S. 758 (2021) ................................................................................ 31

*Allegheny Cnty. v. Frank Mashuda Co.,*
    360 U.S. 185 (1959) ......................................................................... 28, 29

*Am. Farm Bureau Fed'n v. EPA,*
    792 F.3d 281 (3d Cir. 2015)................................................................... 13

*ANR Pipeline Co. v. Corp. Comm'n of Okl.,*
    860 F.2d 1571 (10th Cir. 1988) ........................................................ 27, 28

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015) ...................................................................... passim

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
    570 U.S. 1 (2013) .................................................................................... 4

*Armstrong v. Exceptional Child Center, Inc.,*
    575 U.S. 320 (2015) ............................................................................... 23

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) ............................................................................... 19

*Baker v. Carr,*
    369 U.S. 186 (1962) ................................................................................. 6

*BASF Corp.,*
    50 F.3d .................................................................................................. 28

*Beavers v. Ark. State Bd. of Dental Exam'rs,*
    151 F.3d 838 (8th Cir. 1998) ....................................................... 29, 30, 31

*Buckley v. Am. Const. Law Found.,*
    525 U.S. 182 (1999) ............................................................................... 32

*Bush v. Gore,*
    531 U.S. 98 (2000) ............................................................................... 5

*Carson v. Simon,*
    978 F.3d 1051 (8th Cir. 2020) ................................................... 24, 27

*City of Kennett v. EPA,*
    887 F.3d 424 (8th Cir. 2018) ....................................... 2, 12, 13, 14

*Colo. River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976) ........................................................... 2, 28, 31

*Copenhaver v. Ashcroft,*
    697 S.W.3d 601 (Mo. Ct. App. 2025) ............................................. 14

*Dobrovolny v. Moore,*
    126 F.3d 1111 (8th Cir. 1997) ...................................................... 32

*Edmonson v. Leesville Concrete Co.,*
    500 U.S. 614 (1991) ................................................... 25, 26, 27, 32

*Ex parte Siebold,*
    100 U.S. 371 (1880) ........................................................................ 4

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................ 5

*George v. Parratt,*
    602 F.2d 818 (8th Cir. 1979) ........................................................ 30

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ...................................................................... 33

*Greater Yellowstone Coal. v. Flowers,*
    321 F.3d 1250 (10th Cir. 2003) .................................................... 34

*Green Room LLC v. Wyoming,*
    --- F.4th ---, 2025 WL 2999673 (10th Cir. Oct. 27, 2025) ............ 23

*Hawke v. Smith,*
    253 U.S. 221 (1920) ........................................................................ 6

*Holdings, LLC v. OSHA,*
    17 F.4th 604 (5th Cir. 2021) ......................................................... 15

*Hunter v. Page Cnty.,*
    102 F.4th 853 (8th Cir. 2024) ................................................. 28, 29

*Initiative and Referendum Institute v. Walker,*
    450 F.3d 1082 (10th Cir. 2006) ................................................................ 20

*Kennedy v. Ferguson,*
    679 F.3d 998 (8th Cir. 2012) .................................................................... 13

*Ketcham v. Blunt,*
    847 S.W.2d 824 (Mo. Ct. App. 1992) ....................................................... 16

*Lance v. Coffman,*
    549 U.S. 437 (2007) ................................................................................. 24

*Lexington Ins. Co. v. Integrity Land Title Co.,*
    721 F.3d 958 (8th Cir. 2013) .................................................................... 27

*Lugar v. Edmondson Oil Co.,*
    457 U.S. 922 (1982) ................................................................................. 25

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................. 16

*McCarty v. Sec'y of State,*
    710 S.W.3d 507 (Mo. banc 2025) ............................................................. 14

*Meyer v. Grant,*
    486 U.S. 414 (1988) ................................................................................. 32

*Miller v. Thurston,*
    967 F.3d 727 (8th Cir. 2020) .................................................................... 32

*Minn. Citizens Concerned for Life v. FEC,*
    113 F.3d 129 (8th Cir. 1997) .................................................................... 21

*Missouri Highway,*
    112 F.3d ................................................................................................. 28

*Moore v. Harper,*
    600 U.S. 1 (2023) ............................................................................. 4, 7, 24

*NFIB v. OSHA,*
    595 U.S. 109 (2022) ................................................................................... 9

*Ohio ex rel. Davis v. Hildebrant,*
    241 U.S. 567– (1916) ....................................................................... 4, 6, 8

*Org. for Black Struggle v. Ashcroft,*
    978 F.3d 603 (8th Cir. 2020) .................................................................... 33

*Parrish v. Dayton*,
    761 F.3d 873 (8th Cir. 2014) ...................................................................... 20

*Pennsylvania v. Wheeling & B. Bridge Co.*,
    50 U.S. (9 How.) 647 (1850) ...................................................................... 25

*Preisler v. Sec'y of State*,
    341 F. Supp. 1158 (W.D. Mo. 1972) ........................................................ 34

*Priesler v. Hearnes*,
    362 S.W.2d 552 (Mo. banc 1962) ................................................................ 8

*Pub. Water Supply Dist. No. 8 of Clay Cnty. v. City of Kearney*,
    401 F.3d 930 (8th Cir. 2005) ...................................................................... 20

*R.R. Comm'n of Tex. v. Pullman Co.*,
    312 U.S. 496 (1941) ..................................................................................... 31

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ..................................................................................... 34

*SD Voice v. Noem*,
    60 F.4th 1071 (8th Cir. 2023) .................................................................... 32

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ..................................................................................... 19

*Siler v. Louisville & Nashville R.R. Co.*,
    213 U.S. 175 (1909) ....................................................................................... 5

*Sisney v. Kaemingk*,
    15 F.4th 1181 (8th Cir. 2021) .................................................................... 29

*Smiley v. Holm*,
    285 U.S. 355 (1932) ....................................................................................... 7

*St. Paul Area Chamber of Com. v. Gaertner*,
    439 F.3d 481 (8th Cir. 2006) ............................................................... 20, 21

*State ex rel. Gordon v. Becker*,
    49 S.W.2d 146 (Mo. banc 1932) .................................................................. 8

*State ex rel. Moore v. Toberman*,
    250 S.W.2d 701 (Mo. banc 1952) ............................................................... 9

*State ex rel. Nixon*,
    34 S.W.3d 122 (Mo. banc 2000) ............................................................... 17

*State ex rel. Saupe v. Swink,*
    475 S.W.2d 466 (Mo. Ct. App. 1971) ...................................................... 30

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ........................................................................................ 13

*Sweeney v. Ashcroft,*
    652 S.W.3d 711 (Mo. Ct. App. 2022) ...................................................... 16

*Tex. Voters All. v. Dallas Cnty.,*
    495 F. Supp. 3d 441 (E.D. Tex. 2020) ...................................................... 24

*Texas v. United States,*
    523 U.S. 296 (1998) ...................................................................................... 21

*United States v. Gradwell,*
    243 U.S. 476 (1917) .................................................................................... 4, 5

*Va. Off. for Prot. & Advoc. v. Stewart,*
    563 U.S. 247 (2011) ................................................................................ 23, 25

*Virginia House of Delegates v. Bethune-Hill,*
    587 U.S. 658 (2019) ................................................................................ 18, 24

*Wages & White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ................................................................ 12, 13

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .................................................................................. 4, 5

*Wise v. Circosta,*
    978 F.3d 93 (4th Cir. 2020) .................................................................. 23, 27

**Statutes**

28 U.S.C. § 1331 ........................................................................................... 28

28 U.S.C. § 2284(a) ...................................................................................... 23

Mo. Const. art. III, § 1 .................................................................................. 26

Mo. Const. art. III, § 49 .......................................................................... 7, 35

