**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

MISSOURI GENERAL ASSEMBLY, ET AL.,

    *Plaintiffs,*

    v.

RICHARD VON GLAHN, ET AL.,

    *Defendants.*

Case No. 4:25-cv-01535-ZMB

**AMICUS BRIEF IN SUPPORT OF THE STATE OF MISSOURI'S
MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

## INTEREST OF AMICUS CURIAE

*Amicus curiae* Missouri Republican State Committee is the duly established state committee for the Missouri Republican Party ("the Party") under Section 115.603, RSMo. The Missouri Republican State Committee has been selected and serves in the role of representing and acting for the Party in the interim between party conventions pursuant to Section 115.605, RSMo.

The Party is composed of numerous organizations and committees that work toward the common goal of electing Republicans in all corners of our state, including to the United States House of Representatives. To that end, the Party maintains "a congressional district committee for each congressional district in the state." Section 115.603, RSMo. The Party has expended substantial resources to support the election of Republican candidates to the United States House of Representatives, and to educate and turn out Republican voters, in the past several election cycles and will do so again in the 2026 elections and beyond.

The Party—on behalf of itself, its committees, its voters, and its candidates—has an interest in ensuring Republican candidates win elections to the United States House of Representatives. That includes a clear and obvious interest in redistricting statutes, such as House Bill 1, which prescribe Missouri's congressional district lines. The Missouri Republican State Committee therefore respectfully submits this *amicus curiae* brief to further explain that the Missouri General Assembly's constitutionally vested authority over congressional redistricting is not subject to Defendants' proposed referendum.

1

## INTRODUCTION

A fundamental principle of constitutional interpretation resolves this case. Where the Constitution delegates decisional authority to a specific actor, courts require a clear statement before concluding that it was pawned off elsewhere. This principle spans the vertical and horizontal separation of powers, guarding the prerogatives of all three branches of the federal government, *see, e.g.*, *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016), and protecting the states from federal intrusions, *see, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

It applies equally to protect state legislatures from having their constitutionally assigned responsibilities overridden. As the United States Supreme Court recently instructed, courts "*must respect*" the Constitution's "deliberate choice" to "expressly vest[] power" to set federal election rules "in 'the Legislature' of each State." *Moore v. Harper*, 600 U.S. 1, 34 (2023) (emphasis added).

Defendants ask this Court to do the opposite. With no textual footing in Missouri law or historical precedent for their position, they attempt to wrest control over redistricting from the Missouri General Assembly and lodge it in a referendum process. Their position would invite practical and structural upheaval, transforming deliberative lawmaking into a plebiscite animated by special interest groups. This Court should decline the invitation. Because the Missouri Constitution contains no clear statement transferring authority to conduct congressional redistricting from the General Assembly, this Court should enjoin Defendants' effort to do by referendum what the Constitution expressly vests in "the Legislature."

2

## ARGUMENT

### I.   Clear Statement Rules Protect And Uphold The Constitution's Express Delegations of Authority.

Enforcing constitutional boundaries ranks among federal courts' most vital duties. Given the tendency of institutions to encroach on each other's powers, *see* THE FEDERALIST No. 51 (James Madison) (C. Rossiter ed., 1961), courts must serve as a "bulwark[]" against those incursions, THE FEDERALIST No. 78 (Alexander Hamilton) (C. Rossiter ed., 1961). Consistent with that role, courts will not lightly infer a significant restructuring of a constitutional allocation of power. Where the Constitution assigns authority to a specific actor, that power cannot be divested absent a clear statement. *See West Virginia v. EPA*, 597 U.S. 697, 735 (2022) (Gorsuch, J., concurring) (explaining that clear-statement rules "operate[] to protect foundational constitutional guarantees").

