**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

MISSOURI GENERAL ASSEMBLY, et al.,                )
                                                   )
                                                   )
    Plaintiffs,                                )
                                                   )
    v.                                         )
                                                   )
                                                   ) No. 4:25-CV-1535 ZMB
RICHARD von GLAHN, et al.,                         )
                                                   )
    Defendants.                                )

**PRELIMINARY INJUNCTION HEARING**
**BEFORE THE HONORABLE ZACHARY M. BLUESTONE**
**UNITED STATES DISTRICT JUDGE**
**NOVEMBER 25, 2025**

APPEARANCES:

For Plaintiffs:    Louis Joseph Capozzi, III, Esq.
        Graham Miller, Esq.
        ATTORNEY GENERAL OF MISSOURI - ST. LOUIS
        815 Olive Street, Suite 200
        St. Louis, MO  63101

For Defendants:    Jessica Ring Amunson, Esq.
        JENNER AND BLOCK LLP - DC
        1099 New York Avenue, NW, Suite 900
        Washington, DC  20001

        Charles W. Hatfield, Esq.
        STINSON LLP - JEFFERSON CITY
        230 W. McCarty Street
        Jefferson City, MO  65101

REPORTED BY:    SHANNON L. WHITE, RMR, CRR, CSR, CCR
        Official Court Reporter
        United States District Court
        111 South Tenth Street, Third Floor
        St. Louis, MO  63102
        (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

**(PROCEEDINGS STARTED AT 2:10 PM.)**

**(ALL PARTICIPANTS ARE REMINDED OF THE PROHIBITIONS REGARDING PHOTOGRAPHING, RECORDING, AND BROADCASTING OF COURT PROCEEDINGS IN ACCORDANCE WITH LOCAL RULE 13.02.  PARTICIPANTS WHO VIOLATE THE RULE MAY FACE SANCTIONS UP TO AND INCLUDING DENIAL OF ENTRY TO FUTURE HEARINGS, OR ANY OTHER SANCTIONS DEEMED NECESSARY BY THE JUDICIAL OFFICER.)**

THE COURT:  Good afternoon.  We are here and on the record in the case of Missouri General Assembly, et al., v. Richard von Glahn, et al.  The cause number is 4:25-CV-1535.

Counsel, will you please announce your appearance for the record.

MR. CAPOZZI:  Yes, Your Honor.  Louis Capozzi, Solicitor General, for the State plaintiffs, along with Graham Miller, Deputy Solicitor General.

THE COURT:  Good afternoon.

MS. AMUNSON:  Good afternoon, Your Honor.  Jessica Ring Amunson for Defendant along with my co-counsel, Chuck Hatfield.

THE COURT:  Good afternoon.

We are here today for a hearing on the State's Motion for Preliminary Injunction and the Defendant's Motion to Dismiss this case.  And we discussed with counsel the schedule for today, and everyone has agreed that we will proceed with five minutes of opening.  There's a timer that the parties

will have the benefit of seeing.

The State will begin; the Defendants will have their five minutes; then we'll take up the Defendants' Motion to Dismiss, with ten minutes aside on that issue; and then the State's Motion for Preliminary Injunction with again ten minutes for each side; and then we'll conclude with five minutes per side for any closing statements.

I will try and stay out of your way for the opening and the closing. No guarantees on the substantive issues because I likely will have some questions for everybody.

And one other thing just to note for the record -- and this again was with the agreement of the parties -- but my understanding is that there is no evidence that will be presented but that we'll be proceeding on the briefs in that regard?

MR. CAPOZZI: Yes, Your Honor.

MS. AMUNSON: That's correct, Your Honor.

THE COURT: Okay. Then whenever the State is ready, you may proceed.

MR. CAPOZZI: Good afternoon, Your Honor. May it please the Court.

The U.S. Constitution vests the authority to redistrict Missouri's federal congressional districts in the General Assembly. In *United States v. Gradwell*, the Supreme Court said that any departure from this design must be

4

done by, quote, "positive and clear language," end quote.

Certainly if Congress, the body specifically granted authority to counterman state legislatures by the Elections Clause, must act with clear statements, so too must other actors. Defendants barely try to satisfy that rule.

In *Spector v. Norwegian Cruise Lines*, the Supreme Court said that a party resisting a Clear Statement Rule must identify text specifically addressing the question at issue, but all agree that the Missouri Constitution does not have text specifically addressing whether federal redistricting bills are subject to the initiative and referendum process.

And it is undisputed that no Missouri framer ever discussed, let alone endorsed, this possibility, and no state court has ever held this bizarre system is unconstitutional.

Notably, Defendants don't even contest the State's account of how bizarre this process will be. Voters won't be able to look at images of the competing maps when they vote. At best, voters would have to choose based solely on a 100-word summary statement on the ballot, and Defendants just sued the State, arguing we can't include any summary statement for the referendum.

So voters might get no information at all. Yet voters would have to somehow assess the enormously complex legal, practical, and political factors inherent in

redistricting.  This chaotic process will lead only to dark out-of-state money pouring into Missouri and confused voters making blind choices in the voting booth.

The U.S. Supreme Court has never sanctioned such an extraordinary departure from the Elections Clause, but at the very least, the Court would not allow the General Assembly to be stripped of its powers without a clear statement in the Missouri Constitution.  No such clear statement exists here; so the Court should grant a preliminary relief.

The Court should also reject Defendants' procedural arguments and deny their motion to dismiss.  On standing, the Secretary is suffering ongoing compliance cost injuries because of Defendants' initiation of an unconstitutional referendum process, and the General Assembly has standing to challenge and attempt to gut its core legislative authority just like the state legislature in *Arizona Independent Redistricting Commission*.

As for a cause of action, Defendants properly concede that an equitable cause of action exists to challenge violations of the Elections Clause.  They question only whether they are state actors.  They are.  In *Leesville Concrete*, the Supreme Court said a defendant is a state actor if their challenged action has its source and state authority and is, quote, "governmental in character," end quote.

Defendants don't dispute the first prong, and they

practically concede the second prong on page 8 of their reply brief, where they admit they are trying to exercise legislative power. It's hard to imagine a type of activity more quintessentially governmental than legislation.

As for subject matter jurisdiction, this Court has federal question jurisdiction to consider Plaintiffs' equitable claim for injunctive relief under the Elections Clause. The presence for a live claim -- the presence of a live claim for injunctive relief makes the Wycoff Mirror Image Rule irrelevant as this case does not involve an attempt to expand the Court's subject matter jurisdiction under the Declaratory Judgment Act.

And, finally, this Court cannot abstain under *Pullman* because this case cannot be resolved by referring a pure question of state law to the state courts. As the Supreme Court made clear in *Moore v. Harper*, the meaning of state law in Elections Clause cases is a federal question.

And the vast majority of what the parties are fighting over is federal constitutional law; thus this case is categorically ineligible for abstention. But even if it were, the Court should apply the factors -- the Eighth Circuit's factors in *Beavers* and not abstain, because doing so would be inequitable.

Contrary to Defendants' repeated claims in their brief, it appears unlikely Plaintiffs could raise their

Elections Clause claim in state court before their irreparable harm occurs.  In *Calzone v. Ashcroft*, the Western District Court of Appeals held that substantive state and federal constitutional challenges to a referendum must wait until after the final vote to be ripe.  That pincite is the 559 S.W. 3d. 32.

And here that would mean that Missouri is unable to use its duly enacted redistricting plan in 2026, thus inflicting serious irreparable harm on the State.

The Court should deny the motion to dismiss, grant the motion for a preliminary injunction, and ensure that the federal redistricting power remains where the U.S. Constitution vests it -- with the Missouri General Assembly.  Thank you.

THE COURT:  Thank you.  And I should have noted the yellow light will go off at two minutes, but you came in under that time anyway.

MS. AMUNSON:  Good afternoon, Your Honor.

We, of course, have several legal arguments about why the motion to dismiss should be granted and why Plaintiffs are not entitled to the preliminary injunctive relief they seek. But in this opening, I just wanted to step back for a moment and comment on the really unprecedented nature of this lawsuit.

