UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MISSOURI GENERAL ASSEMBLY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-CV-1535-ZMB |
| | ) | |
| RICHARD VON GLAHN & PEOPLE NOT POLITICIANS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction, Doc. 2, and Defendants' Motion to Dismiss, Doc. 21. Plaintiffs—the State of Missouri, its General Assembly, and its Secretary of State ("the State")—brought this action for declaratory and injunctive relief to prevent Defendants Richard Von Glahn and People Not Politics ("PNP") from submitting a referendum petition to reject a recent congressional-redistricting bill. PNP, in turn, has moved for dismissal on multiple grounds, including ripeness and standing, and it also opposes relief on the merits.

After conducting a hearing and carefully considering the parties' arguments, the Court holds that this case is not ripe for adjudication. Critically, PNP concedes that Plaintiff Denny Hoskins has the authority as Secretary of State to reject their petition as unconstitutional during post-submission review and to defend that decision based on the very same constitutional arguments the State advances in this case. *See* MO. REV. STAT. §§ 116.120, 116.200. Moreover, PNP agrees that, absent a successful court challenge, this determination would obviate the need for signature verification, publication, or a vote, and it also would prevent the displacement of the new map—the only redressable harms the State identifies. Accordingly, given that the parties' dispute is not ripe, the Court must dismiss this action and deny the State's motion for a preliminary injunction as moot.

## BACKGROUND

### I.    Missouri's Veto-Referendum Process

Under the Missouri Constitution, "[t]he people . . . reserve power to approve or reject by referendum any act of the general assembly" with limited exceptions. MO. CONST. art. III, § 49. The referendum process begins when a proponent submits a sample sheet to the Secretary of State, who must "review the petition for sufficiency as to form" in conjunction with the Attorney General. MO. REV. STAT. § 116.332. If the petition clears this initial review, the referendum organizers must collect signatures from "five percent of the legal voters in each of two-thirds of the congressional districts in the state . . . not more than ninety days after the final adjournment of the session of the general assembly which passed the bill." MO. CONST. art. III, § 52(a). The Secretary of State, Attorney General, and State Auditor also must work together to prepare a fiscal note and summary statement for the measure. MO. REV. STAT. §§ 116.175, 116.334. After the timely submission of a final petition, the Secretary of State must "examine the petition to determine whether it complies with the Constitution of Missouri and with [Chapter 116]" and verify whether there are enough valid signatures to trigger a statewide vote. *Id.* § 116.120. If the Secretary finds that the petition satisfies both requirements, *see id.* § 116.150, the challenged law is displaced and will only "take effect when approved by a majority of the votes cast thereon," MO. CONST. art. III, § 52(b).

### II.    Relevant Facts

On August 29, 2025, Governor Mike Kehoe called a special session of Missouri's General Assembly, in part, to "enact legislation establishing updated congressional districts." Doc. 1 ¶ 30. The Missouri House of Representatives approved a redistricting bill on September 9, and the Missouri Senate passed the same bill three days later. *Id.* ¶¶ 31–32. In response, PNP immediately initiated a referendum campaign to overturn the newly enacted map. *Id.* ¶¶ 39–40. In fact, PNP submitted its initial petition before the Governor signed the bill into law. *Id.* ¶¶ 33, 38.

2

Secretary Hoskins and Attorney General Catherine Hanaway rejected PNP's first petition because it preceded the Governor's signature (itself the subject of litigation). Docs. 3-4, 3-5. But they approved a subsequent petition, at least as to form. *See* Doc. 3-7. The State Auditor also prepared a fiscal note, which indicates that ballot measures over the last decade have cost, on average, more than $500,000. Doc. 25-1; *see also* Doc. 3-1 ¶ 19 (estimating this referendum may cost $10 million due to publication costs). Most recently, Secretary Hoskins and Attorney General Hanaway approved a summary statement of the measure (also the subject of litigation). *See* Doc. 29 at 14; MO. ATT'Y GEN., OP. LETTER NO. 329-2025, at 1. And beyond these official actions, interested parties have filed a series of lawsuits in state court as the referendum process progressed. Doc. 29 at 12–13.[1]

Looking forward, if PNP submits its final petition as anticipated, Secretary Hoskins must review its legality, may have to verify signatures,[2] and will issue a certificate of sufficiency or insufficiency. Doc. 1 ¶ 46. If the petition is sufficient, the State must hold a public hearing and take comments from the public, prepare the ballot initiative, and publicize the referendum. *Id.* ¶ 47; Doc. 3 at 11. Most important to the State, the new map will be frozen until after the referendum, which could significantly disrupt the 2026 elections. Doc. 1 ¶ 48; Doc. 3 at 11.

