IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MISSOURI GENERAL ASSEMBLY, *et al.* <br><br> *Plaintiffs,* <br><br> v. <br><br> RICHARD VON GLAHN, *et al.* <br><br> *Defendants.* | Case No. 4:25-cv-01535-ZMB |

**MEMORANDUM IN SUPPORT OF THE STATE OF MISSOURI'S
MOTION FOR SANCTIONS AGAINST DEFENDANTS' COUNSEL**

**INTRODUCTION**

Missouri moves for this Court, pursuant to its inherent authority, to sanction Defendants' Counsel for intentionally misrepresenting their clients' position during questioning by the Court. During a hearing on Defendants' motion to dismiss, Defendants' Counsel expressly conceded that H.B. 1 goes into effect unless and until the Secretary of State certifies the referendum *or* a state court orders the Secretary to certify. *E.g.*, Tr. 52:13–20. In other words, Defendants' Counsel admitted that the mere submission of referendum signatures does not freeze a duly enacted state law. Defendants' Counsel strongly resisted making that concession, but they did so under pointed questioning from the Court. *See* Tr. 43:3–49:4. Indeed, this Court suggested Defendants needed to make that concession in order to prevail on their motion to dismiss. Tr. 44:23–45:1, 45:13–24, 46:4–14, 47:13–19, 48:9–19.

The Court accepted Defendants' concession on that point, and the Court even noted the concession in its opinion granting Defendants' motion to dismiss. *See* slip op. at 1, 4, 7 n.4. Yet during the following days, Defendants and Mr. Hatfield personally have aggressively and repeatedly communicated the opposite position to the media, stating unambiguously that their mere act of submitting referendum signatures immediately froze H.B. 1 and prevented it from going into effect.[1] When

---

[1] *See* Rudi Keller & Jason Hancock, *Missouri Set to Enact Gerrymandered Map Despite 300K Signatures for Repeal Referendum*, Missouri Independent (Dec. 9, 2025), https://missouriindependent.com/2025/12/09/missouri-gerrymander-congressional-map-referendum/; Alisa Nelson, *When Does Missouri's New Congressional Map Take Effect? That Depends on Who You Ask*, Missourinet (Dec. 10, 2025), https://www.missourinet.com/2025/12/10/when-does-missouris-new-congressional-map-take-effect-that-depends-on-who-you-ask/ (quoting People Not

2

the State warned Defendants' Counsel that it might pursue sanctions (and gave them the option to retreat), Defendants doubled down and repeated their contradictory new position.[2]  All of these public statements fully contradict the representations Defendants' Counsel made to this Court.

Lawyers barred (or admitted *pro hac vice*) in this Court should not be permitted to make concessions to help obtain a legal victory, and then immediately turn around and contradict those concessions in public.  *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46 (1944).  Such conduct is dishonorable and unethical.  *See id.*  Missouri respectfully requests this Court impose appropriate sanctions on Defendants' Counsel, including admonishing Defendants' Counsel, vacating the Court's dismissal order, reopening the case, striking Defendants' motion to dismiss, and any other sanction this Court deems warranted in its sound discretion.

## BACKGROUND

After Missouri filed this lawsuit seeking preliminary relief and Defendants filed their motion to dismiss, this Court held a hearing on both motions on November 25, 2025.  In that hearing, the Court honed in on one of Plaintiffs' primary alleged harms—that the congressional map enacted in House Bill 1 could be frozen due to

---

Politicians press release); Jason Rosenbaum, *Missouri Redistricting Foes May Have Dealt Big Blow to Trump-Backed Congressional Map*, St. Louis Public Radio (Dec. 9, 2025), https://www.stlpr.org/government-politics-issues/2025-12-09/missouri-redistricting-foes-may-have-dealt-big-blow-to-trump-backed-congressional-map.

[2] *See* Alix Breeden, How Missourians Rose Up Against Gerrymandering: GOP Is 'Terrified', Daily Kos (Dec. 11, 2025), https://www.dailykos.com/stories/2025/12/11/2357923/-How-Missourians-rose-up-against-gerrymandering-GOP-is-terrified.

3

Defendants' actions. Compl. ¶ 48; PI Br. at 11. That discussion focused on the meaning of the Missouri Constitution, which states that, as part of the referendum process, "[a]ny measure referred to the people shall take effect when approved by a majority of the votes cast thereon, and not otherwise." Mo. Const. art. III, § 52(b).

