# EXHIBIT A

**JENNER&BLOCK** LLP
1099 NEW YORK AVENUE NW SUITE 900, WASHINGTON, DC 20001

**STINSON**
230 W. MCCARTY STREET, JEFFERSON CITY, MO 65101

December 12, 2025

Louis J. Capozzi III
Solicitor General
Missouri Attorney General's Office
221 West High Street
Jefferson City, MO 65101

Re:   Your Demand for a Public Statement Regarding the Status of House Bill 1

Dear Mr. Capozzi:

We write in response to your December 10 letter demanding that we immediately issue a public statement confirming a purported "concession to the Court that HB 1 is in effect unless and until the Secretary certifies the referendum" and threatening to seek sanctions if we do not send a copy of that statement to all media outlets with whom we or our clients have communicated by 12:00 p.m. on Friday, December 12.

We never made any such "concession" and will not be issuing or circulating the public statement that you requested. Our position has always been—and remains—that People Not Politicians' ("PNP") submission of signatures on December 9 prevents H.B. 1 from going into effect on December 11 unless the Secretary of State issues a formal determination that the petition is insufficient. Indeed, we specifically stated at the hearing on November 25 that "it is turning in the signatures [that] ensures that the law will not otherwise go into effect on the 90th day." ECF No. 38, at 45 ("Tr."). That is likewise the position that your witness, the Director of Elections, took in a sworn declaration to the Court in this case, stating under oath that "if the defendants succeed in collecting the necessary signatures, the Missouri Constitution will prevent the new map from taking effect until a referendum occurs." ECF No. 3-1 ¶ 20 ("Director of Elections Decl.").

To the extent you nevertheless intend to seek sanctions, we refer you to Federal Rule of Civil Procedure 11, which requires, among other things, that you first serve upon us, but not file, a draft motion seeking sanctions and provide us with at least 21 days to respond. *See* Fed. R. Civ. P. 11(c)(2). Your letter is no substitute for a draft motion. Moreover, we are aware of no authority that a lawyer has an ethical duty under Rule 11 to make public statements to the media supporting the opposing party's position. To better inform your thinking on whether to seek sanctions, we set forth below an accurate recounting of the proceedings before the Court and the Court's opinion.

**I.      Background**

As you are aware, on Monday, December 8, 2025, the Court issued an opinion granting our motion to dismiss the case on two separate grounds, while denying the State's motion for a

JENNER&BLOCK LLP                                                                                                    STINSON

December 12, 2025
Page 2

preliminary injunction. ECF No. 39, at 1 ("Opinion"). That opinion was issued by December 8 specifically because the State had represented to the Court that a decision was necessary prior to our client turning in signatures given that, if our client "gain[ed] enough signatures to qualify for a vote before the people," that would mean "the challenged law is frozen pending the public vote." ECF No. 1 ¶ 48 ("Compl."); *see* ECF No. 3, at 11 ("State PI Br.") ("[I]f Defendants succeed in obtaining the requisite signatures, the new duly enacted congressional map is placed on hold and cannot take effect until after referendum."); Director of Elections Decl. ¶ 20 ("[I]f the defendants succeed in collecting the necessary signatures, the Missouri Constitution will prevent the new map from taking effect until a referendum occurs."). The State repeatedly argued to the Court that simply submitting the petition would cause injury *because the challenged law would remain frozen* "pending th[e] public vote." Compl. ¶ 48; *see* State PI Br. at 11 (H.B. 1 "cannot take effect until after referendum" if petition is submitted with sufficient signatures); Director of Elections Decl. ¶ 20 (H.B. 1 is ineffective "until [the] referendum occurs").

The State's position throughout its briefing is blackletter law in Missouri. As the Missouri Court of Appeals has explained: "[O]nce a referendum petition has received sufficient signatures to be placed on the general election ballot, the referred measure is placed before the people for their consideration as an original proposition; the prior action by the General Assembly and the Governor on the referred measure is 'suspend[ed] or annul[led],' and has no further legal effect or consequence." *Stickler v. Ashcroft*, 539 S.W.3d 702, 713 n.9 (Mo. Ct. App. 2017) (alterations in original). This is also consistent with how the State has handled referendum petitions in the past. Indeed, the last time Missourians voted on a referendum, which was during the tenure of then-Attorney General Josh Hawley, the Office of then-Secretary of State Jay Ashcroft stated that the challenged act was suspended once a referendum petition that appeared to have sufficient signatures had been submitted.[1]

