# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| MISSOURI GENERAL ASSEMBLY, DENNY HOSKINS, in his official capacity as Missouri Secretary of State, and STATE OF MISSOURI, | )<br>)<br>)<br>) |
| *Plaintiffs*, | ) |
| v. | ) Case No. 4:25-cv-01535-ZMB |
| RICHARD VON GLAHN and PEOPLE NOT POLITICIANS, | ) Hon. Zachary M. Bluestone<br>)<br>) |
| *Defendants*. | ) |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANTS' COUNSEL

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT........................................................................................................................6

    I.      There Is No Misconduct Because PNP's Public Statements and Positions in this Court Are Fully Consistent. ...................................................................6

    II.     The Sanctions Motion Is Meritless and Seeks to Suppress Core Political Speech. ...............................................................................................................10

    III.    The State's Requested Remedies Are Improper. ..........................................14

CONCLUSION...................................................................................................................15

CERTIFICATE OF SERVICE AND COMPLIANCE......................................................16

# TABLE OF AUTHORITIES

**CASES**

*Ascentium Capital LLC v. Littell*, No. 20-cv-4215, 2021 WL 6095550 (W.D. Mo. Dec. 22, 2021) ...................................................................................................14

*Brown v. City of Upper Arlington*, 637 F.3d 668 (6th Cir. 2011)...................................................12

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).....................................................................1, 6, 14

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991)...................................................................13

*Goodwin v. United States*, 869 F.3d 636 (8th Cir. 2017)................................................................15

*Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238 (1944)...........................................12

*State ex rel. Kemper v. Carter*, 165 S.W. 773 (Mo. banc 1914).......................................................6

*Martin v. DaimlerChrysler Corp.*, 251 F.3d 691 (8th Cir. 2001) .....................................................1

*Meyer v. Grant*, 486 U.S. 414 (1988) ............................................................................................13

*State ex rel. Moore v. Toberman*, 250 S.W.2d 701 (Mo. banc 1952)...........................................6, 8

*NAACP v. Button*, 371 U.S. 415 (1963).........................................................................................13

*New Hampshire v. Maine*, 532 U.S. 742 (2001).............................................................................13

*Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ..............................................................................................................................................14

*Stickler v. Ashcroft*, 539 S.W.3d 702 (Mo. Ct. App. 2017) ..............................................................3

*Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946) .......................................12

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)...................................13

**CONSTITUTIONAL PROVISIONS**

Mo. Const. art. III, § 52(a).................................................................................................................4

**OTHER AUTHORITIES**

Jacob Gardenswartz, *Advocates Say They Have Enough Signatures to Block Missouri Gerrymandering, at Least for Now*, 2 News Okla. (Dec. 9, 2025), https://www.kjrh.com/politics/elections/advocates-say-they-have-enough-signatures-to-block-missouri-gerrymandering-at-least-for-now ....................................................5

Rudi Keller & Jason Hancock, *Missouri Set to Enact Gerrymandered Map Despite 300K Signatures for Repeal Referendum*, Mo. Independent (Dec. 9, 2025), https://missouriindependent.com/2025/12/09/missouri-gerrymander-congressional-map-referendum/ ..................................................................................................5

Sam Levine, *Organizers Submit Enough Signatures to Block Gerrymandered Missouri Map*, Guardian (Dec. 9, 2025), https://www.theguardian.com/us-news/2025/dec/09/missouri-map-gerrymandering .......................................................................4

David A. Lieb & Hannah Schoenbaum, *Opponents of Trump-Backed Redistricting in Missouri Submit a Petition to Force a Public Vote*, PBS News (updated Dec. 10, 2025), https://www.pbs.org/newshour/politics/opponents-of-trump-backed-redistricting-in-missouri-submit-petition-with-thousands-of-signatures-to-force-a-public-vote ..................................................................................................4

Jo Mannies & Marshall Griffin, *Missouri's Right-to-Work Law Suspended After Unions Turn In 300K Signatures for Statewide Vote*, St. Louis Pub. Radio (Aug. 18, 2017), https://www.ksmu.org/2017-08-21/missouris-right-to-work-law-suspended-after-unions-turn-in-300k-signatures-for-statewide-vote .........................................3

Mo. Sup. Ct. R. 4-3.6 ..............................................................................................................13

