IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MISSOURI GENERAL ASSEMBLY, ET AL., <br><br> *Plaintiffs,* <br><br> v. <br><br> RICHARD VON GLAHN, ET AL., <br><br> *Defendants.* | Case No. 4:25-cv-01535-ZMB |

**REPLY IN SUPPORT OF THE STATE OF MISSOURI'S MOTION FOR SANCTIONS**

i

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

CONCLUSION ............................................................................................................................. 14

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Abbott v. Perez*,
　585 U.S. 579 (2018) ................................................................................................. 13

*Beavers v. Ark. State Bd. of Dental Exam'rs*,
　151 F.3d 838 (8th Cir. 1998) .................................................................................... 14

*Calzone v. Ashcroft*,
　559 S.W.3d 32 (Mo. Ct. App. 2018) ......................................................................... 12

*Cohen v. Hurley*,
　366 U.S. 117 (1961) ................................................................................................. 10

*Mezibov v. Allen*,
　411 F.3d 712 (6th Cir. 2005) .................................................................................... 10

*Missouri Electric Cooperatives v. Kander*,
　497 S.W.3d 905 (Mo. Ct. App. 2016) ....................................................................... 12

**Statutes**

Mo. Rev. Stat. § 116.120 ............................................................................................. 3, 7

Mo. Rev. Stat. § 116.150 .......................................................................................... 5, 6, 7

Mo. Const. art. III, § 52(a) ............................................................................................... 9

Mo. Const. art. III, § 52(b) ........................................................................................... 3, 7

**Other Authorities**

H.B. 1 ...................................................................................................................... passim

Jason Rosenbaum, *Missouri redistricting foes may have dealt big blow to Trump-
　backed congressional map*, St. Louis Public Radio (Dec. 9, 2025 ........................... 4, 7

Meredith Hood, KOMU 8, *Missouri AG Asks Federal Judge to Sanction Group
　Saying Gerrymandered Map Isn't Yet in Effect* (Dec. 17, 2025) .............................. 14

Press Release from People Not Politicians, *Missouri Attorney General Ignores
　Constitution; Dodging the Voices of 305k+ Missourians* (Dec. 11, 2025) ............... 12

**INTRODUCTION**

Defendants' Counsel themselves highlight the importance of the "abundantly clear" concession they made to this Court—one they opportunistically renounced as soon as this Court granted their motion to dismiss. As Defendants' Counsel explain, one of the primary reasons the State filed this suit was because it was afraid that Defendants' actions would result in H.B. 1 being frozen. *See* Opp. Br. at 2–3. Now, before the State has *any* idea whether Defendants' proposed referendum has an adequate number of valid signatures, *see infra*, Defendants' Counsel insist H.B. 1 is frozen merely because they deposited boxes of unverified signatures with the Secretary of State. *See* Ex. A at 3–4. And they are threatening to sue on the issue.[1]

If Defendants are right that merely depositing unverified signatures automatically freezes a state law, then the State will suffer extraordinary harm that should have conferred standing on the State in this case. *See* PI Br. at 10–11; State PI Resp. Br. at 12–19. That is presumably why the Court asked the State's Counsel what the status of H.B. 1 would be when Defendants submitted their signatures. Tr. 36:1–2. The State's Counsel answered candidly, acknowledging "uncertainty" on the issue, but asserting the State's position that H.B. 1 would be frozen "only after final certification of the signatures." Tr. 36:5–11. In the Court's words, H.B. 1 being frozen "presuppose[s] certification." Tr. 47:4. The State's Counsel knew that position

---

[1] *See* Jason Rosenbaum, *Missouri redistricting foes may have dealt big blow to Trump-backed congressional map*, St. Louis Public Radio (Dec. 9, 2025), https://www.stlpr.org/government-politics-issues/2025-12-09/missouri-redistricting-foes-may-have-dealt-big-blow-to-trump-backed-congressional-map.

1

arguably undermined one of the State's claimed bases for harm, but he made the concession because that is what candor to the Court requires. To its credit, the Court was "eager" to know Defendants' position on the same question, Tr. 36:13, but it did not receive a candid answer from Defendants' Counsel.

