# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| MISSOURI GENERAL ASSEMBLY, DENNY HOSKINS, in his official capacity as Missouri Secretary of State, and STATE OF MISSOURI, | )<br>)<br>)<br>) |
| *Plaintiffs*, | )<br>) |
| v. | ) Case No. 4:25-cv-01535-ZMB |
| RICHARD VON GLAHN and PEOPLE NOT POLITICIANS, | )<br>) Hon. Zachary M. Bluestone<br>) |
| *Defendants*. | )<br>) |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO ALTER THE JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

ARGUMENT ................................................................................................................... 6

    I.    There Is No Manifest Error in the Court's Dismissal for Lack of Jurisdiction. ................................................................................................ 6

    II.   There Is No Reason to Revisit the Court's *Pullman* Holding ............................ 11

    III.  Neither Vacatur nor Abeyance Is Warranted. .................................................... 13

CONCLUSION ............................................................................................................... 14

CERTIFICATE OF SERVICE AND COMPLIANCE ............................................................. 16

## TABLE OF AUTHORITIES

**CASES**

*Bacon v. Neer*, 631 F.3d 875 (8th Cir. 2011) .................................................................. 13

*Garrett v. Quarterman*, No. 4:06-CV-162-Y, 2006 WL 2473025 (N.D. Tex. Aug. 28, 2006) ............................................................................................................... 14

*Hagerman v. Yukon Energy Corp.*, 839 F.2d 407 (8th Cir. 1988) ................................... 6

*Hamod v. Duke*, No. 16-1191, 2017 WL 3668762 (D. Minn. Aug. 24, 2017) ............... 14

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ........................... 10

*Hunter v. Page County*, 102 F.4th 853 (8th Cir. 2024) .................................................. 12

*State ex rel. Kemper v. Carter*, 165 S.W. 773 (Mo. 1914) .............................................. 8

*Kenney v. United States*, No. 12-138, 2013 WL 3733611 (E.D. Ky. July 15, 2013) .... 14

*Missouri Electric Cooperatives v. Kander*, 497 S.W.3d 905 (Mo. Ct. App. 2016) ........... 10, 11

*National Family Planning & Reproductive Health Ass'n v. Gonzales*, 468 F.3d 826 (D.C. Cir. 2006) ......................................................................................................... 9

*Nordgren v. Hennepin County*, 96 F.4th 1072 (8th Cir. 2024) ......................... 6, 11, 14

*Oto v. Metropolitan Life Insurance Co.*, 224 F.3d 601 (7th Cir. 2000) .......................... 6

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950) ...................................... 13

*Stickler v. Ashcroft*, 539 S.W.3d 702 (Mo. Ct. App. 2017) ............................................. 8

*E.L. ex rel. White v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932 (8th Cir. 2017) ......................................................................................................................... 10

*Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018) .......................................... 9

**OTHER AUTHORITIES**

Defendants' Suggestions in Support of Motion to Dismiss, *Maggard v. Missouri*, No. 25AC-CC09120 (Mo. Cir. Ct. Cole Cnty. Jan. 7, 2025) ..................................... 5

Petition for Declaratory Judgment and Injunctive Relief, *Maggard v. Missouri*, No. 25AC-CC09120 (Mo. Cir. Ct. Cole Cnty. Dec. 23, 2025) ................................ 5, 9

Suggestions in Support of Respondent's Answer and Motion to Dismiss, *Johnson v. Hoskins*, No. 25AC-CC07714 (Mo. Cir. Ct. Cole Cnty. Oct. 28, 2025) ............. 5

Damon Grosvenor, *Missouri GOP Declares 'Missouri First' Map in Effect, Opposition Disagrees*, Jefferson City News Trib. (Dec. 12, 2025), https://www.newstribune.com/news/2025/dec/12/missouri-gop-declares-missouri-first-map-in/ ............ 5

Mitchell Kaminski, *Signature Verification Underway for Missouri Referendum on Trump-backed Congressional Map*, ABC 17 News (Dec. 30, 2025), https://abc17news.com/politics/2025/12/30/signature-verification-underway-for-missouri-referendum-on-trump-backed-congressional-map/ ............ 4