Mo. Const. art. III, §§ 3, 7 ............................................................................. 8

Mo. Rev. Stat. § 1.185.8–.9 ......................................................................... 17

Mo. Rev. Stat. § 115.349.1 ................................................................. 33

Mo. Rev. Stat. § 115.642.1 ................................................................. 14

Mo. Rev. Stat. § 116.150.1 ................................................................. 15

Mo. Rev. Stat. § 116.334.1 ............................................... 11, 13, 14, 35

Mo. Rev. Stat. § 27.060 ...................................................................... 17

U.S. Const. art. I, § 4, cl. 1 .............................................................. 3, 4

U.S. Const. art. I, § 7, cl. 2 .................................................................. 7

U.S. Const. art. III, § 2, cl. 1 ............................................................. 28

**Rules**

Fed. R. Civ. P. 20(a)(1) ....................................................................... 20

**Other Authorities**

Debates of the 1943–1944 Constitutional Convention of Missouri 7016 (2008) ........ 8

Missouri Secretary of State Manual 1945–1946 at 148 ............................... 8

Missouri Times, *Freedom Principle MO Files Complaint Alleging Campaign Finance Violations*, The Missouri Times (Nov. 10, 2025) ....................................... 15

Rudi Keller, *Referendum Backers Reject Ballot Title for Vote on Gerrymandered Missouri Congressional Map*, Mo. Indep. (Nov. 6, 2025) ....................................... 14

*Substantive Canons and Faithful Agency*, 90 Boston U. L. Rev. 109 (2010) ................................................................. 9

*The Independent State Legislature Doctrine, Federal Elections, and State Constitutions*, 55 GA. L. REV. 1 (2020) ...................................................................... 10

## INTRODUCTION

Defendants offer no justification for divesting the Missouri General Assembly of its constitutional redistricting authority and transferring it to an initiative-and-referendum process—where special-interest groups backed by dark money battle for voters' imprimatur.  Indeed, they do not dispute the dispositive points:  No provision in the Missouri Constitution specifically subjects federal redistricting bills to the initiative-and-referendum process, and there is no evidence that any Missouri framer intended that result.  Given that reality, Defendants cannot show that Missouri intentionally chose to displace the U.S. Constitution's vesting of redistricting authority in the General Assembly.

The Court should not be surprised that Defendants have mustered such weak support for their theory that federal redistricting bills are subject to the initiative-and-referenda process.  Redistricting is, of course, an inherently technical enterprise, where legislators must balance a host of policy considerations as well as key legal requirements.  Because redistricting takes expertise, the line-drawing power in other States is consistently vested in state legislatures or plainly transferred to expert commissions.  *See Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 798 (2015).

Defendants, however, want to turn Missouri redistricting into utter chaos.  In Defendants' brave new world, map-drawing would be left not to deliberative and democratically accountable legislators or given to expert independent commissions.  Instead, various special interests groups could easily force their maps before voters

1

through the State's initiative process.  Voters would be "educated" on the competing maps via dark-money-funded advertising and 100-word summary statements about each proposal.  And if the General Assembly tries its hand at redistricting, dark-money-funded groups could easily gather signatures for a referendum, thus freezing implementation of a new map until the next election.  That, in turn, will predictably lead to apportionment paralysis and invite one-person, one-vote violations if the State is forced to use an old map in the interim.

Unwilling to defend that bizarre system (and unable to prove Missouri's framers intended it), Defendants instead search for a procedural exit-ramp to avoid a ruling from the Court.  But those efforts fail.  Defendants object to standing on ripeness grounds, but the Secretary of State clearly has standing to challenge the legality of an ongoing governmental process that is forcing him to expend significant resources.  *See, e.g.*, *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018) ("compliance costs" are "classic injury-in-fact").  Defendants claim that Plaintiffs lack a cause of action, but that contention is foreclosed by *Arizona Independent Redistricting Commission*, and it would defy equitable principles to deny a cause of action against individuals who use *governmental processes* to violate constitutional rights.  The Court has federal question jurisdiction to resolve Plaintiffs' claims under the U.S. Constitution.  And Defendants' appeal to abstention necessarily fails where no pending case presents the same legal issues, and where this Court has a "virtually unflagging obligation" to exercise its jurisdiction.  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

Finally, the balance of harms and public interest strongly support a preliminary injunction. The State faces irreparable, here-and-now compliance-cost injuries from Defendants' forced initiation of the referendum process. And those injuries will only worsen if Defendants are allowed to submit their referendum for final approval—an event which threatens to plunge Missouri into chaotic uncertainty over which map will govern elections in 2026. Conversely, Defendants would remain entirely free to advocate however they wish about why Missouri's congressional delegation should be more politically progressive. All Missouri asks here is that it not be forced to surrender its federal redistricting process to dark-money funded groups—at the cost of substantial state resources—without a clear showing that the framers of the Missouri Constitution intended such an implausible result.

The Court should grant State's request for preliminary relief to preserve the status quo guaranteed by the Elections Clause and deny Defendants' motion to dismiss.

<u>**ARGUMENT**</u>

## I.     **Missouri remains likely to succeed on the merits.**

The U.S. Constitution expressly vests the congressional-redistricting authority in "the Legislature" of each State. U.S. Const. art. I, § 4, cl. 1. Without a clear-statement divesting this authority, the sole power to redistrict remains with the Missouri General Assembly. *See* PI Br. 6–8. In their shotgun opposition, Defendants attack everything from precedent to the function of clear-statement rules. Their arguments fail.

## A.    A clear statement rule applies here to protect the General Assembly's authority.

As Plaintiffs have already explained, constitutional clear-statement rules "protect foundational constitutional guarantees" by preserving the Framers' allocation of vested authority in default actors. *West Virginia v. EPA*, 597 U.S. 697, 735 (2022) (Gorsuch, J., concurring); *see* PI Br. 4–6. As relevant here, the Elections Clause vests the power to regulate federal elections in state legislatures. U.S. Const. art. I, § 4, cl. 1; *see Moore v. Harper*, 600 U.S. 1, 34 (2023) ("[T]he Elections Clause expressly vests power to carry out its provisions in 'the Legislature' of each State, a deliberate choice that this Court must respect.").

Of course, the Elections Clause also permits Congress to override the decisions state legislatures make with respect to elections. *See Ex parte Siebold*, 100 U.S. 371, 392 (1880), *abrogated on unrelated grounds as recognized in Jones v. Hendrix*, 599 U.S. 465, 485 n. 7 (2023). But if Congress wishes to displace state legislative authority, it must "do[] so *by positive and clear statutes.*" *United States v. Gradwell*, 243 U.S. 476, 485 (1917) (emphasis added). Certainly, if Congress—the body specifically granted authority to countermand state legislatures by the Elections Clause—must act with clear statements, then so too must other actors. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) ("[T]he [Elections] Clause functions as 'a default provision . . . .'"); *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 567–68 (1916) (pointing to a clear statement in state law before determining a congressional-redistricting act could be subject to a referendum). Therefore, to divest

4

the state legislature of this constitutionally guaranteed power, state law must clearly show such an intent. *See Gradwell*, 243 U.S. at 485; PI Br. 8.

Defendants deny the existence of this constitutional rule, but their arguments fail. *First*, they fundamentally mischaracterize clear-statement rules—insisting that they only place a check on Congress. Def. Br. 23–24. But that is clearly wrong. Some clear-statement rules *preserve* Congress's power vis-à-vis the Executive. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000) (major questions doctrine). As already explained, constitutional clear-statement rules protect the Constitution's default vesting of power in Congress, the President, and the Judiciary. *West Virginia*, 597 U.S. at 735 (Gorsuch, J., concurring). The state legislatures should not receive less protection. *See Gradwell*, 243 U.S. at 485.