Courts deploy an array of clear statement rules to safeguard the prerogatives of each branch of the federal government in its proper sphere. For example, Article I of the Constitution delegates responsibility "to make the laws that govern us" to "the people's elected representatives." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring). To protect Article I's grant of authority, courts will not infer that Congress delegated to executive agencies the power to resolve major policy questions absent a clear statement. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000). This expectation of clarity reflects the constitutional structure. *See West Virginia*, 597 U.S. at 723 (explaining that the major

3

questions doctrine rests on "both separation of powers principles and a practical understanding of legislative intent"). "Because the Constitution vests Congress with 'all legislative Powers,' a reasonable interpreter would expect it to make the big-time policy calls itself, rather than pawning them off to another branch." *Biden v. Nebraska*, 600 U.S. 477, 515 (2023) (Barrett, J., concurring) (citation omitted). Accordingly, the clear statement rule keeps the legislative power "where . . . it belongs." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 124 (Gorsuch, J., concurring).

Clear statement rules likewise protect the President's constitutional prerogatives in Article II. It is axiomatic that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (quotations omitted). So "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect," courts will presume it does not apply extraterritorially. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (cleaned up). In this context, the clear statement rule reflects the structural principle that Congress does not ordinarily intend to intrude on the President's authority to conduct foreign relations. *See RJR Nabisco*, 579 U.S. at 348.

Underscoring the point, federal courts routinely employ clear statement rules to protect their Article III authority. Federal courts will not imply a repeal of their jurisdiction in "the absence of clear congressional language mandating" that result. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483-84 (1991); *see also Goncalves v. Reno*, 144 F.3d 110, 122 (1st Cir. 1998) (applying "the long standing rule

4

disfavoring repeal of jurisdictional provisions by implication"). For example, the Supreme Court has long required that if Congress intends to make exceptions to the Supreme Court's appellate jurisdiction it must do so with unmistakable clarity, not "by mere implication." *Ex parte Yerger*, 75 U.S. 85, 106 (1869). This principle ensures that any retrenchment of federal courts' core functions occurs, if at all, only by Congress speaking with the clarity the Constitution's separation of powers demands.

Clear statement rules also help police the "constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. The Constitution's structure, including the Tenth Amendment's reservation of powers, counsels restraint in inferring federal limitations on state authority. Hence, "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65 (1989) (cleaned up). This clear statement rule governs attempts to displace state sovereign immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 55 (1996) ("unequivocal[] express[ion]" required "to abrogate the immunity") (quotations omitted), to preempt state legislation, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (courts will assume state police powers not superseded "unless that was the clear and manifest purpose of Congress"), to impose conditions on states accepting federal funds, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("unambiguous[]" language required to "impose a condition on the grant of federal moneys"), and to criminalize conduct traditionally regulated by the states, *Bond v. United States*, 572 U.S. 844, 857 (2014)

5

(absent "clear indication," courts will not read statutes to "intrude[] upon traditional state criminal jurisdiction") (quotations omitted).

In short, across multiple doctrinal settings, clear statement rules serve as a structural safeguard ensuring that only a deliberately expressed choice—not ambiguity or implication—can recalibrate the Constitution's usual balance of shared authorities among competing actors.

## II.    The Elections Clause Requires A Clear Statement To Displace The State Legislature's Redistricting Authority.

The Elections Clause, no less than other enumerated delegations, requires a clear statement before courts may determine that a state has reallocated power over redistricting from the state legislature. This clear statement rule flows from the Elections Clause itself, which expressly provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. Art. I, § 4 (emphasis added).

This delegation reflects a reasoned constitutional settlement. The Framers recognized "electoral districting problems and considered what to do about them," and they "settled on a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress." *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019). Courts "must respect" the Constitution's "deliberate choice" to "expressly vest[] power" to conduct congressional redistricting "in 'the Legislature' of each State." *Moore*, 600 U.S. at 34.