In this lawsuit, we have a state, a state official,

and the General Assembly suing their own citizens to prevent them from quite literally petitioning their own government for redress of grievances.  There are many things wrong with this lawsuit -- wrong plaintiffs, wrong defendant, wrong timing, wrong court.  But it's really just wrong as a matter of first principles for the State to be taking its own citizens to court to try to silence political opposition.

The State, of course, says that it's not trying to silence the Defendants; that they have numerous alternative avenues to express their displeasure with the General Assembly's recent congressional redistricting plan.  They just don't want them to use the referendum process.

This is a referendum process that the Secretary of State, in the space of literally one day, went from specifically authorizing our clients to go out and collect signatures on the petition to then turning around and suing our clients to prevent them from turning in the signatures, thereby effectively preventing them from having the voices of tens of thousands of Missouri citizens who have already signed the petition be heard.

The Plaintiffs come to this court with the argument trying to revive the independent state legislature theory, a theory that the Supreme Court has roundly rejected.  And we'll get to those -- discussing those cases in due course.

But, again, I just want to return to first principles

for a moment about the independent state legislature theory and the irony of Plaintiffs' position here.

The whole reason that the founders gave the default power to set the time, place, and manner of federal elections to the state legislature in the first place is because it was thought that the state legislature was the entity that would be most responsive to the needs of the people, and yet the Plaintiffs here are coming in invoking the Elections Clause to insulate them from having to hear the views of the people.

It's really an upside-down world in which we find ourselves, and I think it's safe to say that the founders would actually be confounded by the position here.

As to the actual legal arguments here, there are numerous issues that should prevent the Court from even reaching the merits:  There is no standing; the case is not ripe; there is no cause of action; and there's a lack of federal question jurisdiction.

But if the Court does reach the merits, it should find that the federal claim, which is the only basis for this Court's jurisdiction, is foreclosed by a century of Supreme Court precedent which was reaffirmed just two years ago in *Moore v. Harper*.

Finding that the Elections Clause claim is foreclosed, the Court should then decline to exercise supplemental jurisdiction over the state law claim.

If the Court reaches a state law claim, however, it should find that in fact the Missouri Constitution is clear. It subjects any act of the General Assembly to referendum subject to certain exemptions not relevant here, and this is any act of the General Assembly.

We, therefore, ask the Court to grant the motion to dismiss and to deny the motion for preliminary relief.

With the Court's permission, I will turn directly to the motion to dismiss.

THE COURT: Sure.

MS. AMUNSON: And I know the Court said that it has read the briefs and will have questions, and we'll, of course, welcome those questions.

So I'd like to start with just the threshold issues here, which are the standing, ripeness, lack of cause of action, and lack of federal question jurisdiction. And I will start, with the Court's permission, with standing.

So there's three plaintiffs here. None of the three have standing to bring the federal claim, which is the only basis for this Court's jurisdiction.

So first is the General Assembly. The General Assembly lacks standing for at least three reasons: First, the General Assembly is not an authorized plaintiff in this suit. The General Assembly is a creature of the Constitution. It can act only through legislation. There is

11

no statute authorizing the General Assembly to be a plaintiff in a case like this. And there has been no vote by the two chambers to authorize the General Assembly to be a plaintiff.

THE COURT: So your position is that the General Assembly cannot initiate litigation like this without a statute authorizing it to do so?

MS. AMUNSON: Yes. The General Assembly needs to either have a vote in two chambers to actually authorize the specific litigation, or it can sort of preemptively -- and that's what happens in some states -- is states have statutes that actually allow the General Assembly to be a plaintiff in certain litigation.

And if the --

THE COURT: What's your authority for that in Missouri?

MS. AMUNSON: So if the Court looks at the *Moore* case, which is out of North Carolina, that's where the court dismissed the --

THE COURT: I saw the *Moore* case, but I'm interested in Missouri law.

MS. AMUNSON: In Missouri law, I think it's inherent in the fact that the General Assembly -- there is no authorizing statute. It's part of the whole sort of just constitutional structure that the General Assembly can act only through legislation. That's how a general assembly

expresses itself through any act.

THE COURT: So if I had to go somewhere for authority for that proposition that relates to Missouri law, not North Carolina law, where would I go?

MS. AMUNSON: I don't have a cite for you --

THE COURT: In the Missouri Constitution? In a statute? In a case?

MS. AMUNSON: I'll tell you why I don't have a case cite for you -- is because the General Assembly, as best as we can tell, has never actually tried to be a plaintiff in a case before. This is actually the first time that the General Assembly has shown up as a plaintiff in a case, and so I don't have a case to cite for you.

However, I think that it is apparent from the other cases like the *Moore* case that -- or even if you go back to sort of the kind of first principles of legislative standing, the *Raines v. Byrd* case from the Supreme Court, what the Court looks at is whether there is an authorizing vote that actually authorizes the plaintiffs to be there asserting the rights of the institution.

THE COURT: What is your response to the State's argument that there is a common law right? And this has been discussed in Missouri precedent that the Attorney General has common law rights to represent the General Assembly. There are more relaxed rules that would apply to that

representation.

And you're not going to probably have the opportunity to respond to that directly; so why don't you go ahead and take that on now.

MS. AMUNSON: So I think that the statute that they cite, which is 1.185.8 to 9, is a statute that authorizes the Speaker, the legislative leaders, to intervene in certain cases, but it does not authorize the General Assembly as a whole to be a plaintiff in a case.

We agree. We're not disputing that the Attorney General is the rightful representative of the General Assembly when duly authorized. There is no dual authorization here for the Attorney General to actually be the representative. There needs to be either a vote in the chambers or an authorizing statute, and here we have neither of those.

If I could move on to the other reasons that the General Assembly does not have standing. Here under the precedent in *Bethune-Hill*, the General Assembly is not permanently deprived of its redistricting authority. In fact, what happens if the referendum succeeds is that the General Assembly's own redistricting plan remains in place and/or the General Assembly, it claims, can then enact a new redistricting plan.

So under *Bethune-Hill* there is -- there's no injury

here, no cognizable Article III injury, because there's no permanent deprivation of the General Assembly's rights to redistrict.

There's also no causation here. To the extent that the General Assembly has an Elections Clause injury is not caused by our clients handing in signatures. In fact, it is -- there are numerous intervening steps that have to happen, including the Secretary of State's certification of the issue for the ballot.

So, you know, in thinking about this, when Congress passes a law that you don't like, you don't sue Congress. You sue the people who are actually implementing and enforcing the law. We're the wrong defendant here. We are not the people who are actually causing the injury. So there's no sort of standing, for all of those reasons, as to the General Assembly.

The Secretary of State, likewise, does not have standing to assert the Elections Clause injury. Courts have repeatedly held that plaintiffs other than the institution itself do not have standing. And the Secretary of State there is even further afield than the legislative leaders that courts have found do not have standing.

I also wanted to just point the Court to, on the standing question, Justice Scalia's actual dissent in the *Arizona* case, which talks about the reasons that, in fact --

and this is back on the General Assembly standing for a moment -- the reasons that we -- or that federal courts are very reluctant to find standing in cases where there are legislative bodies asserting an institutional injury. And there Justice Scalia talks about the separation of powers concerns that are at issue. He says he would not even find standing in the *Arizona* case for the legislature itself.

And I think those are the kind of issues -- he says, you know, we should be even more reluctant in cases where it is a state legislative body that's trying to assert those for federal courts to be finding standing.

On the Secretary's standing, also in addition to not being able to assert the Elections Clause claim, the injury that the Secretary asserts arise from the Secretary's own processing, not from any sort of kind of -- they're trying to bootstrap the Elections Clause injury. And then they have no sort of separate theory of injury for the State.

The suit is also not ripe. As mentioned --

THE COURT: Let me just stop you there. For the State, have they not alleged, at least, waste of resources and litigation expenses for the Attorney General?

MS. AMUNSON: They have not alleged that. They have alleged the Secretary of State is -- as litigation expenses. I don't know that they have specifically alleged the State's expenditure of resources. I don't believe they had a separate

16

theory of standing for the State.