---

[1] Indeed, there are at least six cases that could impact the merits of the instant action: *Luther v. Hoskins*, No. 25AC-CC06964 (Mo. 19th Cir. Ct. Sept. 12, 2025) (challenging the General Assembly's ability to conduct mid-decade redistricting); *People Not Politicians v. Hoskins*, No. 25AC-CC07128 (Mo. 19th Cir. Ct. Sept. 18, 2025) (challenging Secretary Hoskins's rejection of the initial sample sheet); *Wise v. Missouri*, No. 2516-CV29597 (Mo. 16th Cir. Ct. Sept. 12, 2025) (challenging the new congressional map under the Missouri Constitution); *NAACP v. Kehoe*, No. 25AC-CC06724 (Mo. 19th Cir. Ct. Sept. 3, 2025) (challenging the Governor's ability to convene a special session for the purpose of mid-decade redistricting); *Healey v. Missouri*, No. 2516-CV31273 (Mo. 16th Cir. Ct.. Sept. 28, 2025) (challenging mid-decade redistricting generally and the new map's compactness); *People Not Politicians, et al. v. Hoskins*, No. 25AC-CC08724 (Mo. 19th Cir. Nov. 20, 2025) (challenging the ballot summary language).

[2] The plan language of MO. REV. STAT. §116.120 implies but does not specify this sequence of review. However, the Missouri Court of Appeals has construed silence in this provision as a grant of discretion to the Secretary of State, and there is no apparent reason why he would incur the significant cost of signature verification given his stated belief that the petition is constitutionally deficient. *See Sweeney v. Ashcroft*, 652 S.W.3d 711, 733 (Mo. Ct. App. 2022) ("The manner in which the secretary of state fulfills this mandatory duty is not clearly, unambiguously, or unequivocally limited by *any* statutory provision."). Most importantly, the parties agree that Secretary Hoskins can take this approach and have indicated their expectation that he will do so. *See, e.g.*, Doc. 1 ¶ 46; Doc. 22 at 34–35; Doc. 38 at 33–35, 43–44.

### III.    Procedural History

On October 15, 2025, the State filed its complaint, seeking two forms of relief: (1) a declaratory judgment that PNP's referendum is unlawful under both the United States and Missouri Constitutions, and (2) an injunction to prevent PNP from continuing its referendum. Doc. 1 at 22. The State simultaneously filed a Motion for a Preliminary Injunction. Doc. 2. While initially seeking expedited review, Doc. 3 at 14, the State withdrew that request after PNP agreed to not submit a final petition before December 9, Doc. 38 ("Tr.") at 59. PNP timely filed its merits opposition and a motion to dismiss, and both motions were fully briefed on November 20. Docs. 21, 29, 32.

The Court held a hearing on the dueling motions on November 25. Doc. 35. At the hearing, the parties agreed that Secretary Hoskins must independently review the constitutionality of the referendum petition and that he could defend a decertification decision based on the constitutional claims at issue here. Tr. at 34–35, 43–44. They also agreed that, if the Secretary rejected the petition, the new map would go into effect unless and until a court invalidated the decertification. *Id.* at 36, 48, 49–50, 52. Finally, the State confirmed it is not seeking recovery of any pre-submission damages, only prospective relief as to PNP's submission of a final petition. *Id.* at 19, 35.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a case for lack of standing. *Disability Support All. v. Heartwood Enters.*, 885 F.3d 543, 547 (8th Cir. 2018) ("Standing is a jurisdictional issue."). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *McNaught v. Nolen*, 76 F.4th 764, 768 (8th Cir. 2023) (citation omitted). As the party invoking jurisdiction, each plaintiff has the burden of establishing standing by showing that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

4

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 768–70 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Further, a plaintiff must have standing as to each asserted harm, which are evaluated independently. *See BCR Safeguard Holding v. Morgan Stanley*, 614 F. App'x 690, 698 (5th Cir. 2015) (citation omitted); *see also Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019) (taking this approach); *DiPierro v. Fla. Health Scis. Ctr.*, 737 F. Supp. 3d 1314, 1322 (M.D. Fla. 2024) ("[A] plaintiff's proffered harms must be analyzed on a claim-by-claim, harm-by-harm basis.").