During the hearing, the Court focused on what the Missouri Constitution means when it says that a "measure referred to the people" is frozen pending a public vote. After Plaintiffs' Counsel noted concerns about the map being frozen, the Court asked if "the map would be frozen post certification"—implying the map would go into effect *pre*-certification. Tr. 36:1–2. In response, Plaintiffs' Counsel agreed that was the State's "understanding," but also candidly acknowledged "uncertainty as to whether mere submission of the signatures freezes the map or whether it is post certification." Tr. 36:3–12. That is why Plaintiffs' Counsel stated he would be "curious to hear [Defendants'] position on that question." Tr. 36:9–12. Fittingly, the Court said it "would be eager to hear that as well." Tr. 36:13.

Unsurprisingly, the Court then questioned Ms. Amunson precisely on that issue. The Court put the point directly and unambiguously: "I think necessary to [your] argument as to why the State isn't facing harm . . . implicit in that is that the freeze wouldn't occur on the new maps *until after the certification.* Is that right?" Tr. 44:23–45:1 (emphasis added).

Ms. Amunson obviously did not want to agree with the Court's suggestion. At first, she echoed the public position taken by her clients, suggesting that merely

4

"turning in the signatures ensures that the law will not otherwise go into effect" until a vote happens. Tr. 45:7–8.

In response, the Court strongly pushed backed, suggesting Ms. Amunson needed to retreat from that position if there was to be "any chance of [her argument] prevailing." Tr. 45:13–19. Yet Ms. Amunson did not immediately agree with the Court, but repeated her position that "once the referenda process starts, it cannot go [into effect]." Tr. 46:15–21.

The Court, however, suggested it read the Missouri Constitution as the State did, and that the reference to a referred law being frozen "presupposed certification" by the Secretary following a review of the signatures being submitted. Tr. 47:1–6. Once again, Ms. Amunson resisted that interpretation and suggested that "[i]t is the submission" of signatures that freezes a law. Tr. 47:7–8.

The Court then gave Ms. Amunson yet another chance. It noted that her resistance to the Court's "reading" was "punching a hole into some of [her] arguments for dismissal." Tr. 47:13–18. And the Court suggested—quite correctly—that the State would be harmed if Defendants' submission of signatures froze H.B. 1. Tr. 47:17–18. But once again, Ms. Amunson rejected the Court's suggestion, reasoning that a law cannot go into effect when referendum signatures are submitted. Tr. 48:3–5.

The Court then gave Ms. Amunson a *fifth* chance to agree. Lest the point was not already obvious to Ms. Amunson, the Court stated she "need[ed] to be arguing . . . for [her] dismissal arguments" the following position:

5

> [T]he law would go into effect, and then you would seek to challenge the law based on the Secretary's actions and say what the Secretary did was impermissible and then file whatever emergency relief that you wanted to do, and that very well could preclude the map from going forward.

Tr. 48:9–15. And the Court said, once again, that, "for [Defendants'] harm arguments to bear out, that needs to be your position." Tr. 48:16–19.

Finally, faced with a situation where any competent advocate would fear losing the case, Ms. Amunson gave up the concession and agreed "that is [Defendants'] position." Tr. 48:20. In response, the Court asked for confirmation that "in the interim, things would move forward *unless and until* you sought emergency relief and filed a lawsuit and everything." Tr. 49:1–3 (emphasis added). Ms. Amunson agreed that was "correct." Tr. 49:4.

The Court subsequently had a similar (albeit much briefer) exchange with Mr. Hatfield. The Court repeated its position that the Missouri Constitution's reference to a law being frozen by the referendum process "presupposes the certification or a successful challenge to decertification." Tr. 49:25–50:2. Mr. Hatfield expressly agreed with the Court's position. Tr. 50:3–8. That repeat of Ms. Amunson's concession led the Court to conclude that "we're all on the same page at this point." Tr. 50:9–10.

Plaintiffs' Counsel was skeptical of Defendants' concession even then, expressly noting uncertainty about what the "status of the map will be once [Defendants] submit their signatures." Tr. 52:13–18. Plaintiffs' Counsel, however, acknowledged that "eventually, my friend conceded, that the map stays in effect unless and until they can win a state court challenge." Tr. 52:15–16.