The morning after the Court's decision, on Tuesday, December 9—the date that PNP told the Court that it would turn in the referendum petition with signatures—our client submitted the referendum petition to the Secretary of State with over 300,000 signatures, well more than the number of signatures required by the Missouri Constitution.[2] *See* Mo. Const. art. III, § 52(a). After PNP submitted the signatures, the Secretary could have issued a certificate of insufficiency, stating the petition was (in his view) unconstitutional—the "unique self-help remedy" that the Court found the Secretary possessed. Opinion at 7; *see id.* at 3 n.2. Had the Secretary done so, that would have avoided all the harms that he complained of in Court, including the freezing of H.B. 1 and the administrative burdens of processing the petition that he allegedly sought to minimize by bringing this lawsuit in the first place. *See* ECF No. 29, at 13–16 ("State Reply Br."); Compl. ¶¶ 43–50. As the Court noted, "there is no apparent reason why [the Secretary] would

---

[1] Jo Mannies & Marshall Griffin, *Missouri's Right-to-Work Law Suspended After Unions Turn In 300K Signatures for Statewide Vote*, St. Louis Pub. Radio (Aug. 18, 2017), https://www.ksmu.org/2017-08-21/missouris-right-to-work-law-suspended-after-unions-turn-in-300k-signatures-for-statewide-vote.

[2] Sam Levine, *Organizers Submit Enough Signatures to Block Gerrymandered Missouri Map*, Guardian (Dec. 9, 2025), https://www.theguardian.com/us-news/2025/dec/09/missouri-map-gerrymandering.

December 12, 2025
Page 3

incur the significant cost of signature verification given his stated belief that the petition is constitutionally deficient." Opinion at 3 n.2.

Nonetheless, despite the fact that Secretary Hoskins repeatedly told the Court that the referendum was unconstitutional, the Secretary did not, by December 11, issue a certificate of insufficiency. The Secretary instead announced that he would require State and local governments to undertake the counting and verifying of the 300,000-plus submitted signatures in a process that will likely take months—which is the very harm the Secretary repeatedly told the Court he wanted to avoid.[3]

Later on December 9, the Missouri Attorney General issued "an official statement from The Attorney General's Office." That statement claimed that the Court had "held that the State has not yet suffered any injury because House Bill 1 . . . will go into effect on December 11 and not be frozen unless and until the Secretary of State certifies the referendum."[4] The Attorney General further asserted that counsel for PNP "agreed in federal court that state law compels this conclusion" and that the Court "based its dismissal ruling on this concession."[5]

In subsequent statements to the media, both Mr. von Glahn and counsel for PNP have attempted to set the record straight.[6] Contrary to the Attorney General's statement, PNP never agreed that "House Bill 1 and the Missouri FIRST Map will go into effect on December 11 and not be frozen unless and until the Secretary of State certifies the referendum."[7] PNP agreed only that the Secretary of State could avoid the alleged harm of H.B. 1 not going into effect on December 11 and being frozen by promptly issuing a certificate of insufficiency upon PNP's submission of signatures, and that certificate would then be quickly challenged in state court. That

---

[3] David A. Lieb & Hannah Schoenbaum, *Opponents of Trump-Backed Redistricting in Missouri Submit a Petition to Force a Public Vote*, PBS News (updated Dec. 10, 2025), https://www.pbs.org/newshour/politics/opponents-of-trump-backed-redistricting-in-missouri-submit-petition-with-thousands-of-signatures-to-force-a-public-vote; *see also* Alisa Nelson, *When Does Missouri's New Congressional Map Take Effect? That Depends on Who You Ask*, Missourinet (Dec. 10, 2025), https://www.missourinet.com/2025/12/10/when-does-missouris-new-congressional-map-take-effect-that-depends-on-who-you-ask ("[I]t will take a significant amount of time to certify those results.").

[4] Jacob Gardenswartz, *Advocates Say They Have Enough Signatures to Block Missouri Gerrymandering, at Least for Now*, 2 News Okla. (Dec. 9, 2025), https://www.kjrh.com/politics/elections/advocates-say-they-have-enough-signatures-to-block-missouri-gerrymandering-at-least-for-now.

[5] *Id.*

[6] *See, e.g.*, Rudi Keller & Jason Hancock, *Missouri Set to Enact Gerrymandered Map Despite 300K Signatures for Repeal Referendum*, Mo. Independent (Dec. 9, 2025), https://missouriindependent.com/2025/12/09/missouri-gerrymander-congressional-map-referendum/; Jason Rosenbaum, *Missouri Redistricting Foes May Have Dealt Big Blow to Trump-Backed Congressional Map*, St. Louis Pub. Radio (Dec. 9, 2025), https://www.stlpr.org/government-politics-issues/2025-12-09/missouri-redistricting-foes-may-have-dealt-big-blow-to-trump-backed-congressional-map.