Alisa Nelson, *When Does Missouri's New Congressional Map Take Effect? That Depends on Who You Ask*, Missourinet (Dec. 10, 2025), https://www.missourinet.com/2025/12/10/when-does-missouris-new-congressional-map-take-effect-that-depends-on-who-you-ask ..............................................................................4

Jason Rosenbaum, *Missouri Redistricting Foes May Have Dealt Big Blow to Trump-Backed Congressional Map*, St. Louis Pub. Radio (Dec. 9, 2025), https://www.stlpr.org/government-politics-issues/2025-12-09/missouri-redistricting-foes-may-have-dealt-big-blow-to-trump-backed-congressional-map .........................5

**INTRODUCTION**

The General Assembly, the Secretary of State, and the State (collectively, the "State") ask the Court to sanction counsel for Defendants Richard von Glahn and People Not Politicians (collectively, "PNP") for refusing to issue press statements endorsing the State's newly minted interpretation of Missouri law—an interpretation that is both wrong and directly contrary to the interpretation the State previously put forth in this litigation. The Court should deny the motion.

First and foremost, PNP has not engaged in any misconduct nor misrepresented anything to the Court. The premise of the State's motion is that PNP's statements in the media since the case's conclusion advance an interpretation of Missouri law that is inconsistent with PNP counsel's position during oral argument. But there is no inconsistency whatsoever. PNP's consistent position has been that PNP's submission of signatures to the Secretary of State on or before December 11 would freeze H.B. 1. Indeed, that is why the State sought to enjoin PNP from turning in signatures and demanded a ruling prior to PNP's planned turn-in date. At the hearing, PNP's counsel agreed that if the Secretary issued a certificate of insufficiency after PNP turned in signatures, H.B. 1 would then become effective, and the Secretary's decision would be quickly challenged in state court. That is exactly what the Court said in its opinion. In its press statements since, PNP has accurately stated that H.B. 1 remains suspended unless and until the Secretary issues a certificate of insufficiency. That follows directly from what PNP said in court.

Even setting aside the consistency of PNP's position, the State has not come close to meeting the test for inherent-authority sanctions. A court's power to sanction "must be exercised with restraint and discretion," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991), and only upon "clear and convincing evidence that the misconduct occurred," *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 695 (8th Cir. 2001). There is no evidence, much less "clear and convincing evidence," of misconduct. As to PNP's in-court statements, the State does not accuse PNP of making *any*

1

false statement. Instead, the State (inaccurately) claims that PNP conceded that H.B. 1 is not frozen upon the submission of signatures and proclaims that purported concession to be *correct*.

What the State is actually doing is trying to police PNP's public statements. The State's letter preceding this motion was not subtle: It demanded, on threat of sanctions, that PNP issue a statement *to the media* endorsing the State's incorrect view that PNP's submission of signatures had no legal effect. PNP appropriately refused to do so. Sanctioning a party based on its out-of-court, post-dismissal political speech—speech that *accurately* recounts what the Court held in its decision—would both exceed the Court's sanctions authority and violate the First Amendment.

In the end, the State's sanctions motion boils down to its dissatisfaction with the Court's ruling. The motion should be denied.

## BACKGROUND

The State's current position—and the premise of its sanctions motion—is that PNP's submission of signatures did not freeze H.B. 1. That is the exact opposite of what the State told this Court. In its complaint, the State alleged that it faced imminent harm because if the petition "gain[ed] enough signatures to qualify for a vote before the people," "the challenged law" would be "frozen pending the public vote." ECF No. 1, ¶ 48 ("Compl."). In its preliminary-injunction motion, the State similarly argued that "if Defendants succeed in obtaining the requisite signatures, the new duly enacted congressional map *is* placed on hold and cannot take effect until after referendum." ECF No. 3, at 11 ("State PI Br.") (emphasis added). As the State's Director of Elections stated in a sworn declaration, "if the defendants succeed in collecting the necessary signatures, the Missouri Constitution will prevent the new map from taking effect until a referendum occurs." ECF No. 3-1, ¶ 20 ("State Decl."). The State specifically told this Court that it needed a ruling on its injunction motion before December 11, explaining that "[t]his expedition is necessary given the operation of state law" because "Defendants have until December 11, 2025 to submit their final

2

referendum petition" and "[i]f Defendants succeed in collecting and submitting the needed signatures prior to issuance of an injunction, . . . the State will then be barred from implementing the new congressional districts during the referendum petition's pendency." State PI Br. 14 (citing Mo. Const. art. III, § 52(b)).