The hearing transcript is unambiguous. The Court engaged in a lengthy inquiry with Ms. Amunson, opening it by unambiguously asking whether "the freeze wouldn't occur on the new maps until after the certification." Tr. 44:21–45:1. As Defendants' Counsel now recount, Ms. Amunson initially held her ground and asserted an immediate freeze. *See* Opp. Br. at 7–8. *Five times*, this Court pushed back on that argument and repeatedly suggested that Ms. Amunson needed to concede that "the law would go into effect, and then [Defendants] [c]ould seek to challenge the law based on the Secretary's actions" in order to avoid Defendants' motion to dismiss being rejected. Tr. 48:9–19. Ms. Amunson made the concession. *See* Tr. 48:20–23. To avoid any confusion, the State's Counsel and the Court *agreed* that the concession was "abundantly clear":

> Mr. Capozzi: It's also still quite unclear to me what the status of the map will be when they submit their signatures. I think eventually, my friend conceded, that the map stays in effect unless and until they can win a state court challenge . . . .
>
> The Court: That's where I think everybody wound up. And Mr. Hatfield is nodding his head yes. I do think that's very important. And I think, as we talked about earlier, that the arguments for dismissal will be very flat if that weren't the case. But I do think—I mean, it is abundantly clear, though, from the record that's been developed at this hearing, that that's their position, right or wrong.

Tr. 52:14–53:1. The Court then confirmed this understanding in its opinion.

2

> After the timely submission of a final petition, the Secretary of State must "examine the petition to determine whether it complies with the Constitution of Missouri and with [Chapter 116]" and verify whether there are enough valid signatures to trigger a statewide vote. [Mo. Rev. Stat.] § 116.120. *If* the Secretary finds that the petition satisfies *both requirements*, *see id.* § 116.150, *the challenged law is displaced* and will only "take effect when approved by a majority of the votes cast thereon," Mo. Const. art. III, § 52(b).

Op. 2 (emphasis added) (first alteration in original); *accord id.* at 3. It is hard to see how the Court could have been clearer.

The State agrees with Defendants' Counsel that federal courts should hesitate before using their inherent authority to issue sanctions. *See* Opp. Br. at 6. But here, Defendants' Counsel made an "abundantly clear" and "very important" concession to this Court to derive a strategic advance, and then immediately renounced that concession. Tr. 52:21–24. Under such circumstances, it is apparent that Defendants' Counsel intentionally deceived the Court.

The Court should grant the motion for sanctions.

## ARGUMENT

As the State previously established through a painstaking, chronological analysis of the hearing transcript, Defendants' Counsel expressly assured the Court that H.B. 1 would not be frozen unless and until the referendum was certified. *See* Tr. 48:9–23 (The Court: "[T]he law would go into effect, and then you would seek to challenge the law based on the Secretary's actions . . . ." Ms. Amunson: "And that is our position . . . ."); Tr. 49:1–4 (The Court: "But in the interim things would move forward unless and until you sought emergency relief and filed a lawsuit and everything." Ms. Amunson: "That's correct."); Tr. 52:13–20 (Mr. Hatfield "nodd[ed]

3

his head yes" agreeing that "the map stays in effect unless and until [Defendants] can win a state court challenge"). And Defendants acknowledge that they are now publicly taking the opposite position—and threatening litigation against the State.[2]

In a bid to avoid sanctions for lack of candor to the Court, Defendants make six arguments, but all fail.

1. To start, Defendants' Counsel try to creatively reinterpret the hearing transcript. They now claim they argued that, under the Missouri Constitution, a referendum is deemed "referred to the people" as soon as a pile of unverified signatures are deposited with the Secretary—and the challenged state law is immediately frozen unless the Secretary *decertifies* the referendum. Opp. Br. 9. But this theory is nonsensical all-around.