Alisa Nelson, *When Does Missouri's New Congressional Map Take Effect? That Depends on Who You Ask*, Missourinet (Dec. 10, 2025), https://www.missourinet.com/2025/12/10/when-does-missouris-new-congressional-map-take-effect-that-depends-on-who-you-ask ............ 5

Jason Rosenbaum, *Missouri Redistricting Foes May Have Dealt Big Blow To Trump-Backed Congressional Map*, St. Louis Pub. Radio (Dec. 9, 2025), https://www.stlpr.org/government-politics-issues/2025-12-09/missouri-redistricting-foes-may-have-dealt-big-blow-to-trump-backed-congressional-map ............ 4

**INTRODUCTION**

The General Assembly, the Secretary of State, and the State of Missouri (collectively, the "State") brought this suit to enjoin People Not Politicians and Richard von Glahn (collectively, "PNP") from pursuing their right to a statewide referendum on the new congressional map enacted by the General Assembly ("H.B. 1"). They lost. Now they want a complete do-over, but they do not come close to meeting the standards of Rule 59(e). Rule 59(e) exists to correct manifest errors of law or fact, not to give losing parties a second bite at the apple.

Though the State never explains exactly what it wants this Court to "alter the judgment" to say, the State makes three arguments in support of its motion: *first*, that PNP has supposedly backtracked on representations it made to this Court and somehow because of this purported backtracking, the State "is facing an irreparable injury sufficient to confer standing," ECF No. 47, at 2 ("Rule 59 Br."); *second*, that this Court "*may* have been incorrect" in its "understanding of state law," *id.* (emphasis added); and *third*, that the Court's *Pullman* abstention holding is "mistaken," *id.* at 3. As to each, the State is attempting to relitigate points this Court already considered and rejected or to raise arguments it could have raised earlier. There is no manifest legal error in the Court's decision.

In dismissing the State's case, the Court correctly held that the State lacked standing and its alleged injuries were not ripe for adjudication because the Secretary had, and still has, "a tool at his disposal"—the power to issue a certificate of insufficiency—that would "forestall" the State's asserted harms and thus preclude this Court's exercise of jurisdiction. ECF No. 39, at 1, 7 ("Op."); *see id.* at 5–8. That the State has not elected to use that tool and is currently facing a challenge from third parties in state court is no reason to revisit this Court's analysis. Nor can the State now assert that the Court misunderstood Missouri law regarding the Secretary's authority to reject referendum petitions. That argument could have been raised before judgment and lacks

1

merit in any event. The State fares no better by trying to relitigate the Court's *Pullman* holding. The Court appropriately exercised its discretion to abstain in light of the serious state-law questions that could, by the State's own admission, avoid or modify the federal Elections Clause issue.

Even if there were a manifest error—and there is none—the State would not be entitled to vacatur or abeyance. The submission of signatures has mooted the State's injunctive claims. And myriad other threshold issues still prevent this Court from reaching the merits, which, in any event, are plainly foreclosed by binding U.S. Supreme Court precedent and the plain text of the Missouri Constitution. This Court should therefore deny the State's motion to alter the judgment.

## BACKGROUND

On October 15, 2025, the State filed this lawsuit to "prevent [PNP] from continuing to seek a referendum on the General Assembly's redistricting bill." ECF No. 1, at 22 ("Compl."). The State asked this Court to issue a preliminary injunction to prevent Defendants from submitting their referendum petition and to declare that the proposed referendum was "unlawful under . . . the U.S. Constitution and . . . the Missouri Constitution." *Id*.

The State sought to enjoin PNP from submitting signatures before December 11 and asserted it would face two different irreparable injuries absent an injunction from this Court by that date. *First*, the State argued that the Court "should issue an injunction before Defendants can submit their final referendum petition" because once PNP submitted the signatures, "the State will then be barred from implementing the new congressional districts during the referendum petition's pendency." ECF No. 3, at 14–15 ("PI Br."); *see id.* at 13 ("If challengers successfully submit a referendum petition, the State would have to carry out the congressional election under the old . . . congressional districts."). *Second*, the State argued about resource expenditures, complaining that it would be "forced to undertake signature verification of the over 106,000 signatures that Defendant von Glahn must submit with his petition" in a "labor-intensive and time-consuming

process." *Id.* at 11.