*Second*, Defendants insist that constitutional clear-statement rules apply only when courts are reading federal statutes. Def. Br. 23. Although that is generally true as a descriptive matter, it is not necessarily so where the reading of state law implicates a federal question. Indeed, the U.S. Supreme Court has previously deployed clear-statement rules to read state laws narrowly—in order to avoid a federal constitutional problem. *See, e.g.*, *Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 193–94 (1909). The same approach is even more appropriate when federal courts confront claims that state actors are wielding state laws to usurp state legislative authority in violation of the Elections Clause. *See Bush v. Gore*, 531 U.S. 98, 114–15 (2000) (Rehnquist, C.J., concurring). In such situations, the meaning of state law is a federal question, *see id.*; S. Shapiro, K. Geller, T. Bishop, E. Hartnett,

D. Himmelfarb, Supreme Court Practice § 3.1(d)(d), p. 3–9 (11th ed. 2019), and federal courts can apply federal interpretive rules—including constitutional clear-statement rules.

*Third*, Defendants rely heavily on the U.S. Supreme Court's decision in *Hildebrant*, Def. Br. 21–22, but that precedent weakens their case. In *Hildebrant*, the Supreme Court emphasized that a "conclusive" decision by the state supreme court which "ma[d]e[] it clear that . . . the referendum constituted a part of the state Constitution and laws." 241 U.S. at 568. Only *after* finding that state law clearly permitted the referendum did *Hildebrant* determine that "a State's decision to employ a referendum in addition" to legislative redistricting was permissible. *See Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 840 (Roberts, C.J., dissenting); *see also Hawke v. Smith*, 253 U.S. 221, 230 (1920) (emphasizing *Hildebrant*'s reliance on state law to issue federal constitutional decision).[1] Unlike in *Hildebrant*, there *is* a dispute whether state law clearly subjects federal redistricting bills to a referendum. PI Br. 9–10. Defendants' contrary citations are stray, unreasoned dicta. Def. Br. 27–28.

Defendants also have no cogent basis for saying that other key Elections Clause cases foreclose a clear-statement rule. In *Arizona Independent Redistricting Commission*, the Supreme Court specifically emphasized how the Arizona Constitution expressly "remove[d] congressional redistricting authority from the

---

[1] The Supreme Court has treated *Hildebrant* as speaking to the Guarantee Clause. *See Baker v. Carr*, 369 U.S. 186, 201 (1962) ("[The Court] has refused to pass on a claim *relying on the Guaranty Clause* to establish that Congress lacked power to allow the States to employ the referendum in passing on legislation redistricting for congressional seats." (emphasis added) (citing *Hildebrant*)).

6

State Legislature, lodging that authority, instead, in a new entity." 576 U.S. at 796–97. *Smiley v. Holm* featured no dispute about whether, under state law, redistricting bills were subject to a veto. 285 U.S. 355 (1932). In any event, gubernatorial vetoes have been understood as consistent with a legislature exercising authority (including over elections) since the founding. *See* U.S. Const. art. I, § 7, cl. 2. Finally, *Moore v. Harper* addressed an entirely distinct legal context—where federal courts review state *judicial* decisions. *See* 600 U.S. at 36. Here, an analogous situation would exist if the Missouri Supreme Court had already held that the Missouri Constitution subjects redistricting to the initiative-and-referendum process, and this Court was solely reviewing that decision as a matter of state law. *See id.* The relatively relaxed standard of review adopted in *Moore*—which makes sense when federal courts review the work of state courts on questions of state law—simply does not settle the question of whether state legislatures can lose their authority over federal redistricting by mere implications from state law.

**B.    Missouri law does not contain a clear statement permitting the referendum to extend to congressional-redistricting.**

Nothing in Missouri law plainly divests the General Assembly of its redistricting authority. *See* PI Br. 8–10. Missouri law is silent on whether congressional redistricting could be subject to the referendum. This silence does not qualify as a clear statement, as Defendants attempt to suggest. *See* Def. Br. 25–28. Defendants are left only with the general language in the Missouri Constitution providing for a referendum of "any act of the general assembly." Mo. Const. art. III, § 49. But the vagaries of state law are not enough to provide a "conclusive" statement

7

stripping the Missouri General Assembly of its constitutional prerogative. *Hildebrant*, 241 U.S. at 568.

Given their uphill battle, Defendants turn to reading between the lines of the Missouri Constitution. They stress (at 26) two sections excluding state redistricting from the referendum. *See* Mo. Const. art. III, §§ 3, 7. But they conveniently ignore the history behind these provisions. Earlier in the 20th Century, the Missouri Supreme Court—in fractured decisions—adopted the position that referenda could be used against state legislative apportionments. *See State ex rel. Gordon v. Becker*, 49 S.W.2d 146, 148 (Mo. banc 1932). The Constitutional Convention, which adopted the current Missouri Constitution, specifically adopted these provisions to abrogate those Missouri Supreme Court holdings. *See* Debates of the 1943–1944 Constitutional Convention of Missouri 7016 (2008).[2] Because the Missouri Supreme Court had never upheld the referendum's use for congressional redistricting, the convention had no need to address the issue.

Missouri case law is also not helpful to Defendants. As just noted, the current Missouri Constitution abrogated prior holdings that the referendum power captured redistricting. And Defendants' two subsequent case citations feature only unreasoned, stray dicta. *See* Def. Br. 27–28; *Priesler v. Hearnes*, 362 S.W.2d 552, 557 (Mo. banc 1962) (rejecting a one-person, one-vote challenge and making a comment

---

[2] The 1945 Constitution only contained Section 7 regarding the Missouri Senate. Section 3, regarding the House of Representatives, was added later to ensure the same protection. *See* Amendment No. 3 from Special Election Held on Jan. 14, 1966; *see also* Secretary of State Manual 1965–1966 at 1301 (detailing the amendment's summary statement).

about referenda); *State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 706–07 (Mo. banc 1952) (deciding only that a petition for a referendum of a congressional apportionment was untimely, but without considering whether such a petition would violate the Elections Clause). In both those cases, there is no indication that any party so much as mentioned the U.S. Constitution's Elections Clause. Such dicta certainly cannot supply the clear statement that Defendants need to strip the General Assembly of its redistricting authority.

Historical practice also does not support Defendants. They put heavy emphasis on *one* referendum from the 1920s, Def. Br. 26–27, but no court ever passed on the legality of that referendum, PI Br. 9. Decades later, a new Missouri Constitution was adopted in 1945.[3] And notably, no congressional plan has subsequently been subjected to a referendum vote—a fact that should surprise the Court if Defendants' legal theory is right, given the strong incentives of the minority party to challenge redistricting plans adopted by the majority party.

In the end, Defendants offer shockingly little textual or historical evidence for the notion that Missouri's framers intended to transfer the General Assembly's redistricting authority to the initiative-and-referendum process. The whole point of a constitutional clear-statement rule is for a Court to be confident that the relevant legal actors carefully considered the issue before departing from the Constitution's design. *See, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring); Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 Boston U. L. Rev.

---

[3] Missouri Secretary of State Manual 1945–1946 at 148.

109, 173 (2010) (explaining they function as "stop and think measures"). Here, given the scant evidence adduced by Defendants, the Court can have no such confidence.

**C.    If the Court concludes that some part of Missouri law subjects federal redistricting bills to the initiative-and-referendum process, it should find that provision unconstitutional.**

The straightforward way to resolve this case is to hold that Missouri never made a conscious choice to divest the General Assembly of its authority over redistricting. Compl. ¶¶ 73–74. But if the Court concludes that Missouri law does subject federal redistricting bills to the initiative-and-referendum process, the Court should hold that such an arrangement violates the federal Constitution and is void. Compl. ¶ 54 n.9.