6

As with other express delegations, courts require a clear statement before concluding that a state has displaced its legislature's authority over congressional redistricting. It is well established that Congress must employ "positive and clear statutes" in order to override a state legislature's prerogative to regulate federal elections. *United States v. Gradwell*, 243 U.S. 476, 485 (1917). Because Congress— the sole actor the Constitution empowers to supersede state legislative regulations— may do so only through unmistakable, affirmative enactments, any contention that some other state actor or process has displaced the legislature's redistricting role must rest on equally explicit and unequivocal language.

The Supreme Court's Elections Clause cases confirm the point. In *State of Ohio ex rel. Davis v. Hildebrant*, the Supreme Court considered whether a constitutional referendum could displace the Ohio General Assembly's authority to redistrict. 241 U.S. 565, 566-67 (1916). The Supreme Court concluded that it could only because a "conclusive" decision by the state supreme court "ma[d]e[]" it clear that . . . the referendum constituted a part of the state Constitution and laws." *Id.* at 568. More recently, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court weighed whether Arizona could create an independent commission to draw congressional districts. 576 U.S. 787, 792-93 (2015). The Supreme Court sustained that arrangement because Arizona's Constitution expressly "remove[d] congressional redistricting authority from the State Legislature." *Id.* at 796-97. In both cases, no doubt existed that the state had deliberately overridden the legislature's authority.

7

Defendants insist that *Smiley v. Holm*, 285 U.S. 355 (1932), disrupts this line of authority, arguing that the decision "did not . . . ask for any sort of clear statement" before recognizing a gubernatorial veto over congressional redistricting. Motion to Dismiss, ECF No. 22, at 22. But *Smiley* had no occasion to address a clear statement rule. In evaluating whether the Minnesota Legislature's congressional redistricting plan was subject to a gubernatorial veto, the Court simply assumed that Minnesota had empowered the governor to exercise such a veto. *See, e.g., Smiley*, 285 U.S. at 365. *Smiley* did not address what state law must say in order to displace the legislature's constitutionally vested power to conduct congressional redistricting, nor did it analyze whether Minnesota had in fact conferred such authority by a clear statement. *See id.*

Moreover, even if *Smiley*'s silence on the antecedent question could be read to dispense with a clear statement rule for a gubernatorial veto, it would not support Defendants' effort to dispose of that rule for their proposed referendum for at least two reasons. *First*, the Supreme Court's later decision in *Arizona State Legislature* applies a clear statement rule. *See* 576 U.S. at 796-97. This Court is bound to follow the Supreme Court's holding in a case where the issue was actually presented, not its silence in a case where the issue was *not* presented. *See Mallory v. Norfolk Southern Ry. Co.*, 600 U.S. 122, 136 (2023) ("If a precedent of th[e] [Supreme] Court has direct application in a case . . . a lower court should follow the case which directly controls.") (cleaned up).

8

*Second*, *Smiley* comports with a longstanding historical tradition, known to the Framers of the Elections Clause, surrounding gubernatorial vetoes that is glaringly absent from Defendants' proposed referendum process. The executive veto is deeply rooted and broadly accepted as a core feature of the separation of powers. The Framers described the veto as a fundamental safeguard against legislative overreach and ill-considered legislation: Indeed, a veto is the executive branch's "major 'fortification'" against the tendency of legislative authority to "'predominate[].'" *Morrison v. Olson*, 487 U.S. 654, 698 (1988) (Scalia, J., dissenting) (quoting THE FEDERALIST No. 51 (James Madison)). They therefore wrote it into the federal Constitution. *See* U.S. Const. art. I, § 7; THE FEDERALIST No. 73 (Alexander Hamilton) (C. Rossiter ed., 1961); *see also* 1 W. Blackstone, Commentaries *154 (noting the Crown's authority to "approve or disapprove" laws passed by both houses of Parliament). The same structural check appeared early and often in state constitutions, with several adopting veto mechanisms even before ratification of the federal Constitution. *See, e.g.*, Mass. Const. pt. II, ch. 1, art. 2 (1780) (gubernatorial veto); N.Y. Const. art. III (1777) (veto by council of revision, composed of governor, chancellor, and judges of the Supreme Court).