However, we've cited numerous --

THE COURT: I think in several places they did identify the -- I mean, you can disagree with it. But you said that they didn't even have arguments for it. I'm not sure that --

MS. AMUNSON: I think their arguments were basically that the State's standing is derivative of the Secretary of State's standing and the injury is the same. So I take Your Honor's point to be, you know, the injury is to the State and the Secretary of State in having to litigate these cases, and our response would be that, in fact, litigation costs are not a cognizable Article III injury.

THE COURT: Yeah. I definitely understand that point. I'm just familiar with State litigation practices. And a lot of times when the Attorney General is representing other state clients, they would refer to the State, which they've done here. And, obviously, the expenses that are borne by the Attorney General's Office are also borne by the State.

So I'm not saying that you have to agree with them, but I think that they have at least advanced a theory that would be separate and apart from those other harms.

MS. AMUNSON: Okay, Your Honor. In any case, our point remains the same, which is that litigation costs are not

a cognizable Article III injury.

THE COURT:  Fair enough.

MS. AMUNSON:  As to the ripeness claims, as we've said, this -- to the extent there is going to be any injury, it rests on multiple contingencies, which involve turning in the signatures, having the Secretary of State certify the issue for the ballot, having the underlying enactment survive the multiple state court litigation that is already ongoing about it.  And so we don't think that they have -- that this is ripe.

In fact, on page 22 of their opposition to our motion to dismiss, they actually say that the issue is not ripe in state court.  And so it's unclear how this could be ripe in federal court yet not ripe in state court where they're currently litigating the issue.

THE COURT:  Let me ask you about *Pullman* just to make sure we have time to cover it.  So in your briefs, you asked for dismissal and then, alternatively, for the Court to hold the case in abeyance based on abstention principles, and specifically *Pullman*.

My understanding is that the normal course in the overwhelming majority of cases would be to a stay or to hold a case in abeyance pending the resolution of the state litigation.  Is there any reason why dismissal is appropriate here versus the more normal approach of holding it in abeyance

if I were inclined to go that route?

MS. AMUNSON: Abeyance would be fine, Your Honor. We think -- we don't think that there's any reason for dismissal. Of course, we think there are multiple reasons for dismissal, you know, sort of independent of this. But if the Court believes that it wants to wait and see the issue play out in state court first, abeyance would be an appropriate course for the Court.

THE COURT: Okay. I think that's taken you to your time there. So if you have any other points, you're welcome to make them in your closing too.

MS. AMUNSON: Thank you.

MR. CAPOZZI: Thank you, Your Honor. I will start with standing, since that's where my friend started.

Defendants contest standing, but they are mistaken. Start with the Secretary. As detailed in the State's brief, Defendants' actions are forcing the Secretary and the State as a whole to expend substantial resources, facilitating an unconstitutional referendum process.

As my friend herself acknowledged, they forced the Secretary to take certain actions with respect to certifying the referendum as to form. The idea that Plaintiffs are just citizens taking private activity is a complete strawman.

In this case, expenses have occurred, expenses are occurring, and even greater expenses are imminent once

Defendants submit their signatures. These are compliance costs incurred in response to unconstitutional state action, precisely what the Eighth Circuit said establishes standing in *City of Kennett v. EPA*.

THE COURT: Let me rewind just a little bit. You mentioned the idea that the Defendants are state actors or have stepped into the shoes of state actors.

If that's the case, is there any reason why the State didn't bring this suit under Section 1983? And kind of a related question, are we -- is this quasi-*Bivens* territory that we would be in? I mean, it's not. But akin to that?

MR. CAPOZZI: We are not seeking damages, Your Honor. *Bivens* is about damages. 1983 is for damages. We're only seeking injunctive and declaratory equitable relief.

So this is the same equitable cause of action that the Supreme Court talked about in *Armstrong* and that was applied in the *Arizona State Legislature* case. So we're not seeking damages. We just want their state action to stop.

THE COURT: And what about the point in the *Arizona* case that that was -- talk a little bit about your point that -- you said it was a claim processing rule, that three-judge panel statute?

MR. CAPOZZI: Yes, that's right. So the statute that my friend cites is not a cause of action statute. It's just a -- it is a claim processing rule. It is a procedural rule

that the Court has to handle it in a certain way once filed.

But the same cause of action was not invoked, for example, in *Carson v. Simon*, which I think forecloses most of their standing and cause of action theories here in the Eighth Circuit. That was under the Electors Clause. But in *Moore v. Harper*, the Supreme Court suggested that the Electors and the Elections Clause are materially basically identical. And so *Carson* would also foreclose their argument there as would cases like *Wise v. Circosta* in the Fourth Circuit which they cite.

THE COURT: I was planning on asking your friends about *Carson*. I have found it a little bit difficult to reconcile some of the language in *Carson* with some of the other cases that have been cited. And you mentioned the Eighth Circuit said that those two clauses are identical. So I don't know if you want to comment on that at all.

MR. CAPOZZI: I think *Carson* makes clear that there is a cause of action here. I mean, the legislature -- their cause of action is clear from the *Arizona State Legislature* case. But their argument that only the General Assembly can assert injury under the Elections Clause is foreclosed under *Carson*, where the plaintiff was a candidate and the court found that that candidate had a sufficiently direct interest in that case in order to have standing.

And here it's harder to imagine a litigant with a

more direct interest, other than the General Assembly, than the Secretary. The Secretary is the State's chief elections officer. He has to run and preside over the referendum process. He is the one most directly expending substantial resources on behalf of the State. The Secretary is not a mere cheerleader, like Defendants say.

Defendants also say that Plaintiffs can avoid harms by simply rejecting the referendum under the Elections Clause. And they say this is a causation argument. It breaks the chain of causation.

To start, that argument doesn't respond to our ongoing pre-signature submission compliance cost injuries. And as mentioned, the Missouri state courts have held that they cannot review substantive state or federal constitutional challenges to referenda or initiatives until after the final vote occurs.

And so that's also a reason *Pullman* Abstention is not applicable here under the *Beavers* factors. There is not a ready, adequate state law remedy available.

Defendants also question whether the General Assembly is properly in this case. I don't want to dwell too long on this point. I think we address it in our brief.

The intervention statute that my friends cite talks about situations where the General Assembly wants to intervene in a case and obtain counsel other than that of the

Attorney General. So that statute obviously presupposes that, by default, the Attorney General will be representing the General Assembly.

The *Moore* case in North Carolina that my friends cite is different because in that case the Attorney General was not representing the interests of the Assembly. They were on opposite political parties.

And in the *Arizona* case, the Attorney General was not representing the state legislature either because different parts of the state were on opposite sides.

So those cases don't even support their theory in those states, and they certainly don't have any theory in this state that can rebut our evidence on this point.

THE COURT: Let me ask you. Stepping back a bit on legislative standing, could you talk me through why the General Assembly as a whole sued here as opposed to a controlling bloc or the Speaker or somebody like that?

MR. CAPOZZI: Thank you, Your Honor. And precisely to avoid the problems raised in cases like *Bethune-Hill* and *Raines v. Byrd*, those are cases about what happens when you don't have the entire legislature in the case. You know, those are cases about what happens if you only have one house or only a controlling bloc or a few legislators. All of those cases are irrelevant here because the entire General Assembly is represented.

And so that's what those legislative standing cases are about.  They want to make sure that the whole legislature is actually in the case and that a mere subpart is not claiming to speak for the legislature.

THE COURT:  Right.  I think, if given the opportunity, they would say that the whole General Assembly is not in the case, and they attached, you know, a letter from one member that is obviously opposed to it.

So talk me through that a little bit and maybe comment on whether an authorizing vote is needed or if the General Assembly is relying on -- well, you --

MR. CAPOZZI:  There's no evidence for the proposition that an authorizing vote is needed.  The General Assembly obviously takes all kinds of actions that the minority party won't agree with.  Senator Beck, if he dislikes our representation, can ask the state legislative leaders to intervene in the case and obtain counsel other than the Attorney General.  That's the statutory system.  That's his remedy in a case like this.