Closely related to standing are the doctrines of ripeness and mootness, which address similar considerations at different time frames. A claim is not ripe when "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *KCCP Trust v. City of N. Kansas City*, 432 F.3d 897, 899 (8th Cir. 2005) (quotation omitted); *Bergstrom v. Bergstrom*, 623 F.2d 517, 519 (8th Cir. 1980) (explaining that ripeness doctrine counsels against "passing upon constitutional questions in advance of the strictest necessity for deciding them"). The Eighth Circuit applies a two-pronged test for ripeness, with the plaintiff required to "show both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (quotation omitted). The related mootness doctrine ensures that the "personal interest that must exist at the commencement of the litigation . . . continue[s] throughout its existence." *McNaught*, 76 F.4th at 769 (quotation omitted).

## DISCUSSION

The parties have presented a host of issues, but the Court cannot address them all because it lacks jurisdiction over this case. Given Secretary Hoskins's unique self-help remedy, the State's only cognizable injuries are not ripe. Alternatively, the Court must abstain under the *Pullman* doctrine as relevant questions of state constitutional law will be decided by the Secretary or in state court.

## I.    Standing, Ripeness, and Mootness

After excluding the State's non-redressable injuries, this lawsuit is not ripe for adjudication. The State's asserted harms—as articulated in the Complaint, through its briefing, and at the hearing—fall into three buckets, which the Court will consider in turn. No injury justifies standing.

The State first highlights the harms that predated this lawsuit. These injuries include the cost of processing the referendum petition and litigating state-court cases. Doc. 1 ¶¶ 43–45, 50; Doc. 3 at 10; Tr. at 25, 32–33. To its credit, however, the State acknowledges it is not relying on these previously expended resources to establish standing given that it seeks only prospective relief. Tr. at 35; *see Frost*, 920 F.3d at 1161–62 (refusing to consider past harms for redressability purposes, as "[a]n injunction is inherently prospective and cannot redress past injuries").

Second, the State points to the ongoing injuries it has suffered during this case through PNP's anticipated submission of a final petition tomorrow. This category is similar to the State's past harms and includes referendum-processing obligations, unspecified investigations, and litigation expenses.[3] Doc. 1 ¶¶ 43–45; Doc. 25-1; Doc. 29 at 12–15; Tr. 32–33. These injuries are likewise insufficient to establish standing. Even if they were redressable at the outset of the case, the State abandoned its ability to prevent these harms when it agreed to forego emergency relief until now. *See* Tr. at 59. Thus, whether viewed through the lens of waiver or mootness, the Court cannot redress these injuries. Tr. at 35 (acknowledging that, "as time passes, [ongoing harms] become no longer redressable"); *see McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992) ("Through the passage of time and the occurrence of irrevocable events, disputes may disappear so that federal courts no longer can grant effective relief.").

---

[3] The State has not identified a single case holding that parallel-litigation expenses can confer standing, nor has the Court found any. But even assuming such costs could amount to a cognizable injury, the State's invocation of its state-court litigation with PNP plainly falls short. *See* Doc. 1 ¶¶ 45, 50; Doc. 3 at 10–11; Doc. 29 at 12–13. As an initial matter, it is far from clear that the Court could enjoin PNP from pursuing these cases or otherwise halt the litigation, *see* Doc. 22 at 11 n.5, underscoring why this harm is nothing like the State's analogy to agency "compliance costs," *see* Doc. 29 at 12–13. More importantly, the State never requested this remedy. *See* Doc. 1 at 22; Doc. 2. Thus, even if the Court granted both declaratory and injunctive relief, PNP would be free to litigate these cases and likely would do so while it pursued an appeal in the Eighth Circuit. In sum, the State's litigation-expense injury lacks redressability.

Third, and most importantly, are the future injuries the State anticipates. Assuming PNP submits a final petition, Secretary Hoskins will need to review it for constitutional validity and potentially verify the accompanying signatures; and if the referendum advances, the State will incur a series of costs, including at least a temporary displacement of the recently enacted map. *See* Doc. 1 ¶¶ 46–48; Doc. 3 at 11; Doc. 29 at 14, 18. Fortunately for the State, Secretary Hoskins has a tool at his disposal that almost no other litigant could boast—the power to declare the petition unconstitutional himself. And at this point, decertification would forestall any remaining cognizable harms.[4] The State's only response for why this unique self-help remedy does not amount to a ripeness defect is that drafting a certificate of insufficiency will "require careful analysis and collaboration between the Secretary and Attorney General." *See* Doc. 29 at 15. But it is hard to imagine that completing this constitutional assessment will impose any measurable burden given that the State has completed an exhaustive analysis in briefing this case. In other