6

The Court expressly agreed with that characterization of the concession, and it even noted on the record that "Mr. Hatfield [was] nodding his head yes." Tr. 52:19–20. And once again, the Court stated its view that this concession was "very important," and that the "arguments for dismissal [would] be very flat if that weren't the case." Tr. 52:21–23. Indeed, the Court noted that it was "abundantly clear" that Defendants' Counsel had conceded the point. Tr. 52:24.

On December 8, the Court issued its ruling dismissing Missouri's claim because their injuries were not ripe for adjudication. *See* slip op. 5–8.[3] The Court expressly noted Defendants' concession, acknowledged the skepticism of Plaintiffs' Counsel, and even referenced the "ethical ramifications of counsel breaching their duty of candor to this tribunal." Slip op. 7 n.4.

Despite the Court's warning and their representation being "abundantly clear," Defendants changed their story just *one day* after this Court's ruling. Defendant Richard von Glahn has stated that his submission of his referendum petition "suspend[s]" House Bill 1.[4] Defendant, People Not Politicians, also unequivocally stated, "Under the Missouri Constitution, any law sent to voters cannot take effect unless approved by a majority vote. Once signatures are submitted, HB1 must be paused until Missourians vote on it at the ballot box."[5]

---

[3] The Court alternatively held that *Pullman* abstention warrants dismissal. *See* slip op. at 9–11.
[4] Keller, *supra* note 1.
[5] Nelson, *supra* note 1.

7

Mr. Hatfield has stated similarly. Responding to the Attorney General's statement that House Bill 1 will not be frozen unless and until the Secretary of State certifies the referendum, Mr. Hatfield stated that Missouri had "made up another incorrect reason to try and stop the will of the people on this. But they're wrong."[6] Troublingly, when presented with the opportunity to clarify and align his position with his representation to this Court, Mr. Hatfield appears to have suggested that he never agreed that the map would remain in effect.[7]

On December 10, Missouri informed Defendants of their intent to seek sanctions and gave them an opportunity to correct their public statements inconsistent with their representations made before this Court. *See* Ex. B. They have not done so and have instead doubled-down.[8] They have even threated suit against the State if the Secretary "attempts to put HB1 into effect prematurely."[9]

## ARGUMENT

The Court should enter sanctions. Defendants and their Counsel have repeatedly and expressly contradicted their "abundantly clear" representation to this Court. Tr. 52:24. Under the extreme facts in this case, it is clear that Defendants' Counsel deceived the Court.

---

[6] Rosenbaum, *supra* note 1.
[7] *See id.* ("Hatfield said People Not Politicians agreed that Hoskins had the ability to potentially block the referendum – not that the map wasn't frozen as soon as signatures were turned in.").
[8] *See* Nelson, *supra* note 1 (recounting statements made after Defendants were alerted to their statements contradicting their representations to this Court).
[9] *Id.*

This Court is vested with the inherent authority "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). This authority is "a broad and powerful tool," *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 900 (8th Cir. 2009), and allows the Court "to fashion an appropriate sanction for conduct which abuses the judicial process," *Goodyear*, 581 U.S. at 107 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). This includes the power "to discipline attorneys who appear before it" as well as the power "'set aside fraudulently begotten judgments.'" *Chambers*, 501 U.S. at 44 (quoting *Hazel-Atlas*, 322 U.S. at 245).

It goes without saying, our judicial system requires truth. *See id.* (recognizing necessity of "the integrity of the courts"). This requirement for integrity is even more true for lawyers. *See* Model Rules of Pro. Conduct r. 3.3(a) (imposing an additional duty of candor for lawyers); Mo. Sup. Ct. R. 4-3.3(a) (same). If a lawyer could make a representation before a court to win a case and then turn around and contradict this representation, "the very temple of justice [would be] defiled." *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946). "No fraud is more odious than an attempt to subvert the administration of justice," *Hazel-Atlas*, 322 U.S. at 251 (Roberts, J., dissenting), and indeed, it's hard to fathom a greater "abuse[]" of "judicial process," *Chambers*, 501 U.S. at 45. But this is exactly what happened here.