[7] Gardenswartz, *supra* n.4.

**JENNER&BLOCK** LLP                                                                                                    **STINSON**

December 12, 2025
Page 4

H.B. 1 is not *currently* in effect is the result of the Secretary's failure to avail himself of his statutory power to make an insufficiency determination.

**II.     PNP's Representations at the Hearing as to the Effectiveness of H.B. 1 Are Fully Consistent with PNP's Statements to the Media.**

Your letter cites four parts of the transcript from the November 25 hearing that you claim support the view that PNP conceded "that HB 1 is in effect unless and until the Secretary certifies the referendum." None of these cites supports that interpretation. Instead, all support the consistent position that PNP has taken—that H.B. 1 was frozen upon the submission of signatures, but that the Secretary can put H.B. 1 into effect by issuing a certificate of insufficiency, or what the Court called a "decertification" decision.

First, your letter cites Judge Bluestone's question to Ms. Amunson asking: "[T]he freeze wouldn't occur on the new maps until after the certification. Is that right?" Tr. 44–45. But your letter omits Ms. Amunson's answer. Ms. Amunson specifically stated that this was not right, and that the freeze would take place upon the submission of signatures:

> MS. AMUNSON: Your Honor, I think state law is a little bit unclear on this. It is the fact that—I think that the turning in of the signatures, once the certification occurs, it sort of is kind of nunc pro tunc to the time of turning in the signatures.
>
> *So it is turning in the signatures [that] ensures that the law will not otherwise go into effect on the 90th day.* But there is still processes that have to take place to ensure that that—the referendum then ends up on the ballot, which include ensuring there are enough valid signatures and that it complies with the Missouri Constitution.

Tr. 45 (emphasis added); *accord id*. at 47 (PNP counsel) (explaining that "[i]t is the submission—it is that the referendum process has been initiated" that prevents the challenged law from going into effect).

Next, you cite the Court's statement that "the law would go into effect, and then you would seek to challenge the law based on the Secretary's actions." Tr. 48. Ms. Amunson stated: "And that is our position, Your Honor." *Id*. That is true and we stand by that statement. Our position is that the law would go into effect *upon the Secretary's decertification*, and then state-court litigation could be filed to challenge "the Secretary's actions" of decertifying. The Court specifically articulated PNP's position that H.B. 1 would go into effect only upon the Secretary's decision *not* to certify it to the ballot (*i.e.*, the Secretary's decision to issue a certificate of insufficiency):

> THE COURT: . . . [Y]ou've argued that the Secretary—there's no harm here. The Secretary can just not certify it based on either of the—you know, maybe there

December 12, 2025
Page 5

> aren't enough signatures. Maybe it's unconstitutional under the Missouri Constitution.
>
> *And if either of those two things happens, then at that point the new map would go into effect*, presumably, and as you said, I think you'd have the ability to then challenge that. I think that needs to be your argument . . . .

Tr. 45 (emphasis added); *see id.* at 46 (the Court) ("So if the Secretary says, no, this isn't valid, . . . what would hold the map, the new map, from going into effect *at that point*?" (emphasis added)).

Next, you cite the transcript where you stated, "I think eventually, my friend conceded, that the map stays in effect unless and until they can win a state court challenge." Tr. 52. As the Court then observed, Mr. Hatfield nodded yes. The "yes" nod signified no more than PNP's agreement with the scenario that the Court and counsel had just been discussing: that upon decertification—which is the action that would trigger the state-court challenge—H.B. 1 is in effect unless and until a state-court challenge invalidates or enjoins the decertification. Although PNP initially argued that H.B. 1 would not go into effect until after the Secretary's decision to issue a certificate of insufficiency survived state-court review, Tr. 45–46, the Court pressed counsel on that argument, and PNP eventually agreed that if the Secretary issues a certificate of insufficiency, H.B. 1 would go into effect unless and until enjoined in a state-court challenge. Tr. 48–49.

Finally, you cite the Court's statement in its opinion that PNP agreed that "the new map would go into effect barring a successful challenge to decertification." Opinion at 7 n.4. That statement is fully consistent with PNP's position that *upon decertification* the new map would go into effect, barring a successful challenge to decertification. The premise of PNP's agreement that the new map would go into effect is that a challenge could be filed—a challenge to decertification. As the Secretary has not made a decertification decision, H.B. 1 remains suspended under clear Missouri law.