The State was correct. As the Missouri Court of Appeals has explained, "once a referendum petition has received sufficient signatures to be placed on the general election ballot, . . . the referred measure is suspend[ed] or annul[led]." *Stickler v. Ashcroft*, 539 S.W.3d 702, 713 n.9 (Mo. Ct. App. 2017) (internal quotation marks omitted) (alteration in original). That is why last time Missouri voted on a referendum, during the tenure of then-Attorney General Hawley, then-Secretary of State Ashcroft stated that the challenged act was suspended upon submission of a petition that apparently had sufficient signatures.[1]

PNP's position throughout this litigation has been that "it is turning in the signatures [that] ensures that [H.B. 1] will not otherwise go into effect on the 90th day" after the end of the legislative session. ECF No. 38, at 45 ("Tr."). PNP maintained, however, that the State had a tool at its disposal to prevent the harms it claimed justified a preliminary injunction: the Secretary of State's power to issue a certificate of insufficiency. As PNP agreed at the November 25 hearing, if the Secretary issued a certificate of insufficiency after PNP turned in its petition, H.B. 1 would *then* go into effect—though the Secretary's decision (and thus H.B. 1's effectiveness) would be subject to expedited judicial review in state court and unwound if the Secretary were deemed to have wrongly rejected the petition. *See id.* at 47–48.

---

[1] *See* Jo Mannies & Marshall Griffin, *Missouri's Right-to-Work Law Suspended After Unions Turn In 300K Signatures for Statewide Vote*, St. Louis Pub. Radio (Aug. 18, 2017), https://www.ksmu.org/2017-08-21/missouris-right-to-work-law-suspended-after-unions-turn-in-300k-signatures-for-statewide-vote.

3

On December 8, the Court granted PNP's motion to dismiss and denied the State's preliminary-injunction motion. ECF No. 39, at 1 ("Op."). The Court's opinion accurately describes both parties' position at the hearing: They "agreed that, *if the Secretary rejected the petition*, the new map would go into effect unless and until a court invalidated the decertification." *Id*. at 4 (emphasis added). In light of that shared understanding of Missouri law, the Court explained that the State lacked standing and the dispute was unripe because the Secretary had a "unique self-help remedy" once PNP submitted its petition: He could "declare the petition unconstitutional himself," and "at th[at] point" his decision "would forestall any remaining cognizable harms." *Id.* at 7.

On December 9—the morning after the Court's decision—PNP submitted the referendum petition to the Secretary of State with more than 300,000 signatures, well over the required number.[2] *See* Mo. Const. art. III, § 52(a). Despite this Court's finding that there is "no apparent reason why he would incur the significant cost of signature verification given his stated belief that the petition is constitutionally deficient," Op. 3 n.2, the Secretary declared that he will undertake the process of signature verification that he repeatedly asked this Court to stave off.[3]

Also on December 9, the Attorney General issued an official statement on the status of H.B. 1. The Attorney General stated that this Court had "held that the State has not yet suffered any injury because House Bill 1 . . . will go into effect on December 11 and not be frozen unless

---

[2] *See* Sam Levine, *Organizers Submit Enough Signatures to Block Gerrymandered Missouri Map*, Guardian (Dec. 9, 2025), https://www.theguardian.com/us-news/2025/dec/09/missouri-map-gerrymandering.

[3] *See* David A. Lieb & Hannah Schoenbaum, *Opponents of Trump-Backed Redistricting in Missouri Submit a Petition to Force a Public Vote*, PBS News (updated Dec. 10, 2025), https://www.pbs.org/newshour/politics/opponents-of-trump-backed-redistricting-in-missouri-submit-petition-with-thousands-of-signatures-to-force-a-public-vote; *see also* Alisa Nelson, *When Does Missouri's New Congressional Map Take Effect? That Depends on Who You Ask*, Missourinet (Dec. 10, 2025), https://www.missourinet.com/2025/12/10/when-does-missouris-new-congressional-map-take-effect-that-depends-on-who-you-ask.