Most fundamentally, this is simply not a plausible interpretation of the hearing transcript. Defendants' Counsel can only cobble it together by thinly quoting language out of context—and utterly failing to rebut the State's careful chronological analysis of the argument. They ignore the Court's discussion with the State's Counsel about the "uncertainty as to whether mere submission of the signatures freezes the map or whether it is post certification." Tr. 36:6–8. They ignore the wording of the

---

[2] *See* Jason Rosenbaum, St. Louis Public Radio, *Missouri's Stack of Redistricting Lawsuits Expected To Grow Over Whether New Map Is in Effect*, (Dec. 16, 2025), https://www.stlpr.org/government-politics-issues/2025-12-16/missouris-redistricting-lawsuits-whether-new-map-effect (Mr. von Glahn stated that "[t]he law is suspended until there is either an issuance of a certificate of sufficiency or insufficiency, either one of those things the Secretary of State has the power to do. And at that point, there will either be an election or potentially litigation."); *see also* Rosenbaum, *supra* note 2.

4

Court's opening question: "implicit in that [argument] is that the freeze wouldn't occur on the new maps until after the certification. Is that right?" Tr. 44:21–45:1. They ignore that this Court said Defendants' Counsel "need[ed] to . . . argu[e]" that "the law would go into effect, and then you would seek to challenge the law based on the Secretary's actions." Tr. 48:10–12. They ignore this Court's characterization of what they agreed to. Tr. 49:1–3 ("But in the interim things would move forward unless and until you sought emergency relief and filed a lawsuit and everything."). And they cannot escape that this Court *agreed* with the State's Counsel's characterization of the concession. *See* Tr. 52:13–20. Indeed, this Court deemed the matter "abundantly clear." Tr. 52:24. It is.

Further, Defendants' Counsel *never* advanced their decertification theory in their briefs or at the hearing. Indeed, Defendants' Counsel *never* used any variant of the word "decertify" at the hearing. Rather, only *the Court* used that term—apparently synonymously with its description of the Secretary merely refusing to certify the referendum in the first instance. Tr. 50:2. Understood that way, the Court's terminology makes sense—as the State has explained. Opening Br. 11 n.10.

Instead, Defendants' Counsel are obviously trying to exploit ambiguity in the Court's use of the word "decertify" in the hearing and its opinion. But this novel interpretation makes no sense. The Secretary, after reviewing the submitted signatures, must issue a certification as to whether the referendum can proceed. Mo.

5

Rev. Stat. § 116.150. *That* is the initial certification decision.[3] But under Defendants' Counsels' new view, the mere submission of unverified signatures somehow *certifies* the referendum—thus requiring decertification. Opp. Br. 6. That makes no sense.

Defendants also point to—again, through stray quotes taken out of context—language in the hearing transcript focusing on their concession that the State can obtain judicial review of its Elections Clause claim before the referendum. *See* Opp. Br. 6–9. The State agrees Defendants' Counsel made that concession. But they also made an additional concession: that the map would not be frozen unless and until the Secretary certified the referendum or was ordered to do so. Tr. 52:15–53:1. Defendants' Counsel cannot cover up one of their concessions by hyper-focusing on the other.

\* \* \*

Unfortunately for Defendants' Counsel, the hearing transcript is "abundantly clear." Tr. 52:24. After a lengthy exchange, this is how the Court summarized it:

> Mr. Capozzi: It's also still quite unclear to me what the status of the map will be when they submit their signatures. I think eventually, my friend conceded, that the map stays in effect unless and until they can win a state court challenge . . . .
>
> The Court: That's where I think everybody wound up. And Mr. Hatfield is nodding his head yes. I do think that's very important. And I think, as we talked about earlier, that

---

[3] When the Secretary makes an initial certification decision, and chooses *not* to certify, he issues a certificate of insufficiency. Mo. Rev. Stat. § 116.150.2. That does not suggest—as Defendants' Counsel claim now—that the referendum was somehow previously certified by the mere submission of signatures. And once again, Defendants' Counsel never brought this theory up during the argument. They never used the term "insufficiency" or any variant when questioned by the Court about the map being frozen.

6

> the arguments for dismissal will be very flat if that weren't the case. But I do think—I mean, it is abundantly clear, though, from the record that's been developed at this hearing, that that's their position, right or wrong.

Tr. 52:13–53:1. This language is crystal clear and, unsurprisingly, Defendants all but ignore it. The Court should not allow Defendants' Counsel to muddle that concession with a post-hoc rationalization.

2. Next, Defendants' Counsel insist the Court's opinion embraces their post-hoc frozen-until-decertification theory. It does not.