At its November 25 hearing, the Court focused on PNP's claim that the State had the ability to avoid these harms by issuing a certificate of insufficiency. PNP agreed that the Secretary had the authority "to reject their petition as unconstitutional during post-submission review and to defend that decision based on the very same constitutional arguments the State advances in this case." Op. 1 (citing Mo. Rev. Stat. §§ 116.120, 116.200). The Court and counsel for PNP then engaged in a discussion about whether H.B. 1 would go into effect immediately upon the Secretary's issuance of a certificate of insufficiency, or whether H.B. 1 would remain suspended while the Secretary's decision was litigated in state court. *See* ECF No. 38, at 43:3–49:4 ("Tr."). PNP agreed that H.B. 1 would go into effect if and when the Secretary issued a certificate of insufficiency and would remain in effect unless and until that decision was reversed in state court. *See id.* at 48:20–23. However, all parties were proceeding from the common premise—which was the entire reason for the expedited briefing and hearing and the State's preliminary-injunction request—that PNP's turning in of signatures on or before December 11 would suspend H.B. 1.

On December 8, the Court denied the State's preliminary-injunction motion and granted PNP's motion to dismiss. Op. 1. The Court explained that the State lacked standing and the dispute was unripe because the Secretary had a "unique self-help remedy" once PNP submitted its petition: He could "declare the petition unconstitutional" by issuing a certificate of insufficiency, and "at th[at] point" his decision "would forestall any remaining cognizable harms." *Id*. at 7.

On December 9, as PNP told this Court it would, PNP submitted to the Secretary its referendum petition, with over 300,000 signatures distributed across congressional districts. Though the Court had observed that there was "no apparent reason" why the Secretary of State would "incur the significant cost of signature verification given his stated belief that the petition is

3

constitutionally deficient," *id*. at 3 n.2, the Secretary decided to undertake that process[1] and will apparently now wait until July to decide whether to issue a certificate of insufficiency.[2] That is, rather than avail itself of its "unique self-help remedy," *id*. at 5—and despite the fact that "the parties [had] agree[d] that Secretary Hoskins [could] take this approach [of issuing a certificate of insufficiency] and ha[d] indicated their expectation that he w[ould] do so," *id*. at 3 n.2—the State instead has chosen to incur the very same "labor-intensive and time-consuming process" that it repeatedly represented to this Court that it needed emergency relief to avoid. PI Br. 10–11.

Before the Court's December 8 opinion, the State also repeatedly told this Court that "[i]f Defendants succeed in collecting and submitting the needed signatures prior to issuance of an injunction, . . . the State will then be barred from implementing the new congressional districts during the referendum petition's pendency." *Id*. at 14 (citing Mo. Const. art. III, § 52(b)); *see also* ECF No. 3-1, ¶ 20 ("State Decl."); Compl. ¶ 48. But after PNP's submission of signatures, the State reversed course. On December 11, both the Secretary and the Attorney General claimed that

---

[1] *See* Mitchell Kaminski, *Signature Verification Underway for Missouri Referendum on Trump-backed Congressional Map*, ABC 17 News (Dec. 30, 2025), https://abc17news.com/politics/2025/12/30/signature-verification-underway-for-missouri-referendum-on-trump-backed-congressional-map/ ("On Dec. 23, the signatures were distributed electronically to election officials in 116 counties, who now have until July to complete the verification process.").

[2] *See* Jason Rosenbaum, *Missouri Redistricting Foes May Have Dealt Big Blow to Trump-Backed Congressional Map*, St. Louis Pub. Radio (Dec. 9, 2025), https://www.stlpr.org/government-politics-issues/2025-12-09/missouri-redistricting-foes-may-have-dealt-big-blow-to-trump-backed-congressional-map ("[Judge] Bluestone did say that Hoskins could potentially rule that the referendum can't go forward. Hoskins said he would make that determination *after* election officials verify the signatures in late July. 'Post-submission review would be after the local election authorities and county clerks have submitted their verification of signatures back to me for certification,' Hoskins said. 'Once that happens, I will take a look at it.'" (emphasis added)).