The Elections Clause unambiguously vests redistricting authority in the General Assembly—not an initiative-and-referendum process. As originally understood, the Constitution would not permit what Defendants are trying to do. *See, e.g., Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 840–41 (Roberts, C.J., dissenting); Michael T. Morley, *The Independent State Legislature Doctrine, Federal Elections, and State Constitutions*, 55 GA. L. REV. 1, 70–78 (2020).

True, a closely-divided U.S. Supreme Court held that the Arizona Constitution permissibly transferred redistricting authority to an independent commission. *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 824. But *Arizona Independent Redistricting Commission* does not control this case, *id.* at 813 (limiting holding to "redistricting by independent commission"), which is quite different. First, as previously discussed, that case addressed a state constitution that explicitly transferred redistricting authority from the state legislature; there was no doubt that the people of Arizona

10

intended that result.  PI Br. 7.  Here, there is great doubt whether the framers of the Missouri Constitution intended to strip the General Assembly of its redistricting authority.  *Supra*, at 7–10.  That distinction matters, given that the majority in *Arizona Independent Redistricting Commission* heavily relied on the right of the people to consciously "choose" who conducts redistricting.  576 U.S. at 820.

Second, the practical differences between *Arizona Independent Redistricting Commission* and this case are enormous.  These differences matter because the Supreme Court relied heavily on what it perceived as the practical efficacy and advantages of independent commissions.  *Id.* at 821; *id.* at 826 (Roberts, C.J., dissenting) (noting policy concerns were core of majority decision).  Whereas independent redistricting commissions can—like legislatures—consider the complex political, geographical, and legal tradeoffs inherent in redistricting, it is not clear how subjecting redistricting to an initiative-and-referendum process could feasibly be accomplished.  In Missouri, voters must cast their votes based solely on a 100-word summary statement.  Mo. Rev. Stat. § 116.334.1.  How, for example, would voters consider competing arguments on whether redistricting plans violate federal or state laws?  How would voters know about and consider various communities of interest across the State?  Would they even be able to look at picture of the proposed maps, when Missouri's Constitution and statutes seemingly do not allow images on the ballot? In this respect and many others, it is almost farcical to imagine voters making redistricting decisions based on 100-word summary statements.  That helps explain

11

why, in U.S. history, it has been vanishingly rare to subject redistricting plans to popular votes, and it has been practically unheard of in recent decades.

In short, if the Court declines to apply a clear-statement rule, or if it finds such a rule satisfied, it should hold that subjecting federal redistricting to an initiative-and-referendum procedure violates the Elections Clause.

## II.    This case is justiciable.

### A.    The Secretary of State faces a direct injury.

The Secretary of State faces immediate and tangible harm from the referendum effort.  Defendants assert these harms are either in the past or speculative, future harms.  *See* Def. Br. 9–10.  But that is wrong several times over.

To start, the Secretary and State face ongoing litigation expenses due to Defendants' unlawful proposed referendum.  *See* PI Br. 10–11; *cf. City of Kennett*, 887 F.3d at 431 (compliance costs incurred in response to challenged action are "classic injury-in-fact"); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("Complying with [an agency order] later held invalid almost *always* produces the irreparable harm of irrecoverable compliance costs.").  Even before the Secretary's approval of the referendum petition, Defendants sued the Secretary challenging his rejection as to form.  *See* Pet., *People Not Politicians v. Hoskins*, 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Sept. 18, 2025).  Even after approval of their petition, Defendants brought another claim trying to force the Secretary to count pre-approval signatures. *See* First Am. Pet., *People Not Politicians v. Hoskins*, 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Sept. 18, 2025).  The Secretary and the State are expending resources

litigating Defendants' claims, Peters Decl. ¶ 13, but this Court can stop that ongoing injury by granting relief.

In response, Defendants cite inapt cases about how litigants cannot manufacture standing by claiming that the expenses of litigating their pending offensive case constitute a valid injury. *See* Def. Br. 10–11; *Kennedy v. Ferguson*¸ 679 F.3d 998, 1002–03 (8th Cir. 2012) (rejecting the position that parties gain "standing based solely on the expense of filing suit or even the expense of the pre-suit act of consulting with an attorney"). "Obviously . . . ." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). But these cases say nothing about whether state actors gain standing from expenses incurred during a process *initiated by someone else*. The reality is that Defendants initiated the referendum process and, as part of that process, sued the Secretary, forcing him and the State to expend resources. Such compliance costs, incurred in response to challenged actions, are a "classic injury-in-fact." *City of Kennett*, 887 F.3d at 431 (quoting *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015)); *cf. Wages & White Lion*, 16 F.4th at 1142. This is simply not a case where litigation expenses are some kind of self-inflicted injury that cannot give rise to standing. *See Kennedy*, 679 F.3d at 1003.

Litigation expenses aside, the Secretary is currently suffering other ongoing economic injuries. *See Steel Co.*, 523 U.S. at 107–08 ("The recovery of such expenses unrelated to litigation would assuredly support Article III standing."). After approving Defendants' referendum petition as to form, the Secretary had to post— and is posting—a copy of the sample petition on his website. Mo. Rev. Stat.

§ 116.334.1.  He must also—on an ongoing basis—"accept public comments regarding" the referendum and even "provide copies of such comments upon request." *Id.*

Additionally, the Secretary and the Attorney General must prepare "a summary statement of the measure" under strict statutory rules.  *Id.*  As has been publicly supported, the Secretary already submitted proposed language to the Attorney General,[4] and both officials have expended time and resources considering that language.  Now, the Secretary is required to release that proposed statement in just a few days.  Mo. Rev. Stat. § 116.334.1.  Once proposed, summary statements like these are routinely contested.  *See, e.g.*, *McCarty v. Sec'y of State*, 710 S.W.3d 507 (Mo. banc 2025); *Copenhaver v. Ashcroft*, 697 S.W.3d 601 (Mo. Ct. App. 2025).  Indeed, Defendants have already threatened to sue the Secretary over his proposed language.  *See* Keller, *supra* note 4.  And that will force Plaintiffs to expend even more resources on this unconstitutional referendum process.  *Cf. City of Kennett*, 887 F.3d at 431.

And there are even more ongoing injuries.  The Secretary also oversees Defendants' signature collection efforts and is required to investigate any reported improprieties.  Mo. Rev. Stat. § 115.642.1.  There are public reports that complaints

---

[4] *See* Rudi Keller, *Referendum Backers Reject Ballot Title for Vote on Gerrymandered Missouri Congressional Map*, Mo. Indep. (Nov. 6, 2025), https://missouriindependent.com/2025/11/06/referendum-backers-reject-ballot-title-for-vote-on-gerrymandered-missouri-congressional-map/.

14

have been filed against People Not Politicians for accepting illegal foreign donations.[5] The Attorney General is statutorily barred from commenting on pending campaign-finance investigations, *id.* § 130.185, but the State obviously expends resources considering and investigating complaints that are filed.