It therefore comes as no surprise that, prior to *Smiley*, Minnesota treated the veto as a settled feature of its constitutional landscape, even as to redistricting. Minnesota explicitly enshrined the gubernatorial veto in its original constitution in 1857. *See* Minn. Const. art. IV, § 11 (1857). And beginning the next year, when the Minnesota Legislature passed the state's first congressional map, the governor

9

approved the map before it was enacted into law on seven separate occasions. *See* Laws of Minnesota 1858, c. 83; 1872, c. 21; 1881, c. 128; 1891, c. 3; 1901, c. 92; 1913, c. 513; 1929, c. 64. This unbroken course of practice confirmed that congressional redistricting in Minnesota was always treated as legislation subject to the executive check of a gubernatorial veto. So, far from relaxing any requirement of a clear statement, *Smiley*—at most—presupposed that the Framers of the Elections Clause were aware of gubernatorial veto power and contemplated that the entrenched historical practice of gubernatorial vetoes could bear on state legislatures' exercise of their authority under the Elections Clause.

But that presupposition, if any, is unilluminating with respect to procedures, such as Defendants' proposed referendum, that were unknown to the Framers of the Elections Clause. Indeed, Missouri did not amend its constitution to provide for a referendum until 1908, 120 years after ratification of the Elections Clause. *See Marsh v. Bartlett*, 121 S.W.2d 737, 742 (Mo. 1938). And where a state purports to transfer its legislature's Elections Clause authority to conduct congressional redistricting to a novel process not contemplated by the Framers, it must make a clear statement to do so. *See, e.g.*, *Arizona State Legislature*, 576 U.S. at 796-97 (involving redistricting commission, which did not exist at the Founding); *Hildebrant*, 241 U.S. at 568 (involving referendum).

Thus, if anything, *Smiley* actually *confirms* that the clear statement rule is alive, well, and applicable to Defendants' attempt to wield the power to "prescribe" a congressional redistricting plan that the Elections Clause vests in the General

10

Assembly. U.S. Const. Art. I, § 4; *see also Arizona State Legislature*, 576 U.S. at 796-97; *id.* at 825 (Roberts, C.J., dissenting).

### III. Missouri Law Does Not Provide A Clear Statement That Displaces The General Assembly's Authority.

The Missouri Constitution does not supply a clear statement reallocating authority over congressional redistricting away from the General Assembly to a referendum process. All agree that Missouri law is completely silent on whether a referendum can override congressional redistricting. In the face of this silence, Defendants offer three main arguments in an effort to read a non-existent clear statement into Missouri law. All fail.

*First*, Defendants point to the generic referendum provision in Article III, Section 49, which provides that "[t]he people reserve power . . . to approve or reject by referendum any act of the general assembly." Mo. Const. art. III, § 49. This is a textbook example of a broad, undifferentiated clause that does not provide a clear statement. *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion) ("[C]lear statement rules ensure [the state] does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation."). Section 49 gives no indication that Missouri "specifically considered" whether to displace the legislature's federally assigned authority over redistricting and "intentionally legislated on the matter." *Sossamon v. Texas*, 563 U.S. 277, 290 (2011). Accordingly, it does not provide a "conclusive" statement divesting the General Assembly of its Elections Clause authority over congressional redistricting,

11

much less vesting that authority in the referendum process. *Hildebrant*, 241 U.S. at 568.

*Second*, Defendants cite other provisions of the Missouri Constitution that exclude *state* redistricting from the referendum. *See* Motion to Dismiss, ECF No. 22, at 26 (citing Mo. Const. art III, §§ 3, 7). Defendants appear to think that these provisions "resolve[] any doubt that *congressional* redistricting is subject to the referendum under Missouri law." *Id.* (emphasis added). That is wrong on every level. To start, "mere implications" from other provisions that *do not mention* congressional redistricting cannot supply a *clear statement* to displace legislative authority over that subject. *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 260 (1991) (Scalia, J., concurring in part and concurring in judgment).