And I would just point out no authorizing vote is taken when the Attorney General represents the General Assembly on defense.  I don't really understand my friend's basis for distinguishing between offense and defense. I mean, we represent the General Assembly by default, without an authorizing resolution for defense, every day and Sunday.

So I find their entire argument quite strange on this point.

I also want to talk about the ripeness argument briefly. They say, well, that we haven't submitted the signatures yet. Plaintiffs have alleged that, as of several weeks ago, they had a hundred thousand more signatures than necessary to qualify. And my friends haven't disputed that point.

It's now several weeks later. They've continued to invest substantial resources to gain signatures. They don't deny that they have enough signatures to qualify. They simply speculate that, well, the Secretary might reject some of those signatures.

But that argument about -- that speculation about future events really seems to sound more in mootness than in ripeness. I don't see how their speculation about potential future events post submission can defeat the imminence of our injury.

On cause of action, I would direct the Court to the *Edmonson v. Leesville Concrete* case. I think that that case is much closer on state action than this one. In there the court found that a peremptory challenge to a juror by a private litigant with state action -- and the court emphasized, you know, they're using a process created by the government, and they require assistance from government officials to facilitate that.

That's true, and then some, here. They don't contest that they are trying to exercise a right only created by state law. They require enormous assistance from state officials to facilitate what they're trying to do from start to finish. They've already forced the state to do several things, including the certification as to form, now the summary statement, as well as other resource expenditures.

And they concede on page 8 of their reply brief that they are trying to exercise legislative power. And I was grateful for the concession, because it's hard to think of a more quintessential action that is governmental in nature than legislative power, than exercising legislative power.

And, finally, on abstention, we would restate our point that this case is categorically ineligible for *Pullman* Abstention because it involves a federal constitutional dispute. My friends don't want the state court to decide a state legal issue. They simply want to punt a federal legal question to state court.

And, again, the Supreme Court, in the *Pennzoil* case, said that when there is not a pending state court action that raised the claim in the federal suit, abstention is almost always inappropriate unless they can show that the court's opinion would be almost certainly advisory.

So there's a heightened standard they can't satisfy, and as discussed, there's no adequate state court remedy

available because of the *Calzone* case.

Unless the Court has questions, I'll sit down.

THE COURT: I think you're up again now for the merits; right?

MR. CAPOZZI: That's right, Your Honor. And I won't sit down. And I will say something about the merits.

THE COURT: Just to note on why we arranged it this way, it follows with the parties' burdens; that you all have the burden on motion to dismiss, and you all have the burden on the preliminary injunction.

MR. CAPOZZI: It's been a long week. A moment of forgetfulness.

THE COURT: That's okay.

MR. CAPOZZI: On the merits, Your Honor, the U.S. Elections Clause says that the times, places, and manner of holding elections for Senators and Representatives shall be prescribed in each state by the legislature thereof, but the Congress may, at any time, make or alter such regulations.

The Elections Clause vests the General Assembly with authority over redistricting. All agree that is the default. And the text identifies only one actor who can override that authority: Congress. Yet even when Congress wants to displace the default rule of state legislative authority, the U.S. Supreme Court, in *United States v. Gradwell*, held that Congress must employ clear and positive statutes to do so.

27

That same rule should apply to attempts by other state actors to strip away the authority of state legislatures over redistricting.  In *Hildebrandt*, for example, the U.S. Supreme Court rejected a challenge under the Republican Form of Government Clause to a referendum against a redistricting map, but it did so only after noting the existence of a conclusive -- that was the phrase it used -- conclusive decision subjecting redistricting bills to the referendum.

The Supreme Court also noted a clear delegation to the Redistricting Commission in *Arizona State Legislature*.

THE COURT:  Let me ask you before you move on from *Hildebrand*t.  In that case, wasn't the conclusive determination from the state supreme court?  Isn't that what the states --

MR. CAPOZZI:  Yes, Your Honor.

THE COURT:  And does that comport with the Clear Statement Rule?  I mean, my understanding of the Clear Statement Rule is that it would need to be the statute or the actor provision that's being interpreted, not extrapolation from a court's holding.

MR. CAPOZZI:  I think a state court's holding would be evidence on the meaning of state law.  So there, of course, there was no dispute as to the state law prerequisite.  There was no dispute that the authority had been clearly delegated.

But if the point had been disputed, yes, Your Honor

is correct that the Ohio -- the fact that the Ohio Supreme Court had held on the issue would not necessarily be dispositive. Then the Court would apply the standard of review from *Moore v. Harper* to see if that is a fair reading of state law -- consistent, of course, with the federal Constitution.

Applying that rule here, the Court will find no clear statement in the Missouri Constitution. Indeed, appellants barely contest the point. All agree that no language in the Missouri Constitution specifically addresses whether federal redistricting bills are subject to the initiative and referendum process. And it is undisputed that no framer of the Missouri Constitution expressly considered, let alone endorsed, the possibility of federal redistricting being subject to the initiative and referendum process. And it is undisputed that there is no state court holding addressing this issue.

Altogether, if Defendants prevail, it seems pretty clear that Missouri will only have accidentally subjected federal redistricting bills to the initiative and referendum process, with dramatic and severe consequences, which I'll return to in a minute.

The Supreme Court does not allow any other branch of government -- whether it's Congress, the President, the courts, or the states -- to lose core constitutional

delegations of power by mere implication.  This Court should not allow that to happen here.

On the merits, Defendants offer a few counter-arguments, but those fail.  First, Defendants deny that a Clear Statement Rule exists under the Elections Clause, arguing that the General Assembly should be left uniquely unprotected against the loss of its authority over federal elections, but they offer no principled reason why that should be so.

And United States Supreme Court already applied that Clear Statement Rule in *United States v. Gradwell*.  Defendants deal with *Gradwell* in a footnote, saying that it's an application of the federalism canon.  But if the Court reads *Gradwell*, it rests on the assumption and the longstanding tradition that state legislatures traditionally exercise authority over elections, and the court explains that it's a big deal to depart from that longstanding tradition.  Regardless of how the deprivation occurs, *Gradwell* suggests it must be done clearly.

Second, Defendants assert that Clear Statement Rules apply only to protect Congress' authority.  That's obviously wrong, as the State cited cases protecting the Constitution's default assignment of power to every governmental actor in the Constitution.

Third, Defendants assert that constitutional Clear

30

Statement Rules cannot be applied against state law, but the Supreme Court did just that in *Seiler*. And as *Moore v. Harper* makes clear, when federal courts hear claims under the Elections Clause, the meaning of state law is a federal question, which means courts can apply federal interpretive rules, including constitutional Clear Statement Rules.

Fourth, Defendants insist that the Supreme Court has rejected a Clear Statement Rule, but that is wrong. In *Hildebrandt* and *Arizona State Legislature*, the court expressly noted the existence of conclusive state law, depriving the legislature of authority.

Defendants also rely heavily on *Moore v. Harper*, but that case doesn't help them. There it was undisputed -- and all agreed -- that, as a matter of state law, redistricting bills were subject to judicial review in states courts.

So the equivalent of this case in *Moore* would have been is there a fight as to whether, as a matter of state law, redistricting bills are subject to judicial review at all? But that case was about the standard that applies, because all agreed that they were subject to judicial review.

Finally, Defendants meekly insist that the Missouri Constitution does clearly subject federal redistricting bills to the initiative and referendum process. They correctly observed the broad, open-ended provision for referenda and initiatives in the Missouri Constitution.

But as the Supreme Court explained in *Norwegian Cruise Lines v. Spector*, broad, open-ended language that does not address the specific topic at issue cannot satisfy a Clear Statement Rule.  As the court explained, quote, "a Clear Statement Rule is an implied limitation on otherwise unambiguous general terms," end quote.

Defendants don't point to any historical evidence suggesting that the framers of the Missouri Constitution considered whether federal redistricting would be subject to the initiative and referendum process.  All they have is stray dictum from a couple of cases which considered completely different issues and didn't even mention the Elections Clause.