---

[4] At the hearing, the State expressed concern that PNP would backslide on its repeated representations to this Court that the Secretary of State will have the opportunity to review the final petition for constitutionality before conducting signature verification, that he could at least defend a finding of unconstitutionality based on the same claims the State advances in this case, and that the new map would go into effect barring a successful challenge to decertification. *See* Tr. at 51–52. *But see, e.g.*, Doc. 22 at 1, 8, 11-12, 13–14, 34–35, 38; Doc. 32 at 4, 6; Tr. at 43–44, 48–50. While the State cannot be faulted for failing to anticipate these concessions at the outset of the case, the Court has expressly found that PNP affirmatively waived these points, *see* Tr. at 52, precluding any argument to the contrary in future litigation (to say nothing of the ethical ramifications of counsel breaching their duty of candor to this tribunal).

In any event, the Court's review of Missouri law indicates that a contrary position would plainly fail. There is no doubt that the Secretary of State has both the authority and duty to assess the constitutionality of the final petition. *See* MO. REV. SAT. § 116.120 (requiring that, upon submission, the Secretary "shall examine the petition to determine whether it complies with the Constitution of Missouri and with this chapter"); *Missourians to Protect the Initiative Process v. Blunt,* 799 S.W.2d 824, 828 (Mo. banc 1990) (rejecting a claim that constitutional review was limited to signature provisions because "the language used [in section 116.120] mandates a more extensive examination"). Given the State's position that PNP's referendum violates the Missouri Constitution itself, *see* Doc. 1 ¶¶ 71–74, that finding alone is sufficient for decertification. Moreover, the Secretary of State has an independent obligation flowing from his oath of office "to support the Constitution of the United States and of [Missouri]." MO. REV. STAT. § 28.020. And if the Secretary perceived any conflict between the Missouri and United States Constitution, he might argue that the Supremacy Clause prevents him from taking an action permitted by the latter but forbidden by the former.

7

words, there would be no "hardship to the parties [from] withholding court consideration."[5] *See KCCP Trust*, 432 F.3d at 899 (quotation omitted); *see also Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (requiring a showing of "significant harm").

One final point warrants a brief mention. At the hearing, the State cited *Calzone v. Ashcroft* to suggest that Missouri courts may conclude that the Secretary of State lacks authority to conduct "a full constitutional review" before a referendum vote. Tr. at 33–34. But in *Calzone*, the Secretary already ***certified*** the petition, and the Missouri Court of Appeals held only that "Missouri courts recognize and follow a general rule against pre-election ***judicial*** review concerning the substantive legality of ballot measures." 559 S.W.3d 32, 35 (Mo. Ct. App. 2018) (emphasis added). Thus, that case says nothing about the ***Secretary's*** authority to ***decertify*** a petition on constitutional grounds. Moreover, the ripeness concerns underpinning *Calzone* would not be present in that scenario because there would be no vote to await absent court intervention. And even if state ripeness doctrine were relevant, a state court likely could hear the case because the State's claims relate to "constitutional requirements and limits of power" as to whether the referendum can even occur, not the substance of the underlying measure (i.e., the validity of the map). *See Blunt*, 799 S.W.2d at 827–29 (collecting cases where "courts have conducted a pre-election review to determine if conditions precedent to placing a proposal on the ballot have been met").

As detailed above, the State's past injuries are no longer redressable because it seeks only prospective relief. And given Secretary Hoskins's ability to vindicate the State's interests, the only cognizable injuries are not ripe for adjudication. Accordingly, the Court must dismiss this case.

---

[5] The Secretary's access to a self-help tool creates another stranding problem, in that post-submission review also breaks the chain of causation between PNP's actions and his alleged harms. *See Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 667-68 (7th Cir. 2015) ("[P]laintiffs cannot allege an injury from one of multiple options where they can choose another which causes them no injury.") (quotation omitted); *cf. Berkadia Real Est. Advisors v. Wadlund*, No. CV-22-00049-TUC-JCH, 2022 WL 18495279, at *17 (D. Ariz. Mar. 3, 2022) (denying a preliminary injunction because the plaintiff could exercise self-help). The same is true for the General Assembly and the State of Missouri, whose injuries depend on the Secretary's review, likewise breaking the chain of causation for their claims. *See E.L. ex rel. White v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932, 936 (8th Cir. 2017) (no causation for standing purposes when the injury "is the result of actions by some third party, not the defendant") (quotation omitted).