At this Court's November 25 hearing, the Court gave Ms. Amunson *five* separate opportunities to concede that H.B. 1 is not frozen by the mere submission of

9

signatures—but only if (1) the Secretary certifies the referendum or (2) a court orders the Secretary to do so. *See* Tr. 44:23–45:1, 45:13–24, 46:4–14, 47:13–18, 48:9–19. And Ms. Amunson ultimately made that concession after this Court repeatedly warned that her failure to make that concession could cost her the case. Tr. 48:20. Mr. Hatfield made the same concession. Tr. 50:3–8, 52:20. And this Court agreed with Plaintiffs' Counsel's characterization of the concession. Tr. 52:19. The concession was "abundantly clear." Tr. 52:24.

Defendants did not need to make that concession. They could have stood their ground as they did after the Court's first four concession invitations, and they could have accepted the possibility of losing the case. But they did not. If Defendants' Counsel had buyer's remorse after the hearing, they could have filed a statement with the Court correcting their representations. *See, e.g.*, *In re Cummings*, 381 B.R. 810, 837 (S.D. Fla. Bankr. 2007) (lawyer "should not improperly permit the lawyer's silence or inaction to mislead anyone"). But they did not. Instead, Defendants are trying to benefit from their concession while not honoring it. Not only are Defendants threatening litigation against the State in contradiction of their concession, but their public remarks are obviously designed to encourage third parties (who would not be bound by the concession) to sue the State to immediately freeze the map. When the State presented Defendants' Counsel with evidence of their misconduct, they could have retreated and avoided this motion. But they did not.

Defendants' misrepresentations significantly influenced this Court's decision to grant their motion to dismiss. They were "critical[]" for this Court's finding that

10

the State did not imminently face the harm of having its duly enacted law frozen. Slip op. at 1; *see also* Tr. 48:17–19 (The Court: "I think for [Defendants'] harm arguments to bear out, that needs to be [Defendants'] position."); *supra* 4–7. The Court's alternative *Pullman* abstention holding is similarly undergirded by Defendants' concessions. *See id.* at 9–10 (abstaining because, at least in part, "the State may protect its own interests through" refusing to certify).[10]

Defendants cannot wiggle out of their earlier representations now that the Court has ruled in their favor. *See, e.g.*, *In re Hentges*, 352 B.R. 487, 498 (N.D. Okla. Bkr. 2006) (prohibiting "misrepresentation" during oral argument); *cf. Hazel-Atlas*, 322 U.S. at 245 (setting aside fraudulently begotten judgment based on "nothing but [Defendant's] sworn admissions"). Even if the Court's decision did not rest on Defendants' representations, this cannot excuse Defendants' counsel's lack of candor to this tribunal—a point that this Court itself emphasized in assuring the State that Defendants could not "backslide on [their] repeated representations." Slip op. at 7 n.4 (explaining that Defendants would be precluded from contrary arguments "in

---

[10] The Court used the phrase "decertification" in its opinion. Slip op. at 7 n.4. The State understands the Court to be using that phrase synonymously with the Secretary merely refusing to certify the referendum—as the Court did during the hearing. *See, e.g.*, Tr. 49:21–50:2. It is probably more accurate to characterize the Secretary's initial certification decision as either certification or non-certification. Indeed, the term "decertification" could—without the clear context provided during the hearing—be understood to suggest that the mere submission of signatures certified the referendum. But only the Secretary can certify a referendum in the first instance; he does so by issuing a certificate. Mo. Rev. Stat. § 116.150. That statutory language confirms the trueness of Defendants' concession: A referendum is not certified *until* the Secretary issues the certificate. Tr. 48:10–20, 52:15–20.

11

future litigation (to say nothing of the ethical ramifications of counsel breaching their duty of candor to this tribunal)").

Yet Defendants *and* Mr. Hatfield have made statements following the decision in this case directly conflicting their prior representations. Defendants' experienced Counsel should know this is unacceptable. As Judge Schelp recently noted when issuing a show-cause order as to why Mr. Hatfield should not be sanctioned, Mr. Hatfield should understand his ethical obligations because he is a "talented litigator in the area of governmental policy and regulation." *City of St. Louis v. Missouri*, 4:25-cv-00498, ECF No. 6 at 2 n.1 (E.D. Mo. Apr. 16, 2025). In response to a warning from the State, Ms. Amunson has taken no action to remedy her misrepresentations to the Court.[11] As deeply experienced lawyer, Ms. Amunson should also have known better.