**III.   The Court's Opinion Reflects PNP's View of Missouri Law and of PNP's Representations in This Litigation.**

The Court's opinion is entirely consistent with PNP's position as set out at the hearing and, contrary to the Attorney General's statement, nowhere "held that the State has not yet suffered any injury because House Bill 1 . . . will go into effect on December 11 and not be frozen unless and until the Secretary of State certifies the referendum."[8] Indeed, the Court never discussed "certification" of the referendum at all, only decertification.

As the Court described the hearing, the parties "agreed that, *if the Secretary rejected the petition*, the new map would go into effect unless and until a court invalidated the decertification."

---

[8] Gardenswartz, *supra* n.4.

December 12, 2025
Page 6

Opinion at 4 (emphasis added).  And a footnote later in the Court's opinion again confirms PNP's representations at the hearing:  that Secretary Hoskins "will have the opportunity to review the final petition for constitutionality before conducting signature verification"; that he "could at least defend a finding of unconstitutionality based on the same claims the State advances in this case"; and that if he does so, "the new map would go into effect barring a successful challenge to decertification."  Opinion at 7 n.4.  This was the basis on which the Court held that the Plaintiffs' asserted injuries were not ripe for adjudication:  It is the Secretary's power to make an *insufficiency* determination that drove the outcome of the case.[9]

No less than nine times, the Court stated that it was the self-help remedy of "decertification" (i.e., issuance of a certificate of insufficiency) that the Secretary would need to use to avoid the harms that the Secretary complained of.  *See* Opinion at 4 ("[T]he parties agreed that Secretary Hoskins must independently review the constitutionality of the referendum petition and that he could defend a *decertification* decision based on the constitutional claims at issue here. . . . They also agreed that, if the Secretary rejected the petition, *the new map would go into effect unless and until a court invalidated the decertification*." (emphasis added) (citation omitted)); Opinion at 7 ("Secretary Hoskins has a tool at his disposal that almost no other litigant could boast—the power to declare the petition unconstitutional himself.  And at this point, *decertification* would forestall any remaining cognizable harms." (emphasis added)); Opinion at 7 n.4 (PNP agreed that "the new map would go into effect barring a successful challenge to *decertification*" (emphasis added)); Opinion at 7 n.4 ("Given the State's position that [the] referendum violates the Missouri Constitution itself, that finding alone is sufficient for *decertification*." (emphasis added) (citation omitted)); Opinion at 8 (distinguishing *Calzone v. Ashcroft* on the ground that the "case says nothing about the Secretary's authority to *decertify a petition on constitutional grounds*" (some emphasis added; some emphasis omitted)); Opinion at 9 ("The first factor [for *Pullman* abstention]—'the effect abstention would have on the rights to be protected'—weighs strongly in favor of the PNP, as *the State may protect its own interests through decertification*." (emphasis added) (citation omitted)); Opinion at 10 (rejecting the State's argument that it would be "unable to raise its Elections Clause claim before the future harms occur" because "Secretary Hoskins has a self-help remedy under state law in the form of *decertification* for unconstitutionality" (emphasis added)); Opinion at 11 ("In addition to the nature of this action and important state interests at play, the Court notes that this case will almost certainly be moot by the time a probabl[e] state court lawsuit is filed because *decertification would leave this Court with no meaningful relief to grant*." (emphasis added)).

---

[9] The Court also explained that because Secretary Hoskins holds the power to cease the displacement of H.B. 1, any alleged injury suffered by the other Plaintiffs was contingent on the Secretary's action and thus could not give rise to Article III standing.  *See* Opinion at 8 n.5.

JENNER&BLOCK LLP                                                                                       STINSON

December 12, 2025
Page 7

### IV. The State's Representations to the Court Are Inconsistent with the State's New Positions.

The Court's repeated references to the Secretary's "self-help remedy," Opinion at 5, 7, 10, presuppose that H.B. 1 is suspended upon the turning in of signatures unless and until the Secretary issues a certificate of insufficiency. If the State's newfound position on the law were correct, standing in this case would have been lacking for a far more straightforward reason: Submitting the petition on or before December 11 would have no effect whatsoever on H.B. 1's effective date. Indeed, the very reason the State sought to enjoin PNP from turning in signatures, and the reason it requested a ruling from the Court before December 11, was that the submission of the petition itself had some immediate legal effect. It is puzzling that you have now changed your view on this question, particularly given your accusation that it is PNP and its counsel that are backsliding on representations to the Court.

We take our duty of candor to the Court extremely seriously and we hope that you do too. Therefore, we respectfully suggest that you may want to evaluate your own duties in light of your repeated representations to the Court about the harm that Plaintiffs would face from PNP's submission of signatures by December 11, 2025.

Sincerely,

Jessica Ring Amunson, Partner                    Charles W. Hatfield, Partner
Jenner & Block LLP                               Stinson LLP