and until the Secretary of State certifies the referendum."[4]  She further asserted that counsel for PNP "agreed in federal court that state law compels this conclusion" and that the Court "based its dismissal ruling on this concession."[5]

In subsequent press statements, Mr. von Glahn and PNP's counsel Mr. Hatfield attempted to set the record straight.[6]  They explained that under longstanding Missouri law, the submission of signatures suspends H.B. 1, but that the Secretary can issue a certificate of insufficiency to put H.B. 1 into effect—and that certificate would be quickly challenged.  As Mr. von Glahn stated: "He doesn't have to decide on [the constitutionality] until he reviews the signatures, but if he doesn't make a decision, the law is suspended."[7]

On December 10, the State sent a letter to PNP's counsel, demanding that PNP immediately issue a public statement confirming a purported "concession to the Court that HB 1 is in effect unless and until the Secretary certifies the referendum."  ECF No. 41-3, at 3 ("State Ltr.").  The State threatened to seek sanctions if PNP's counsel did not send a copy of that statement to all media outlets with whom PNP and its counsel had communicated.  *Id.*  On the morning of December 12, counsel for PNP responded that it never made any such "concession" and would not issue a public statement.  ECF No. 41-2 at 1 ("PNP Ltr.").  A few hours after receiving PNP's December

---

[4] Jacob Gardenswartz, *Advocates Say They Have Enough Signatures to Block Missouri Gerrymandering, at Least for Now*, 2 News Okla. (Dec. 9, 2025), https://www.kjrh.com/politics/elections/advocates-say-they-have-enough-signatures-to-block-missouri-gerrymandering-at-least-for-now.

[5] *Id.*

[6] *See, e.g.*, Rudi Keller & Jason Hancock, *Missouri Set to Enact Gerrymandered Map Despite 300K Signatures for Repeal Referendum*, Mo. Independent (Dec. 9, 2025), https://missouriindependent.com/2025/12/09/missouri-gerrymander-congressional-map-referendum; Jason Rosenbaum, *Missouri Redistricting Foes May Have Dealt Big Blow to Trump-Backed Congressional Map*, St. Louis Pub. Radio (Dec. 9, 2025), https://www.stlpr.org/government-politics-issues/2025-12-09/missouri-redistricting-foes-may-have-dealt-big-blow-to-trump-backed-congressional-map.

[7] Keller & Hancock, *supra* note 6.

5

12 response, the State filed the present motion for sanctions.

## ARGUMENT

Sanctions are an extraordinary remedy aimed at "conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45. "A court must, of course, exercise caution in invoking its inherent [sanctions] power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing" the appropriate sanction. *Id.* at 50. Here, there was no misconduct, so there is no cause for sanctions.

### I. There Is No Misconduct Because PNP's Public Statements and Positions in this Court Are Fully Consistent.

There is no basis for sanctions because Mr. von Glahn and Mr. Hatfield's public statements are entirely consistent with counsel's statements at argument. At the hearing, counsel agreed that *when the Secretary issues the certificate of insufficiency*, H.B. 1 would become effective—unless and until that insufficiency determination is unwound in state-court litigation. That is consistent with public statements that *before that happens*, H.B. 1 is frozen. That H.B. 1 is frozen upon the submission of signatures is likewise consistent with more than a century of Missouri law. Precedent holds that "the intendment of the framers of the Constitution was that all laws, except those declared non-referable, should be subject to referendum *if petitions to refer them were duly filed before their effective date*." *State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 706 (Mo. banc 1952) (emphasis added); *see also State ex rel. Kemper v. Carter*, 165 S.W. 773, 779 (Mo. banc 1914) ("without doubt or hesitation[] . . . all acts of the Legislature, touching which the referendum may properly be invoked, are suspended by the filing of a legal, sufficient, and timely petition for the submission of such acts to a vote of the people for their approval or rejection. . . .").

As noted above, the State's complaint, preliminary-injunction motion, and sworn declaration expressly affirmed that PNP's submission of signatures would freeze H.B. 1. PNP never

disputed that understanding. In its motion to dismiss, however, PNP argued that the Secretary had a way to avoid harm: "If Secretary Hoskins determines that the petition is unlawful, and his decision survives state-court scrutiny, the General Assembly's asserted injury would never materialize." ECF No. 22, at 8 ("PNP PI Opp.").