In fact, the Court's opinion expressly rebuts Defendants' new theory. Consider how the Court described the referendum process:

> After the timely submission of a final petition, the Secretary of State must "examine the petition to determine whether it complies with the Constitution of Missouri and with [Chapter 116]" and verify whether there are enough valid signatures to trigger a statewide vote. [Mo. Rev. Stat.] § 116.120. *If* the Secretary finds that the petition satisfies *both requirements*, *see id.* § 116.150, *the challenged law is displaced* and will only "take effect when approved by a majority of the votes cast thereon," Mo. Const. art. III, § 52(b).

Op. 2 (emphases added) (first alteration in original); *accord id.* at 3 (noting freezing takes place only after Secretary review of legality *and* signatures); *id.* at 7 ("Assuming PNP submits a final petition, Secretary Hoskins will need to review it for constitutional validity and potentially verify the accompanying signatures; and *if* the referendum advances, the State will incur a series of costs, *including at least a temporary displacement of the recently enacted map*." (emphasis added)). That is *exactly* what the State's position was during the hearing, Tr. 36:3–12, and it is *exactly* what the State's position is now. But for Defendants' Counsels' re-interpretation of the Court's opinion to be right, the cited parts of the Court's opinion must be wrong.

7

Additionally, the Court's opinion expressly notes Defendants' Counsels' concession that "the new map would go into effect barring a successful challenge to decertification." Op. at 7 n.4. The Court also noted the State's Counsel's fear that Defendants' Counsel would try to wiggle out of that concession, and the Court noted the ethical consequences of doing so. *Id.*

In response, Defendants' Counsel seize (again) on this Court's use of the word "decertification." Opp. Br. at 4, 9–11. Once again, a careful examination of the hearing transcript and the Court's opinion shows that the Court was using the term synonymously with the Secretary's potential refusal to certify the referendum in the first instance. Opening Br. 11 n.10; Tr. 50:2.

But assume (*dubitante*) that Defendants' Counsel are right about what the Court meant in its opinion. That cannot change what Defendants' Counsel conceded during the hearing. What Defendants' Counsel *told the Court* is what is at issue. And that, once again, was "abundantly clear." Tr. 52:24.

3. Remarkably, Defendants' Counsel next try to suggest that it is *the State* that flip-flopped before the Court. Opp. Br. 10. That assertion is absurd.

The language Defendants' Counsel quotes from the State's briefs and declaration is accurate. Opp. Br. 2–3. H.B. 1 will be frozen *if* the referendum has a sufficient number of signatures. *See* Compl. ¶ 48 ("If a referendum petition gains *enough* signatures to qualify for a vote before the people, the challenged law is frozen pending the public vote." (emphasis added)); PI Br. at 11 ("[I]f Defendants succeed in obtaining the *requisite* signatures, the new duly enacted congressional map is

8

placed on hold and cannot take effect until after referendum." (emphasis added)); PI Br. at 14 ("If Defendants succeed in collecting and submitting the *needed* signatures" (emphasis added)).

But the State has *no idea* if that is true with respect to Defendants' proposed referendum. Echoing their media statements, Defendants falsely claim there is no doubt that they have sufficient signatures for their referendum to qualify, pointing to the *total* number of signatures they allegedly submitted. Opp. Br. 4.[4] But that number is irrelevant. The only question that matters is whether they submitted enough *valid* signatures in at least six congressional districts. *See* Mo. Const. art. III, § 52(a). Whether they have done so is *far* from clear. The State does not know if the signatures are evenly distributed. Moreover, the Secretary has already suggested he will reject over 100,000 signatures because they were obtained before Governor Kehoe even signed H.B. 1 or before the Secretary approved the referendum petition as to form. *See* Def.'s Br. at 33–38, *People Not Politicians v. Hoskins*, 25AC-CC07128 (Mo. 19th Cir. Ct. Oct. 31, 2025). And, in prior referenda, substantial percentages of submitted signatures have proved invalid. Whether Defendants have submitted enough signatures, ultimately, can be decided only after the thorough review process established by law.

---

[4] *See* Press Release from People Not Politicians, *Missouri Attorney General Ignores Constitution; Dodging the Voices of 305k+ Missourians* (Dec. 11, 2025), https://peoplenotpoliticiansmo.org/missouri-attorney-general-ignores-constitution-dodging-the-voices-of-305k-missourians/.