H.B. 1 was officially in effect, attributing H.B. 1's effectiveness to this Court's ruling.[3]

Third parties have since challenged in state court the State's newfound position that H.B. 1 is currently in effect. *See* Petition for Declaratory Judgment and Injunctive Relief, *Maggard v. Missouri*, No. 25AC-CC09120 (Mo. Cir. Ct. Cole Cnty. Dec. 23, 2025) ("*Maggard* Petition"). The State has moved to dismiss that third-party suit as unripe on the ground that although "Missouri's statutes permit any citizen . . . to challenge the Secretary of State's refusal to certify a referendum . . . the Secretary has not yet declined to certify the referendum." Defendants' Suggestions in Support of Motion to Dismiss 2, *Maggard v. Missouri*, No. 25AC-CC09120 (Mo. Cir. Ct. Cole Cnty. Jan. 7, 2025) (emphasis omitted). The State claims that "[b]efore the Secretary can make his certification decision, he must ensure there are enough signatures in at least six of Missouri's eight congressional districts." *Id.*[4]

On December 12, the State moved for sanctions against PNP's counsel, claiming that counsel had not been candid with the Court. ECF No. 41 ("Sanctions Br."). The State moved for sanctions because PNP and its counsel refused the State's demand that PNP parrot to the media the State's erroneous legal position on the effectiveness of H.B. 1. ECF No. 41-1. When that

---

[3] Alisa Nelson, *When Does Missouri's New Congressional Map Take Effect? That Depends on Who You Ask*, Missourinet (Dec. 10, 2025), https://www.missourinet.com/2025/12/10/when-does-missouris-new-congressional-map-take-effect-that-depends-on-who-you-ask ("According to Hanaway's Office, the federal court ruling also said the state has not yet suffered any injury because House Bill 1 and the new map will go into effect on December 11 and not be frozen unless and until the Secretary of State certifies the referendum."); Damon Grosvenor, *Missouri GOP Declares 'Missouri First' Map in Effect, Opposition Disagrees*, News Trib. (Dec. 12, 2025), https://www.newstribune.com/news/2025/dec/12/missouri-gop-declares-missouri-first-map-in/.

[4] This claim directly contradicts the position the State is taking in other state-court litigation that the Secretary can reject a petition as constitutionally insufficient under Mo. Rev. Stat. §§ 116.120 and 116.200 before even receiving, let alone counting, signatures. *See* Suggestions in Support of Respondent's Answer and Motion to Dismiss 2–3, *Johnson v. Mo. Sec'y of State*, No. 25AC-CC07714 (Mo. Cir. Ct. Cole Cnty. Oct. 28, 2025).

5

motion did not prompt an immediate response from this Court, the State returned once more, filing a Rule 59 motion to alter the judgment.

**ARGUMENT**

Rule 59(e) motions "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987)). "A manifest error is not demonstrated by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotation marks omitted). Rule 59(e) "cannot be used as a vehicle to tender new legal theories, raise arguments that could have been made prior to the issuance of judgment, re-argue the merits of claims, or suspend a judgment's finality without specifically identifying for the court a manifest error of law or fact that needs correcting." *Nordgren v. Hennepin Cnty.*, 96 F.4th 1072, 1077 (8th Cir. 2024).

The State's motion should be denied. There is no manifest error in the Court's dismissal for lack of jurisdiction, nor in its *Pullman* holding. The State seeks merely to relitigate issues already decided. What's more, the State's requested remedies—vacatur or abeyance in the alternative—are plainly inappropriate, given the myriad other defects in the State's suit.

**I.      There Is No Manifest Error in the Court's Dismissal for Lack of Jurisdiction.**

There is no error—let alone a manifest error—in the Court's jurisdictional holding. As the Court correctly held, the State's suit was "not ripe for adjudication" because the Secretary of State had a "self-help remedy" to prevent all the State's asserted harms: namely, the power to issue a certificate of insufficiency. Op. 1, 7. Had the Secretary declared the submitted referendum petition to be insufficient based on what he believed to be its purported constitutional infirmities when PNP submitted the petition on December 9, he could have "forestall[ed]" all cognizable harms,

including the freezing of H.B. 1. *Id.* at 7.

The Secretary's refusal to avail himself of that self-help remedy does not magically give this Court jurisdiction over this case. The Secretary had (and still has) the power to put H.B. 1 into effect and otherwise avoid the "harms" of signature verification that he has now voluntarily undertaken. All he has to do is "reject[] the petition" by issuing a certificate of insufficiency—as the Court and PNP "expect[ed]" he would do. *Id.* at 3 n.2, 4. Then the State could have avoided signature verification, and "the new map would [have] go[ne] into effect unless and until a court invalidated the decertification." *Id.* at 4. Because that self-help remedy was (and remains) available, this Court does not have jurisdiction.