Given all the State's ongoing injuries, Defendants are simply wrong to claim that Plaintiffs can somehow avoid all their harms if the Secretary just denies Defendants' proposed referendum. Def. Br. 34–35. Doing so would not spare Plaintiffs from any of their ongoing harms—all of which arise before Defendants submit their final petition. And even once they do, the Secretary cannot simply reject the petition the night that Defendants submit it. Per state law, the Secretary must undertake an exhaustive review of the validity of the submitted signatures. *See* Mo. Rev. Stat. § 116.150.1; Peters Decl. ¶ 14. And if the Secretary deems a referendum petition legally invalid, he must "issue a certificate stating the reason for the insufficiency." Mo. Rev. Stat. § 116.150.2. Any rejection—especially one facing judicial review from a sure legal challenge—will require careful analysis and collaboration between the Secretary and Attorney General. Needless to say, this will require expenditure of time and resources. *See* Peters Decl. ¶ 15; *BTS Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("the diversion of resources" and burdens on the State's constitutionally granted role qualify as irreparable harms). And this

---

[5] *See* Missouri Times, *Freedom Principle MO Files Complaint Alleging Campaign Finance Violations*, The Missouri Times (Nov. 10, 2025), https://themissouritimes.com/freedom-principle-mo-files-complaint-alleging-campaign-finance-violations/.

is to say nothing of the uncertainty for implementation of the law in time for candidate-filing deadlines from the lawsuit that Defendants all but promise to bring. *See* Def. Br. 12.

Defendants are likewise mistaken when they claim that the Secretary lacks standing because he is merely a "cheerleader" in a dispute between the General Assembly and Defendants. Def. Br. 10. When it comes to administering elections and overseeing referenda in Missouri, it is hard to imagine a public official with more of a direct and personal stake than the Secretary of State. After all, "[i]t is the secretary of state who is charged with the ultimate administrative determination as to whether [a] petition complies with the Constitution of Missouri and with the statutes." *Sweeney v. Ashcroft*, 652 S.W.3d 711, 736 (Mo. Ct. App. 2022) (quoting *Ketcham v. Blunt*, 847 S.W.2d 824, 830 (Mo. Ct. App. 1992)) (alternations in original). And these interests are not abstract. The Secretary certainly has concrete interests in not expending time and resources in presiding over a referendum that would unconstitutionally strip power away from the General Assembly. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

**B.    The General Assembly has standing.**

The General Assembly is a proper plaintiff and has standing to challenge Defendants' attempt to usurp their authority over redistricting. Defendants' contrary arguments lack merit.

Defendants begin by briefly questioning whether the Attorney General has the authority to represent the General Assembly. Def. Br. 6. But this is not a serious argument. The Attorney General has *default* authority to represent the General

16

Assembly. *See* Mo. Rev. Stat. § 27.060; *State ex rel. Nixon*, 34 S.W.3d 122, 136 (Mo. banc 2000) (holding that the Attorney General has broad authority to represent the General Assembly as she sees fit unless General Assembly specifically takes power away). Indeed, the very statute Defendants cite confirms this point. *See* Def. Br. 6 (citing Mo. Rev. Stat. § 1.185.8–.9). That statute details when the General Assembly can *intervene* in an action and obtain "legal counsel *other than* from the attorney general." Mo. Rev. Stat. § 1.185.8–.9 (emphasis added). In other words, the statute speaks to situations when the General Assembly may find itself at odds with the Attorney General in a particular case and wants to chart its own course by intervening in a suit with its own counsel.[6] And that statute assumes that, absent legislative action, the General Assembly will be represented by the Attorney General and not "counsel other than" the Attorney General. *Id.* Thus, if the elected Democrats who submitted declarations in support of Defendants disagree with the Attorney General's representation, they should speak to the leaders of their legislative chambers. *See id.*

---

[6] That is precisely what happened in *Arizona State Legislature v. Arizona Independent Redistricting Commission*. There, the legislature was on its own in challenging the redistricting commission's authority to apportion congressional districts. *See* 576 U.S. at 798–99. Arizona's Attorney General did not participate in the litigation and Arizona's Secretary of State was a defendant with the commission. *See* Compl. ¶¶ 2–5, *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 2:12-CV-012111 (D. Ariz. July 20, 2012). Because the legislature was at odds with the executive branch of government, it necessarily had to act as a body and authorize the initiation of the lawsuit and retention of outside counsel. *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 802.

Defendants next question how the General Assembly can have standing to avoid the loss of authority granted to it by the U.S. Constitution. Def. Br. 7. Citing *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 668 (2019), Defendants contend that a plaintiff legislature must show that it will be "*permanently* deprived" of its redistricting authority. Def. Br. 7. Defendants overstate the quote for several reasons. For one thing, the statement is dictum; *Bethune-Hill* held that a single house of the Virginia legislature did not have standing to appeal an adverse apportionment decision. 587 U.S. at 667. The statement was made only as further support for distinguishing the case from *Arizona Independent Redistricting Commission*. *See id.* at 668.

But even taking the statement at face value, the Missouri General Assembly *does* face a permanent deprivation of its redistricting authority. Unlike *Bethune-Hill*, where the legislature faced only a temporary loss of its final say-so on redistricting under a court's remedial order, *id.*, Defendants will open Pandora's Box if their legal theory is accepted and they succeed in getting this referendum on the ballot. Going forward, every new redistricting done by the General Assembly will be subject to the whims of moneyed special-interest groups looking to maximize partisan advantage in Congress. Defendants' suggestion (at 7) that their referendum petition challenges only a "specific redistricting enactment"—rather than being a wholesale invitation to future partisan-activist groups to follow the same path—is hard to take seriously.

Finally, Defendants question whether the General Assembly's injury is ripe. Def. Br. 8. It is. To start, the continued existence of an ongoing illegal referendum

18

process is the sort of "'here-and-now injury'" that courts can redress without waiting for the process to end. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020)). But in any event, as detailed earlier, Defendants' filing their petition (even one with potential infirmities) triggers many obligations. And Defendants' referendum petition seeks to freeze the new map the General Assembly just enacted—an aim that could inflict irreparable harm by preventing Missouri from "conducting [next] year's elections pursuant to a statute enacted by the Legislature." *Abbott v. Perez*, 585 U.S. 579, 602 (2018). And more broadly, nullifying the legislature's Elections Clause authority and subjecting redistricting to a different process gives the General Assembly standing. *See Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 803–04.

Further, Defendants' claims of ripeness ring hollow because they likely already have the signatures they need to force the referendum onto the ballot. In a separate case, Defendants admitted on November 5 that they have collected 200,000 signatures—well in excess of the 106,000 needed. *See* Keller, *supra* note 4. Given the ease with which groups have gathered signatures in recent years, Peters Decl. ¶ 20, and immense financial backing Defendants have, *id.* ¶ 11, Defendants seem highly likely to submit a petition with enough signatures if this Court denies relief. That event—which usurps the General Assembly's redistricting authority—is an imminent and concrete injury to the General Assembly and the State. *See* PI Br. 11.

## C.    Plaintiffs' declaratory claims are ripe.

Defendants also charge that Plaintiffs' request for declaratory relief is "premature" because it is "highly speculative whether any Elections Clause dispute

will ever materialize." Def. Br. 11. And according to Defendants, Plaintiffs should just wait to be sued instead of being allowed to seek declaratory relief in advance of that impending lawsuit. Def. Br. 12. But Plaintiffs need not wait to obtain declaratory relief. *Parrish v. Dayton*, 761 F.3d 873, 876 (8th Cir. 2014); *Pub. Water Supply Dist. No. 8 of Clay Cnty. v. City of Kearney*, 401 F.3d 930, 932 (8th Cir. 2005) ("A declaratory judgment action can be sustained if no injury has yet occurred.").