At any rate, historical evidence establishes that Defendants get the implications of these provisions completely backwards. The Framers of the Missouri Constitution inserted them to repudiate a decision by the Missouri Supreme Court upholding the referendum's use for state redistricting. *See State ex rel. Gordon v. Becker*, 49 S.W.2d 146, 149 (Mo. 1932); Debates of the 1943–1944 Constitutional Convention of Missouri 7016 (2008). That deliberate rejection demonstrates the Missouri Framers' *distrust* of referenda in the redistricting sphere; it hardly proves that they *authorized* referenda to override the General Assembly's authority to regulate federal elections. The fact that Defendants think such a flimsy inference could override the General Assembly's federal authority only betrays their lack of

"respect" for the Constitution's "deliberate choice," *Moore*, 600 U.S. at 34, and illustrates the practical necessity of a clear statement rule.

*Finally*, Defendants retreat to a slanted historical account of congressional redistricting in Missouri. *See* Motion to Dismiss, ECF No. 22, at 26-27. Their position boils down to this: On a single occasion, before Missouri adopted its current Constitution, voters subjected congressional redistricting to a referendum. No court addressed the legality of the referendum then or since, but a few courts opined in dicta (decades later) that a referendum was permissible. One such case was *Becker*, which the Framers of the 1945 Constitution explicitly abrogated. *See* Debates of the 1943–1944 Constitutional Convention of Missouri 7016 (2008). The others did not concern the Elections Clause. *See Preisler v. Hearnes*, 362 S.W.2d 552, 557 (Mo. banc 1962) (rejecting a one-person, one-vote challenge); *State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 706-07 (Mo. banc 1952) (holding that a petition for a referendum of a congressional apportionment was untimely).

It is unclear what Defendants think these isolated data points establish. Dicta obviously cannot provide a "conclusive" statement of Missouri law. *Cf. Hildebrant*, 241 U.S. at 568 (explaining that the state supreme court's "conclusive" determination provided the requisite clarity). Nor can a single historical aberration predating the current Missouri Constitution. Indeed, despite the fact that a minority party has every incentive and nothing to lose from challenging the majority party's redistricting plan, Missouri has subjected no congressional plan to a referendum vote since the state adopted its latest Constitution in 1945. Defendants' attempt to circumvent the

13

General Assembly's authority over redistricting through the referendum process is, quite literally, unprecedented. Lacking any clear statement in Missouri law to support that transparently political gambit, it must fail.

## CONCLUSION

The Court should grant Missouri's request for a preliminary injunction and deny Defendants' motion to dismiss.

Dated: November 24, 2025         Respectfully submitted,

**ELLINGER BELL LLC**

By:     */s/ Marc H. Ellinger*
        Marc H. Ellinger, #40828
        Stephanie S. Bell, #61855
        308 East High Street, Suite 300
        Jefferson City, MO 65101
        Telephone:   (573) 750-4100
        Facsimile:   (314) 334-0450
        E-mail: mellinger@ellingerlaw.com
        E-mail: sbell@ellingerlaw.com

**JONES DAY**

By:     */s/ John M. Gore*
        John M. Gore (*pro hac vice*)
        51 Louisiana Ave., NW
        Washington, DC 20001
        Telephone:   (202) 879-3930
        Facsimile:   (202) 626-1700
        E-mail: jmgore@jonesday.com

        *Attorneys for Missouri Republican State Committee*

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that a true and accurate copy of the foregoing was served via the Court's electronic filing system on November 24, 2025 on all parties of record. I further certify that the foregoing document contains 3342 words and appears on 14 typed pages, exclusive of matters designated for omission.

/s/ Marc H. Ellinger