And they have one historical instance of a referendum occurring in the late teen, 1920s under a prior version of the State Constitution and where no court ever considered its legality.  Such thin evidence does not show the framers of the Missouri Constitution intentionally subjected federal redistricting bills to the initiative and referendum process.

As the U.S. Supreme Court explained in *Norwegian Cruise Lines v. Spector*, quote, "Clear Statement Rules ensure the government does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation," end quote.  There's no evidence of any deliberation in Missouri as to whether federal redistricting would be subject to a chaotic initiative and referendum

32

process; thus Plaintiffs are likely to succeed on the merits.

Plaintiffs also satisfy the other prerequisites for a preliminary injunction.  All the harms identified by the State in its briefs, when discussing standing, are irreparable and cannot be remedied by monetary damages.

The equities also overwhelmingly justify a preliminary injunction hearing.

THE COURT:  While we're on the harms, I just want to walk through those, the harms that the State's asserted, I guess mostly chronologically.

So my understanding is the biggest harm -- or my guess would be the biggest harm the State is asserting would be the encroachment on the apportionment power asserted on behalf of the General Assembly.

Then there's the resources arguments that you raise, the sample sheet the Secretary of State and AG review, the auditor's preparation of a fiscal note, posting the measure on the website, litigation expenses.  And then after submission of the final petition, there's the review for compliance with the Constitution and signature verification certification.

So I guess everything that we've discussed so far, other than the submission, has already happened, maybe is still happening?

MR. CAPOZZI:  Just a couple corrections.  We also have to provide copies of the comments upon request.  There

are investigatory burdens. And the Secretary does not get a full -- or probably does not, under cases like *Calzone*, get to do a full constitutional review. There's only limited constitutional review for things like single subject and things that go to --

THE COURT: Is that based on -- my understanding with that argument -- and maybe I'm misinterpreting what your argument is -- but that the ripeness, state ripeness doctrine on referenda is the main block to courts hearing that.

MR. CAPOZZI: Yes, Your Honor.

THE COURT: But that -- and I think your friends have argued pretty strenuously that under Missouri statute the Secretary has, you know, not only the ability but the obligation to review for constitutional compliance.

MR. CAPOZZI: I'm confident my friends will turn around and make the opposite argument if this case gets kicked to state court, because traditionally --

THE COURT: And I'm forewarning we're going to be talking about that. If they raise that argument and assert it here, I would advise against turning around and making a different argument in state court. But that is their argument. That's my reading of the statute -- is that there is this opportunity under state law for the Secretary to review the constitutionality of a referendum once the final petition is submitted.

MR. CAPOZZI: So in the context of the initiative, the state courts have refused to distinguish between secretarial review and judicial challenges by outside parties. And so, again, the State's not entirely sure on this issue, but we think it is likely the state courts would extend those prior holdings.

And if you read the *Calzone* case, you know, it uses very broad, sweeping language about how these substantive challenges are almost always kicked until after the vote. That's been true in cases where the Secretary has tried to reject on substantive bases. You know, the *Coleman v. Ashcroft* case discusses this. That's the Missouri Supreme Court in 2024.

So, again, I want to be careful here because, you know, if the Court does abstain or dismisses, we may try to assert the language of the plain statute too. But I think the precedent has largely rejected the language of the plain statute, which, you know, it's a tricky situation for the State, of course. But yes.

THE COURT: You would agree that the plain language of the statute -- and I take it that this is the argument that we're going to hear in a couple minutes -- would allow the Secretary to do the -- to conduct -- actually requires the Secretary to conduct that constitutional review.

MR. CAPOZZI: We think that's the best reading, but

the state courts have strongly suggested that that constitutional review is limited to things that go to the form of the vote, things like single subject challenges, original purpose. That's the *Coleman v. Ashcroft* case.

So, yes, we agree with that, but we understand that there's difficult precedent against us here, which is why we don't have a guaranteed alternative remedy in state court.

THE COURT: Okay. A couple more follow-up questions, and I'll give you all some extra time too.

I understand that you've included the pre-litigation or ongoing harms that would be incurred before injunctive relief could be granted for purposes of standing. But for the resources that have already been expended, you're not seeking to reclaim those, are you?

MR. CAPOZZI: We are not. So for standing purposes, we are pointing primarily to the ongoing and certainly imminent and pending future injuries.

I think our broader point with discussing the past injuries is, from start to finish, Defendants' actions impose serious burdens. And, yes, as time passes, some of those become no longer redressable, but there are still ongoing harms, and there are very big imminent future harms.

Again, they don't deny that they have the signatures, which means they'd be pretty close to their aim of freezing the state's congressional map and denying it.

36

THE COURT:  The map would be frozen post certification; is that right?

MR. CAPOZZI:  That is our understanding.  Although I will point out to the Court that there is some legal uncertainty.  Given the unprecedented nature of everybody's actions in this larger dispute, there's some uncertainty as to whether mere submission of the signatures freezes the map or whether it is post certification.

The State's tentative position is that it is only after final certification of the signatures that the map would be frozen, although I would be curious to hear my friend's position on that question as well.

THE COURT:  I'll be eager to hear that as well.  Okay.  Thank you.

MR. CAPOZZI:  Thank you, Your Honor.

MS. AMUNSON:  Thank you, Your Honor.

I'd like to just briefly return to the cause of action question and then turn to the merits and then address some of the questions that the Court has raised.

As to the cause of action issues, there is no equitable cause of action in sort of the tradition of our nation's history for a state to sue its own citizens who are circulating a referendum petition.

THE COURT:  Yeah.  I think the problem that you all run into there is at some point I think you would have to

concede that if you're arguing that the referendum process is authorized under the Elections Clause because the referendum supporters are sharing in the state's legislative power, it would strike me as a pretty curious argument for you to then argue that they're not engaged, at least at some point, in something that is akin to state action.

And maybe that's after the initial filing of the initial petition, or maybe that's after the filing of the final petition. I'm not sure where that would kick in. But I don't see how you can argue both of those things.

MS. AMUNSON: So I think the Supreme Court's decision in *City of Cuyahoga* forecloses the argument that petition circulators become state actors simply by using the referendum process.

And the Ninth Circuit's decision in the *Fred Meyer* case also addresses this specific issue and talks about how, in some cases, legislative power is shared between the General Assembly and citizens. But that does not make the citizens state actors for purposes of circulating a petition. If that were true, Your Honor --

THE COURT: I don't know that I'm -- what I'm suggesting is the circulation of the petition. What I'm suggesting is if -- probably more the submission of the petition, because they are formalizing the requirement post certification, I guess, that the Secretary of State is going

to have to see to it that this goes onto the ballot. There's going to be an entire referendum election. And I don't know. Maybe you can try and thread the needle. I don't see how you can have it both ways.

And it's less about the circulation of the petition, though, and more about using a state process to compel a vote, an up or down vote, on whether a law from the General Assembly is going to be upheld.

And your argument, unless you're going to run afoul of the Elections Clause, is that you necessarily are, at some point in this process, exercising legislative power.

MS. AMUNSON: Your Honor, if it were true -- so I understand Your Honor's point. But if it were true that you became the State simply by sort of using the referendum process --

THE COURT: I don't know that I'm suggesting that you become the State --

MS. AMUNSON: -- you'd lose your First Amendment rights, which would be completely --

THE COURT: I'm not suggesting --

*[Reporter clarification.]*

THE COURT: Yeah, you're going to have to stop talking when I'm talking so the court reporter can pick up.

MS. AMUNSON: I apologize.

THE COURT: What I was asking you is not suggesting

that you become that -- a referendum petitioner would become the State.  But the action of at least submitting the petition strikes me as being very much in the business of undertaking state action, undertaking -- I mean, the argument is, literally, sharing in the legislative power of the State; right?

MS. AMUNSON:  I understand Your Honor's point.  I do want to -- I haven't been able to address the merits yet, and I would like to make sure that I have time to address the State's arguments on the merits.

THE COURT:  I'll give you a bit of extra time, but maybe addressing what we're -- I mean, are you just pivoting away from what we're talking about?