## II.    *Pullman* Abstention

Alternatively, even if the case were justiciable, *Pullman* abstention would be warranted. Like other abstention doctrines, *Pullman* applies when federal courts exercise discretion to depart from their general obligation to exercise jurisdiction and "abstain from deciding an issue in order to preserve traditional principles of equity, comity, and federalism." *Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 840 (8th Cir. 1998) (quotations omitted). The *Pullman* abstention doctrine requires the Court to consider five factors:

> (1) the effect abstention would have on the rights to be protected by considering the nature of both the right and necessary remedy; (2) available state remedies; (3) whether the challenged state law is unclear; (4) whether the challenged state law is fairly susceptible to an interpretation that would avoid any federal constitutional question; and (5) whether abstention will avoid unnecessary federal interference in state operations.

*Id.* at 841. In particular, courts should avoid "needless friction between federal pronouncements and state policies," especially in cases involving "a matter of great state concern." *See Reetz v. Bozaich*, 397 U.S. 82, 87 (1970) (abstaining from issuing declaration that state fishing laws violated the Fourteenth Amendment and the Alaska Constitution) (quotation omitted); *see also, e.g.*, *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 85 (1975) (noting that abstention is appropriate where "the nub of the whole controversy may be the state constitution").

Applying the Eighth Circuit's *Pullman* test, the Court concludes that abstention would be warranted. The first factor—"the effect abstention would have on the rights to be protected"—weighs strongly in favor of the PNP, as the State may protect its own interests through decertification. *See Beavers*, 151 F.3d at 841. The last three factors—whether the state law is unclear, whether that law is susceptible to interpretation avoiding the federal constitutional question, and whether the abstention avoids federal interference in state operations—also decidedly weigh in favor of PNP. Here, the State's case rests on the premise that Missouri's

9

Constitution does not provide a "clear statement" permitting a veto referendum on redistricting bills and, thus, that the General Assembly retains exclusive authority to redistrict in light of the Elections Clause. Doc. 1 ¶¶ 4–7, 50–63. At a minimum, the State has conceded that the law is unclear. *See* Doc. 1 ¶ 6. And as explained above, a decision that the Missouri Constitution does not permit a redistricting referendum would moot the State's federal constitutional claims, while a decision that it does clearly permit them would significantly narrow the issues. Further, abstaining here would avoid federal interference in a referendum process created entirely by the Missouri Constitution and state law.

With abstention all but decided, the State contends that the second factor—"available state remedies"—torpedoes the whole analysis because it likely will be unable to raise its Elections Clause claim before the future harms occur. Tr. at 6–7, 21. But Secretary Hoskins has a self-help remedy under state law in the form of decertification for unconstitutionality. *See Fender v. Washington Cnty.*, No. 14-CV-0142, 2014 WL 1491138, at *3 (W.D. Pa. Apr. 15, 2014) (recognizing that "questions must be resolved at the state level—both administratively and judicially—before this Court may properly analyze the underlying federal constitutional claim."). The State also cited to *Pennzoil Co. v. Texaco* at the hearing, arguing that it counseled abstention where no pending state court action existed, unless the court's opinion would almost certainly be advisory. *See* Tr. at 25 (citing 481 U.S. 1, 11 (1987)). But that case involved *Younger*, rather than *Pullman*, abstention. *Id.* at 10. While "various types of abstention are not rigid pigeonholes," different principles govern the application of these doctrines, and accordingly, the case is inapposite. *Id.* at 11 n.9. More importantly, as PNP notes, there was no pending state court case in *Pullman* itself, so this factor is by no means required. *See* Doc. 33 at 15 (citing *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 501–02 (1941)).

The last aspect of abstention the Court must consider is whether to grant dismissal or hold the case in abeyance pending a state determination. While courts are required to stay an action at law "pending [the] completion of state proceedings," the Eighth Circuit has recognized that dismissal or remand may be appropriate for equitable actions "based on abstention principles." *Warmus v. Melahn*, 110 F.3d 566, 567 (8th Cir. 1997). In addition to the nature of this action and important state interests at play, the Court notes that this case will almost certainly be moot by the time a probably state court lawsuit is filed because decertification would leave this Court with no meaningful relief to grant. Accordingly, the Court would dismiss on abstention grounds.

**CONCLUSION**

Accordingly, the Court **GRANTS** Defendants' [21] Motion to Dismiss and **DENIES** as moot the State's [2] Motion for a Preliminary Injunction. The Court will issue a separate Order of Dismissal to accompany this order.

So ordered this 8th day of December 2025.

ZACHARY M. BLUESTONE
UNITED STATES DISTRICT JUDGE