---

[11] Ms. Amunson and Mr. Hatfield sent the State a letter on December 12, 2025, doubling down on their clients' public media statements and insisting that H.B. 1 is frozen unless the Secretary affirmatively "decertif[ies]" the referendum. Ex. A at 4–6. With respect, that is simply not a plausible interpretation of the hearing transcript. *See, e.g.*, Tr. 52:13–53:1. And Defendants' Counsel never advanced that interpretation during the hearing. Indeed, Defendants' Counsel never even used the word "decertify" during the hearing.

If the Court somehow agrees with Defendants' novel interpretation, the State would likely move for reconsideration and/or appeal, because H.B. 1 being frozen by the mere submission of potentially insufficient or invalid signatures surely constitutes a serious irreparable harm. *See Abbott v. Perez*, 585 U.S. 579, 602 (2018) (explaining that "barring the State from conducting this year's elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm the State" (footnote omitted)); *see also Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 801 (2015) (explaining that the legislature's having its singular control over the redistricting process divested is not "too 'conjectural' or 'hypothetical' to establish standing," nor need the legislature show that the Secretary of State would disregard his obligations under state law). And it is not an adequate remedy to say the Secretary can avoid that harm by rushing to reject the referendum under the U.S. Constitution's Elections Clause—before signatures are even verified.

12

Allowing Defendants' counsel to represent one thing to this Court but say and do another would undermine this Court's rulings and public confidence in the judicial system. This "tampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246. This Court should not tolerate this affront on "the integrity of the judicial process." *Id.*[12]

---

Despite the Court's assurances, it is *far* from clear the State has the authority to reject a referendum based on substantive federal-constitutional concerns. *See, e.g.*, *Mo. Elec. Coop. v. Kander*, 497 S.W.3d 905, 920 (Mo. Ct. App. 2016) (expressly disagreeing with this Court's interpretation and stating that the legal "sufficiency determination the Secretary of State is required to conduct plainly does not include whether an initiative petition complies with the **Federal** Constitution" (emphasis in original)). And of course, the Court's assurance would likely not stop a third party not bound by Defendants' now-revised concession from arguing that point. *See Feinstein v. Edward Livingston & Sons, Inc.*, 457 S.W.2d 789, 794 (Mo. banc 1970).

In any event, skipping signature verification is not prudent. It is far from clear whether Defendants have submitted enough signatures for each of the congressional districts from which they must submit signatures. The legal status of a significant percentage of those signatures is unclear. *See* Order, *People Not Politicians v. Hoskins*, 25AC-CC07128 (Mo. 19th Cir. Ct. Dec. 12, 2025) (holding in abeyance case addressing whether Secretary Hoskins can reject signatures gathered prior to referendum petition approval pending the Secretary's determination on sufficiency of signatures). And it makes little sense for the Secretary to rush into the adjudication of a difficult and serious federal-constitutional question in state court before determining whether Defendants have submitted enough signatures. *Cf. NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 501 (1979). That rash course of action cannot fully remedy the State's sovereign harms because it merely inflicts new ones—chiefly, by interfering with the Secretary's statutory discretion to process the referendum as he deems prudent.

[12] In their letter to the State, Defendants' Counsel also suggested that the State is obligated to give them 21 days to respond to a draft sanctions motion under Federal

13

## CONCLUSION

The State does not lightly move for sanctions. Litigation can be difficult work, and the State recognizes that mistakes happen. But that is not what happened here. Defendants made a concession to this Court to help secure a win; as soon as they got that win, they exposed their concession as a deception. The reality is "abundantly clear." Tr. 52:24.

For the foregoing reasons, the Court should grant Missouri's motion to sanction Defendants' counsel.

---

Rule of Civil Procedure 11(c). Ex. A at 1. By its plain text, that rule does not apply because Defendants' misrepresentation was made during oral argument—and not a paper filed with the Court. *See* Fed. R. Civ. P. 11(b) (requiring "a pleading, written motion, or other paper"). Under this Court's inherent authority, there is no 21-day requirement. *See Anderson v. CitiMortgage, Inc.*, 519 F. App'x 415, 417–18 (8th Cir. 2013). In any event, Defendants' letter and continued statements to the media confirm that giving them more time to retract would be futile. Finally, giving Defendants that much time would potentially prejudice the State's ability to move this Court for reconsideration within the prescribed time.

14

Dated: December 12, 2025  Respectfully submitted,

**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
  *Solicitor General*
William James Seidleck, #77794(MO)
  *Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025 the foregoing was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

s/ *Louis J. Capozzi III*