This self-help remedy was the focus of the Court's questions to PNP's counsel at the November 25 hearing. The State now claims that the Court's questions were an attempt to get PNP's counsel to "concede that H.B. 1 is not frozen by the mere submission of signatures," ECF No., 41-1 at 9–10 ("Sanctions Br."), and further claims that PNP's counsel ultimately did concede "that the mere submission of referendum signatures does not freeze a duly enacted state law." *Id.* at 2. That revisionist history makes no sense. The whole point of the State's request for a preliminary-injunction ruling before December 11 was that the submission of signatures would harm the State by freezing H.B. 1. The questioning at the hearing thus focused upon what would happen when—as PNP expected—the Secretary attempted to stave off that harm by rejecting the petition on the basis that the referendum was unconstitutional.[8]

In response to the Court's questioning, counsel for PNP agreed that the Secretary could make this determination and noted that it would be promptly challenged in state court.[9] The topic then debated was the status of H.B. 1 *after the Secretary had rejected the petition*. The Court's questions all proceeded from the premise that *the Secretary's rejection* would be the trigger for H.B. 1 to go into effect. As the Court put it: The Secretary could reject the petition if "there aren't enough signatures" or "it's unconstitutional," and "if *either of those two things happens, then at*

---

[8] *See* Tr. 43 (Ms. Amunson: "So if the Secretary rejects, as we expect the Secretary will, rejects the petition as not being in conformance with the Missouri Constitution, our clients and anyone has the ability to then take the Secretary to court to litigate that.").
[9] *See id.* at 43–44.

7

*that point the new map would go into effect.*" Tr. 45 (emphasis added).  The Court then asked: *"[I]f the Secretary says, no, this isn't valid, . . .* what would hold the map, the new map, from going into effect *at that point?*"  *Id.* at 46 (emphasis added).

Counsel for PNP, Ms. Amunson, initially argued that, after the rejection, the "Secretary's decision would have to survive state-court review and only then would the map go into effect." *Id.*  But after the Court reiterated that "the law would go into effect, *and then* you would seek to challenge the law based on the Secretary's actions and say what the Secretary did was impermissible and then file whatever emergency relief that you wanted to do, and that very well could preclude the map from going forward," Ms. Amunson agreed, stating, "And that is our position, Your Honor."  *Id.* at 48 (emphasis added).  The State treats this statement as a smoking gun, but it is perfectly accurate:  The law would "go into effect" upon "the Secretary's actions" of rejecting the petition, and then state-court litigation would be filed to challenge "the Secretary's actions" of rejecting the petition.  The only "concession" in this entire exchange was that H.B. 1 could go into effect immediately upon the Secretary's issuance of a certificate of insufficiency rather than waiting to see if the Secretary's decision survived state-court review.[10]

The State also relies on a transcript reference to Mr. Hatfield's "nodding his head."  Tr. 52; *see* Sanctions Br. 7.  The nod signified no more than PNP's agreement with the scenario that the

---

[10] Counsel initially argued that the map would not go into effect until after the Secretary's decision survived state-court review based on counsel's understanding of the Missouri Supreme Court's holding in *State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 706 (Mo. banc 1952), that a referendum cannot take place on a law that has taken effect.  *See* Tr. 47 (Ms. Amunson: "So the issue, Your Honor, is that you cannot have a referendum on a law that has gone into effect.").  Given that understanding of *Toberman*, counsel wanted to ensure PNP "would not lose the right to the referendum" merely because H.B. 1 would have taken effect during the (likely brief) period of state-court litigation "if, in fact, the Secretary's decision does not survive state court review."  *Id.* at 48.  Based on the Court's acknowledgement that PNP would not lose the right to the referendum in this circumstance, *see id.*, counsel agreed that H.B. 1 would go into effect when the Secretary issues a certificate of insufficiency.

8

Court and counsel had just been discussing: Upon the Secretary's rejection of the petition, H.B. 1 would be in effect unless and until a state-court challenge invalidated the rejection.