9

Even if the Court could somehow deem the State's position on this point unclear, any doubt was eliminated during the hearing. The Court asked the State's Counsel if "[t]he map would be frozen post certification." Tr. 36:1–2. The State's Counsel answered candidly, acknowledging uncertainty on the issue, but asserting the State's position that H.B. 1 would not be frozen unless and until the Secretary certified the referendum. Tr. 36:3–11. The State's Counsel knew that position arguably undermined one of the State's claimed bases for harm, but he made the concession because that is what candor to the Court requires.[5]

4. Fourth, Defendants' Counsel suggest they cannot be sanctioned for making statements to the media, and that sanctions would implicate First Amendment concerns. Opp. Br. 10–11. But that is a red herring. *See Mezibov v. Allen*, 411 F.3d 712, 720–21 (6th Cir. 2005) ("[I]n the context of the courtroom proceedings, an attorney retains no personal First Amendment rights when representing his client in those proceedings."). The State is not trying to prevent anyone from speaking to the media. The State is trying to prevent lawyers from *misleading* a federal judge. *See Cohen v. Hurley*, 366 U.S. 117, 126 (1961) ("As a lawyer he was 'an officer of the court, and, like the court itself, an instrument . . . of justice' with the inevitable consequences that the court which was charged with control and discipline of its

---

[5] Defendants also suggest the State has flipped positions because it notes that Missouri courts have suggested the Secretary cannot reject a proposed referendum based on federal constitutional concerns. Opp. Br. at 10. But that is exactly what the State's Counsel said at the hearing. Tr. 6:25–7:2 ("[I]t appears unlikely [the State] could raise their Elections Clause claim in state court before their irreparable harm occurs.").

10

officers had its own right to demand his full, honest and loyal co-operation . . . ."). The State seeks sanctions based on what Defendants' Counsel told this Court—that's it.

Defendants' Counsel thus miss the mark when they point to the State's demand that they make a public statement acknowledging what they told this Court. The point of that proposed remedy was to partially undo the damage caused by Defendants' Counsels' misleading this Court.[6] The State offered that as a *voluntary* remedial option. Now, the State is not asking the Court to compel any speech, but to develop another remedy to counter Defendants' Counsels' deception.

5. Defendants' Counsel next suggest their "abundantly clear" freezing concession simply does not matter, and that any remedy that involves reopening the case is not warranted. Opp. Br. 14. But this is wrong.

Defendants' Counsel made *two* concessions during the hearing: (1) that H.B. 1 is not frozen until the Secretary's certification decision, and (2) that the Secretary will have the right to obtain judicial review under the U.S. Constitution's Elections Clause. *See* Tr. 44:15–20, 48:9–23; *accord* op. at 1. But now, Defendants' Counsel insist that only the second concession mattered to the Court. *See* Opp. Br. at 6–9. In their view, the Secretary can avoid the freezing harm by rashly rejecting the referendum before signatures are even verified. *Id.* at 9.

---

[6] As Defendants intended, media outlets are now suggesting that H.B. 1 is not in effect, undoubtedly confusing the public and election officials. *See* Meredith Hood, KOMU 8, *Missouri AG Asks Federal Judge to Sanction Group Saying Gerrymandered Map Isn't Yet in Effect* (Dec. 17, 2025), https://www.komu.com/news/state/missouri-ag-asks-federal-judge-to-sanction-group-saying-gerrymandered-map-isnt-yet-in-effect/article_f500b38f-73f2-4bb1-92b7-ce0b0427aa7f.html. Such statements are also designed to generate yet more litigation against the State.

11

Admittedly, the Court suggested the Secretary *could* do that. Op. 3. n.2. With respect, the State doubts whether the state courts will agree. State law seems to suggest the Secretary cannot reject a referendum under the U.S. Constitution. *See Calzone v. Ashcroft*, 559 S.W.3d 32, 37 (Mo. Ct. App. 2018). As the Western District Court of Appeals explained in *Missouri Electric Cooperatives v. Kander*, the legal "sufficiency determination the Secretary of State is required to conduct plainly does not include whether an initiative petition complies with the **Federal** Constitution" 497 S.W.3d 905, 920 (Mo. Ct. App. 2016) (emphasis in original).