The State identifies two purported reasons for altering that jurisdictional holding or holding the case in abeyance: (1) that PNP "having backtracked on H.B. 1 going into effect means that the State was and is facing an irreparable injury sufficient to confer standing"; and (2) that "the Court's understanding of state law may have been incorrect such that the State has no ability to use its 'unique self-help remedy.'" Rule 59 Br. 2. Neither justifies altering the judgment.

*First,* the State is just wrong about PNP supposedly "backtracking." Counsel for PNP have been entirely consistent in their representations to this Court. PNP agreed with the Court that when the Secretary issues a certificate of insufficiency (which he has not done), H.B. 1 will become effective and will remain in effect unless and until that sufficiency determination is reversed in state-court litigation. *See* ECF No. 42, at 6–10 ("Sanctions Opp."). PNP has consistently maintained, however, that absent the issuance of a certificate of insufficiency, H.B. 1 was suspended as soon as PNP submitted a prima facie number of valid signatures. *See* Tr. 45:7–8, 47:7–8.[5]

---

[5] It is blackletter Missouri law that "the mere lodging of a timely, legal, and sufficient referendum petition with the Secretary of State is all that the petitioners were required to do, and that the law

7

That H.B. 1 would be suspended upon the submission of signatures on or before December 11 was the basic premise upon which this entire case was litigated and the whole reason the State demanded this Court issue a decision prior to PNP's scheduled date for turning in signatures. But, for the sake of argument, even taking as true the State's theory that PNP conceded that H.B. 1 was not suspended by the submission of signatures, that simply introduces a new jurisdictional problem for the State. Under the State's new theory, the State obviously would lack standing because it would face no injury at all under a regime in which the submission of signatures has no effect on H.B. 1. Attempting to sidestep this fundamental flaw, the State argues that it would face irreparable harm "[i]f Defendants' mere submission of their referendum—without counting signatures, much less verifying their legitimacy—suspended H.B. 1." Rule 59 Br. 7.[6] But, again, because the Secretary had the power to prevent both the suspension of H.B. 1's effectiveness and the signature-verification process by issuing a certificate of insufficiency, *see supra* 6–7, the decision to incur and prolong the alleged harm from suspension of H.B. 1 is entirely a problem of the State's own

---

affected, or sought so to be, is halted, regardless of any affirmative act on the part of the Secretary of State or the Attorney General." *State ex rel. Kemper v. Carter*, 165 S.W. 773, 779 (Mo. 1914). That was the exact question the Missouri Supreme Court faced in *Kemper*: Was the law suspended upon the filing of the petition with a prima facie sufficient number of signatures, or did it have to await certification by the Secretary, including a "careful, certain, and definite counting of the names on the petition"? *Id.* The Court did not find it a close question: "When we consider the primary object of the adoption of the referendum and have regard to the evils which its friends had in mind to correct by it, any view other than that [the submission of the referendum] suspends the taking effect of the act against which it is invoked till a vote be had is illogical and well-nigh unthinkable." *Id.* at 778; *see also Stickler v. Ashcroft*, 539 S.W.3d 702, 713 n.9 (Mo. Ct. App. 2017) ("[O]nce a referendum petition has received sufficient signatures to be placed on the general election ballot, . . . the referred measure is suspend[ed] or annul[led.]" (brackets in original)).

[6] The State now claims that it does not have "*any* idea whether Defendants' proposed referendum has an adequate number of valid signatures." ECF No. 43, at 1 ("Sanctions Reply"). But the State previously represented to this Court that the State's claims were ripe specifically because PNP did not "deny that they have the signatures, which means they'd be pretty close to their aim of freezing the state's congressional map." Tr. 35:23–25.

8

making. Such self-inflicted injury does not confer standing. *See Nat'l Fam. Plan. & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing. Such harm does not amount to an 'injury' cognizable under Article III." (citation omitted)); *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (same).