As already explained, Plaintiffs are suffering substantial resource injuries on an *ongoing* basis, and those harms will continue to grow with each passing day. *Supra*, at 12–19; Compl. ¶¶ 37–49; *see also St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 488 (8th Cir. 2006) (determining ripeness from "allegations in the complaint"). These injuries do not depend on any "uncertain" or "contingent future events." *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006).[7]

Indeed, Congress authorized declaratory-judgment actions for cases precisely like this one—ones where a party suffers irreparable harms while waiting to be sued. *See* Richard H. Fallon, Jr. et. al., Hart and Wechsler's The Federal Courts and the Federal System 837 (7th ed. 2003). And here, the State will only be "relieved of significant hardship by knowing that its established methods of" reviewing the referendum petition will not be invoked to further an end that violates the Elections

---

[7] Defendants also imply that this case is not ripe because the Secretary of State has argued in a parallel state case that a state-law-rooted claim is "unripe until the referendum petition is actually submitted." Br. 12 n.7. But as Defendants acknowledge, that case brought by them "concern[s] the validity of certain signatures," not the constitutionality of the referendum petition.

Clause. *Minn. Citizens Concerned for Life v. FEC*, 113 F.3d 129, 132 (8th Cir. 1997). "That is sufficient to satisfy the hardship prong." *Id.* Moreover, this promotes "good public policy by" challenging the petition before it is submitted rather than waiting for Defendants potentially to sue after their time and efforts at collecting signatures. *St. Paul Area Chamber*, 439 F.3d at 488.

Resisting that point, Defendants cite (at 12) *Texas v. United States*, 523 U.S. 296 (1998), but this case undercuts their position. There, the U.S. Supreme Court explained that a declaratory judgment action is ripe where a defendant's actions cause a plaintiff "to engage in, or refrain from, any conduct." *Id.* at 301. As explained above, Defendants' actions in initiating the ongoing referendum process have imposed—and will continue to impose—a mountain of such obligations on Plaintiffs.

Finally, Defendants' arguments (at 12) that this case is not ripe because of the "multiple ongoing state-court suits" falter. To start, this argument sounds in abstention, not ripeness, and abstention is not warranted. *See infra* Section V. Further, "as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .'" *Colo. River*, 424 U.S. at 817.

In any event, Defendants are wrong to suggest that any state court is considering whether congressional redistricting bills can constitutionally be subject to the referendum. Def. Br. 30–31. They cite state constitutional challenges to the

21

General Assembly's power to redistrict,[8] but those theories do not overlap with Plaintiffs' Elections Clause theory at all. Defendants also misleadingly claim that Plaintiffs have "invoked" their Elections Clause argument in *People Not Politicians v. Hoskins*, Def. Br. 31, but the legal issues in that suit are entirely dissimilar. There, Defendants have sued the Secretary of State over the rejection of three referendum petitions as to form, and to have signatures gathered before approval counted. *See* First Am. Pet., *People Not Politicians v. Hoskins*, 25AC-CC07128 (Mo. Cir. Ct. Cole Cnty. Sept. 29, 2025). But there is no allegation that a referendum petition on congressional redistricting is proper. Nor could there be at this point. *See ACLU of Mo. v. Ashcroft*, 577 S.W.3d 881, 892 (Mo. Ct. App. 2019) (holding that Secretary of State's review at filing stage is "limited to determining whether the sample sheet is substantially in the form required by statute"). The footnote that Defendants misleadingly cite from the State's brief in that case merely notes the existence of this case. *See* Def. Br. 14 n.8.

These state-court cases present entirely distinct legal questions (which do not arise under federal law), are thus no bar to proceedings in this case.

---

[8] *NAACP Mo. State Conf. v. Kehoe*, No. 25AC-CC06724 (Mo. Cir. Ct. Cole Cnty. filed Sept. 3, 2025) (extraordinary session); *Luther v. Hoskins*, No. 25AC-CC06964 (Mo. Cir. Ct. Cole Cnty. filed Sept. 12, 2025) (mid-decade); *Wise v. Missouri*, No. 2516-CV29597 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 12, 2025) (mid-decade, equal population, compactness, and continuity); *Healey v. Missouri*, No. 2516-CV31273 (Mo. Cir. Ct. Jackson Cnty. filed Sept. 28, 2025) ((mid-decade and compactness).

### III.    Plaintiffs have an equitable cause of action to vindicate the General Assembly's right under the Elections Clause.

Defendants' efforts to derail this case by arguing that Plaintiffs have no cause of action likewise fail.

All three Plaintiffs have an equitable cause of action to assert constitutional claims under the Elections Clause.  *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."); *Green Room LLC v. Wyoming*, --- F.4th ---, 2025 WL 2999673, at *5 n.4 (10th Cir. Oct. 27, 2025) ("[*Armstrong*] recognize[es] an equitable cause of action for an injunction against preempted state law without needing to address whether the plaintiff was invoking a federal right.").  This is true—"novelty notwithstanding"—even when one state actor brings a suit against another state actor in federal court.  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 261 (2011).

Plaintiffs' equitable cause of action is precisely the same one that the Arizona Legislature used to sue in *Arizona Independent Redistricting Commission*.  *See* Compl. ¶ 34, *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 2:12-CV-012111 (D. Ariz. July 20, 2012); *see also id.* ¶¶ 35–36.[9]  Litigants have asserted the same equitable cause of action in other cases too.  *E.g.*, *Wise v. Circosta*, 978 F.3d 93, 101

---

[9] Defendants misstate the cause of action in *Arizona Independent Redistricting Commission*, claiming that it was provided by 28 U.S.C. § 2284(a).  *See* Def. Br. 16 n.10.  But that is wrong.  That statute does not supply a cause of action, but merely provides claim-processing rules.

(4th Cir. 2020) (en banc); *Carson v. Simon*, 978 F.3d 1051, 1059–60 (8th Cir. 2020) (per curiam) (Electors Clause). As for the Secretary, the U.S. Supreme Court has recognized that state-executive-branch officials may seek to enforce—through an equitable cause of action seeking injunctive relief—the rules of an upcoming election. *See Perez*, 585 U.S. at 601.[10] It is thus bizarre that Defendants accuse Plaintiffs of bringing "a novel cause of action." Def. Br. 16.

Against that binding authority, Defendants rely on an out-of-circuit district-court opinion holding that *private entities* lack a cause of action to assert claims under the Elections Clause. Def. Br. 16 (quoting *Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 462 (E.D. Tex. 2020)). That decision, which relied on authority about taxpayer standing, *see Tex. Voters All.*, 495 F.Supp.3d at 461–62 (relying on *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam)), is inapt in a case where a state legislature and state executive officials are bringing Elections Clause claims. And notably, the Eighth Circuit has held that private entities *can* assert equitable claims under the Electors Clause, *Carson*, 978 F.3d at 1059–60, which is materially identical to the Elections Clause, *see Moore*, 600 U.S. at 27.

Unable to point to any precedent supporting their cause-of-action argument, Defendants invoke broader equitable principles and assert that government officials

---

[10] Defendants' contention (at 15 n.9) that the State somehow does not have a proper cause of action because it asserts the same theories as the Secretary of State is without merit. Different plaintiffs are free to assert the same claims for relief and theories of recovery. *See* Fed. R. Civ. P. 20(a)(1). Even if Defendants are right (they're not) that the Secretary cannot bring an Elections Clause claim, the State can. *See Bethune-Hill*, 587 U.S. at 663–64 (2019) (recognizing that States can prosecute the constitutionality of their enacted redistricting laws).

24

should not be able to bring an equitable cause "to sue private citizens" over "political activity." Def. Br. 16. But that argument fundamentally mischaracterizes the nature of this lawsuit and Defendants' relevant activities. Plaintiffs are not asking this Court to enjoin private conduct. Instead, Plaintiffs seek an order prohibiting Defendants from using a state public-policy-creating apparatus for an unconstitutional means. Compl. ¶ 74. There is nothing private about Defendants' endeavor—they are trying to engage in legislating, thus functioning as state actors. Just as the availability of an equitable cause of action does not "turn on the identity of the plaintiff," *Stewart*, 563 U.S. at 256, it should not turn on the identity of the defendant when that defendant is taking state action. To hold otherwise would be to embrace the "empty formalism" that equity eschews. *Id.*

Giving away the game, Defendants concede, as they must, that courts can properly enjoin private parties who essentially become state actors. Def. Br. 17. Federal courts have long done so against private parties acting under color of state law. *See, e.g.*, *Pennsylvania v. Wheeling & B. Bridge Co.*, 50 U.S. (9 How.) 647, 657–58 (1850). Seeing this coming, Defendants suggest (at 17) that they cannot be considered state actors. They can—they are taking over the machinery of state government.