MS. AMUNSON:  No, Your Honor.  I think we -- what I'm saying is that the referendum process under *City of Cuyahoga*, under *Fred Meyer*, it does not -- it does not make you a state actor, thereby subjecting you to an equitable cause of action. There is no -- under *Trump v. CASA*, et cetera, there are no sort of historical analogs to an equitable cause of action like this.

You have -- the only sort of case that we have is the *Arizona* case.  That's the only kind of Elections Clause case where you have the legislature suing another state actor. We've never had an analog of them, of this legislature trying to sue private citizens using a referendum process for this.

And so just if you look at the Elections Clause precedents, this case is on all fours with *Hildebrandt*.

As to Plaintiffs' Clear Statement Rule, the constitutional provision in the Ohio Constitution is essentially the exact same referendum provision that was -- that's in the Missouri Constitution. It says any law is subject to referendum just as the Constitution here says any act is subject to referendum.

The Supreme Court found that contentions that that violated the Elections Clause to be plainly without substance. That has been reaffirmed in numerous cases over the last hundred years in *Smiley*, in *Arizona*, and finally in *Moore*. In none of those cases was there a Clear Statement Rule required. In *Smiley* there was no sort of do you actually have to specify that the governor has a veto power over congressional enactments?

Just as in *Hildebrandt*, there was no do you have to specify that the referendum applies to congressional enactments? It's exactly on all fours. And in *Moore*, in a 6-3 decision, the court reaffirmed all of those precedents. Even the dissent in *Arizona* accepts *Smiley* and *Hildebrandt* and the fact that the referendum process is an extension of the legislature's power. It does not supplant the legislature's power.

We think that the Elections Clause plainly forecloses

the federal law claim and likewise forecloses the state law claim, because the state law claim is simply based on -- they are asking Your Honor to, as a matter of federal law, impose a federal judicially created rule of construction to interpret the Missouri Constitution. That would be, I think, an extraordinary thing for a federal court to do.

THE COURT: Would you mind addressing *Carson* and maybe helping me see the light there.

MS. AMUNSON: So *Carson*, of course, is an Electors Clause claim, not an Elections Clause claim.

THE COURT: But the language is identical, isn't it?

MS. AMUNSON: The language is not identical. And, in fact, when -- in the *Arizona* case, the court actually goes through and specifies that, in fact, legislature can mean different things in different parts of the Constitution.

THE COURT: The words --

MS. AMUNSON: And they talk about --

THE COURT: I do understand that point. But the operative language in those two clauses, "the legislature thereof," is the same, isn't it? You can argue that it has different meaning, which is, I guess, what you're arguing, but the words on the page are the same.

MS. AMUNSON: The words "the legislature thereof" are the same. However, what the court said in *Arizona* is that in the Electors Clause the court -- or the state is exercising

appointment power.  That is different than when the state is exercising lawmaking power, which is what is happening in the Elections Clause.

So *Carson*, we think, is addressing a completely different thing and is also about candidate standing.  So the *Carson* case, I think, does not control this case at all, particularly given the Supreme Court's precedent in *Arizona* that says the Electors Clause is a different function.  It's an appointment function as opposed to a lawmaking function.

And *Smiley*, *Hildebrandt*, *Moore*, *Arizona* all hold that when the court is -- when the state is exercising a lawmaking function, the legislature's powers can be supplemented or controlled by things like gubernatorial vetoes and things like referenda.  We think those cases squarely control here.

I just wanted to briefly address the other side's contention that, in fact, there is no on-point Missouri precedent.  In fact, the Missouri courts, in *Preisler*, held or said that if folks wanted -- were unhappy with the congressional plan, they could seek the referendum process.

THE COURT:  You agree that that is certainly dicta in that case; right?

MS. AMUNSON:  It is not the holding of the case, you're correct, Your Honor.  However, there would have been -- also in the 1952 case, there would have been no reason to decide the timeliness of congressional referenda petition if,

43

in fact, there were no ability to subject congressional enactments to referenda.

I also want to address the contention that, in fact, you -- that you could only challenge the referendum after it actually happens.  That is true as to sort of the substance of the law but not true as to what -- and I know Your Honor was asking about this -- the Secretary's certification decision.

So if the Secretary rejects, as we expect the Secretary will, rejects the petition as not being in conformance with the Missouri Constitution, our clients and anyone has the ability to then take the Secretary to court to litigate that.  That is something that can be resolved in advance of the election, thus foreclosing kind of their parade of horribles of everything that might otherwise happen.

THE COURT:  Just to flesh out that point a little bit more -- and we talked about this, and this is littered throughout your brief -- you are arguing that the Secretary has the ability to review the constitutionality of the final petition when it's submitted for review?

MS. AMUNSON:  The Secretary has the ability to review the constitutionality of it for compliance with Missouri Constitution, which is where the Secretary can say this is not something that is subject to referendum because it is foreclosed by the Missouri Constitution.  That's what we expect the Secretary would say.  And that's something that can

be challenged.

THE COURT: Yeah. But, essentially, to rewind, to step back before whether it can be challenged or not, that determination -- you're effectively arguing as part of your motion to dismiss that there's no reason to address these claims now because the Secretary is going to have the opportunity to raise the exact same claims about the Missouri Constitution when he does that review as part of the certification process.

MS. AMUNSON: Yes, that's correct, Your Honor. And then we would sue the Secretary in state court. Or, you know, in all likelihood, the Secretary would be sued in state court to challenge that, at which point the Secretary could then raise the federal Elections Clause defense.

THE COURT: So in some form or fashion, you're arguing that they could make all of the same arguments that they're making now in whatever litigation would arise after that certification, and that's why you're asking the Court to not get to them now.

MS. AMUNSON: Yes.

THE COURT: Okay. And given that the -- I think that this was -- I think that I understood this from the briefing. But I think necessary to that argument as to why the State isn't facing harm, if this Court weren't to rule now, implicit in that is that the freeze wouldn't occur on the new maps

until after the certification. Is that right?

MS. AMUNSON: Your Honor, I think state law is a little bit unclear on this. It is the fact that -- I think that the turning in of the signatures, once the certification occurs, it sort of is kind of nunc pro tunc to the time of turning in the signatures.

So it is turning in the signatures ensures that the law will not otherwise go into effect on the 90th day. But there is still processes that have to take place to ensure that that -- the referendum then ends up on the ballot, which include ensuring there are enough valid signatures and that it complies with the Missouri Constitution.

THE COURT: But I think -- well, I'll just say central to your argument, if there's any chance of it prevailing, is that if the Secretary -- I mean, you've argued that the Secretary -- there's no harm here. The Secretary can just not certify it based on either of the -- you know, maybe there aren't enough signatures. Maybe it's unconstitutional under the Missouri Constitution.

And if either of those two things happens, then at that point the new map would go into effect, presumably, and as you said, I think you'd have the ability to then challenge that. I think that needs to be your argument if there's any chance of --

MS. AMUNSON: I think the Secretary's decision would

still have to survive state court review, yes, but I think only upon the Secretary's decision surviving state court review would the map go into effect.

THE COURT: Okay. So if the Secretary says, no, this isn't valid, what would keep the -- I mean, I think you can go and seek -- in that event, I think that you can go and seek emergency relief in the state or maybe -- and in federal court, in some court, but what would hold the map, the new map, from going into effect at that point?

And just keep in mind that if your answer is anything other than that it's not going into effect, I think your -- all of the arguments related to this in your motion to dismiss are going to collapse, because that is the ultimate harm, I think, that the State is seeking to prevent.

MS. AMUNSON: So I think it is that the Constitution says that, once the referenda process starts, it cannot go -- and I'll get the exact language from 52(a). But it's once the voters vote that the law takes effect.

So if, in fact, there is -- we think that the Secretary's decision would have to survive state court review and only then would the map go into effect.

THE COURT: So two questions. And I would appreciate maybe during the State's closing if you can get that language. I think it's 52(b), though, not (a). Oh, actually, I'm sorry. I'm sorry. I totally lost my train of thought.

And maybe Mr. Hatfield can help us with the language. My reading of it was that the only thing that would trigger what you're talking about is if there were valid signatures submitted. It presupposed certification.