The Court's opinion is fully consistent with PNP's understanding of these exchanges. As the Court put it, the parties "agreed that, *if the Secretary rejected the petition*, the new map would go into effect unless and until a court invalidated the decertification." Op. 4 (emphasis added). The Court explained that Secretary Hoskins "will have the opportunity to review the final petition for constitutionality *before* conducting signature verification"; he "could at least defend a finding of unconstitutionality based on the same claims the State advances in this case"; and if he does so, "the new map would go into effect barring a successful challenge to decertification." *Id.* at 7 n.4 (emphasis added). Nine times, the Court confirmed that the Secretary would need to use the self-help remedy of "decertification" to avoid the harms of which he complained. *See id.* at 4, 7 & n.4, 8, 9, 10, 11. Indeed, the Court's repeated references to the "self-help remedy" of decertification presuppose that H.B. 1 is suspended unless and until the Secretary issues a certificate of insufficiency. *Id.* at 5, 7, 10,

The State now claims that it "understands the Court to be using" the term "decertification" "synonymously with the Secretary merely refusing to certify the referendum." Sanctions Br. 11 n.10. But the Court explicitly equated "reject[ing the] petition" with "decertification." Op. 4. The Court was even more pointed in explaining that it was using the term "decertification" as a synonym for issuing a certificate of insufficiency:

> Fortunately for the State, Secretary Hoskins has a tool at his disposal that almost no other litigant could boast—the power to declare the petition unconstitutional himself. And at this point, decertification would forestall any remaining cognizable harms. The State's only response for why this unique self-help remedy does not amount to a ripeness defect is that drafting a certificate of insufficiency will "require careful analysis and collaboration between the Secretary and Attorney General." But it is hard to imagine that completing this constitutional assessment will impose any measurable burden given that the State has completed an exhaustive

9

analysis in briefing this case.

*Id.* at 7 (footnote and citations omitted).

Mr. von Glahn and Mr. Hatfield's statements to the media since the conclusion of the case are entirely consistent with PNP's position at argument and with this Court's opinion.  In reality, *the State* is the party that is changing positions.  The Court's opinion states that, at the hearing, "the parties agreed that Secretary Hoskins must independently review the constitutionality of the referendum petition" and "could defend a decertification decision based on the constitutional claims at issue here."  *Id.* at 4.  But the State now claims it is "far from clear the State has the authority to reject a referendum based on substantive federal-constitutional concerns."  Sanctions Br. 13 n.11.  The Court's opinion also notes that "there is no apparent reason" why the Secretary would "incur the significant cost of signature verification given his stated belief that the petition is constitutionally deficient," and "the parties agree that Secretary Hoskins can take this approach and have indicated their expectation that he will do so."  Op. 3 n.2.  Now, however, the State claims it "makes little sense for the Secretary to rush into the adjudication" of the constitutional questions before undertaking the process of verifying signatures, characterizing this as a "rash course of action" that would inflict "sovereign harms."  Sanctions Br. 13 n.11.  It is ironic, to say the least, that the State declares on the very same page of its brief that allowing counsel "to represent one thing to this Court but say and do another would undermine this Court's rulings and public confidence in the judicial system."  *Id*. at 13.

## II.     The Sanctions Motion Is Meritless and Seeks to Suppress Core Political Speech.

Even setting aside the fact that PNP's in-court and out-of-court statements have been accurate and consistent, the State's sanctions motion suffers from numerous other fatal defects.  The State does not even attempt to show that PNP made any *in-court* misrepresentations.  To the contrary, the State now purports to *agree* with the in-court position it (falsely) attributes to PNP.  The

10

State is actually attempting to police PNP's *out-of-court* political speech—an effort that the First Amendment forbids.

Begin with PNP's in-court statements. The request for sanctions is based on supposed "misrepresentations" to the Court. Sanctions Br. 10. But even accepting the State's version of events at the hearing, the alleged "misrepresentation" was the purported concession that H.B. 1 "is not frozen by the mere submission of signatures." *Id.* at 9–10. The State does not claim that this statement (that PNP never made) is false. Instead, it claims this is a *true* statement of Missouri law. The State cannot claim that PNP defrauded the Court by taking a legal position with which the State now claims to *agree*.

The State's theory that PNP defrauded the Court fails for another reason: The Court's decision shows that it understood PNP's position perfectly. As the Court described the hearing, the parties "agreed that, *if the Secretary rejected the petition*, the new map would go into effect unless and until a court invalidated the decertification." Op. 4 (emphasis added). The Court's characterization is completely accurate, consistent with both parties' statements during the hearing, and consistent with PNP's post-judgment press statements. *See supra* pages 6–10.