But in fairness, the Court's opinion does not suggest the Secretary *must* undertake that rash course to avoid the irreparable harm of the map being frozen. Op. 3 n.2. And rightly so. As the Court recognized, the Secretary—at minimum—has discretion to review the signatures first. *Id.* And it would be imprudent for the Secretary to prematurely steer a major federal constitutional question into state court—Defendants' preferred venue and one arguably bound to reject the State's argument out of the gate. *See Mo. Elec. Coop.*, 497 S.W.3d at 920. Just as courts avoid constitutional questions where possible, the Secretary can sensibly want to check the signatures first.

According to the concessions made by Defendants' Counsel, the Secretary should be able to utilize this latter, more prudent option without H.B. 1 being immediately frozen. *See supra.* Although the State still respectfully disagrees that it lacked standing, it is at least plausible that the State does not face imminent injury from the map being frozen if the Secretary can at least review the signatures first.

12

After all, Defendants may not have submitted enough signatures. But if Defendants' reinterpretation of the Court's decision is correct and the Secretary can only avoid harm by forfeiting his discretion to check the signatures first, then the State respectfully submits that this Court's standing decision is wrong.

6. Finally, Defendants' Counsel questions how, as a practical matter, the Court could sanction them by vacating the dismissal order. Opp. Br. 14–15. But doing so is quite straightforward. If Defendants are right that the map is now frozen unless and until the Secretary abandons his statutory discretion to review signatures and "decertifies" the referendum, the State is currently suffering serious irreparable harm. *See Abbott v. Perez*, 585 U.S. 579, 602 (2018). The Court could simply rule that, in the absence of a concession on the point, the State's alleged harm on this point should be credited.

In response, Defendants' Counsel suggests the case is moot. Opp. Br. 15. It is not. The State asked for declaratory relief that the proposed referendum violates the U.S. Constitution. Compl. ¶ 70, prayer for relief 1, 2. Many of the harms the State pleaded are happening *right now*, and others appear quite likely to emerge in the coming months. *See* PI Br. 11–12 (uncertainty of State's legislative enactment, uncertainty of which congressional map is in place as candidate-filing deadlines rapidly approach, costs of signature verification). A declaration that the referendum cannot proceed—as a matter of federal law—would redress those harms.

Defendants also insist this Court's *Pullman* holding should shield them from reconsideration. Opp. Br. 15. But the Court's *Pullman* holding was based at least in

13

part on Defendants' freezing concession, as the State previously explained. Opening Br. 11; Op. 9 (abstaining because, at least in part, "the State may protect its own interests through" refusing to certify). And if the Court is inclined to vacate its standing ruling, the Court should allow the State to be heard—especially in light of Defendants' conduct—on whether a meaningful remedy exists in state court, as required for *Pullman* abstention. *See Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 841 (8th Cir. 1998). The State is deeply dubious on this point.[7]

Finally, at the very least, the Court should hold the case in abeyance—instead of dismissing—in the event that a state court holds that H.B. 1 is immediately frozen by the mere submission of unverified signatures, or in the event that a state court holds the State cannot obtain pre-referendum judicial review of its Elections Clause claim. Indeed, Defendants expressly conceded that they would be fine with the Court holding the case in abeyance. Tr. 18:2–8 ("Abeyance would be fine, Your Honor.").

## CONCLUSION

The Court should grant the motion for sanctions.

---

[7] The State also respectfully reiterates its argument that the Court cannot abstain on a question of federal law. State PI Resp. Br. 39. The State should be able to have a *federal* court answer the questions of federal constitutional law that are disputed in this case.

If the Court is inclined to withdraw its standing ruling—but not its *Pullman* ruling—the State respectfully requests that the Court clarify that its dismissal was based solely on *Pullman* so that the State can pursue an emergency appeal under the *Beavers* decision. 151 F.3d at 841.

14

Dated: December 18, 2025

Respectfully submitted,

**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
  *Solicitor General*
William James Seidleck, #77794(MO)
  *Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2025, the foregoing was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

s/ *Louis J. Capozzi III*