That third parties have now sued the State over the status of H.B. 1, *see* Rule 59 Br. 8, likewise does not call into question the Court's analysis. The issue now being litigated in state court is the effect of the Secretary's inaction on H.B. 1. *See Maggard* Petition ¶¶ 38–46. That issue was not contemplated here because the "parties agree[d]" that the Secretary could issue a certificate of insufficiency upon receipt of PNP's submission and "indicated their expectation that he w[ould] do so." Op. 3 n.2. The focus at the hearing on November 25 was what would happen to H.B. 1 *after* the Secretary issued a certificate of insufficiency. *See* Sanctions Opp. 7. That scenario has not yet come to pass because—despite PNP's and the Court's expectations—upon receipt of PNP's petition, the Secretary did not issue a certificate of insufficiency and instead voluntarily undertook the very process of signature verification he previously asserted would constitute irreparable harm. The fact that the Secretary now faces separate litigation by third parties is, again, a problem of his own making.

The State protests that such third parties are not bound by PNP's representations in this Court. *See* Rule 59 Br. 9–10. While true, that does not resuscitate the State's case. The State does not argue that its separate litigation expenses confer standing, nor could it. *See* Op. 6 n.3 ("The State has not identified a single case holding that parallel-litigation expenses can confer standing, nor has the Court found any."). And if distinct litigation by a third party were somehow to affect the status of the referendum petition or H.B. 1—which is entirely speculative at this juncture—

9

any possible harm to the State would be "the result of actions by [that] third party, not [by PNP]." *E.L. ex rel. White v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932, 936 (8th Cir. 2017).[7]

*Second*, the State says it is "dubious" whether the Secretary can reject a referendum on federal constitutional grounds, Rule 59 Br. 8; but there is no error, manifest or otherwise, in the Court's opinion. As the Court recognized, the Secretary "has both the authority and duty to assess the constitutionality of the final petition." Op. 7 n.4 (citing Mo. Rev. Stat. § 116.120). Because the State claims that "PNP's referendum violates the Missouri Constitution itself," that "alone is sufficient" to issue a certificate of insufficiency, *id.*—and therefore to avert all the State's claimed harms. Put otherwise, the Secretary's ability to assess the petition for consistency with the Missouri Constitution would be independently sufficient to support the judgment.

In any event, as the Court noted, the State might seek to assert federal constitutional violations, too: "[I]f the Secretary perceived any conflict between the Missouri and United States Constitution[s], he might argue that the Supremacy Clause prevents him from taking an action permitted by the latter but forbidden by the former." *Id.* Or he might raise the Elections Clause as a defense. *See* Tr. 44:11–14. The State takes a snippet from *Missouri Electric Cooperatives v. Kander*, 497 S.W.3d 905 (Mo. Ct. App. 2016), out of context to argue that the State will be foreclosed from making Elections Clause arguments in state court in defense of a certificate of insufficiency. But *Kander* involved the claim that an initiative petition on campaign-finance reform

---

[7] The State also is not entitled to relief under *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). Even on the State's misguided understanding, an alleged inconsistency between a defendant's post-dismissal out-of-court statements and its in-court statements is a far cry from the kinds of conduct justifying the setting aside of a fraudulently begotten judgment. *See* Sanctions Opp. 12 n.11 (citing *Hazel-Atlas Glass Co.*, 322 U.S. at 240, 245; *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 577 (1946)). The State cites no case, and PNP is aware of none, in which post-judgment statements to the media were sufficient to reopen a judgment.

10

that had already been certified to the ballot violated the First Amendment, the Equal Protection Clause, and the Privileges and Immunities Clause. *See id.* at 907. The federal constitutional challenge in that case was about the "substance of the underlying measure" and was not related to the "'constitutional requirements and limits of power' as to whether the referendum can even occur." Op. 8. At any rate, the State's reliance on *Kander* is too late: The appropriate time to raise any concerns about the scope of the Secretary's certification authority was before judgment. The State cannot use a Rule 59(e) motion to relitigate the issue now. *See Nordgren*, 96 F.4th at 1077.

In sum, there is no legal error in the Court's jurisdictional holding, and certainly not a manifest one. The State seeks merely to "re-argue the merits" and "raise arguments that could have been made prior to the issuance of judgment." *Id*. That does not warrant Rule 59(e) relief.