The relevant markers from caselaw support this conclusion. First, Defendants are exercising "some right . . . created by the State," namely the right of referendum. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The right to a referendum does not exist apart from state law establishing it. *See Edmonson v. Leesville*

*Concrete Co.*, 500 U.S. 614, 620 (1991) (analyzing whether law creates the action a person engages in).

Second, Defendants' actions fit the description of "fairly be[ing] said to be a state actor." *Id.* "[P]erforming a traditional government function" can make conduct "governmental in character." *Id.* at 621. So too does an action that "relies on governmental assistance and benefits." *Id.*

Lawmaking and law-repealing are categorical examples of a traditional government function. *See* Mo. Const. art. III, § 1 ("The legislative power shall be vested in a senate and house of representatives . . . ."); *see also Edmonson*, 500 U.S. at 620 ("[G]overnmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints."). And, as described, the process of getting a referendum petition on the ballot heavily relies on governmental assistance. *See* Compl. ¶¶ 44–47; Peters Decl. ¶¶ 14–19. Beginning with submitting the referendum petition for approval as to form through the submission of signatures, referendum petitioners "make extensive use of state procedures." *Edmonson*, 500 U.S. at 622; *see* Compl. ¶¶ 43–48.

"It cannot be disputed that, without the overt, significant participation of the government, the [referendum process] simply could not exist." *Edmonson*, 500 U.S. at 622. The "government alone administers" the referendum process and has "outlined the procedures by which" referenda appear on the ballot and take effect. *Id.* Hence, the State is not looking to enjoin purely private conduct. It is instead looking

26

to prevent Defendants from "serv[ing] an important function within the government and act[ing] with its substantial assistance." *Id.* at 628. Thus, nothing should prevent Plaintiffs from bringing an equitable cause of action to vindicate federal constitutional rights against Defendants.

## IV.  The Court has Federal Question Jurisdiction.

Defendants' assertion that this court lacks federal question jurisdiction is likewise wrong. Def. Br. 12–15. Defendants admit that their jurisdictional argument rests on a "constru[ction]" of Plaintiffs' suit. Def. Br. 12. Under that "construction," Defendants seemingly think Plaintiffs are asserting a "pure state-law claim," and that they should only be allowed to invoke the Elections Clause as a *defense* to a state-law claim. *Id.* at 12–13.

But Defendants' "construction" is wrong because they misunderstand the nature of this lawsuit. Plaintiffs are asserting claims under the U.S. Constitution's Elections Clause—claims court have repeatedly recognized can be brought. *E.g.*, *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 804; *Wise*, 978 F.3d at 101; *Carson*, 978 F.3d at 1059–60 (Electors Clause). Defendants are thus wrong when they claim this lawsuit is merely a state-law suit that is the mirror-image of any lawsuit that Defendants could bring. Def. Br. 14. Because Defendants cannot sue to vindicate the General Assembly's prerogatives under the Elections Clause, Defendants are obviously not the "natural plaintiff" in this suit. Def. Br. 14 (quoting *Lexington Ins. Co. v. Integrity Land Title Co.*, 721 F.3d 958, 973 (8th Cir. 2013)).

In response, Defendants rely on cases involving "an action for declaratory judgment that is not coupled with a [live] request for injunctive relief." *ANR Pipeline*

27

*Co. v. Corp. Comm'n of Okl.*, 860 F.2d 1571, 1575–76 (10th Cir. 1988); *see* Def. Br. 12–13. But those cases are inapt because this suit is not based solely on a claim for declaratory judgment but also includes a claim for injunction. *See ANR Pipeline*, 860 F.2d at 1575–76. This makes sense. The mirror image rule relies on a potential suit brought by the "natural" plaintiff resolving the entirety of the dispute. *See, e.g.*, *Missouri Highway*, 112 F.3d at 1336 ("no reason why the State's exposure would be any greater for having waited until the Klan came to court"); *BASF Corp.*, 50 F.3d at 559 ("granting relief [to the declaratory plaintiff] could effectively deny an allegedly injured party its otherwise legitimate choice of the forum"). But here, Defendants cannot bring a suit as the "natural plaintiff" that would resolve the federal constitutional claims in this case. Therefore, this Court has jurisdiction "to enjoin state [actors] from interfering with federal rights." *ANR Pipeline*, 860 F.2d at 1576.

This case presents important federal legal questions under the U.S. Constitution. The Court has federal question jurisdiction. U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1331.

## V.    Abstention is not warranted.

Finally, Defendant's arguments for abstention also fail. "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River*, 424 U.S. at 813. *Pullman* abstention is no different. *See Hunter v. Page Cnty.*, 102 F.4th 853, 873 (8th Cir. 2024) (describing abstention as "extraordinary and narrow" (quoting *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959))). It is a "limited exception" to "the virtually unflagging obligation" of federal courts to exercise their

jurisdiction in the proper case. *Id.* (quoting *Sisney v. Kaemingk*, 15 F.4th 1181, 1189 n.2 (8th Cir. 2021)).

Federal courts may abstain "*only if* the case raises a federal constitutional question, and the answer to that question necessarily depends on state courts' construction of ambiguous state law." *Id.* (emphasis added). And that is simply not true here. Although Plaintiffs' federal constitutional question features some overlap with the state-law question of what the Missouri Constitution means, their claim (and the parties' dispute) centers largely on the existence of a federal constitutional rule. Def. Br. 21–25; PI Br. 4–8. That dispute simply would not be answered by the state courts' interpretations of Missouri law. Thus, this case is categorically ineligible for *Pullman* abstention because it does not present a question that "necessarily depends on state courts' construction of ambiguous state law." *Allegheny Cnty.*, 360 U.S. at 188.

Beyond that, abstention is not warranted under the Eighth Circuit's "five-factor test [used] to determine when *Pullman* abstention is appropriate." *Hunter*, 102 F.4th at 873. First, abstaining would take away the General Assembly's redistricting prerogative under the Elections Clause. *See Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 841 (8th Cir. 1998) (first factor is "effect abstention would have on the rights"). Allowing the submission of a referendum petition on redistricting inflicts injury by usurping the General Assembly's authority. The General Assembly's ability to redistrict is "guaranteed by the Constitution," and the

State has requested "extraordinary relief." *George v. Parratt*, 602 F.2d 818, 820 (8th Cir. 1979).

Second, no state remedy is "available." *Beavers*, 151 F.3d at 841. As previously explained, no pending case presents the state-law question Defendants claim could moot this case. *See* Def. Br. 12 & nn.6–7. And contrary to Defendants' assertions, Plaintiffs could not have pursued these claims as "counterclaims in pending state-court litigation." Def. Br. 29. The General Assembly is not a defendant in any of the state court cases Defendants cite. And "[b]y definition a counterclaim is a counter demand existing in favor of a defendant and against a plaintiff." *State ex rel. Saupe v. Swink*, 475 S.W.2d 466, 467–68 (Mo. Ct. App. 1971). Thus, the General Assembly could not have filed a counter-claim; no state remedy was "available."