And my question was what authority is holding the law from going into effect?

MS. AMUNSON: It is the submission -- it is that the referendum process has been initiated.

THE COURT: So when is that? If you all have waited to file a lawsuit challenging what the Secretary had done for six months and then filed it, would it just graft all the way back to the fact that you had submitted signatures?

I guess my reading of it -- and, again, I think that you may be punching a hole into some of your arguments for dismissal. If the state law is going to not go into effect, even if the Secretary certifies that it's unconstitutional, or declines to certify the petition to move forward, I don't see how they're not being harmed at that point.

MS. AMUNSON: So the issue, Your Honor, is that you cannot have a referendum on a law that has gone into effect. So that is why --

THE COURT: Actually, Missouri courts have held exactly the opposite. I think that was an argument that was advanced in *No Bands on Choice v. Ashcroft*; that the law had gone into effect. And that was the State's argument. And

they said, even though it had gone into effect, that basically the court unwound that. That was the argument in that case.

MS. AMUNSON: So that is the issue here -- is that it would have to survive state court review. So the state court review is sort of the unwinding and going back. That's why --

THE COURT: Yes. But in that case, the law did go into effect.

MS. AMUNSON: So, Your Honor --

THE COURT: What I'm saying is -- and I think you need to be arguing it for your dismissal arguments -- the law would go into effect, and then you would seek to challenge the law based on the Secretary's actions and say what the Secretary did was impermissible and then file whatever emergency relief that you wanted to do, and that very well could preclude the map from going forward.

But I think if the Secretary -- well, and direct me where I need to be on this if I'm misreading this, but I think for your harm arguments to bear out, that needs to be your position.

MS. AMUNSON: And that is our position, Your Honor. However, I'm just saying that we would not lose the right to the referendum if, in fact, the Secretary's decision does not survive state court review.

THE COURT: Yes.

MS. AMUNSON: Okay.

THE COURT: But in the interim things would move forward unless and until you sought emergency relief and filed a lawsuit and everything.

MS. AMUNSON: That's correct.

THE COURT: Okay. Okay.

I guess we've had -- unless you had anything else? Five minutes for both sides to close.

And if Mr. Hatfield has some reasons for why what I said was wrong, I'm sure you all will let me know.

MR. HATFIELD: Judge, if I might, it is 52(b) that I believe you all were talking about.

THE COURT: Yes.

MR. HATFIELD: And do you want the language?

THE COURT: Sure.

MR. HATFIELD: So, of course, I stated looking up the *No Bands* case, so give me one second. In 52(b) -- I'm not young enough to do this on my phone, but I'm trying.

52(b): "Any measure referred to the people" -- this is in the second half -- "shall take effect when approved by a majority of the votes cast thereon and not otherwise."

THE COURT: Yeah. And my thinking on that was that nothing would be referred to the people if the Secretary decertified it and there was no challenge.

MR. HATFIELD: That's true.

THE COURT: So what I was saying was it almost

presupposes the certification or a successful challenge to decertification.

MR. HATFIELD:  Right.  And I don't mean to upset the Court's procedures, but that's why the statute says that in the case of failure to certify, a plaintiff only has ten days. So if that were to happen, one of us would be in state court. We'd have to be there within ten days.  We'd be seeking emergency relief.  So Your Honor's right.

THE COURT:  Yeah, I think we're all on the same page at this point.

MR. HATFIELD:  Yeah, we are.  We wouldn't want to sit long, is all I'm trying to say.

THE COURT:  Understood.

MR. CAPOZZI:  Your Honor, I confess I'm thoroughly confused after that abstention discussion.  Abstention is not permissible for a host of reasons, but the easiest one is --

THE COURT:  Well, I'll let them correct me on this, but I think this is more about harms.

MR. CAPOZZI:  And ripeness.

THE COURT:  And ripeness.

MR. CAPOZZI:  Well, the idea --

THE COURT:  Maybe it would flare in to abstention, because I think you can argue that it's an alternative remedy or alternative State remedy.  But I think, at least in the briefs, the way that it's been advanced is more related to the

harms.

MR. CAPOZZI: As conceived of as a ripeness argument, first of all, that doesn't speak at all to the State's ongoing pre-submission harms.

As for the sovereign injury, the loss of the General Assembly's authority over redistricting, there was a lot of hedging and careful words from my friend about whether state court review would be available if the Secretary -- and whether the Secretary would be allowed to reject under the Elections Clause. I notice my friend specifically --

THE COURT: Well, I just -- I'm sorry. I know I promised to not jump in on closing, but I think this is very important. I left that conversation with -- well, I thought the briefs were clear. I left it with more clarity that they are -- they have stated in this court and represented that they believe that the Secretary is going to have the opportunity to review the constitutionality.

If the Secretary decertifies, then they believe -- and I am inclined to agree with them -- that they then could challenge that in state court under Missouri law, and I'm sure that they would do so.

MR. CAPOZZI: I think what my friend said was that the Secretary could raise arguments under the Missouri Constitution, the state constitution. She never conceded that the Secretary could reject based on substantive

federal constitutional concerns. And, in fact, my friend said the opposite quite clearly until the Court pushed quite a lot.

And so the idea -- I don't think it's clear at all that the Secretary will have the opportunity to raise the Elections Clause as a defense for denying certification. I'm quite confident that my friends will turn around and argue contrary in state court.

But even putting that aside, even putting all of that aside, from a ripeness perspective, the State has current, ongoing pre-signature submission injuries. I don't think that that does not cut off the chain of causation for those injuries in particular.

It's also still quite unclear to me what the status of the map will be when they submit their signatures. I think eventually, my friend conceded, that the map stays in effect unless and until they can win a state court challenge, but I'm frankly not sure after that exchange. There was a lot of hedging.

THE COURT: That's where I think everybody wound up. And Mr. Hatfield is nodding his head yes.

I do think that's very important. And I think, as we talked about earlier, that the arguments for dismissal will be very flat if that weren't the case. But I do think -- I mean, I think it is abundantly clear, though, from the record that's been developed at this hearing, that that's their position,

right or wrong.

MR. CAPOZZI: Even putting all of that aside, the case is still ripe. The State has ongoing injuries that are caused by Defendants' actions and could be redressed by the Court's actions.

I don't think my friends responded to the point that compliance costs are cognizable injuries under *City of Kennett*.

And so in the end, Defendants really can't escape the reality that they are trying to take away legislative power that the U.S. Constitution vests in the General Assembly. The idea that that federal constitutional issue should be kicked to state court, when the State is suffering ongoing and also certainly impending future injuries, that is not a service to federalism. That's a disservice to kick an inherently federal constitutional dispute to state court.

Whether the U.S. Constitution permits -- ever permits the General Assembly's authority to be kicked to a referendum process is a grave question. *Hildebrandt*, *Smiley*, and *Arizona State Legislature* don't answer that question for the reasons stated in the State's brief, but the Court should just apply the rule in *United States v Gradwell*.

THE COURT: I'm sorry. And, again, I know that I promised I wouldn't do this. I wanted to ask you before. I know that you preserved your right to argue down the road that

*AIRC* was wrongly decided.  Does that argument extend also to *Smiley* and *Hildebrandt*?  Would you necessarily -- let's say it ended up going that route.  Would you be trying to challenge all of those on eventual review, or do you think just *AIRC* would be sufficient?

MR. CAPOZZI:  Well, *Smiley* is certainly not relevant.  *Hildebrandt* -- we read that as a Republican Form of Government case, just like the U.S. Supreme Court did in *Baker v. Carr* and the Chief Justice did in *Arizona State Legislature*.

If the Court disagreed, we could ask -- if the Court accepted their interpretation of *Hildebrandt*, we would be asking to overrule *Hildebrandt* and not *Arizona State Legislature*, to clarify that point.

Defendants cannot meet their burden here of identifying a clear statement.  They point to no text in the Missouri Constitution specifically addressing federal redistricting.  They point to no historical evidence.  They point to no state court holdings.  They admit it's just dicta.