In actuality, the State's argument is not that *counsel's in-court statements* were false and somehow tainted this Court's judgment. Instead, the State's argument is that *Mr. von Glahn and Mr. Hatfield's out-of-court statements to the press* were false—or at least, inconsistent with counsel's in-court statement. That much is clear from the State's December 10 letter, in which the State did not demand that PNP take any action that would uphold the "integrity of the judicial process," Sanctions Br. 13, such as submitting a corrective statement to the Court. The State instead demanded that PNP make media statements endorsing the State's newfound interpretation of the law. *See* State Ltr. If, as the State suggests, this Court's judgment was tainted by a misrepresentation,

11

that taint could not possibly be cured by issuing press statements.  What the State is really doing is asking the Court to punish PNP's counsel for the out-of-court, post-judgment media statements by Mr. von Glahn and Mr. Hatfield.[11]  Such a punishment would both exceed the Court's authority and violate the First Amendment.

First, the Court lacks authority to issue such sanctions.  Although a court has the inherent authority to "manage its proceedings, vindicate its authority, and effectuate its decrees," that authority does not encompass the power "to punish conduct that did not violate any court order" and "that occurred after the dismissal of the case." *Brown v. City of Upper Arlington*, 637 F.3d 668, 673 (6th Cir. 2011) (Sutton, J.) (internal quotation marks omitted).  And it certainly does not encompass the power to punish post-judgment press statements that are purportedly inconsistent with legal positions taken during litigation.  Litigants sometimes do try to walk back arguments they previously made, and the law addresses that concern via the doctrine of judicial estoppel.  That doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotation marks omitted).  But judicial estoppel is applied by a *second* court (not the first court); it applies to parties making new post-judgment *legal claims* (not press statements); and it results in rejection *of those claims* (not sanctions, and not reopening the first court's judgment).

---

[11] This case therefore does not bear the slightest resemblance to *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238 (1944), as the State insists. Sanctions Br. 3. In *Hazel-Atlas*, following the revelation that a supposed trade-journal article declaring the patentee's invention to be a "remarkable advance" was actually a fake document manufactured by plaintiff's counsel, the Court affirmed the "historic power of equity to set aside fraudulently begotten judgments." 322 U.S. at 240, 245. *Hazel-Atlas* has nothing to do with public statements that purportedly contradict their positions in court. Similarly inapplicable, *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946), involved the "bribery" of a judge "to secure a decision favorable to Universal" and had nothing to do with in-court versus out-of-court statements. *Id.* at 577.

12

Second, Mr. Hatfield and Mr. Von Glahn's media statements are core political speech protected by the First Amendment. *See Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) (the initiative process "involves the type of interactive communication concerning political change that is appropriately described as 'core political speech'"). The State expresses concern that PNP's speech might "encourage third parties . . . to sue the State," Sanctions Br. 10, but speech that encourages litigation is also fully protected by the First Amendment. *See NAACP v. Button*, 371 U.S. 415, 422 (1963). The Supreme Court has authorized only narrow restrictions on attorney speech. Specifically, when lawyers represent clients in "pending cases," courts may restrict those lawyers from making comments that yield a "substantial likelihood of material prejudice" to the proceeding. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074–75 (1991) (opinion of the Court by Rehnquist, C.J.); *see also* Mo. Sup. Ct. R. 4-3.6. The State does not even attempt to show that this standard is satisfied, and it plainly is not. Among other reasons, this proceeding was *already over* when the statements were made.[12]

That *the State* is pursuing sanctions amplifies the First Amendment concerns. State officials demanded on state letterhead that private citizens stop criticizing the government and instead publicly affirm the State's views. *See* State Ltr. When those private citizens refused, the State demanded punishment. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics" and "force citizens" to become mouthpieces for the State's preferred political views. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The State cannot demand—on pain of sanctions—that counsel

---

[12] Applying the inherent-authority doctrine to sanction out-of-court statements such as this would also be unconstitutionally vague. Excessively vague disciplinary rules violate the First Amendment, particularly when they purport to police speech that "involve[s] criticism of the Government." *Gentile*, 501 U.S. at 1051 (opinion of the Court by Kennedy, J.). Here, "inherent authority" provides no guidance as to what types of out-of-court political statements are sanctionable.

13

adopt its erroneous legal position as to the effectiveness of H.B. 1.

Finally, even if there were any misconduct—and PNP emphatically denies there was—the State has not substantiated that it was sufficiently grave to be sanctionable. At most, there is a disagreement about the implications of state law, which just further supports the Court's decision to "avoid federal interference in a referendum process created entirely by the Missouri Constitution and state law." Op. 10. While "a court can sanction a party under its inherent authority if it finds by a clear and convincing evidence that the party acted in bad faith," *Ascentium Capital LLC v. Littell*, No. 20-cv-4215, 2021 WL 6095550, at *8 (W.D. Mo. Dec. 22, 2021), the State proffers no evidence, much less "clear and convincing evidence," that PNP's counsel made *any* improper statements, let alone did so in bad faith. Moreover, to show that sanctions are warranted, the State must make the required showing as to *each* counsel, "based solely on his own improper conduct without considering the conduct of the parties or any other attorney." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 650 (9th Cir. 1997) (internal quotation marks omitted). The State conducts no individualized analysis of either Ms. Amunson or Mr. Hatfield's conduct.

## III. The State's Requested Remedies Are Improper.

Finally, the Court should deny the motion because it seeks improper remedies. The State asks the Court to "vacat[e]" its dismissal order and "reopen the judgment." Sanctions Br. 3. The right vehicle to reopen a judgment is a Rule 59 or Rule 60 motion, not a sanctions motion. "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned" under existing Rules of Civil Procedure, "the court ordinarily should rely on the Rules rather than the inherent power." *Chambers*, 501 U.S. at 50.

Moreover, the State appears to have no clue what this Court should do were the judgment reopened. Suppose the Court agrees with the State that PNP "conceded" that turning in the signatures had no legal effect on H.B. 1. The Court would have to decide this state-law issue for itself

14

because courts are "not bound by a party's concession of law." *Goodwin v. United States*, 869 F.3d 636, 639 (8th Cir. 2017). But the Court has already held that it lacks jurisdiction and that state-law questions should be decided by state courts. *See* Op. 8. And what relief could the Court provide? The State sought an injunction against the submission of signatures. Such an injunction now would be both factually impossible (since the signatures have been submitted) and legally useless (since according to the State, the submission of signatures had no legal effect).

The State ultimately reveals that it just disagrees with this Court's decision and threatens to "move for reconsideration and/or appeal." Sanctions Br. 12 n.11. It is free to do that.

## CONCLUSION

For the foregoing reasons, this Court should deny the State's motion for sanctions.

Dated:  December 16, 2025            Respectfully submitted,

|  |  |
|---|---|
| Jessica Ring Amunson (*pro hac vice*) | */s/ Jeremy A. Root* |
| Sam Hirsch (*pro hac vice*) | Jeremy A. Root, MOBAR 59451 |
| Jonathan J. Marshall (*pro hac vice*) | Charles W. Hatfield, MOBAR 40363 |
| Elizabeth H. Starr (*pro hac vice*) | Alexander C. Barrett, MOBAR 68695 |
| **JENNER & BLOCK LLP** | Alixandra Cossette, MOBAR 68114 |
| 1099 New York Ave., Suite 900 | Greta Bax, MOBAR 73354 |
| Washington, DC 20001 | **STINSON LLP** |
| 202-639-600 (phone) | 230 West McCarty Street |
| 202-639-6066 (fax) | Jefferson City, MO 65101 |
| jamunson@jenner.com | 573-636-6263 (phone) |
| shirsch@jenner.com | 573-636-6231 (fax) |
| jmarshall@jenner.com | jeremy.root@stinson.com |
| estarr@jenner.com | chuck.hatfield@stinson.com |
|  | alexander.barrett@stinson.com |
|  | alixandra.cossette@stinson.com |
|  | greta.bax@stinson.com |

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, Eastern Division, using the CM/ECF system, which will send a notice of filing to all counsel of record who have consented to service by electronic means.  I further certify that the foregoing document contains 5,021 words and appears on 15 typed pages, exclusive of matters designated for omission.

Dated:  December 16, 2025          */s/ Jeremy A. Root*
                                                    Jeremy A. Root