**II.    There Is No Reason to Revisit the Court's *Pullman* Holding.**

The State also seeks to relitigate the Court's *Pullman* holding. But once again, Rule 59(e) is not meant to give the State a mulligan.

This Court's *Pullman* holding is correct. As this Court explained, it has the "discretion" to "'abstain from deciding an issue in order to preserve traditional principles of equity, comity, and federalism.'" Op. 9 (quoting *Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 840 (8th Cir. 1998)). This Court reasonably exercised that discretion in dismissing the State's case as an independent alternative holding on *Pullman* grounds because all of this Circuit's five factors favor abstention. As this Court explained, as to the first two factors—the effect of abstention on the "rights to be protected" and the "available state remedies"—"the State may protect its own interests through decertification," *id*. 9, 10 (internal quotation marks omitted)—a "self-help remedy" that the State has thus far refused to avail itself of. *See supra* 6–7. On the third factor, "whether the state law is unclear," as this Court recognized, "the State's case rests on the premise" that the state Constitution is not sufficiently "clear" to allow for referenda on congressional-redistricting

11

enactments. Op. 9–10. As to the fourth factor, "whether the law is susceptible to interpretation avoiding the federal constitutional question," *id.* at 9, as this Court observed, a state-court holding that the Missouri Constitution does not permit such referenda would "moot the State's federal constitutional claims, while a decision that it does clearly permit them would significantly narrow the issues." *Id.* at 10. Finally, as to "whether the abstention avoids federal interference in state operations," *id.* at 9, this Court's abstention appropriately "avoid[s] federal interference in a referendum process created entirely by the Missouri Constitution and state law." *Id.* at 10.

Against all that, the State has only two things to say. *First*, the State claims that *Pullman* is "categorically impermissible" because the State raised a federal-law question that was the subject of much of the parties' briefing. Rule 59 Br. 10–11. That simply ignores that the State *also* pled a state-law claim, which the parties *also* briefed, and the State itself argued that resolving the state-law claim would obviate the need to answer the federal question. As the State told this Court: "The straightforward way to resolve this case is to hold that Missouri never made a conscious choice to divest the General Assembly of its authority over redistricting." ECF No. 29, at 10 ("MTD Opp."). This is the textbook case for *Pullman* abstention.[8]

*Second*, the State attempts to relitigate its argument—already considered and rejected by this Court—that state remedies are unavailable. But the parties could always have litigated these precise claims in state court. That was true when the State filed its case, and it remains true today. As this Court recognized, "the nature of this action and important state interests at play" counsel

---

[8] Underscoring this point, *Hunter v. Page County*, 102 F.4th 853 (8th Cir. 2024), holds the exact opposite of the premise for which the State cites it. *See* Rule 59 Br. 11. There, the Eighth Circuit found no abuse of discretion in the district court's declining to exercise *Pullman* abstention because it had "*dismissed* plaintiffs' federal due process claim," so "no federal constitutional question remained" that could be obviated by the answer to a state law-question. *Hunter*, 102 F.4th at 873 (emphasis added).

12

strongly for resolution in state courts. Op. 11.

### III. Neither Vacatur nor Abeyance Is Warranted.

Even assuming the State could identify a manifest error in the Court's judgment, it still would not be entitled to vacatur of the dismissal order, for several independent reasons. As already noted, the State still lacks standing. *See supra* 8–10.

In addition, this case is moot. The State does not dispute that its request for injunctive relief is moot. *See* Rule 59 Br. 10 n.6. Nor could it. The State sought a preliminary injunction "prohibiting [PNP] from submitting a petition for referendum on the General Assembly's recent congressional redistricting to the Missouri Secretary of State." ECF No. 2, at 1 ("PI Mot."). But, shortly after this Court granted PNP's motion to dismiss and denied the State's preliminary-injunction motion, PNP submitted its referendum petition to the Secretary of State (as it told this Court it would). *See supra* 3. The submission of signatures moots the State's claim for an injunction blocking the submission of signatures. *See Bacon v. Neer*, 631 F.3d 875, 877 (8th Cir. 2011) (claims for preliminary injunctive relief "become[] moot if the act sought to be enjoined has occurred"). The State's alternative request for declaratory relief cannot alone supply federal-question jurisdiction. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–74 (1950) (federal-question jurisdiction is not established by a declaratory-judgment plaintiff's "artful pleading [that] anticipates a defense based on federal law"); ECF No. 22, at 12–15 ("MTD Br."); ECF No. 32, at 9 ("MTD Reply").

Even if the Court could overlook those remaining jurisdictional defects, the State's suit would still be dead on arrival. The State does not have a valid cause of action to sue private citizens over their First Amendment-protected petitioning activity. MTD Br. 15–18; MTD Reply 7–9. Its federal Elections Clause claim runs headlong into a century's worth of U.S. Supreme Court precedent. MTD Br. 19–21; MTD Reply 10–11. It would therefore be improper to exercise

13

supplemental jurisdiction over the remaining state-law claim, which is meritless anyway. MTD Br. 21–28; MTD Reply 11–14. For all these reasons, the Court was right to dismiss this suit in its entirety.

Tellingly, the State barely argues that its claims should proceed to the merits. Instead, tacitly acknowledging the weakness of its request for vacatur, the State falls back on a request to "hold this case in abeyance to see if the State's feared injuries materialize." Rule 59 Br. 3. The State cites no precedent—and there is no sound reason—for a court to hold in abeyance an already-dismissed case over which it lacks jurisdiction, just to wait and see if it might have jurisdiction at some future date. *See Nordgren*, 96 F.4th at 1077 (Rule 59(e) "cannot be used as a vehicle to . . . suspend a judgment's finality . . . ."); *see also, e.g.*, *Hamod v. Duke*, No. 16-1191, 2017 WL 3668762, at *2 n.4 (D. Minn. Aug. 24, 2017) (declining to hold claims in abeyance because "[t]he Court lack[ed] subject matter jurisdiction at th[e] time" and "d[id] not find it appropriate to continue the action until it attains jurisdiction"); *Kenney v. United States*, No. 12-138, 2013 WL 3733611, at *2 (E.D. Ky. July 15, 2013) (finding "no authority for the Court to hold this matter in abeyance when it lacks subject matter jurisdiction"); *Garrett v. Quarterman*, No. 4:06-CV-162-Y, 2006 WL 2473025, at *1 (N.D. Tex. Aug. 28, 2006) ("As jurisdiction is lacking, the Court is not in a position to hold the case in abeyance . . . ."). The proper course instead is to dismiss the action, as the Court has already done.

## CONCLUSION

For the foregoing reasons, this Court should deny the State's motion to alter the judgment under Rule 59(e). Because of the confusion the State has created by claiming that this Court's December 8 ruling is the reason H.B. 1 is now in effect, PNP respectfully requests that the Court expedite its ruling on this motion, as well as its ruling on the currently pending motion for sanctions.

14

Dated:  January 14, 2026    Respectfully submitted,

|  |  |
|---|---|
| Jessica Ring Amunson (*pro hac vice)*<br>Sam Hirsch (*pro hac vice*)<br>Jonathan J. Marshall (*pro hac vice*)<br>Elizabeth H. Starr (*pro hac vice*)<br>**JENNER & BLOCK LLP**<br>1099 New York Ave., Suite 900<br>Washington, DC 20001<br>202-639-600 (phone)<br>202-639-6066 (fax)<br>jamunson@jenner.com<br>shirsch@jenner.com<br>jmarshall@jenner.com<br>estarr@jenner.com | */s/ Jeremy A. Root*<br>Jeremy A. Root, MOBAR 59451<br>Charles W. Hatfield, MOBAR 40363<br>Alexander C. Barrett, MOBAR 68695<br>Alixandra Cossette, MOBAR 68114<br>Greta Bax, MOBAR 73354<br>**STINSON LLP**<br>230 West McCarty Street<br>Jefferson City, MO 65101<br>573-636-6263 (phone)<br>573-636-6231 (fax)<br>jeremy.root@stinson.com<br>chuck.hatfield@stinson.com<br>alexander.barrett@stinson.com<br>alixandra.cossette@stinson.com<br>greta.bax@stinson.com |

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, Eastern Division, using the CM/ECF system, which will send a notice of filing to all counsel of record who have consented to service by electronic means. I further certify that the foregoing document contains 5,073 words and appears on 14 typed pages, exclusive of matters designated for omission.

Dated:  January 14, 2026                              */s/ Jeremy A. Root*
                                                     Jeremy A. Root