As for the Secretary of State, none of the state litigation provides him with an "available" remedy. At the pre-signature submission stage, the Secretary of State's review of a petition's sample sheet is "limited to determining whether the sample sheet is substantially in the form" required by statute. *ACLU of Mo.*, 577 S.W.3d at 892. "[I]f it is, the secretary . . . *shall* deem the sample sheet sufficient." *Id.* (third alteration in original). His review as to form does not extend "to matters of substance, *including constitutional compliance*," *id.* (emphasis added), so state law did not afford the Secretary an opportunity to seek review predicated on Elections Clause concerns. Thus, this lawsuit is the first opportunity for the Secretary to seek review of whether the referendum violates the Elections Clause.

As for the remaining three factors ("unclear" state law; whether "state law is fairly susceptible to an interpretation that would avoid any federal constitutional question"; and whether abstention will avoid "unnecessary federal interference in state operations," *Beavers*, 151 F.3d at 841), these no more favor Defendants. Submission of the referendum petition on congressional redistricting to the Secretary of State inflicts the injury on the State. *See* Compl. ¶ 51. Plaintiffs do not ask this Court to "mak[e] a tentative answer" on state law, but merely to recognize that federal law requires a clear statement before the General Assembly's redistricting authority is usurped, and that state law is *currently* silent as to the permissibility of a referendum petition on congressional redistricting. *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941). This silence is enough for this Court to exercise its "virtually unflagging obligation" and step into the gap to prevent Defendants from divesting the General Assembly of its redistricting authority. *Colo. River*, 424 U.S. at 817.

## VI.    Plaintiffs easily satisfy the factors for a preliminary injunction.

Plaintiffs are likely to succeed on the merits. *See* PI Br. 3–10. And all the harms Plaintiffs identify to prove standing are irreparable. *See* PI Br. 10–14; *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 765 (2021) (per curiam) (recognizing the irreparable harm from no means of financial recovery). The balance of the equities and the public interest also clearly favor Plaintiffs.

On their side of the balance-of-harms ledger, Defendants identify very little. Deploying a red herring, Defendants repeatedly assert that granting a preliminary injunction would injure their speech and petition rights. Def. Br. 36–38. But

Plaintiffs do not seek to enjoin Defendants from advocating for more politically progressive representation in Congress.  All Plaintiffs ask is that Defendants be prevented from seizing the State apparatus for an unconstitutional referendum.  *See* PI Mot. 1 (to "prohibit[] Defendants . . . from submitting a petition for referendum on . . . congressional redistricting").

The First Amendment thus does not apply here.  Defendants are free to write letters and to circulate signed petitions to whomever they please expressing their disagreement with the redistricting.  *See Miller v. Thurston*, 967 F.3d 727, 737–38 (8th Cir. 2020) ("There must be some affect on 'the communication of ideas associated with the circulation of petitions.'" (quoting *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997))).  The First Amendment, however, does not compel the State to stand aside and let Defendants arrogate an inherently governmental role—created by State law.  *See Edmonson*, 500 U.S. at 620–21.

Defendants' contrary authorities are inapt because they all involved the regulation of *speech*—not an attempt to exercise legislative power.  Def. Br. 36–38.  *SD Voice v. Noem* (at 37), for example, involved state-created "hindrances to political conversations and the exchange of ideas."  60 F.4th 1071, 1078 (8th Cir. 2023) (quoting *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 192 (1999)).  Specifically, the change to state law reduced the time to circulate a petition, limiting the proponent's ability to advocate for the initiative—i.e., "core political speech" between voters.  *Id.* (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)).  Similarly inapt is *Grayned v. City of Rockford* (at 37), which involved a First Amendment challenge to

32

a city's anti-noise and anti-picketing ordinances after petitioner demonstrated outside a local high school.  408 U.S. 104, 105–06 (1972).

By contrast, Plaintiffs here are not seeking to burden Defendants' ability to communicate about their desired partisan makeup of Congress.  They remain completely free to continue collecting signatures and preparing a petition expressing their desire for a map that favors politically progressive candidates and to discuss it to any forum they wish.  The injunction would only prevent them from using their petition as a legislative ignition switch, transforming Defendants from advocating citizens to state actors exercising the State's legislative power.

On the other hand, if Defendants succeed in their stated aims, they will plunge Missouri into chaos.  A State's inability to conduct "[next] year's elections pursuant to a statute enacted by the Legislature" leaves the state "irreparably harm[ed]." *Perez*, 585 U.S. at 602; *see Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (finding harm when a state cannot apply its "duly enacted legislation regarding election procedures").  But Defendants' attempt to force a referendum— and to potentially freeze the redistricting bill—goes much further than that and jeopardizes Missouri's ability to run orderly elections in 2026.  After all, candidate-filing deadlines are coming in March.  Mo. Rev. Stat. § 115.349.1.  And primary elections will occur in the summer of 2026.  *Id.* § 115.121.2.  But if Defendants succeed in freezing the old map, it is not even clear which map Missouri would use for 2026. Defendants likely assume that the old map would somehow snap back into effect, *see* Def. Br. 35–36, but there is no authority suggesting that is true.  Amidst the vacuum

33

Defendants are seeking to create, the General Assembly might be forced to adopt yet another map sometime in 2026. At a minimum, the State and all Missouri voters will be harmed by the chaos Defendants plan to inflict on them. *See Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("[A] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative.").

And beyond the 2026 elections, Defendants' legal theory would subject Missouri to profound long-term harms. All future redistricting bills will be targeted by dark-moneyed special interest groups. Gathering sufficient signatures is not a high bar. Peters Decl. ¶ 20. And referenda traditionally succeed in blocking challenged laws. *See* Jason Hancock, *National Republicans gear up to fight referendum on Missouri congressional map*, Missouri Independent (Nov. 6, 2025) ("[V]oters have rejected actions by the General Assembly all but twice."). Missouri could thus easily face redistricting paralysis—with the General Assembly unable to adopt new maps. That paralysis would be especially embarrassing if Missouri is unable to adopt a new map after the decennial Census, as such a failure would violate the federal Constitution. *Preisler v. Sec'y of State*, 341 F. Supp. 1158, 1160 (W.D. Mo. 1972) (per curiam); *see also Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

What do Defendants have to say about the radical and implausible implications of their theory? Nothing—except that courts can worry about all of this later. Def. Br. 38. They offer no other reassurance because they cannot.

Moreover, Defendants' legal theory would enable private dark-money-backed groups to propose maps in the first instance through the initiative process. PI Br. 3, 10. Nothing will prevent activist organizations from using the initiative process to propose their favored maps. *See* Mo. Const. art. III, § 49. Redistricting will not be done by the deliberative General Assembly or even a specialized body capable of appreciating technical and legal nuances. Instead, battles will be fought trying to "educate" voters through dark-money financed advertising and 100-word ballot summary statements. *See* Mo. Rev. Stat. § 116.334.1. The idea of trying to inform voters about the immense complexities of redistricting through 100-word summary statements is patently absurd.

Shockingly, Defendants do not even try to deny that any of this will happen. *See* Def. Br. 38. Nor could they. This chaotic future for redistricting in Missouri is the logical consequence of their legal arguments.

This Court can and should spare Missourians from such chaos. The best calibrator of the public interest here is the balance struck by the Elections Clause itself—keeping quintessentially technocratic redistricting decisions with the state legislature; not partisan special-interest groups funded by out-of-state dark money.

## CONCLUSION

The Court should grant Missouri's request for a preliminary injunction and deny Defendants' motion to dismiss this case.

35

Dated: November 13, 2025           Respectfully submitted,


**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
  *Solicitor General*
William James Seidleck, #77794(MO)
  *Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2025, the foregoing was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

s/ <em>Louis J. Capozzi III</em>