Missouri has laid out the extraordinary implications of Defendants' position and how redistricting will become a senseless exercise subject to uninformed plebiscites.

Defendants don't contest any of that.  They don't contest the State's account.  But the Court has to consider the balance of the equities, and all this weighs heavily in favor of a preliminary injunction to stop this chaos.  And

more broadly, all of -- may I have a couple extra seconds, Your Honor?

THE COURT: Sure.

MR. CAPOZZI: And more broadly, all of this should make the Court pause and ask itself, did Missouri really intend to adopt the system? Is that really plausible?

The answer is it's not. Allowing Defendants to forcibly back Missouri into a strange new world of redistricting that the State is obviously not prepared to implement in a feasible way violates the Elections Clause. This Court should prevent the ongoing and imminent harms the State faces and enter a preliminary injunction. Thank you.

THE COURT: Thank you.

I will try to be more disciplined and not cut in quite as much with you.

MS. AMUNSON: That's fine, Your Honor. I want to make sure that we do answer all of the Court's questions. So if the Court has any lingering questions, please feel free.

I think that the hundred years of Elections Clause precedent, reaffirmed by *Moore v. Harper* just two years ago, squarely foreclosed the only federal claim that is before this Court.

As I said earlier, this case is on all fours with *Hildebrandt*. It is essentially the exact same referendum provision. And the Supreme Court found in *Hildebrandt* that

any contention that the use of that referendum violated the Elections Clause was, quote, "plainly without substance."

Again, in *Smiley* the court did not -- courts did not look for a clear statement that, in fact, congressional redistricting was subject to a gubernatorial veto.

In *Arizona*, which my friends have preserved their right to ask for the overruling of, even the chief dissent by Chief Justice Roberts accepted *Arizona* -- accepted *Hildebrandt* and *Smiley* as givens, accepted the referendum power as something that was consistent with the Elections Clause.

And that is again what the Chief Justice held in *Moore v. Harper*, where, contrary to my friend on the other side saying that he thinks of *Hildebrandt* as a Guarantee Clause, the Chief Justice specifically described it as an Elections Clause holding. So I simply don't see how they are able to overcome that their Elections Clause argument is squarely foreclosed.

Their Clear Statement Rule kind of makes for a good law review article, but it has never been actually applied by the Supreme Court in its Elections Clause jurisprudence. Even if one says that the Missouri Constitution actually requires a clear statement, there is, in fact, no ambiguity as to the Missouri Constitution, and that is all that a Clear Statement Rule normally requires. It is not a magic words requirement. It is a lack of ambiguity.

The Constitution says any act of the General Assembly is subject to referendum. Then congressional enactments have been subject to referendum in 1922, and the Missouri Supreme Court has repeatedly referenced the fact that congressional enactments can be subject to referendum. In the 1952 case, there would have been no need to decide the timeliness of petitions if, in fact, congressional redistricting was not allowed to be subject to referendum.

I wanted to briefly address the harms point. So the State essentially says that their harm is their ongoing costs of processing the petition. Those are harms that arise from Missouri statutes that are within the control of -- largely within the control of the General Assembly.

The State is trying to bootstrap the harm of processing the petition on to sort of just a view that what they are being required to do is unconstitutional. The only -- as the Pennsylvania court held, the only -- if there is a harm, it belongs to the General Assembly. And that harm would be being stripped of its redistricting power.

It is not being stripped of its redistricting power, as they concede. If, in fact, the referendum goes forward and this congressional enactment is rejected, what goes into effect? The legislature's own redistricting plan from the prior -- from 2022. It is not as if the legislature is stripped of their redistricting authority. So we think that

also forecloses their harm arguments.

I also just want to talk about the balance of the equities here. On the one hand, you have the State saying there are compliance costs from the fact that we are being required to do our job, which is to process a referendum petition. On the other hand, you have tens of thousands of Missouri citizens who want to make their voice heard to their legislature, which has done an unprecedented thing in mid-decade, introducing a new redistricting plan.

The State says the First Amendment does not apply here, which is a remarkable assertion given that the referendum procedure has been held to be core political speech. What the State is asking the Court to do is to impose a new federal judicially created rule of construction on a state constitution so as to foreclose tens of thousands of Missouri citizens from exercising their First Amendment rights.

We ask the Court to grant the motion to dismiss and to deny the preliminary relief requested by Plaintiffs. Thank you.

THE COURT: Thank you.

Couple housekeeping issues just before everybody goes. I don't know that this was ever put on the record; so I'd like to do so now. The State had requested in its motion for preliminary injunction -- and maybe it was in the memo in

support -- expedited briefing.

And the Court talked with everyone, and I just want to put on the record that they modified that request, based on an agreement with the Defendants, that they would not file their petition before December 9. As a result of that, the State withdrew its request for expedited briefing.

I do appreciate the parties working together on that. I think that the briefing in this case was excellent, and I think it would have been difficult to pull that off on the timeline that we were originally working with. So I appreciate that everybody did that.

I don't want to put you all on the spot, but do you know when you would anticipate submitting the petition? Obviously, there's not a huge window there between the 9th and 11th.

MR. HATFIELD: December 9th, Judge.

THE COURT: Okay. Well, then I will uphold my end of the bargain and make sure that we have a decision out before then.

I also wanted to ask -- and I've been following along a little bit. But as I count, there are six pending state cases. Is that ish?

MR. CAPOZZI: It might be five, but it could be six.

MR. HATFIELD: It might be eight.

THE COURT: It might be eight, okay. I thought it

51/25/25  Preliminary Injunction Hearing

60

was five until the ballot language case was filed.  By my count, that pushed it up to six.

MR. CAPOZZI:  If Your Honor is counting the challenges to mid-decade redistricting --

THE COURT:  Yes.  I'm sorry.  Yes.

MR. CAPOZZI:  Three of those, two in Jackson County and one in Cole County.  There is a dispute as to the rejection as to form, the initial rejection as to form by the Secretary.  There's a dispute over the summary statement for the referendum.

MR. HATFIELD:  The NAACP case would be six.

MR. CAPOZZI:  Oh, that's right, yes.  A challenge to the constitutionality of a special session, so that's six.

MR. HATFIELD:  There's collateral litigation that probably is not what Your Honor is referring to.  Six feels like a good number.

THE COURT:  Okay.  I think that's probably enough.  My understanding is that none of those have been resolved yet.  They are obviously ongoing, but there has not been any resolution to the cases where there are trials or hearings.  Is that right?

MR. CAPOZZI:  The only merits ruling in any of these cases is in the NAACP case.  The court denied a preliminary injunction, but that is not the final judgment.

MR. HATFIELD:  *Luther v. Hoskins*, in which

Mr. Capozzi and I are counsel, is fully submitted to the Circuit Court of Cole County and awaiting decision at any moment.

THE COURT:  Okay.  Can I ask if there are developments -- and, again, I've got Case.net too.  But if there are developments that any of you see, could you just file a joint notice with the Court within a reasonable amount, you know, of time, you know, within a day or so, just letting the Court know about that.  In case it may have -- because I think some of those could have ramifications on this case, potentially.

MR. CAPOZZI:  Your Honor mentioned you are aware about the challenged summary statement for the referendum.  That came out after the briefing.

THE COURT:  Yes.

MR. CAPOZZI:  So it sounds like you don't need submission on that one.

THE COURT:  No, no.  Yes, I'm aware that that case exists, but if there are significant developments in it --

MR. HATFIELD:  That's months away.

THE COURT:  If there are developments in any of those cases that either of you thinks has any bearing on this case, I would say definitely let us know.

MR. CAPOZZI:  Yes, Your Honor.

THE COURT:  Okay.  Anything else for the Court?

62

MS. AMUNSON:  No, Your Honor.

THE COURT:  Okay.  Thank you again for the briefing and the arguments.  I think they were extremely helpful to the Court.  And everybody did a great job on it; so thank you very much.

We'll be in recess.

**(PROCEEDINGS CONCLUDED AT 3:30 PM.)**

CERTIFICATE


I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 63 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 26th day of November, 2025.


/s/Shannon L White
_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter